PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019
Tel: 212-373-3000
Fax: 212-757-3990
Alan W. Kornberg
Brian S. Hermann
Lauren Shumejda

*Proposed Counsel for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| **CGG HOLDING (U.S.) INC., *et al.*,** | Case No. 17-_____ (___) |
| Debtors.[1] | (Joint Administration Pending) |

-------------------------------------------------------------x

**DECLARATION OF BEATRICE PLACE-FAGET
IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY
MOTIONS PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

     I, Beatrice Place-Faget, do hereby declare, under penalty of perjury, that:

     1.     I serve as Executive Vice President, General Secretary and Group General

Counsel for CGG S.A., a publicly traded *société anonyme* organized under the laws of the

Republic of France that is the direct or indirect parent for each of the affiliated debtors and

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: CGG Holding (U.S.) Inc. (6762); CGG Holding B.V. (4673); CGG Marine B.V. (1518); CGG Holding I (UK) Limited (2086); CGG Holding II (UK) Limited (2105); CGG Services (U.S.) Inc. (3790); Alitheia Resources Inc. (5147); Viking Maritime Inc. (7405); CGG Land (U.S.) Inc. (2437); Sercel, Inc. (6603); Sercel-GRC Corp. (1837); Sercel Canada Ltd. (9968); CGG Canada Services Ltd. (4132); and CGG Marine Resources Norge AS (7825).  The location of the Debtors' and their non-Debtor affiliates' global corporate headquarters is Tour Maine-Montparnasse 33, Avenue du Maine, B.P. 191, 75755 Paris Cedex 15, France.

debtors in possession in the above-captioned cases (each, a "<u>Debtor</u>," and collectively, the "<u>Debtors</u>").  I have served in my current capacities since 2012 and have been employed by CGG S.A. since 2002.  In addition, I am also the Managing Director of CGG Holding B.V., a wholly owned subsidiary of CGG S.A. that is a Debtor in these chapter 11 cases.

2.    Before joining CGG S.A., I worked as a lawyer for France Cables et Radio (France Telecom Group) from 1995 through 2000 specializing in contracts, M&A and corporate law.  I then joined Eridania Beghin Say in 2000 as senior lawyer specialized in corporate law and M&A and became General Counsel for Cerestar (starch industry), one of the companies resulting from the demerger of Eridania Beghin Say.  I hold a Doctorate in English and U.S. Business Law from Université Paris 1 Pantheon-Sorbonne and a Master's in Common Law Studies from Georgetown University Law Center (USA– Washington DC).

3.    In my capacity as Group General Counsel, I am responsible for, among other things, overseeing legal affairs of CGG S.A. and its Debtor and non-Debtor subsidiaries (collectively, "<u>CGG</u>" or the "<u>Group</u>").  In this capacity, I have been extensively involved in the restructuring process that has culminated in, among other things, the commencement of a *procédure de sauvegarde* (the "<u>Safeguard Proceeding</u>") by CGG S.A. (also referred to herein as the "<u>Foreign Debtor</u>") under the Commercial Code of the Republic of France and the concurrent filing of these chapter 11 cases by each of the Debtors (the "<u>Chapter 11 Cases</u>") and the chapter 15 case by the Foreign Debtor.  I have detailed knowledge of, and experience with, the business and financial affairs of the Group and the industry in which it operates.

4.    Today (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition seeking relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>").  As described below, the Chapter 11 Cases have been commenced

concurrently with the commencement by CGG S.A. of a Safeguard Proceeding in France to implement a comprehensive financial restructuring that has been agreed to by a majority of the Group's secured creditors, a majority of the Group's high-yield bondholders, and certain other financial creditors and shareholders of CGG S.A.  CGG S.A. is not a Debtor in these Chapter 11 Cases; however, CGG S.A. has sought recognition of the Safeguard Proceeding as a foreign main proceeding pursuant to chapter 15 of the Bankruptcy Code.  In its opening ruling, the French Court held that I have been appointed by the Chief Executive Officer of the Foreign Debtor to act as the foreign representative of the Foreign Debtor in connection with its chapter 15 case.

5.    I submit this declaration in support of the chapter 11 petitions (the "Petitions") and the relief requested by the Debtors in various motions and applications (collectively, the "First Day Motions") filed contemporaneously herewith, and to provide an overview of the Group and its current circumstances.  I have reviewed the Petitions and the First Day Motions, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Group's businesses and the success of the restructuring to be implemented through these Chapter 11 Cases.

6.    Except as otherwise indicated, the facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees with responsibility for the relevant business and corporate matters addressed in the First Day Motions, or my opinion based upon experience, knowledge and information concerning the Group and the industry in which it operates.  I am authorized to submit this declaration on behalf of each Debtor, and if called upon to testify, I would testify competently to the facts set forth herein.

7.      Section I of this declaration describes the Group's businesses, corporate structure, history and current indebtedness.   Section II describes the Group's prepetition restructuring efforts and the events leading up to the filing of the Safeguard Proceeding and the Chapter 11 Cases, including prepetition negotiations with the Group's key constituencies that resulted in an agreement regarding the terms of a comprehensive financial restructuring that will be implemented through such proceedings.   Section III provides information about the particular Debtors in these Chapter 11 Cases and the Foreign Debtor in its chapter 15 case.   Finally, Section IV sets forth relevant facts in support of the First Day Motions.

## I.      Overview of the Group

*A.      Overview of the Group's Businesses.*

8.      CGG is a global geophysical and geoscience services company serving customers principally in the oil and gas exploration and production ("E&P") industry.   CGG is a recognized leader in the field, with more than 100 years of combined operating experience as a result of various acquisitions, including Veritas and Fugro Geoscience, and a proven track record for technical innovation in geophysics and geology.   It is a fully integrated geoscience company, capable of providing its clients with a wide range of data acquisition, processing and interpretation services, as well as related imaging and interpretation software that can be used in all aspects of their E&P activities, ranging from initial exploration of potential fields to the conclusion of oil and gas production.   The Group is also a global manufacturer of geophysical equipment.   Altogether, the Group has more than 50 locations worldwide, more than 30 separate data processing centers, and a workforce of more than 5,700, of whom more than 600 are solely devoted to research and development ("R&D").

9.      CGG S.A. was formed under French law in 1931 as "Compagnie Générale de Géophysique" to develop and market geophysical techniques that could be used to analyze underground geological resources.   Over time, the Group developed seismic techniques that could be adapted to oil and gas exploration and production, and gradually grew through a series of acquisitions.   CGG S.A. formally changed its name from "Compagnie Générale de Géophysique" to "Compagnie Générale de Géophysique – Veritas" in 2007 upon the acquisition of Veritas and then to "CGG S.A." in 2013.

10.     The Group operates around the world, with offices, branches and employees in many different countries, including material operations in the United States.   As described in detail below, these worldwide operations are organized in a number of distinct reporting segments, depending on the type of work performed: (i) "Data Acquisition," through which the Group performs geophysical acquisition of seismic and mining data by land, air and sea; (ii) "Equipment Manufacturing," through which the Group manufactures market-leading geophysical equipment under the "Sercel" name; and (iii) a broad-ranging geology, geophysics and reservoir services business ("GGR"), through which the Group, among other things, processes and interprets seismic and other data, and offers geoscience and petroleum engineering consulting.   Included within this last category are a number of discrete business lines, including, most notably: (a) the subsurface imaging and reservoir business ("SIR"), through which the Group processes and interprets seismic data and develops and deploys software and other technology necessary for this effort; and (b) the multi-client library business ("Multi-Client"), through which the Group generates and maintains a library of processed seismic data, which is available for license and sale to multiple E&P customers.

11.     While each of these divisions and business lines is capable of operating on a stand-alone basis, the Group enjoys significant benefits by operating as an integrated whole.  In particular, the business lines complement and interact regularly with one another: for example, Equipment Manufacturing provides sensors and other equipment that Data Acquisition requires to operate, and Data Acquisition, in turn, may generate data for SIR to process and analyze. Similar synergies exist between the Multi-Client and SIR businesses, where SIR provides imaging and intelligence on preferred target areas for further data acquisition projects by Multi-Client.  As a result, the Group is able to leverage its different business lines to efficiently allocate resources and respond to changing market and customer demands, while differentiating itself as a full-service seismic data provider for its customers.

12.     Details regarding the Group's key business lines are provided below.

**B.      *The Data Acquisition Businesses.***

13.     The Data Acquisition Division physically acquires geophysical imagery and data from across the globe, including, from time to time, through joint venture arrangements.  The Group's survey teams operate in all environments and use the latest technologies and most sophisticated equipment available.  As such, the Group is highly respected for its innovative use of technology, and has a reputation for handling complex targets where traditional survey formats may not yield sufficient or complete data sets.

14.     In 2016, Data Acquisition generated consolidated revenues of $238 million, which represented approximately 20% of the Group's overall revenues for the year.  The data that the Group collects ultimately belongs to the customer that requested the survey.

15.     Data Acquisition is run and reported as three separate business lines, which reflect the different means by which data is collected:  Marine, Land, and Multi-Physics.

16.    *Marine.*  This segment has historically been the centerpiece of the Group's Data Acquisition Division, generating more than 70% of the division's total revenues.  In 2016, however, in part due to a decision by CGG to downsize its Marine fleet for reasons described below, that percentage dropped to approximately 55%.

17.    Through this segment, CGG conducts marine seismic surveys around the world.  This process involves deploying submersible cables, known as "streamers," and other acoustical equipment such as airguns from marine vessels over a specific area.  Streamers can be up to 12 kilometers (more than seven miles) long and are equipped with hydrophone nodes approximately every 12.5 meters (roughly 40 feet) along their length.  The extent and type of data that a survey vessel can acquire depends on the number of streamers and other acoustical equipment that it can tow at one time, as well as the sophistication and configuration of the data record system being used.  In general, the more streamers that are used, the more quickly and efficiently a survey can be conducted, and the better the resolution of the collected data.

18.    Historically, Marine has used a combination of owned, leased and chartered vessels for its survey activities.  However, as part of its prepetition operational restructuring efforts, which are described in detail below, Marine significantly reduced its fleet size over the last few years.  In addition, in early 2017, CGG transferred ownership of its operating owned vessels to a newly-created joint venture, as described below.

19.    As a result of these efforts, as of the Petition Date, Marine operates a limited fleet of five vessels that are owned by the joint venture.[2]  These vessels are, however, high capacity[3] vessels that employ the latest technology for data recording and enhancement and are capable of

---

[2]    This joint venture is described in detail below.  In addition, CGG continues to own one vessel, which is not currently in operation and is being marketed for sale.

[3]    These vessels are considered high capacity because they can tow 12 or more streamers at one time.

3-D imaging.  Specifically, each vessel uses CGG's proprietary Sentinel line of solid streamers, which are manufactured by CGG's Equipment Manufacturing division.  Each of these vessels also has state-of-the-art proprietary data collection and processing software and capabilities developed by the GGR division.  By employing such market-leading data recording and enhancement software in conjunction with the market-standard Sentinel streamers, CGG offers its clients detailed, high-resolution images that it believes are superior to the data offered by many of its competitors.

20.    CGG is one of four main participants in the 3-D marine survey market. Collectively, these four companies accounted for approximately 80% of the market at the end of 2016.

21.    ***Land and Multi-Physics.***  CGG also conducts data acquisition on land and by air. Both the land and airborne markets are highly fragmented and competitive, with a mix of international and local players.  CGG is an international land seismic acquisition contractor, and one of the few geographically diverse airborne contractors.  Together, these business lines generated approximately 45% of Data Acquisition's total revenues in 2016.

22.    Through the Land business line, CGG conducts ground-based seismic surveys all over the world, including operations in seabed, shallow water, swamp and other transition zones. This process involves generating acoustic impulses using vibrators, explosives or air guns, with the resulting seismic signals being recorded through geophones or hydrophones, depending on location.  As is true for Marine, Land relies heavily on sophisticated equipment manufactured by its affiliated Equipment Manufacturing business and state-of-the-art data recording and enhancement technology.  As a result, Land is able to specialize in difficult target areas and differentiate itself from its competitors.

23.     Operations for the Land business line use a number of joint venture and similar arrangements reflecting the nature of these operations around the world, including the Argas joint venture with the Saudi company TAQA in the Middle East and the Seabed joint venture with Fugro that conducts seabed acquisitions.

24.     Through the Multi-Physics business line, CGG conducts airborne surveys to collect data using a fleet of airplanes and/or helicopters, which CGG then processes and interprets.  CGG attempted to sell its Multi-Physics business line in April 2016 to NEOS, another company in the geoscience industry, but the deal fell through earlier this year.  As of the Petition Date, CGG had a fleet of approximately 14 airplanes; helicopter projects are supported by subcontracting or charter arrangements with third parties.  Multi-Physics also processes certain non-seismic data, such as marine gravity and bathymetry, *i.e.*, submarine topography, survey data, which customers may use to supplement existing seismic information.

### C.     The Equipment Manufacturing Business Line.

25.     CGG's Equipment Manufacturing business line operates under the name "Sercel." Sercel is a global leader in the development, production and sale of a comprehensive range of geophysical equipment for seismic data acquisition, including seismic recording equipment, software, and seismic sources such as vibrators and air guns.  Included in its market leading equipment is its Sentinel line of solid streamers, which is critical to marine seismic data collection.  The Sentinel line of streamers is the current market standard.  Sercel is also a market leader in various equipment used in land data acquisition.  Sercel's diverse range of offerings accounts for approximately 50% of all such equipment, and Sercel has a balanced portfolio in terms of product range and geographical presence.

26.     As of the Petition Date, Sercel operated six equipment manufacturing facilities located in Nantes and Saint Gaudens in France, Houston and Tulsa in the United States, Krimpen

aan de Lek in The Netherlands, and Singapore.  In addition, Sercel has two locations in France dedicated to specific tool and undersea instrumentation manufacturing, and is the 51% owner of an equipment manufacturing joint venture in China, Hebei Sercel-JunFeng Geophysical Prospecting Equipment Co. Ltd.  In 2016, Sercel generated consolidated revenues of $255 million, which represented approximately 20% of the Group's overall revenues for the year. However, in 2016 a significant portion of this revenue (roughly 30%) is attributable to internal sales, rather than to third-party customers. Sales are split relatively equally between Sercel's marine equipment and land equipment offerings.

**D.      The Geology, Geophysical and Reservoir Division.**

27.      The final and largest segment of the Group's operation is the geoscience services division.  Through this segment, the Group offers a variety of services to customers around the world to assist them in identifying, analyzing and managing exploration targets.  These include: developing and licensing multi-client seismic surveys and other geological data; processing seismic data; selling data processing and similar software; providing geoscience and petroleum engineering consulting; and providing other data management services and software.  This segment functions as a full range and full service geosciences company, enabling CGG to offer integrated and comprehensive services to its customers.

28.      In 2016, this division generated consolidated revenues of $784 million, which represented approximately two-thirds of the Group's overall revenues for the year.  Each of the division's two primary business lines – Subsurface Imaging and Multi-Client – accounted for roughly half of these revenues.

29.      ***Subsurface Imaging and Reservoir.***   Through SIR, CGG applies innovative methods to transform seismic data into high quality interpretive images that customers can use to identify potential targets for oil and gas production.  In addition, SIR routinely reprocesses older

data using new techniques and software to improve the quality of existing imagery. From these images, customers can gain an enhanced understanding of the structure of the subsurface and obtain information about the quality and type of rocks and fluids in the relevant areas.

30.     SIR is the market leader in high-end seismic imaging, which relies heavily on state-of-the-art software and technology. It is recognized in the industry as a leader in terms of technological advances and innovation, with highly respected and experienced geoscientists and an outstanding reputation for client service.

31.     As of the Petition Date, SIR had nine primary seismic imaging centers, located in: Houston (USA), Calgary (Canada), Crawley (England), Massy (France), Singapore, Rio de Janeiro (Brazil), Oslo (Norway), Perth (Australia), and Kuala Lumpur (Malaysia). In addition, SIR utilized multiple other regional and local centers, as well as a number of centers on-site at particular clients that are dedicated to delivering in-house processing. This broad geographical footprint enables technicians, scientists and other SIR employees to work closely and collaboratively with their counterparts at the various clients to ensure the resulting images satisfy the customers' specific needs.

32.     To supplement this primary work stream, SIR offers a range of seismic, geophysical and geological consulting services. Under these arrangements, SIR scientists perform a wide range of proprietary geophysical and geological studies for clients, such as interpreting existing data to further help customers develop appropriate models to target and optimize production. Similarly, SIR offers state-of-the-art software under the Jason and Hampson-Russell brands. GeoConsulting is a geological and geophysical consulting services business line which offers, among other things, services and products under the Robertson brand. Robertson is a brand that develops and maintains geological data libraries that are available to

customers on a subscription basis. Both the Jason and Robertson brands were acquired by CGG in 2013 as part of a targeted acquisition from Fugro, as described below.

33. ***Multi-Client Business Line.*** CGG maintains a library of seismic data and processed imagery collected from the major producing and prospective oil and gas generating regions around the world, which they make available to customers through non-exclusive licenses. As of the end of 2016, the Multi-Client library of 3-D seismic imagery included more than 846,000 square kilometers (more than 326,000 square miles) of marine surveys, concentrated in the Gulf of Mexico and Brazil, and more than 73,000 square kilometers (roughly 28,000 square miles) of land data, focused primarily on shale data in the United States. During the fourth quarter of 2015, the Multi-Client segment sold its Canadian land data and exited the Canadian market.

34. In addition to maintaining the data library, Multi-Client undertakes new surveys to supplement the data that are available to its customers. In this endeavor, Multi-Client typically relies on CGG's Data Acquisition business, using its Marine fleet and other equipment in the data collection. CGG generally seeks to pre-fund a significant portion of the costs of such surveys by pre-selling licenses to the data it collects to end-user E&P companies that are interested in the particular survey under consideration. In 2016, Multi-Client invested $295 million in seismic data libraries, and was able to pre-fund more than 90% of those costs, meaning that a substantial portion of the cost of the surveys is recouped prior to their conclusion. Multi-Client arrangements can be attractive to E&P companies, particularly in an adverse market, because they enable them to obtain access to seismic data without bearing the sole cost of obtaining it. In contrast, traditional survey arrangements generally have one customer paying for all the costs of a proprietary survey. In light of current market conditions, and a general increase

in the total cost of surveys in recent years driven by the use of more sophisticated equipment and instrumentation, CGG anticipates that such arrangements will become more prevalent over time.

35.    Multi-Client also reprocesses seismic data as new techniques and technologies become available.  In doing so, it works hand-in-hand with SIR.  For example, Multi-Client and SIR are currently reprocessing a massive dataset, over 38,000 square kilometers, from the Perdido fold belt area in both the U.S. and the Gulf of Mexico.  The survey, named Encontrado, has significant pre-funding, and processing was ongoing at the end of 2016.  This survey represents the single largest reprocessing effort that CGG has conducted.

36.    Revenues from this business line are generated by licensing the data library to end-users.  These licenses are typically long-term and non-transferrable, subject to applicable law.  Multi-Client accounts for roughly half of GGR's overall revenues.

**E.    *Overview of the Group's Financial Position and Prepetition Debt Structure.***

37.    In 2016, the Group generated total consolidated operating revenues of $1.195 billion.  Of the total consolidated revenues generated by the Group in 2016, Data Acquisition accounted for $238 million; Equipment Manufacturing for $255 million; SIR for $401 million; and Multi-Client for $383 million.  Similarly, the Group's annual revenues are not concentrated in any particular customer or region.  In 2016, the Group's top two customers represented 6.7% and 6.4%, respectively, of the Group's consolidated revenues.  In terms of geographical regions of operation in 2016, North America generated 30% of the Group's consolidated revenues; Central and South America, 14%; Europe, Africa and the Middle East, 40%; and Asia Pacific, 16%.

38.    As of the Petition Date, the Group had approximately USD $2.868 billion in total funded indebtedness, including accrued interest thereon, comprised of: (i) approximately USD $810 million in secured debt; (ii) approximately USD $1.997 billion in senior unsecured

and convertible notes; and (iii) approximately $61 million of capital lease and other obligations to which none of the Debtors is a party except as specifically noted below.[4]

### F.   *The Group's Secured Debt.*

39.     As of the Petition Date, the Group had approximately USD $809.5 million in secured debt outstanding, including accrued but unpaid interest, comprised of a French revolver, a U.S. revolver and a U.S. term loan (collectively, the "Secured Debt", and the lenders thereunder, the "Secured Lenders").  Each of these is described immediately below.

40.     ***French Revolver.*** Foreign Debtor CGG S.A. is the borrower under a $300 million multicurrency revolving credit facility (the "French Revolver"), dated as of July 31, 2013, as amended and restated from time to time including most recently pursuant to an amendment and restatement agreement dated as of February 4, 2016.   Each of the Debtors (except the two Canadian entities) is a guarantor under the French Revolver.   Wilmington Trust (London) Limited acts as the successor agent to Natixis and Credit Suisse AG, Cayman Islands Branch, acts as the security agent and the collateral agent.   The French Revolver was fully drawn as of the Petition Date.   It is governed by French law and requires that any actions under the agreement be brought in the French courts (*Tribunal de commerce*).

41.     The French Revolver was originally entered into in July 2013, and had a three-year maturity, with two one-year extension options.   In January 2016, the Group obtained an extension of the maturity date and a new scheduling of the lenders' commitments thereunder as follows:   $300 million through July 2017, and $275 million through July 2018.

---

[4]   As described below, certain of the Group's funded indebtedness is or may be, at the Group's election, denominated in Euros.   For the Court's convenience, outstanding amounts as of the Petition Date herein are denominated in U.S. dollars and, where appropriate, reflect the conversion rate in effect as of May 31, 2017.

42.    Obligations under the French Revolver are secured by first priority liens on certain assets of (i) CGG S.A., including shares in certain of its subsidiaries, and certain receivables and promissory notes owed to CGG S.A. by certain other members of the Group, and (ii) the guarantor Debtors (excluding the non-U.S. Debtors), but including, with respect to Debtors incorporated in the U.S., general asset security, with certain material exceptions such as shares in foreign-incorporated subsidiaries and any French assets.  As such, the primary assets securing the French Revolver are the U.S. Multi-Client library, certain marine equipment, shares, intragroup receivables, and intellectual property, as well as third-party receivables and certain deposit accounts.

43.    Interest on borrowings under the French Revolver is based on the London Interbank Offered Rate ("LIBOR") rate for U.S. dollar drawings or Eurobank rate for Euro drawings, plus an applicable margin.  Interest is paid at the end of each interest period, which may occur monthly, quarterly or bi-annually, at CGG S.A.'s election, or on such other timing as agreed between the parties.  As of the Petition Date, the total outstanding amount of the French Revolver was approximately USD $304.1 million.

44.    *U.S. Revolver.*    Debtor CGG Holding (U.S.) Inc. ("CGG Holding") is the borrower under a $165 million revolving credit facility (the "U.S. Revolver"), dated as of July 15, 2013, as amended and restated as of January 10, 2016.  Each of the other Debtors (except for the two Canadian Debtors) is a guarantor under the U.S. Revolver.  Foreign Debtor CGG S.A. is also a guarantor.  Credit Suisse AG serves as both the administrative agent and collateral agent under the U.S. Revolver.  It was fully drawn as of the Petition Date and has a maturity date of July 15, 2018.  The U.S. Revolver is governed by New York law and contains a New York forum selection clause.

45.    Obligations under the U.S. Revolver are secured by a first priority lien on the same collateral that secures the French Revolver.  Interest on borrowings under the U.S. Revolver is based, at CGG Holding's election, on an adjusted LIBOR rate or adjusted base rate, in each case, plus an applicable margin, subject to certain minimums. Interest on LIBOR borrowings is paid at the end of each interest period as elected by CGG Holding; interest on base rate borrowings is paid quarterly.  As of the Petition Date, the total outstanding amount of the U.S. Revolver was approximately USD $162.8 million.

46.    **_U.S. Term Loan._**  Debtor CGG Holding is also the borrower under a $342 million secured term loan (the "U.S. Term Loan"), entered into on November 19, 2015, as amended from time to time.  Each of the other Debtors in these Chapter 11 Cases (except the two Canadian entities) is a guarantor under the U.S. Term Loan.  Foreign Debtor CGG S.A. is also a guarantor. Wilmington Trust, National Association (as successor to Jefferies Finance LLC) is the administrative agent and Credit Suisse AG is the collateral agent for the U.S. Term Loan.  The U.S. Term Loan matures on May 15, 2019 and bears interest, at CGG Holding's option, at a rate of adjusted LIBOR plus 5.50% per annum or adjusted base rate plus 4.50% per annum, subject to certain minimums.  The U.S. Term Loan is governed by New York law and contains a New York forum selection clause.

47.    Obligations under the U.S. Term Loan are secured by a first priority lien on the same collateral that secures the French Revolver and the U.S. Revolver.  The U.S. Term Loan was issued as part of an exchange offer in 2015 for certain of CGG S.A.'s then-existing unsecured notes.  As of the Petition Date, the total outstanding amount of the U.S. Term Loan was approximately USD $342.6 million.

48.    ***Intercreditor Agreements.***    Because each of the French Revolver, the U.S. Revolver and the U.S. Term Loan enjoy a first priority lien on the same collateral package, the relative rights of the different Secured Lenders are governed by an intercreditor agreement (the "Intercreditor Agreement"), pursuant to which any collateral agent or Secured Lender under any of the Secured Debt may take actions to enforce its rights against the collective collateral. However, proceeds received therefrom must be allocated pro rata among all of the first lien obligations, that is, equally among all of the holders of the Secured Debt, subject only to the payment of the enforcing party's costs in respect of its enforcement actions.    The Intercreditor Agreement is governed by New York law.

49.    Various members of the Group, including Foreign Debtor CGG S.A. and the Debtors are also parties to a supplemental intercreditor agreement (the "Supplemental Intercreditor Agreement") with the Secured Lenders under the French Revolver and, for certain purposes, the U.S. Revolver that governs, *inter alia*, the relative priorities of intra-Group loans (as described below) and the Secured Debt.    Specifically, certain liabilities owed by guarantors or Group members whose shares have been pledged under the Secured Debt to other members of the Group that have acceded to the Supplemental Intercreditor Agreement shall be contractually subordinated to the Secured Debt, except to the extent that this would breach the terms of other permitted financial indebtedness.    Subject to this agreement and certain limitations, payments in respect of such intra-Group receivables are permitted under the Secured Debt agreements.    The Supplemental Intercreditor Agreement is governed by English law.

## G.    *The Group's Unsecured Debt.*

50.    As of the Petition Date, the Group had approximately USD $1.997 billion in unsecured funded debt, including accrued interest, including high yield bonds and convertible bonds (collectively, the "Unsecured Debt").    Each of these is described immediately below.

51.    ***High Yield Bonds.***    Foreign Debtor CGG S.A. is the issuer of various bonds, totaling approximately USD $1.6 billion in the aggregate, including accrued interest thereon, outstanding as of the Petition Date (collectively, the "High Yield Bonds," and the holders thereof, the "High Yield Bondholders").    The High Yield Bonds include: (i) €400.0 million in original principal amount of 5.875% guaranteed senior notes due 2020, issued on April 23, 2014, of which approximately USD $464.3 million remains outstanding as of the Petition Date; (ii) $650 million in original principal amount of 6.5% guaranteed senior notes due 2021, issued on May 31, 2011, and increased on January 20, 2017 and March 13, 2017, of which approximately USD $698.7 million remains outstanding as of the Petition Date; and (iii) $500 million in original principal amount of 6.875% senior notes due 2022, issued on May 1, 2014, of which approximately USD $431.7 million remains outstanding as of the Petition Date. The Bank of New York Mellon is the indenture trustee for all of the High Yield Bond issuances.

52.    While the High Yield Bonds are unsecured, they are guaranteed on a senior unsecured basis by each of the Debtors in these Chapter 11 Cases.[5]    Interest is due semiannually: on May 15 and November 15 for the High Yield Bonds due 2020; on June 1 and December 1 for the High Yield Bonds due 2021; and on January 15 and July 15 for the High Yield Bonds due 2022.[6]    Each of the High Yield Bond indentures is governed by New York law and contains a New York forum selection clause.

---

[5]    The High Yield Bonds are also guaranteed by a non-Debtor Sercel Australia Pty. Ltd.  It is intended that this entity will be dissolved under Australian law.  It is therefore not a Debtor in these Chapter 11 Cases.

[6]    Foreign Debtor CGG S.A. did not make the May 15th interest payment due on the High Yield Bonds due 2020 or the June 1st interest payment due on the High Yield Bonds due 2021; instead, on May 12, 2017 and June 2, 2017, respectively, the Group announced its intention to utilize applicable 30-day grace periods in respect thereof.

53.    ***Convertible Bonds.***    Foreign Debtor CGG S.A. also had approximately USD $402.7 million of convertible bonds (collectively, the "Convertible Bonds") in the aggregate outstanding amount, including accrued interest, as of the Petition Date.  The Convertible Bonds consist of (i) €30.9 million in original principal amount of 1.25% convertible bonds due 2019, of which approximately USD $35.0 million, inclusive of accrued interest, was outstanding as of the Petition Date, and (ii) €325 million in original principal amount of 1.75% convertible bonds due 2020, of which USD $367.8 million, inclusive of accrued interest, was outstanding as of the Petition Date.  Interest is due on the Convertible Bonds semiannually on January 1 and July 1 of each year.  The Convertible Bond indentures are governed by French law and require that all actions be brought in a French court.  The Convertible Bonds are unsecured, and there are no guarantees issued in connection therewith; thus, the Convertible Bonds are not claims against the Debtors.

**H.    *Other Financing Arrangements.***

54.    In addition to the foregoing, Foreign Debtor CGG S.A. and certain of its Debtor and non-Debtor subsidiaries are obliged under other financing arrangements.  These are described herein only to the extent that they implicate or affect either the Foreign Debtor or one of the Debtor entities.[7]

55.    ***Nordic Debt.***    Prior to the Petition Date, non-Debtor CGG Geo Vessels AS ("Geo Vessels") was the borrower under a five-year, $250 million secured loan (the "Nordic Debt") dated as of July 1, 2013, as amended from time to time.  The Nordic Debt was secured by certain assets of Debtor CGG Marine Resources Norge AS and non-Debtor Geo Vessels, including certain vessels owned by Geo Vessels that are used in the Marine Data Acquisition business.

---

[7]    Further information regarding these facilities is available in the Group's Form 20-F for fiscal year ended December 31, 2016, filed on May 1, 2017, available at www.cgg.com.

However, as described below, in April 2017, the Group formed a new joint venture and contributed the equity in Geo Vessels, and therefore, ownership of the five seismic vessels that Geo Vessels owns, to the newly formed entity. The Nordic Debt was then amended and restated to reflect that contribution and the creation of the joint venture. Importantly, the guarantees of the Nordic Debt that had previously been provided by Foreign Debtor CGG S.A. and Debtor CGG Marine Resources Norge AS were released. Thus, as a result of this transaction (the "Vessel Co Transaction"), as of the Petition Date, neither CGG S.A. nor any of the Debtors are guarantors or are otherwise directly obligated under the Nordic Debt.

56.    *Equipment Financing.*    As of the Petition Date, Debtor CGG Marine B.V. was party to a secured financing arrangement for the purchase of certain marine equipment (the "Streamers Facility"). Through this arrangement, Debtor Sercel, Inc. sold marine equipment to a third party, Sea Survey IV, that is a subsidiary of Crédit Industriel et Commercial ("CIC"), which, in turn, resold the equipment to CGG Marine B.V. pursuant to a sale agreement with reservation of title, dated December 19, 2013. CGG Marine B.V.'s obligations under the sale agreement are guaranteed by Foreign Debtor CGG S.A. Sea Survey IV finances the purchase of such equipment pursuant to a loan agreement with CIC and Sea Survey IV has assigned its claim against CGG Marine B.V. under the sale agreement and its claim against CGG S.A. under the guarantee to CIC. All insurance claims with respect to the equipment have been delegated to the lenders and seller's warranties have also been assigned to the lenders. As of the Petition Date, approximately $1.58 million, including accrued interest, was outstanding under the Streamers Facility.

57.    *Charter Guarantees.*    Foreign Debtor CGG S.A. routinely provides guarantees in respect of the obligations of certain of its subsidiaries under vessel charter agreements and

related agreements such as capacity off-take agreements.  As of the Petition Date, the aggregate

total obligations of CGG S.A. under such guarantees were approximately $473 million.

58.    ***Performance Obligations.***    In addition to the foregoing, Foreign Debtor CGG

S.A. and Debtor CGG Holding BV ("HBV") routinely provide operational guarantees designed

to ensure that their respective subsidiaries and affiliates can perform under their contractual

arrangements with third parties, primarily for the Marine Data Acquisition business line.[8]  These

operational guarantees can take many forms, depending on the particular circumstances,

including comfort letters, formal guarantees, or working capital letters of credit; these guarantees

are generally provided to or on behalf of subsidiaries or joint ventures in which either CGG S.A.

or HBV is a partner or a substantial shareholder.  Comfort letters generally confirm that CGG

S.A. or HBV will provide financial support to the applicable Group entity for a one-year period

following the date of the letter, or the entity's most recent financial statements, to ensure the

entity is able to meet its financial obligations as they come due.  CGG S.A. and/or  HBV may

also execute guarantees in favor of third parties under which it will guarantee the performance or

financial obligations of the applicable subsidiary or joint venture.  Finally, in limited

circumstances, these entities may provide working capital letters of credit to affiliates to fund

their working capital needs under contracts with third parties.  As of the Petition Date, the

aggregate obligations of CGG S.A. under such arrangements was approximately €787 million

(including the charter guarantees referred to above) and the aggregate obligations of HBV under

such arrangements was approximately $170 million.

59.    ***Affiliate Financing Arrangements and Intercompany Loans.***  As described in

detail in the Debtors' Cash Management Motion (defined below), prior to the Petition Date, the

---

[8]    From time to time, certain other entities within the Group provide similar guarantees on an as needed
basis.

Group operated a single, comprehensive cash management system for all legal entities within the Group. Under this system, funds were collected, transferred and disbursed across the entire Group as determined by the Group's treasury department to satisfy the various entities' obligations. Accordingly, as of the Petition Date, each of the Debtors and its non-Debtor affiliates routinely engaged in intercompany transactions ranging from intercompany sale transactions between business lines to routine allocations and reimbursements for expenses incurred by the Group on behalf of specific entities.

60.     As described in the Cash Management Motion, this also includes certain intercompany loans and other financing arrangements consisting of long- and medium-term debt transactions pursuant to intercompany notes or other loan agreements, as well as short-term cash advances pursuant to treasury agreements between the central pooling entities and other Group members. Prior the Petition Date, Debtor CGG Holding B.V. – as the primary cash pooling entity for the Group – and Foreign Debtor CGG S.A. were the principal lenders to other Group members under such arrangements. As of the Petition Date, various Debtors owed approximately $943 million to Foreign Debtor CGG S.A. under long- and medium-term loan agreements and promissory notes.

61.     These intercompany transactions are integral to the Group's business operations. The Debtors anticipate that such transactions will continue in the ordinary course during the Chapter 11 Cases, subject to certain limitations and modifications necessitated by the commencement of the Chapter 11 Cases, as described in the Cash Management Motion.

62.     In addition to the foregoing, the Debtors had approximately $13 million in ordinary course trade debt owed to third parties (excluding affiliates, including joint ventures) that was unpaid as of the Petition Date. Because the Debtors were generally paying their debts

as they came due in the prepetition period, this amount generally consists of third-party trade debt that had not become due and payable under the terms of the relevant contracts and other trade arrangements as of the Petition Date.

## II. Events Leading to the Commencement of the French Safeguard and the Chapter 11 and Chapter 15 Cases

### A. *Industry Overview.*

63.     As a service provider for the E&P industry, the Group's success is tied closely to market trends in the global E&P industry and, in particular, the willingness of E&P companies to invest in data acquisition projects and related analyses, whether to identify areas for future production or to maximize the production at existing locations.  The precipitous drop in oil and gas prices since 2013 (the price of Brent decreasing from $110.80 per barrel at the end of 2013 to a low of $37.28 per barrel at the end of 2015) and the failure of those prices to rebound significantly since that time is well known, as are the dramatic and severe negative consequences that those changes have wrought for the industry as a whole.

64.     In an effort to improve cash positions in the face of adverse market conditions, E&P companies have implemented dramatic cost-saving measures.  In particular, investments in E&P projects, including seismic, have been severely curtailed: in 2015, E&P companies decreased their E&P spending by more than 20%, with a similar decline in seismic.  In 2016, these numbers further dropped, with companies reducing their E&P investments by an additional 23%.  The dramatic decline in demand has led to a financial crisis for some of the E&P companies' service providers.

65.     The Group has suffered the effects of this adverse market.  In 2012, before oil prices dropped, the Group had total operating revenues of more than $3.41 billion; by 2015, that number had decreased to $2.1 billion, and for 2016, that number was $1.195 billion.  The

Group's annual revenues in 2016 were roughly one-third of what they were before the current crisis began. The Group's consolidated earnings have dropped similarly over this period: in 2012, the Group's earnings before interest and tax (EBIT) was $368 million; the Group has reported negative EBIT for each subsequent year since that time, including losses of $1.136 billion in 2015 and $404.7 million in 2016. Similarly, the Group's EBITDA has fallen from a high of $1.139 billion in 2013 to $273.6 million in 2016.

### B.    The Strategic Transformation Plan.

66.    To combat this decline, starting in 2014, the Group began to implement a series of cost-saving measures. In 2015, these efforts were consolidated and formalized as a comprehensive "Transformation Plan" through which the Group refocused on its existing strengths, while divesting non-core and underperforming assets and eliminating general and administrative costs wherever possible.

67.    *Focus on Growth Areas.* The premise behind the Transformation Plan was that, notwithstanding current market conditions, long-term demand for geophysical services would be driven, in substantial part, by the development of new technology. This viewpoint was informed by existing trends in the market toward ever-increasing complexity and sophistication in imaging, including the use of 4-D techniques (where imaging is augmented by time lapse views) and wide-azimuth techniques (where imaging is enhanced to provide superior image resolution), and the application of such technology in difficult terrain. Thus, the Transformation Plan prioritized CGG's cutting-edge technologies and products and its reputation for excellence in assessing and applying new technologies to difficult targets. Accordingly, the Transformation Plan necessarily also prioritized funding the R&D necessary to ensure ongoing technological advancements and innovation in these areas.

68.     Consistent with this commitment to developing technological capabilities, in 2013, CGG acquired certain seismic assets from a competitor, Fugro, that included two businesses in the GGR division: (a) Robertson, a leading geologic consulting company, specializing in subscription geological databases and reports, which operates globally in substantially all significant petroleum basins; and (b) Jason, a geophysical software company whose products are used for a range of data processing necessary to create predictive reservoir modeling.

69.     ***Cost-Saving Measures.***  Management also implemented an extensive cost-saving plan with respect to many other areas of the Group's business.  Data Acquisition capacities, in particular, were sharply downsized: over the last three years, Marine has scrapped, sold, cold-stacked or returned to their owners more than 10 different vessels.  The remaining fleet represented the vessels that are best able to produce high-quality, technologically advanced data, in keeping with the Group's overall commitment to an area of the market where technological differentiation is critical.  CGG has conducted a similar downsizing and refocusing on high-end niche markets in the Land Data Acquisition business, again emphasizing CGG's technological strengths and expertise.  Finally, CGG pursued – but ultimately did not consummate – a sale of the Multi-Physics business.

70.     To further manage risks and costs associated with the Marine fleet, CGG renegotiated a number of charter agreements with the goal of reducing its payment of above-market daily charter rates.  This effort included, among other things, the issuance of additional High Yield Bonds to charter counterparties to reduce cash burdens associated with charter agreements for cold-stacked vessels.  (These issuances are included in the aggregate outstanding amount of High Yield Bonds described earlier.)  Furthermore, as noted above, in April 2017,

CGG negotiated with Eidesvik Shipping AS ("Eidesvik"), and the lender under the Nordic Debt, to change the ownership structure of CGG's remaining high-capacity Marine fleet. Specifically, CGG and Eidesvik created a new joint venture, Global Seismic Shipping AS ("Vessel Co"),[9] and each partner contributed certain seismic survey vessels and certain related indebtedness to Vessel Co. On the CGG side, non-Debtor EIR II transferred to Vessel Co 100% of its shares in non-Debtor Geo Vessels, the CGG entity that owned CGG's five high-capacity seismic vessels. The joint venture partner similarly contributed two seismic vessels. As a result, CGG no longer directly owns any operating seismic survey vessels.

71.     As part of the Vessel Co Transaction, CGG also was able to renegotiate the terms of certain charter agreements relating to Eidesvik's seismic vessels and to secure continued access to Vessel Co's fleet through a long-term vessel capacity commitment by Vessel Co. Under the "umbrella" agreement, CGG will enter into bareboat charters with Vessel Co at fixed charter rates based on current market conditions, subject to certain minimum chartering commitments. Consistent with the Group's prior practice in respect of such charter agreements, the obligations of the non-Debtor charterer under the umbrella agreement and the bareboat charters are guaranteed by CGG SA.

72.     Finally, CGG has cut headcount and other costs throughout the company. Since 2013, CGG has reduced its headcount by more than 3,700 employees. Similarly, since 2013, CGG has reduced its overhead costs by more than 50%, and its Marine costs by more than 60%. As part of that effort, CGG has focused on achieving substantial pre-funding levels for its Multi-Client surveys to minimize capital costs associated with those projects. In 2016, pre-funded

---

[9]     Vessel Co is owned 50% by non-Debtor Exploration Investment Resources II AS ("EIR II"), a subsidiary of CGG SA, and 50% by Eidesvik, and is managed by directors appointed by each of EIR II and Eidesvik.

levels for such projects exceeded 90%. This operational restructuring plan was financed, in part, by a capital increase in February 2016 for a total amount of approximately €350 million through an offering by CGG S.A. of preferential subscription rights to existing shareholders.

73.    ***Operating Results.***    Notwithstanding these efforts, however, performance has continued to suffer, and the Group's revenues decreased by an additional 43% in 2016. The Data Acquisition and Sercel businesses have been particularly impacted by the challenging market conditions. Thus, despite CGG's extensive restructuring of its Data Acquisition assets and its ability to keep its remaining fleet operating at more than a 94% production rate, revenues from Data Acquisition have fallen from $2.226 billion in 2013 to less than $240 million in 2016 – a drop of almost 90%, which resulted in a net operating loss of $99 million in 2016. Similarly, despite Sercel's market-leading products, streamlined cost profile and manufacturing flexibility, Sercel's revenues have fallen from more than $1.045 billion in 2013 to $255 million in 2016 – a drop of almost 75%, which resulted in a net operating loss of $42 million in 2016. While the SIR and Multi-Client businesses have fared better, they too have experienced significant contractions: SIR's revenues have dropped by more than 40% since 2013, and Multi-Client by about 45%. Just in 2016, SIR's performance was down about 29% from the prior year, and Multi-Client about 30%, which resulted in a net operating loss of $16 million in 2016. As such, the Group was required to – and did – obtain consents from its Secured Lenders concerning its compliance with certain financial covenants for the year ending December 31, 2016 and the 12 months ending March 31, 2017.

## C.    *The Financial Restructuring Process.*

74.    Despite these extensive efforts to achieve operational improvements, management ultimately concluded that the Transformation Plan would not be sufficient to allow the Group to successfully weather the ongoing downturn in light of its significant funded indebtedness.

Having determined that a comprehensive financial restructuring was needed to right-size the Group's balance sheet, management began discussions with the Group's various stakeholders concerning the terms of such a restructuring. Management was assisted in this effort by various advisors, including Linklaters LLP, the Group's existing counsel, and Morgan Stanley and Lazard, as financial advisors.

75.    Given the complexity of this restructuring effort and the number of stakeholders involved, in February 2017, the Group requested that the President of the Commercial Court of Paris appoint a *mandataire ad hoc* to aid in these negotiations. A *mandataire ad hoc* is an important player in French restructurings, and may best be analogized to a mediator. Like a mediator, a *mandataire ad hoc* does not have the ability to compel parties to reach agreement; instead, the *mandataire ad hoc* facilitates negotiations among a company and its stakeholders.

76.    The President of the Commercial Court of Paris appointed a *mandataire ad hoc* on February 27, 2017, naming SELARL FHB, and specifically Mrs. Hélène Bourbouloux, a French attorney, to the position. Since her appointment, the *mandataire ad hoc* has coordinated and directed numerous in-person meetings and calls between the Group and its various stakeholders regarding the terms of a potential financial restructuring. This effort has included representatives and advisors from each of the Group's key constituencies, including: (i) an *ad hoc* group of Secured Lenders (the "Ad Hoc Lender Group"); (ii) an *ad hoc* group of High Yield Bondholders (the "Ad Hoc Bondholder Group"); (iii) certain holders of Convertible Bonds; and (iv) certain of the largest shareholders of CGG S.A., including a shareholder with significant cross-holdings in certain of the Group's funded indebtedness.

77.    The meetings directed and/or led by the *mandataire ad hoc* have been extensive and intense: indeed, at times during the months leading up to the filing of the French Safeguard,

28

the Chapter 11 Cases and the chapter 15 case, the parties met almost daily.   In an effort to facilitate productive negotiations, the *mandataire ad hoc* encouraged parties to meet in a number of different configurations.   For instance, meetings in France over the last three and a half months have been held with the *mandataire ad hoc* in attendance; they have also occurred solely among the parties.   Similarly, some meetings have been held among principals only, others among advisors only, and yet others with both principals and advisors in attendance.   Furthermore, as circumstances have dictated, plenary meetings have been held at which all parties have been present; there have also been innumerable bilateral discussions between the Group and each separate creditor and equity constituency.

78.   In sum, the Group and its key constituencies, and each of their respective advisors, have devoted an extraordinary amount of time and effort over the last three and a half months to negotiating the terms of a consensual restructuring under the auspices of the court-appointed *mandataire*.   During this time, many different proposals and term sheets have been developed by, and circulated to, the different parties.

79.   ***Agreement in Principle.***   On June 2, 2017, the Group reached an agreement in principle regarding the terms of a comprehensive financial restructuring with (i) the Ad Hoc Lender Group, (ii) the Ad Hoc Bondholder Group, and (iii) a substantial shareholder of CGG S.A. that has significant cross-holdings in certain of the Group's funded indebtedness.   This agreement envisions a balance sheet restructuring of the Group and a substantial new debt and equity financing on the principal terms described immediately below.   The specific terms of the proposed transaction are detailed in a comprehensive term sheet (the "Term Sheet") attached as an exhibit to the Lock-Up Agreement (defined below), which has been filed contemporaneously herewith.

- **Secured Debt.** Amendment and extension of the Secured Debt in the form of a new secured bond to be issued by CGG Holding with a five-year maturity, after a paydown at closing of up to $150 million from the proceeds of the New Money (described below).

- **High Yield Bonds/Convertible Bonds.** Full equitization of the principal amount of the High Yield Bonds and Convertible Bonds into common stock of CGG S.A. at the exchange rates and on the other terms specified in the Term Sheet. In addition, holders of High Yield Bonds will receive new Second Lien Notes to be issued by CGG S.A. on account of their accrued and unpaid interest (in a maximum amount of $86 million) and holders of the Convertible Bonds will receive cash on account of their accrued and unpaid interest (in an amount of $5 million). Finally, the holders of High Yield Bonds will have the right to (i) participate in the Debt Raise (described below), and (ii) backstop the Equity Raise (also described below) if the full amount of the Equity Raise is not subscribed for by DNCA and CGG S.A.'s other existing shareholders, by way of offset of a portion of their existing High Yield Bonds.

- **Existing Shareholders of CGG S.A.** Current equity holdings will be diluted by the bond equitizations to approximately 4.5% of CGG S.A.'s equity (subject to change based on levels of participation in the various New Money raises and exercise of certain warrants to be issued as part of the restructuring). In addition, current equity holders will receive (i) new four-year warrants with an exercise price of $3.50 with four warrants giving the right to subscribe three shares and (ii) the right to participate in the Equity Raise (described below).

- **New Money.** Up to $500 million in new debt and equity to be raised at closing through (i) an equity rights offering of $125 million of new common shares (the "Equity Raise") and (ii) the issuance of $375 million of new second lien notes (the "Debt Raise") on the terms set forth in a private placement agreement, an agreed form of which is attached as an exhibit to the Lock-Up Agreement. Each of the Equity Raise and the Debt Raise are backstopped by certain parties on the terms set forth in the Term Sheet.

80.    To ensure expeditious implementation of the transactions described above, the Group executed (1) an agreement with the Group's significant creditor constituencies (the "Lock-Up Agreement") that commits such parties to support the transactions on the terms set forth therein, including the Term Sheet, and (2) a support agreement with DNCA, one of CGG S.A.'s largest shareholders, (the "Restructuring Support Agreement") that similarly commits DNCA to support the transaction on the terms set forth therein. Such documents were finalized and executed on June 13, 2017 by, as applicable, (i) members of the Ad Hoc Lender Group holding approximately 56.9% of the Secured Debt, (ii) members of the Ad Hoc Bondholder

Group holding approximately 52.4% of the High Yield Bonds, and (iii) DNCA, which holds approximately 7.9% of CGG S.A.'s share capital, as well as approximately 5.5% of the High Yield Bonds and approximately 20.7% of the Convertible Bonds (collectively, the "Supporting Stakeholders").

81.     Of particular relevance to the Debtors, the Lock-Up Agreement (which is governed by French law) obligates the Supporting Stakeholders to support the agreed restructuring on the terms set forth in the Term Sheet.  This obligation includes the Supporting Stakeholders' agreement to take any steps and actions that are reasonably necessary for implementation of the transactions, including, among other things, voting in favor of the safeguard and chapter 11 plans (subject to receipt of appropriate disclosure materials), providing any necessary waivers, and directing the various agents, indenture trustees and authorized parties as required under the terms of the operative debt documents.  In exchange, the Group has agreed, among other things, that the restructuring documents necessary for implementation must be approved by the Ad Hoc Lender Group and the Ad Hoc Bondholder Group and, furthermore, that certain "key" documents must be approved by 50% of the Secured Lenders and 50% of the High Yield Bondholders that have signed the Lock-Up Agreement.

82.     Finally, the Lock-Up Agreement obligates the parties to work expeditiously to consummate the restructuring by February 28, 2018.  In furtherance of that goal, the Group has agreed to certain interim milestones (the "Milestones"), including the following key Milestones that relate specifically to these Chapter 11 Cases:

- to file a chapter 11 plan and disclosure statement that are consistent with the Term Sheet and the Lock-Up Agreement by July 30;

- to obtain an order approving the disclosure statement by August 29; and

- to obtain an order confirming the chapter 11 plan by November 7.

While the Debtors are party to the Lock-Up Agreement, they do not intend to seek Court approval of the Lock-Up Agreement in these Chapter 11 Cases, and there is no requirement in the Lock-Up Agreement concerning any such approval.

**D.      *Preparation for the Safeguard Proceeding and Chapter 11 and Chapter 15 Cases.***

83.      In parallel with the negotiations in Paris leading up to the agreement described above], the Group also took steps to protect against the possibility that a consensual resolution could not be reached in the time frame required by the Group's liquidity situation.  Thus, the Group retained counsel and other advisors who were tasked with preparing for in-court restructuring cases, including filings under chapter 11 of the Bankruptcy Code.  To that end, the Debtors retained Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") and AlixPartners LLP ("AlixPartners").

84.      Through careful coordination between, and with input from, the Group's various advisors, management developed a two-prong strategy for a possible in-court restructuring.  Specifically, the Group and its advisors determined that, if circumstances required an in-court process, CGG S.A. – as the obligor for most of the Group's principal indebtedness – would commence a Safeguard Proceeding in France and each of the Debtors – as the guarantors under much of that same indebtedness – would commence chapter 11 cases in the U.S.  In addition, the parties determined that CGG S.A. would commence a chapter 15 case in the U.S. to recognize the Safeguard Proceeding and to aid in implementation of the overall restructuring.  Finally, certain of the Debtors who are not organized under U.S. law would commence proceedings in their own jurisdictions to recognize the chapter 11 filings.

85.      In preparation for these potential filings, the Group and its advisors engaged in an extensive undertaking to determine how the Group's centralized cash management system would

function during these cases, particularly in light of the fact that the entire corporate Group would not be seeking relief either under safeguard or chapter 11. This effort entailed, among other things, careful consideration of each aspect of the Group's cash management system, including each type of intercompany transaction and how decisions were made in respect thereof. Attention was also paid to how such transactions were recorded and tracked. From this analysis, and in light of certain considerations relevant to the Chapter 11 Cases, the parties determined that the Group's centralized cash pooling would be separated into four discrete pools: one for the U.S. Chapter 11 Debtors; one for the non-U.S. Chapter 11 Debtors; one for CGG S.A.; and one for other entities in the corporate Group. New protocols were then implemented to govern transactions and transfers between different pools to ensure, among other things, that such transfers would be properly tracked and would comply with all relevant restrictions that could be imposed by the different judicial processes.

86.     In conjunction with that effort, the Group and its advisors similarly engaged in an analysis of the Group's overall cash needs during this process, as well as the specific cash needs of the Debtors. Given the particular industry in which the Group operates, and, in particular, the significant cash outlays that can be associated with a single survey or other project, cash needs – and in particular, cash receipts – can be quite volatile. As such, the Group devoted considerable time and effort to developing a rolling 13-week cash forecast for the Debtors.

87.     In April 2017, in parallel with negotiations regarding an overall transaction, the Debtors and their advisors began discussions with the Secured Lenders regarding the terms under which the Debtors would be able to use their cash collateral during the Chapter 11 Cases. After extensive discussion and diligence by the Secured Lenders and their advisors concerning the Group's cash position, among other relevant items, the parties successfully negotiated the terms

33

of a stipulation pursuant to which the Debtors would be able to use cash collateral on a consensual basis during the Chapter 11 Cases in exchange for standard protections, including adequate protection payments and the Debtors' agreement to comply with an agreed budget.

88.     The Board of Directors of CGG S.A. expressed its support for the Group's CEO to determine that it is in the best interests of each of CGG S.A. and the Debtors, and their respective stakeholders, to implement the agreed financial restructuring by means of a Safeguard Proceeding for CGG S.A. and concurrent Chapter 11 Cases for each of the Debtors. Subsequently, the board of each of the Debtors approved and authorized the filing of these Chapter 11 Cases.  Accordingly, on June 12, CGG S.A. appeared before the Commercial Court in Paris to request the commencement of the Safeguard Proceeding and, on June 14, the Commercial Court entered an order formally opening the Safeguard Proceeding.  CGG S.A. continues to operate in the ordinary course of business under the protection of an automatic stay against creditor action that arose as a matter of French insolvency law upon the commencement of the Safeguard Proceeding.  Immediately upon entry of that order, CGG S.A. commenced its chapter 15 case with this Court to recognize the Safeguard Proceeding.  Thereafter, each of the Debtors filed its chapter 11 petition to commence these Chapter 11 Cases.

### III.     Overview of the Debtor Entities

89.     As noted above, the Debtors serve as guarantors under a significant portion of the Group's primary funded indebtedness, including the French Revolver and all of the High Yield Notes for which the Foreign Debtor is the principal obligor.  In addition, certain of the Debtors are either primary obligors or guarantors under the U.S. Term Loan and U.S. Revolver.  The Debtors have therefore commenced these Chapter 11 Cases to protect their assets from actions that might be taken in respect of those guarantees now that the Foreign Debtor has commenced

the Safeguard Proceeding and, ultimately, to implement an overall restructuring in coordination with the Safeguard Proceeding.

90.     The Debtors in these Chapter 11 Cases are only a small fraction of the legal entities that comprise the Group.  For the Court's convenience, attached as <u>Exhibit A-1</u> is a simplified chart that reflects the corporate organization of the Debtor entities.  By way of contrast, attached as <u>Exhibit A-2</u> is the full corporate structure chart of the Group, which includes more than 130 different legal entities and branches, plus equity interests in a number of different joint ventures.  A brief description of each of the Debtors in these Chapter 11 Cases is provided below.  For the Court's convenience, the Debtors are categorized as: (i) holding companies; (ii) SIR and Multi-Client operating entities; (iii) Sercel operating entities; and (iv) Data Acquisition operating entities.  In addition, a brief description of CGG S.A. is also provided.

## A.     *The Holding Company Debtors.*

91.     The lead Debtor in these Chapter 11 Cases is CGG Holding (U.S.) Inc. ("<u>CGG Holding</u>").  CGG Holding is the top Group entity organized in the United States, and is the direct or indirect parent of all of the U.S.-incorporated Debtors.  In addition, it is the borrower under the U.S. Revolver and the U.S. Term Loan.  CGG Holding is a holding company with no material assets other than its equity interests in the U.S. subsidiaries and certain miscellaneous intellectual property; it does not have any employees.  CGG Holding does, however, serve as the cash pooling entity for its U.S. subsidiaries, as described in the Cash Management Motion; this function is expected to continue during the Chapter 11 Cases.

92.     Debtor CGG Holding BV (HBV) is a holding company organized under Dutch law.  HBV is the direct parent of Debtor CGG Holding, among many other non-Debtor affiliates,

and is a direct subsidiary of Foreign Debtor CGG S.A.  Historically, HBV has served as the primary cash pooling entity for the Group and has been responsible for all of the Group's treasury functions.  However, as described in detail in the Cash Management Motion, because only certain entities within the corporate Group have filed for chapter 11 relief, in anticipation of the filing, the existing cash pooling system was divided into various pools to ensure that the limitations and restrictions imposed by the Bankruptcy Code on transfers by and among the Debtors could be properly respected during the Chapter 11 Cases.  As a result of these modifications, Debtor HBV will continue to act as the primary cash pooling entity only for the Debtors that are organized outside of the U.S.

93.     HBV has only a few employees and holds cash by virtue of its role in the Debtors' cash management system and its equity interests in subsidiaries and various joint ventures. Those joint venture interests include, among others: (i) a 49% stake in a joint venture with Petrovietnam Technical Services Corp., PTSC CGGV Geophysical Survey Company Ltd., which performs offshore 2-D and 3-D seismic data acquisition in and near Vietnam; and (ii) a 36% stake in a partnership with certain individuals in Kazakhstan, Reservoir Evaluation Services LLP, which acquires data processing equipment to provide data processing services to E&P customers.

**B.      *The SIR and Multi-Client Debtors.***

94.     Debtor CGG Services (U.S.) Inc. ("CGG Services") is the main GGR operating entity in the U.S. and conducts a wide range of operations for the Group in respect of this segment.  Most importantly, CGG Services owns and manages the offshore data portion of the U.S. Multi-Client library and runs SIR's domestic operations.  Additionally, CGG Services provides project management for Marine Data Acquisition projects that are conducted in the

Western Hemisphere; it is also involved in the data acquisition and processing of non-seismic data. Finally, CGG Services manages extensive storage facilities where E&P companies can store collected data, survey records and coring samples, among other information. CGG Services has approximately 730 employees in total and is headquartered in Houston, Texas.

95.    Debtor CGG Land (U.S.) Inc. ("CGG Land") is a U.S. operating entity based in Houston, Texas that owns and manages the land-based portion of the Multi-Client library. It is a direct subsidiary of CGG Services and has approximately 20 employees. CGG Land's operations include a number of non-operating, legacy branches throughout South America, including in Argentina, Bolivia and Peru.

96.    Debtors Viking Maritime and Alitheia are direct subsidiaries of CGG Services that are incorporated in the U.S. Neither entity, however, has current material operations, assets or employees.

97.    Debtors CGG Holding I and CGG Holding II are holding companies organized under U.K. law. Both are direct subsidiaries of HBV. Neither entity has material operations, employees or bank accounts. However, CGG Holding II is the direct parent of a material non-Debtor operating entity in Canada, CGG Services (Canada) Inc., that owns, develops and sells proprietary geosoftware that is utilized in the SIR business line.

## C.    *The Equipment Manufacturing (Sercel) Debtors.*

98.    As described above, the Group's Equipment Manufacturing business is conducted under the Sercel name. Debtor Sercel Inc. ("Sercel Inc.") is the main Equipment Manufacturing operating entity in the U.S. It is a non-wholly owned direct subsidiary of Debtor CGG Holding (a non-Debtor affiliate holds the remaining equity interests) and is involved in the design, development and manufacture of various marine equipment, including the Sentinel streamers

described above.  Sercel Inc. has approximately 225 employees.  It is incorporated in Oklahoma and has manufacturing facilities in Houston, Texas.

99.     Debtor Sercel-GRC Corp ("Sercel-GRC") is a direct U.S. subsidiary of Sercel Inc. that is also involved in equipment manufacturing for the seismic industry.  Sercel-GRC focuses on the design and manufacture of specialized measurement tools.  Sercel-GRC has approximately 70 employees and has manufacturing facilities in Tulsa, Oklahoma.

100.    Debtor Sercel Canada Ltd. is a wholly owned direct subsidiary of Sercel Inc.  It is incorporated and based in Canada, and does not have material assets, ongoing operations or a significant number of employees.

**D.    The Data Acquisition Debtors.**

101.    Debtor CGG Marine BV ("Marine BV") is an operating company organized under Dutch law and is a direct subsidiary of HBV.  Marine BV owns streamers and other marine equipment, generally manufactured by Sercel, that is used in marine survey operations. This equipment is generally sold or leased to survey operators, including Marine Data Acquisition, that install the equipment in marine vessels for a particular project.  Marine BV also handles the storage of such equipment.  Marine BV does not have any direct employees.

102.    Debtor CGG Marine Resources Norge AS ("CGG Marine Resources") is a holding company organized under Norwegian law and is a direct subsidiary of non-Debtor parent CGG S.A.  Through its subsidiaries, it has, among other things, an indirect ownership interest in Vessel Co and, thus, certain marine survey vessels that are utilized by the Marine business line. As discussed above, by virtue of that indirect ownership, CGG Marine Resources previously was a guarantor for the Nordic Debt; the guarantee, however, was released prior to the Petition Date. CGG Marine Resources does not have any employees or material operations.

103.    Finally, Debtor CGG Canada Services Ltd. ("CGG Canada") is an operating
entity organized under Canadian law and is a direct subsidiary of HBV.  CGG Canada operates a
fleet of airplanes that is used to conduct surveys for the Multi-Physics Data Acquisition business
line.  It has approximately 50 employees.

### E.      The Foreign Debtor.

104.    Foreign Debtor CGG S.A. is a holding company organized under French law that
is the ultimate parent company of the Group.  CGG S.A. is a publicly traded company whose
shares are listed on the Paris Stock Exchange and also on the New York Stock Exchange in the
form of American Depository Shares.   Its registered office and executive headquarters are
located in Paris, France, as are many members of CGG S.A.'s senior management (including its
Chief Executive Officer, Chief Financial Officer and me).   All key corporate activities for the
Group, including meetings of the board of directors, typically occur in France.  The prospectuses
and other public filings made by the Foreign Debtor state that the Foreign Debtor is organized
under French law, its registered office is located in France and its shares are listed on the Paris
Stock Exchange.   Those materials also state that the Foreign Debtor may be subject to
reorganization or bankruptcy proceedings under French law.   The Foreign Debtor has
approximately 30 employees, all of whom are located in France.

105.    CGG S.A.'s significant shareholders are French entities or entities otherwise
based in France.  These include:  (i) Bpifrance Participations, which is a finance company
partially owned by the French state that holds approximately 9.3% of CGG S.A.'s outstanding
shares and approximately 10.8% of the CGG S.A.'s voting rights; (ii) AMS Energie, which also
holds approximately 8.3% of CGG S.A.'s outstanding shares and approximately 8.1% of CGG
S.A.'s voting rights; (iii) DNCA Finance, which holds approximately 7.9% of the company's

outstanding shares and approximately 7.7% of CGG S.A.'s voting rights; and (iv) IFP Energies Nouvelles, which is a French state agency that holds approximately 1.3% of CGG S.A.'s outstanding shares and approximately 2.1% of its voting rights.

106.    In addition to the New York law governed debt documents noted above, the Foreign Debtor has the following assets in the U.S.: (i) a $100,000 evergreen retainer with the New York office of Linklaters LLP (its counsel for the Foreign Debtor's chapter 15 case) being held in a client trust account located in New York; and (ii) a $150,000 evergreen retainer with Hogan Lovells (as counsel for the indenture trustee under the High Yield Bond indenture) being held in a New York bank account.

### IV.    First Day Motions

107.    As a result of my first-hand experience, and through my review of various materials and information, discussions with members of the Debtors' management, and discussions with the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions described below, and (b) the immediate and irreparable harm to which the Debtors and their businesses will be exposed unless the relief requested in the First Day Motions is granted without delay.  A list of the First Day Motions is annexed hereto as Exhibit B.

108.    I submit this Declaration in support of the Petitions and the First Day Motions filed with the Court in these cases and as described below.

109.    I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would,

based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

110.    The relief sought in the First Day Motions is critical to a smooth transition into chapter 11 to minimize the adverse effects of the Chapter 11 Cases on the Debtors' business and on their employees and creditors.  Collectively, the First Day Motions maximize value for the Debtors' estates and stakeholders by reducing unnecessary disruption and minimizing any negative impact of the Chapter 11 Cases on the Debtors' businesses and operations.  As described more fully below, the Debtors, in consultation with their professionals, have carefully tailored the relief requested in the First Day Motions to ensure the Debtors' immediate operational needs are met, and that the Debtors suffer no immediate and irreparable harm.  For the reasons identified immediately below, I believe that the relief requested in each of the First Day Motions is appropriate under the circumstances and should be granted by the Court.

111.    ***Motion for Joint Administration of Related Chapter 11 Cases.***  By this motion, the Debtors seek authorization to jointly administer these Chapter 11 Cases for procedural purposes only.  Many of the motions, applications, hearings and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor.  Thus, the Debtors believe the interests of the various Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these Chapter 11 Cases for procedural purposes.  Joint administration of these Chapter 11 Cases will reduce fees and costs, avoid needless duplicative filings and enable a more efficient and economical administration of the Chapter 11 Cases.  Joint administration also relieves the Court from the burden of entering duplicative orders and maintaining duplicative files.  Furthermore, I understand that creditors' rights will not be

adversely affected as this motion seeks only administrative, not substantive, consolidation of the estates. Creditors thus maintain their ability to file claims against specific Debtor estates.

112. ***Motion for Extension of Time to File Schedules and Statements.*** By this motion, the Debtors seek a 30-day extension of the statutory time periods by which they must file their schedules and statements of financial affairs. As described above, the Debtors are part of a complex, integrated business with multiple business lines involving worldwide operations. While the Debtors have filed a consolidated list of creditors holding the largest 30 unsecured claims against the Debtors, the Debtors estimate that, as of the Petition Date, they have approximately 28,000 creditors in the aggregate. In the ordinary course of their operations, the Debtors have entered into hundreds, if not thousands, of contracts and other commercial relationships. Because of the size and scope of the Debtors' businesses, the complexity of their financial affairs and the numerous business matters incident to the commencement of the Chapter 11 Cases, the Debtors do not anticipate they will be able to complete the schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and statements of financial affairs within the time frame that the applicable Bankruptcy Rules require. Moreover, the Debtors and their advisors will need to address numerous critical operational matters in the early days of these Chapter 11 Cases to effect a smooth transition into the chapter 11 process, thereby maximizing estate value. The requested extension sought in this motion will allow the Debtors and their advisors to focus on these operating exigencies for the benefit of all creditors and parties in interest.

113. ***Motion Enforcing and Restating Automatic Stay and Ipso Facto Provisions.*** By this motion, the Debtors seek entry of an order confirming the applicability of the various protections afforded to the Debtors by the Bankruptcy Code, including, most especially, the

42

automatic stay set forth in section 362 of the Bankruptcy Code. Despite the self-executing and global nature of these protections, I understand that not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of, comprehensively understand or will abide by these provisions.   The Debtors' advisors have counseled that it is often necessary to advise third parties of the existence, scope, and effect of these sections through a separate order, particularly when the debtor is engaged in operations around the globe and where many of the debtors' creditors are located in foreign jurisdictions – as is true here.

114.    The Debtors intend to use this order to help their creditors and other interested parties understand the consequences of the Chapter 11 Cases and thereby ensure that the Debtors' assets are protected during these Chapter 11 Cases. Absent entry of such an order, creditors in foreign jurisdictions may take actions that violate the Bankruptcy Code and directly harm the Debtors' operations; in such circumstances, the Debtors and their advisors may be required to expend considerable time and resources applying to foreign courts to enjoin such creditor actions on an individual basis.  The Debtors submit that entry of such an order will be greatly beneficial to the estates in reducing the likelihood of such actions.  Moreover, entry of this order will not harm any party in interest as I understand that it seeks only confirmation of the protections that are afforded automatically to a debtor upon the filing of a chapter 11 case.

115.    ***Application to Appoint Prime Clerk as Claims and Noticing Agent.***  By this application, the Debtors seek entry of an order authorizing the appointment of Prime Clerk as the Claims and Noticing Agent in these Chapter 11 Cases.  Upon information and belief, Prime Clerk is an experienced claims agent and is frequently used by debtors in large chapter 11 cases, and I believe Prime Clerk is well qualified to serve as the Claims and Noticing Agent in these Chapter 11 Cases.  The employment of Prime Clerk will provide the Clerk of the Court and the

Debtors with efficient management of the claims and noticing processes in these Chapter 11 Cases, which will allow the Debtors' management and professionals to focus their attention more closely on the Debtors' overall chapter 11 efforts.

116.     ***Motion to Approve CGG Canada Services Ltd. as Foreign Representative.***  By this motion, the Debtors seek an order authorizing CGG Canada Services Ltd. to act as a foreign representative on behalf of CGG Canada and Sercel Canada Ltd. in certain proceedings under the *Companies' Creditors Arrangement Act* (the "CCAA") in Canada.  As noted above, these two Debtors will seek ancillary relief in Canada on behalf of their respective estates.  The purpose of these proceedings is to obtain recognition of these Chapter 11 Cases as a "foreign proceeding" under the applicable provisions of the CCAA in order to protect the Canadian Debtors' assets and operations in Canada.  However, as a condition of commencing these proceedings, the Debtors must obtain an order from this Court authorizing CGG Canada Services Ltd. to act as a foreign representative in the proceedings in Canada.  Accordingly, Debtors request approval of the relief requested in this motion.

117.     ***Motion to Approve Continued Use of Cash Management System.***   By this motion (the "Cash Management Motion"), the Debtors seek entry of an interim and final order: (i) authorizing and approving the Debtors to continue using their existing cash management system; (ii) authorizing the Debtors to continue using prepetition bank accounts and existing checks; (iii) waiving the requirements of section 345(b) of the Bankruptcy Code on an interim basis with respect to the Debtors' deposit and investment practices; and (iv) granting administrative expense priority to the Debtors' intercompany transactions and loans.   In connection with this relief, the Debtors also respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the Southern

District of New York that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and obtain new checks bearing a "debtor-in-possession" legend.

118.   To lessen the impact of the chapter 11 filings on the Debtors' business and thereby maximize the value of the Debtors' estates, it is vital that the Debtors keep their cash management system in place and be authorized to pay outstanding fees owed in relation to the Debtors' bank accounts, such as payments to third-party vendors whose services are critical for the uninterrupted operation of the cash management system.   As described above, the Group operates a comprehensive cash management system: any disruption to that system (except for those changes that are necessary in light of the Chapter 11 Cases, each as described in the Cash Management Motion) would severely impair the operations of the Debtors and their non-Debtor affiliates and ability of those parties to optimize their business performance to the detriment of all parties in interest.   Accordingly, the Debtors request approval of the relief requested in the Cash Management Motion.

119.   ***Motion for Authority to Pay Prepetition Wages and Continue Benefits.***   By this motion (the "Wages Motion"), the Debtors seek entry of an interim and final order: (i) authorizing the Debtors to pay or otherwise honor all prepetition employee obligations; (ii) authorizing, but not directing, the Debtors to continue in the ordinary course of business their employee programs; and (iii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' bank accounts to make the foregoing payments.

120.   As described in detail in the Wages Motion, the Debtors have a substantial workforce of more than 1,000 employees (the "Workforce").   The Debtors' Workforce generally

45

relies exclusively on the compensation and benefits provided by or funded by the Debtors to continue to pay their daily living expenses, and will be exposed to significant financial difficulties if the Debtors are not permitted to pay these obligations.  The Debtors believe that if they are unable to honor all such obligations immediately, morale and loyalty will be jeopardized at a time when the support of these individuals is crucial.

121.    Moreover, a stable Workforce is critical to the uninterrupted continuation of the Debtors' business and the preservation and maximization of the value of the Debtors' estates during these Chapter 11 Cases.  Particularly in this instance, the Debtors' business relies heavily on its experienced and knowledgeable Workforce.  Any significant number of departures or deterioration in morale among the Debtors' Workforce at this time will immediately and substantially adversely impact the Debtors' efforts in chapter 11 and result in immediate and irreparable harm to the Debtors' estates and creditors.  There is a real, immediate risk that if the Debtors are not authorized to continue to honor their prepetition obligations to these parties in the ordinary course, the employees and independent contractors would no longer support and maintain the operations of the Debtors, thereby crippling them.  Consequently, the Debtors strongly believe it is critical that they be permitted to pay prepetition wages and continue with their ordinary course personnel policies, programs and procedures, including, but not limited to, maintenance of workers' compensation programs and health care programs, that were in effect prior to the Petition Date.

122.    ***Motion for Use of Cash Collateral.*** By this motion (the "Cash Collateral Motion"), the Debtors seek authority to use cash collateral, as I understand that term is defined in section 363 of the Bankruptcy Code, and to grant adequate protection to the Debtors' prepetition Secured Lenders.  In the normal course of business, the Debtors use cash on hand and cash flow

from operations and other sources to fund working capital and capital expenditures to operate their business.  Specifically, the Debtors require access to cash collateral to, among other things, satisfy payroll, pay suppliers, meet overhead, pay utility expenses, and pay professionals.   In exchange for the use of cash collateral and to ensure that the Secured Lenders are adequately protected, the Debtors propose granting superpriority administrative expense claims against the Debtors on account of any diminution in value under section 507(b) of the Bankruptcy Code.

123.    The Debtors' ability to access and use cash is essential to ensuring continued operations during these Chapter 11 Cases.  Absent access to the cash collateral, the Debtors will not have adequate unencumbered cash on hand to pay these critical expenses.   Ensuring the Debtors have sufficient working capital will allow the Debtors to preserve and maintain the going concern value of the business, thus enhancing the prospects for a successful reorganization.  Accordingly, the relief requested in the Cash Collateral Motion is intended to prevent any disruption or damage to the Debtors and their estates, while providing adequate protection to the Secured Lenders.   Importantly, the relief requested in the Cash Collateral Motion reflects an agreement between the Debtors and the affected Secured Lenders regarding the use of cash collateral during these Chapter 11 Cases and is, therefore, consensual.

124.    ***Motion for Authority to Continue Insurance and Pay Prepetition Claims.***  By this motion, the Debtors seek authority to continue their existing insurance policies and surety arrangements and to pay premiums and other amounts arising thereunder, including any prepetition amounts.  Maintaining the existing insurance programs and surety arrangements is necessary to preserve the value of the estates and the Debtors' business.  Any lapse or disruption in insurance coverage, or the Debtors' failure to maintain the surety bonds, could result in immediate and severe consequences for the business, as well as the value of the Secured

Lenders' collateral.  Absent sufficient and continuing insurance coverage and maintenance of the surety bonds, the Debtors may also be exposed to substantial liability and may be unable to operate in certain key jurisdictions.  Similarly, the nonpayment of any premiums, related fees, deductibles, claims or other obligations under any of the insurance programs could result in one or more of the insurance carriers increasing future insurance premiums, declining to renew the insurance programs or refusing to enter into new insurance policies to the immediate detriment of the Debtors and their estates.

125.    ***Motion for Authority to Pay Prepetition Taxes.***  By this motion, the Debtors seek authority to pay taxes, fees, assessments and other charges to applicable taxing authorities in the ordinary course of business, including any prepetition amounts that may be due.  The Debtors' failure to pay certain taxes and fees when due may adversely affect their business operations.  Depending on the relevant jurisdiction, tax authorities may have the ability to initiate audits if taxes and fees are not timely paid.  Similarly, tax authorities may attempt to suspend the Debtors' operations, seek to lift the automatic stay, or even seek to hold the Debtors' directors and officers personally liable for any unpaid amounts.  Moreover, I understand that certain taxes and fees may give rise to tax liens and some or all may be entitled to priority.  Accordingly, for such amounts, the relief requested by this motion affects only the timing of the payments, and not the amounts that ultimately would be received by the applicable tax authorities.

126.    ***Motion to Authorize Payment of Prepetition Claims of Critical Vendors.***  By this Motion, the Debtors seek authority to pay the prepetition claims of certain critical vendors, suppliers, and service providers up to a maximum amount of $1.9 million and to implement certain related procedures.  Due to the specialized and highly technical nature of the Debtors' business, the Debtors have a number of vendors and suppliers that provide essential goods and

services for the Debtors' operations.  Because of the essential nature of these goods and services, and the fact that most are single-source suppliers and/or are pre-qualified as meeting specific testing and other standards, any disruption or delay related to the provision of goods and services from these parties could have significant negative impacts on the Debtors' operations.  The relief requested in this motion is therefore intended to prevent any such disruption, which would cause immediate harm to the Debtors and their estates.

127.    ***Motion to Authorize Payment of Prepetition Claims of Foreign Vendors.***  By this Motion, the Debtors seek authority to pay the prepetition claims of certain foreign vendors, suppliers, and service providers up to a maximum amount of $600,000.  Due to the global nature of the Debtors' business operations, the Debtors regularly incur obligations to foreign vendors, service providers, and independent contractors around the world.   In particular, the Debtors source critical components and other goods from foreign vendors and rely on foreign service providers to, among other things, operate their international business and provide seismic equipment and geoscience services to their clients.  The goods and services these parties provide are critical to the continued operation of the Debtors' business.

128.    If, however, the Debtors fail to pay prepetition amounts that are owed to their foreign creditors, those parties could place the Debtors at risk of asset seizures, lien filings, and other "self-help" remedies by the foreign creditors in foreign jurisdictions where the Debtors' ability to enforce the automatic stay under section 362 of the Bankruptcy Code may be limited. Certain of the foreign creditors may also lack minimum contacts with the United States and therefore I understand that they are not likely to be effectively subject to the jurisdiction of the Court or provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations.  The relief requested in this motion is therefore intended to prevent any such

disruption to the business caused by this type of action by foreign creditors, which would cause immediate harm to the Debtors and their estates.

129.    ***Motion to Authorize Payment of Prepetition Claims of Lien Claimants.*** By this Motion, the Debtors seek authority to pay the prepetition amounts owed to parties who may be able to assert liens on the Debtors' assets in respect of certain shipping, logistics, and other services provided to the Debtors by such parties up to an aggregate amount of $700,000.   The Debtors, particularly those involved in the data acquisition and equipment manufacturing business lines, rely on a number of domestic and foreign commercial shippers to transport goods between the Debtors' businesses and to transport materials, products, and supplies to and from the Debtors' customers and vendors.   These Debtors also routinely rely on warehousemen to repair, process, and store goods necessary to the Debtors' business and conduct business with a number of third-party mechanics and materialmen who perform services for the Debtors – often on the third-party's premises – that are integral to the Debtors' businesses.

130.    In the event that the Debtors do not pay these parties for the prepetition amounts they are owed, these parties may refuse to release goods of the Debtors that are in their control and possession.   Moreover, I understand that, pursuant to applicable law, these parties may hold possessory liens in the Debtors' property.   As a result, the Debtors' operations could suffer immediate and irreparable harm because they would be unable to use the machinery, equipment, and inventory in their daily operations or deliver goods en route to their customers.   In contrast, prompt and continued payment to these parties will provide for the uninterrupted use and delivery of goods and, in turn, the smooth continuation of the Debtors' operations.

## V.  Information Required by Local Rule 1007-2

131.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

132.    Pursuant to Local Rule 1007-2(a)(3), Schedule 1 hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date.

133.    Pursuant to Local Rule 1007-2(a)(4), Schedule 2 hereto lists the holders of the Debtors' 30 largest unsecured claims on a consolidated basis, excluding claims of insiders.

134.    Pursuant to Local Rule 1008-2(a)(5), Schedule 3 hereto lists the holders of the four largest secured claims against the Debtors on a consolidated basis.

135.    Pursuant to Local Rule 1007-2(a)(6), Schedule 4 hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

136.    Pursuant to Local Rule 1007-2(a)(7), Schedule 5 hereto provides information regarding the number and classes of shares of stock, debentures, and other securities of the Debtors that are publicly held.

137.    Pursuant to Local Rule 1007-2(a)(8), Schedule 6 hereto provides a list of all of the Debtors' property not in the Debtors' possession.

138.    Pursuant to Local Rule 1007-2(a)(9), Schedule 7 hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

139.    Pursuant to Local Rule 1007(a)(10), Schedule 8 hereto provides the location of the Debtors' substantial assets and their books and records.

140.    Pursuant to Local Rule 1007-2(a)(11), Schedule 9 hereto provides information regarding each action or proceeding against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

141.   Pursuant to Local Rule 1007-2(a)(12), <u>Schedule 10</u> hereto provides information regarding the Debtors' senior management.

142.   Pursuant to Local Rule 1007-2(b)(1)-(2)(a), <u>Schedule 11</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officer, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the 30-day period following the filing of these Chapter 11 Cases as the Debtors intend to continue to operate their business.

143.   Pursuant to Local Rule 1007-2(b)(3), <u>Schedule 12</u> hereto provides, for the 30-day period following the filing of these Chapter 11 Cases, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

## VI. <u>Conclusion</u>

In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.


_/s/ Beatrice Place-Faget_
Beatrice Place-Faget
Group General Counsel

## **EXHIBIT A**

### **Organization Chart**

# CGG Simplified Structure Chart

- Borrower under French Revolver
- Borrower under US Revolver and US Term Loan
- Guarantor under French Revolver
- Guarantor under US Revolver and US Term Loan
- Guarantor under High Yield Bonds

- Shares pledged under French Revolver, US Revolver and US Term Loan
- Receivables under certain rental agreements pledged under French Revolver, US Revolver and US Term Loan
- Streamers, other marine equipment and all movable assets pledged under French Revolver, US Revolver and US Term Loan
- Grantors under the US Pledge and Security Agreements (general asset security) dated July 18, 2013 in connection with the US RCF, August 8, 2013 in connection with the French RCF and December 22, 2015 in connection with the TLB
- Intragroup receivables pledged under French Revolver, US Revolver and US Term Loan

US:11268498_2



CGG (France)

CGG HOLDING B.V. (The Netherlands)

**APAC REGION**

COGVEICRAS SERVICES (B) SDN BHD (Brunei)

CGG TECHNOLOGY SERVICES (BEIJING) CO. LTD (China)

CGG GEOSCIENCE (BEIJING) LTD (China)

CGG SERVICES (MALAYSIA) SDN BHD (Malaysia)

CGG JASON (MALAYSIA) SDN. BHD. (Malaysia)

PTSC CGGV GEOPHYSICAL SURVEY COMPANY LIMITED (Vietnam)

CGG SERVICES INDIA PRIVATE LTD (India)

CGG SERVICES (AUSTRALIA) PTY. LTD. (Australia)

CGG GROUND GEOPHYSICS (AUSTRALIA) PTY. LTD. (Australia)

CGG AVIATION (AUSTRALIA) PTY. LTD. (Australia)

CGG SERVICES (SINGAPORE) PTE LTD (Singapore)

CGG SERVICES (MYANMAR) CO. LTD (Myanmar)

P.T. ELNUSA CGGVERITAS SEISMIC (Indonesia)

P.T. CGG SERVICES INDONESIA (Indonesia)

ARGAS (Saudi Arabia)

ARDISEIS FZCO (United Arab Emirates)

SEABED GEOSOLUTIONS B.V. (The Netherlands)

CGG SERVICES (NL) B.V. (The Netherlands)

CGG MARINE B.V. (The Netherlands)

CGG DATA MANAGEMENT (NETHERLANDS) B.V. (The Netherlands)

CGG HOLDING SOUTH AFRICA (PTY.) LTD. (South Africa)

CGG AIRBORNE SURVEY (PTY.) LTD. (South Africa)

CGG VOSTOK (Russia)

ARCTIC GEOPHYSICAL EXPLORATION LLC (Russia)

SEVOTEAM ZAO (Russia)

EPIGEON (NIGERIA) LTD (Nigeria)

VERITAS GEOPHYSICAL (NIGERIA) LTD (Nigeria)

COMPAGNIE GENERALE DE GEOPHYSIQUE (NIGERIA) LIMITED (Nigeria)

CGG SERVICES SAS (France)

Geo Ship Management Services sas (France)

CGG SERVICES (GABON) (Gabon)

CGG SERVICES (NORWAY) AS (Norway)

CGG EIDESVIK SHIP MANAGEMENT AS (Norway)

CGG MARINE RESOURCES NORGE AS (Norway)

EXPLORATION INVESTMENT RESOURCES II AS (Norway)

GLOBAL SEISMIC SHIPPING AS (Norway)

OCEANIC SEISMIC VESSELS AS (Norway)

EIDESVIK SEISMIC VESSELS AS (Norway)

CGG GEO VESSELS AS (Norway)

WAVEFIELD INSEIS AS (Norway)

EXPLORATION VESSEL RESOURCES II AS (Norway)

**LAM REGION**

LASA Prospecções SA (Brazil)

CBG GEOFISICA LTDA (Brazil)

CGG DO BRASIL PARTICIPAÇÕES (Brazil)

TECNICA BRASILEIRA DE GEOFISICA LTDA (Brazil)

VERITAS DO BRASIL LTDA (Brazil)

EXGEO C.A. (Venezuela)

VERITAS DGC LAND GUATEMALA SA (Guatemala)

VERITAS GEOPHYSICAL (CHILE) SA (Chile)

CORPORACIONES GEOFISICAS VERITAS GEOFISICAS CHILE LTA (Chile)

CGG MEXICO, S.A. DE C.V. (Mexico)

CGG EXPLO SARL (France)

GOSCO Geoscience Services Limited (Ghana)

CGG GEOSCIENCE GMBH (Switzerland)

CGG DATA SERVICES (Switzerland)

CGG INTERNATIONAL SA (Switzerland)

CGG ELECTRO MAGNETICS (GERMANY) GMBH (Germany)

GRIAL TECH S.R.L. (Italy)

CGG ELECTROMAGNETICS (ITALY) SRL (Italy)

RESERVOIR EVALUATION SERVICES LLP (Kazakhstan)

GEOEXPLO LLP (Kazakhstan)

VERITAS CASPIAN LLP (Kazakhstan)

GEOMAR SAS (France)

GEONOVACION CORPORATIVA S. DE R.L. DE C.V. (Mexico)

CGG GEOSCIENCE MEXICO S.A. DE C.V. (Mexico)

VITZEL S.A. DE C.V. (Mexico)

**NAM REGION**

CGG HOLDING (U.S.) INC. (USA)

CGG MARINE (U.S.) INC. (USA)

CGG SERVICES (U.S.) INC. (USA)

VERITAS GEOPHYSICAL III (Cayman Islands)

VERITAS GEOPHYSICAL IV (Cayman Islands)

VIKING MARITIME INC. (USA)

ALITHEIA RESOURCES INC. (USA)

CGG LAND (U.S.) INC. (USA)

GEOKINETICS INC. (USA)

CGG SERVICES (CANADA) INC. (Canada)

VERI KLUG GEOPHYSICAL LTD (Canada)

VIAMORIA GEOPHYSICAL LTD (Canada)

CGG CANADA SERVICES LTD (Canada)

CGG AVIATION (CANADA) LIMITED (Canada)

**EQUIPMENT DIVISION**

RESERVOIR IMAGING LTD (UK)

SERCEL HOLDING SAS (France)

SERCEL SAS (France)

SERCEL INC. (USA)

SERCEL AUSTRALIA PTY. LTD (Australia)

SERCEL CANADA LTD (Canada)

STK CORP. (USA)

GEOSENSOR CORP. (USA)

INTERACTIVE NETWORK TECHNOLOGIES INC. (USA)

SERCEL-GRC (USA)

SERCEL ENGLAND LTD (UK)

SERCEL SINGAPORE PRIVATE LTD (Singapore)

(OOO) SEISMIC SUPPORT SERVICES (Russia)

SERCEL (BEIJING) TECHNOLOGICAL SERVICES CO. LTD(China)

HEBEI SERCEL-JUNFENG GEOPHYSICAL PROSPECTING EQUIPMENT CO. LTD. (China)

XIAN SERCEL (China)

DE REGT MARINE CABLES B.V. (The Netherlands)

DE REGT GERMANY GMBH (Germany)

GRC SINGAPORE LLC (USA)

GRC MEXICO LLC (USA)

GRC DUBAI LLC (USA)

GEOPHYSICAL RESEARCH MEXICO S.A. DE C.V. (MEXICO)

GEOPHYSICAL RESEARCH CORPORATION (Dubai) (USA)

**EAME REGION**

ROBERTSON (UK) LIMITED (United Kingdom)

ROBERTSON RESEARCH INTERNATIONAL LIMITED (United Kingdom)

ROBERTSON GEOSPEC INTERNATIONAL LIMITED (United Kingdom)

PETROLEUM EDGE LIMITED (United Kingdom)

VERITAS GEOPHYSICAL LIMITED (UK)

VERITAS DGC LTD (UK)

CGG DATA MANAGEMENT (UK) LIMITED (United Kingdom)

CGG HOLDING (U.K.) LIMITED (UK)

CGG HOLDING II (UK) LIMITED (UK)

CGG HOLDING IV (UK) LIMITED (UK)

CGG HOLDING III (UK) LIMITED (UK)
(all shares owned by CGG Holding IV (UK) Limited have been pledged)

CGG SERVICES (UK) LTD (UK)

Companies to be liquidated

G   Companies that are guarantors/obligors under our credit agreements and/or senior notes

XXXX   Companies whose shares are pledged under our credit agreements

## **EXHIBIT B**

### **List of First Day Motions**

| | | **List of First Day Motions** |
|---|---|---|
| | 1. | *Joint Administration Motion* |
| | 2. | *Schedules and Statements Extension Motion* |
| | 3. | *Waiver of Notice Rules and Motion* |
| | 4. | *Automatic Stay Motion* |
| | 5. | *Cash Collateral Motion* |
| | 6. | *Cash Management Motion* |
| | 7. | *Wages Motion* |
| | 8. | *Insurance Motion* |
| | 9. | *Taxes Motion* |
| | 10. | *Critical Vendor Motion* |
| | 11. | *Foreign Vendors Motion* |
| | 12. | *Possessory Lien Motion* |
| | 13. | *Notice and Claims Agent Motion* |
| | 14. | *Foreign Representative Motion* |

## Schedule 1

### Committees

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, the following committees have been formed prior to the Petition Date:

| Type of Committee | Committee Members[1] | Counsel for Committee |
|---|---|---|
| Ad Hoc Secured Lender Committee | Och Ziff<br><br>Goldman Sachs International<br><br>Makuria Investment Management (UK) LLP<br><br>Certain funds and accounts, advised by T. Rowe Price Associates, Inc., severally not jointly. | Kirkland & Ellis LLP<br>30 St Mary Axe<br>London EC3A 8AF<br>United Kingdom<br>Attn: Kon Asimacopolous<br><br>and<br><br>601 Lexington Avenue, New York, NY 10022<br>Attn: Stephen Hessler<br><br><br>De Pardieu Brocas Maffei<br>57 avenue d'Iéna - CS 11610<br>75773 Paris Cedex 16<br>France<br>Attn: Joanna Gumpelson |
| Ad Hoc Committee of Holders of High Yield Bonds | Alden Global Capital<br><br>Attestor Capital LLP<br><br>Boussard & Gavaudan Asset Management, LP<br><br>Contrarian Capital Management, L.L.C.<br><br>Aurelius Capital Capital Management, LP<br><br>Third Point LLC | Willkie Farr & Gallagher LLP<br>21-23 rue de la Ville l'Evêque<br>75008 Paris<br>France<br>Attn: Lionel Spizzichino<br><br>and<br><br>787 Seventh Avenue<br>New York, NY 10019-6099<br>Attn: John Longmire & Weston Eguchi |

---

[1] The members of the committees set forth herein are to the best of the Debtors' knowledge and are based on information provided to the Debtors by counsel to the various committees.

| Type of Committee | Committee Members[1] | Counsel for Committee |
|---|---|---|
| Ad Hoc Committee of Holders of Convertible Notes | Administrative representatives<br><br>Jean Gatty, 10 avenue George V, 75008 Paris,<br><br>Olivier Dousset, 20 rue de la Cure, 75016 Paris, | Darrois Villey Maillot Brochier<br>69 Avenue Victor Hugo<br>75116 Paris<br>France<br>Attn: François Kopf |
| Ad Hoc Committee of Participating Shareholders | Jean Paul Bize<br><br>Bpifrance & IFP SA | BDGS Associés AARPI<br>51 Rue Francois 1er<br>75008 Paris<br>Attn: Anne-Sophie Noury |

## Schedule 2

# CONSOLIDATED LIST OF 30 LARGEST UNSECURED CREDITORS
## (EXCLUDING INSIDERS)[1]

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date ($'s in 000s) |
|---|---|---|---|---|---|
| 1 | **Bank of New York Mellon - 2021 Notes** 101 Barclay Street, 7E New York, NY  10286 United States | Lesley Daley (888) 204-3933 lesley.daley@bnymellon.com | 6.5% Senior Unsecured Notes due 2021 issued by CGG S.A. as borrower and guaranteed by each of the Debtors | - | $698,780 |
| 2 | **Bank of New York Mellon - 2020 Notes** 101 Barclay Street, 7E New York, NY  10286 United States | Lesley Daley (888) 204-3933 lesley.daley@bnymellon.com | 5.875% Senior Unsecured Notes due 2020 issued by CGG S.A. as borrower and guaranteed by each of the Debtors | - | $464,295 |
| 3 | **Bank of New York Mellon - 2022 Notes** 101 Barclay Street, 7E New York, NY 10286 United States | Lesley Daley (888) 204-3933 lesley.daley@bnymellon.Com | 6.875% Senior Unsecured Notes due 2022 issued by CGG S.A. as borrower and guaranteed by each of the Debtors | - | $431,657 |
| 4 | **Brunei Shell Petroleum Company SDN BHD** Jalan Utara Panaga Brunei | Fabian Ernst 673 337 2037 fabian.ernst@shell.com | Guarantee | Contingent | $20,194 |
| 5 | **Credit Agricole Corporate & Investment Bank** 9, Quai du Président Paul Doumer Paris La Defense Cdx  92920 France | Marine Le Clainche Trouillet +33 02 49 79 05 06 Marine.Leclainche-Trouillet@Ca-Atlantique-Vendee.Fr | Letter of Credit | Contingent | $9,053 |

---

[1]    The information provided herein shall not constitute an admission of liability by, nor is it binding on, any of the Debtors.  All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date ($'s in 000s) |
|---|---|---|---|---|---|
| 6 | **U.S. Specialty Insurance Company** 13403 Northwest Freeway Houston, TX 77040 United States | Edwin H. Frank, III (713) 355-3100 efrank@indemco.com | Surety | Contingent | $2,045 |
| 7 | **The Welsh Ministers** Crown Buildings Cardiff  CF10 3NQ Great Britain | Jeff Godfrey Fax: 029 2082 3834 Email Not Available | Guarantee | Contingent | $628 |
| 8 | **Travelers Casualty and Surety Company** 770 Pennsylvania Drive Exton, PA  19341 United States | Bonnie S. Kolibas (610) 458-2235 bkolibas@travelers.com | Surety | Contingent | $500 |
| 9 | **Sea Support Ventures LLC** 14637 East Main Cut Off, LA 70345 United States | Randy Adams (985) 632-6000 Email Not Available | Contract Counter Party | Contingent, Unliquidated | $335 |
| 10 | **Fedco Batteries** 1363 Capital Drive Fond Du Lac, WI  54937 United States | Weldon Peterson (920) 238-3245 wpeterson@fedcobatteries.com | Trade | - | $334 |
| 11 | **FS Precision Tech Co., LLC** 3025 East Victoria Street Compton, CA  90221 United States | Vimal Parikh (310) 638-2429 vimal.parikh@fs-precision.com | Trade | - | $184 |
| 12 | **American Alternative Insurance Corporation** 555 College Road East Princeton, NJ  08540-6616 United States | Susan Allen (281) 821-3995 susan.allen@ariesww.com | Surety | Contingent | $150 |
| 13 | **Hmr Mikromekanikk** Toppemyr 3 Mjolkeraaen 10 5136 NO | Irene Grindheim 004755199800 irene.grindheim@hmr.no | Trade | - | $121 |
| 14 | **Owens Machine & Tool Co.** 561 North Cowan, #201 Lewisville, TX  75057 United States | Candace Chatman (972) 219-2354 candace@owensmachine.com | Trade | - | $72 |
| 15 | **Future Electronics Corporation** 3255 Paysphere Circle Chicago, IL  60674 United States | Gabriel Paterson (978) 779-3124 gabriel.paterson@future.ca | Trade | - | $70 |
| 16 | **Greeneffecient Inc** 4501 Magnolia Cove Drive, Suite 210 Kingwood, TX  77345 United States | Rick Walker (281) 227-5732 rickwalker@greenefficient.com | Trade | - | $63 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date ($'s in 000s) |
|---|---|---|---|---|---|
| 17 | **Arw Transformers Ltd** Units 3-4, Block 1 Glasgow, Renfrewshire Re G46 8JF Great Britain | Mhairi Mcvitie + 44(0)141-638-103 mhairi.ncvitie@arwtransformers .co.uk | Trade | - | $59 |
| 18 | **Wireco Worldgroup Inc.** P.O. Box 844341 Dallas, TX  75284-4341 United States | Renata Foley (281) 633-5317 renatafoley@wirecowolrdgroup. com | Trade | - | $59 |
| 19 | **Katalyst Data Management LLC** 10311 Westpark Drive Houston, TX  77042 United States | Steve Darnell (281) 529-3202 steve.darnell@katalystdm.com | Trade | - | $58 |
| 20 | **TDB, Inc.** 10010 Tanner Road Houston, TX  77041 United States | Judy Sullivan (713) 690-1452 judy@tdbinc.net | Trade | - | $56 |
| 21 | **Sodexo, Inc. & Affiliates** P. O. Box 536922 Atlanta, GA  30353-6922 United States | Christy Lynne (713) 515-8463 christy.lynne@sodexo.com | Trade | - | $53 |
| 22 | **Indalo International Ltd.** Westcott Lane Exeter, 0 EX5 2LL Great Britain | Joe Aldridge + 44 1392 204 304 joe@indalo-uk.com | Trade | - | $47 |
| 23 | **Digi-Key Corporation** P.O. Box 250 Thief River Falls, MN 56701-0250 United States | Customer Service (800) 858-9616 customer.service@digi-key.com | Trade | - | $43 |
| 24 | **Accel International** 508 North Colony Street Meriden, CT  06450 United States | Melissa St. Pierre (203) 237-2700 mstpierre@accelinternational .com | Trade | - | $41 |
| 25 | **D & J Electronics** P. O. Box 330220 Tulsa, OK  74133 United States | Dennis Phillipo (918) 906-3951 dennis951@cox.net | Trade | - | $39 |
| 26 | **The Nut Place, Inc** 6605 North Gessner Houston, TX  77040 United States | Vernon Achgill (713) 462-3147 vernon@thenutplace.com | Trade | - | $38 |
| 27 | **Krayden Inc** 1491 West 124th Avenue Westminster, CO  80234 United States | Rachel Harris (800) 448-0406 remit@krayden.com | Trade | - | $38 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (e.g., trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim as of the Petition Date ($'s in 000s) |
|---|---|---|---|---|---|
| 28 | **WS Manufacturing LLC** P. O. Box 781 Oologah, TX 74053 United States | Shiley Pierson (918) 443-2773 metalcutter49@hotmail.com | Trade | - | $35 |
| 29 | **Concept Systems Ltd.** 1 Logie Mill Edinburgh, EH7 4HG Scotland | Rod Leger (504) 726-2626 rob.leger@iongeo.com | Trade | - | $35 |
| 30 | **Hisco Inc** P.O. Box 890811 Charlotte, NC 28289-0811 United States | Robin Winningham (713) 934-1620 arctx@hiscoinc.com | Trade | - | $34 |

## Schedule 3

## Holders of Four Largest Secured Claims Against the Debtors on a Consolidated Basis[1]

Pursuant to Local Rule 1007-2(a)(5), to the best of the Debtors' knowledge and belief, the following is a list of creditors holding the four (4) largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Creditor | Contact, Mailing Address, Telephone/Fax Number, Email | Amount of Claim | Description of Security Interest | Estimate Value of Collateral | Whether Claim or Lien is Disputed |
|---|---|---|---|---|---|
| Credit Suisse AG (as collateral agent) and Wilmington Trust, National Association (as administrative agent) under that certain **Term Loan Credit Agreement**, dated November 19, 2015, by and among, *inter alia*, CGG Holding (US) Inc., as borrower, and the guarantors party thereto | Credit Suisse AG Eleven Madison Avenue New York, NY 10010 Attn: Agency Manager Attn: Sean Portrait Fax No. (212) 322-2291 Email: agency.loanops@credit-suisse.com  Wilmington Trust, National Association 50 South Sixth Street Suite 1290 Minneapolis, MN 55402 Attn: Jeffery Rose Fax No.: (612) 217-5651 E-mail: jrose@wilmingtontrust.com | $342,586,654 | Varies by country, but generally all assets, including cash, third-party receivables, intragroup receivables, notes, and agreements, rental agreements, pledged shares of certain subsidiaries, equipment, general intangibles, instruments, inventory, investment property, letter-of-credit rights, commercial tort claims, books and records pertaining to article 9 collateral, and the proceeds and products from the foregoing. | Undetermined | No |

---

[1]    The information contained herein shall not constitute an admission of liability, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor | Contact, Mailing Address, Telephone/Fax Number, Email | Amount of Claim | Description of Security Interest | Estimate Value of Collateral | Whether Claim or Lien is Disputed |
|---|---|---|---|---|---|
| Wilmington Trust (London) Limited, as administration agent under that certain **Multicurrency Revolving Facility Agreement**, dated February 4, 2016, as amended, restated, modified or supplemented from time to time, among, *inter alia*, CGG S.A. as borrower and the guarantors party thereto | Wilmington Trust (London) Limited<br><br>Third Floor, 1 King's Arms Yard,<br><br>London EC2R 7AF<br>Company Number: 05650152 | $303,625,664 | Varies by country, but generally all assets, including cash, third-party receivables, intragroup receivables, notes, and agreements, rental agreements, pledged shares of certain subsidiaries, equipment, general intangibles, instruments, inventory, investment property, letter-of-credit rights, commercial tort claims, books and records pertaining to article 9 collateral, and the proceeds and products from the foregoing. | Undetermined | No |
| Credit Suisse AG, as administrative agent and collateral agent under that certain **Amended and Restated Credit Agreement**, dated February 4, 2016, as amended, by and among, *inter alia*, CGG Holding (US) Inc., as borrower, and the guarantors party thereto | Credit Suisse AG<br>Eleven Madison Avenue New York, NY 10010<br>Attn: Agency Manager<br>Attn: Sean Portrait<br>Fax No. (212) 322-2291 Email: agency.loanops@credit-suisse.com | $162,858,832 | Varies by country, but generally all assets, including cash, third-party receivables, intragroup receivables, notes, and agreements, rental agreements, pledged shares of certain subsidiaries, equipment, general intangibles, instruments, inventory, investment property, letter-of-credit rights, commercial tort claims, books and records pertaining to article 9 collateral, and the proceeds and products from the foregoing. | Undetermined | No |
| Credit Industriel et Commercial, both agent and borrower, under loan agreement dated Dec. 19th 2013 and amended on Sept. 29th 2014 | Jean-Philippe Guillon<br>CIC<br>4, rue Gaillon<br>75002 Paris<br>France | $1,580,454 | 105 sections of Sercel Sentinel Streamer systems manufactured H1 2014. Affixed to vessels registered to CGG Marine B.V. | Undetermined | No |

## Schedule 4

## Summary of the Debtors' Assets and Liabilities

The amounts reflected below were derived by totalling the indicated amounts reflected in each Debtor's books and records. No adjustments have been included for elimination or consolidation items.

**Balance Sheets - Debtors**
**At March 31, 2017**
**Rounded to millions (USD)**

| Assets | | Liabilities | |
|---|---:|---|---:|
| | | **Current Liabilities** | |
| Cash and cash equivalents | 21 | Bank overdrafts | 0 |
| Trade accounts and notes receivable, net | 102 | Current portion of financial debt | 5 |
| Inventories and work-in-progress, net | 50 | Trade accounts and notes payables | 25 |
| Income tax assets | 36 | Accrued payroll costs | 15 |
| Other current assets, net | 12 | Income taxes payable | 1 |
| Assets held for sale, net | - | Advance billings to customers | 2 |
| Intercompany receivables (short term) | 1,138 | Provisions—current portion | 2 |
| | | Other current liabilities | 13 |
| **Total Current Assets** | **1,359** | Intercompany payables (short term) | 1,021 |
| | | | |
| **Non-current Assets** | | **Total Current Liabilities** | **1,084** |
| Property, plant and equipment, net | 208 | | |
| Goodwill, net | 755 | **Non-current Liabilities** | |
| Intangible assets, net | 429 | Deferred tax liabilities | 155 |
| Deferred tax assets | 121 | Provisions—non-current portion | 2 |
| Investments and other financial assets, net | 18 | Financial debt | 490 |
| Investments in companies | 5,428 | Other non-current liabilities | 8 |
| Intercompany receivables (long term) | 443 | Intercompany payables (long term) | 1,796 |
| **Total Assets** | **8,761** | **Total Liabilities** | **3,535** |
| | | | |
| | | **Equity** | |
| | | Common stock | 1,144 |
| | | Additional paid-in capital | 5,659 |
| | | Retained earnings | (1,993) |
| | | Other Reserves | 508 |
| | | Treasury shares | - |
| | | Net income (loss) for the period attributable to | (91) |
| | | Cumulative income and expense recognized dir | - |
| | | Cumulative translation adjustment | 0 |
| | | **Equity attributable to owners** | **5,226** |
| | | Non-controlling interest | - |
| | | **Total Equity** | **5,226** |
| | | **Total Liabilities + Shareholder's Equity** | **8,761** |

## <u>Schedule 5</u>

**The Debtors' Securities**

Pursuant to Local Rule 1007-2(a)(7), the Debtors do not have any publicly traded stock, debentures, or securities.

———

## Schedule 6

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

One of the Debtors (CGG Marine B.V.) is the owner of the seismic streamers used by certain non-Debtor affiliates of the Debtors that operate seismic vessels. The streamers are in the possession of the non-Debtor affiliates under a formal rental agreement. The current locations of these vessels are:

- Geo Coral – off the coast of Ireland
- Oceanic Endeavour – South Atlantic Ocean, off the west coast of Nigeria
- Oceanic Sirius – Gulf of Mexico
- Oceanic Vega – Gulf of Mexico
- Oceanic Champion – South Atlantic Ocean, off the east coast of Brazil

Additionally, The Debtors have leased 60 Streamers to Polarcus Naila AS, Wikborg, Rein & Co., Kronprinsesse Marthas pl. 1, 0160, Oslo, Norway.

Some of the tapes that contain the Debtors' geo data are stored at the following off-site storage facilities managed by a third party:

- Ovation Data Services - 14199 Westfair E Dr, Houston, TX 77041
- Midcon Data Services - 10200 Harwin Dr, Houston, TX 77036
- Data Logic Services - 1821 West Sam Houston Pkwy N, Houston, TX 77043
- Underground Vaults & Storage – 3500 E Ave G, Hutchinson, KS  67501

Additionally, in the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, vendors, shippers, common carriers, materialmen, distributors, warehousemen, service providers or custodians, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property and their addresses and telephone numbers would be impractical.

## Schedule 7

## Debtors' Premises

Pursuant to Local Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| CGG Canada Services Ltd. | 3675-63rd Avenue NE<br>Calgary, AB T3J 5K1<br>Canada | Leased |
| CGG Canada Services Ltd. | 100 Comet Private<br>Ottawa, ON K1G 6C9<br>Canada | Leased |
| CGG Canada Services Ltd. | 9 Gurdwara Road, Suite 110<br>Ottawa, ON K2E 7X6<br>Canada | Leased |
| CGG Canada Services Ltd. | 2505 Meadowvale Boulevard<br>Mississauga, ON L5N 5S2<br>Canada | Leased |
| CGG Canada Services Ltd. | 2660 Meadowvale Boulevard<br>Unit 10<br>Mississauga, ON L5N M6M<br>Canada | Leased |
| CGG Services (U.S.) Inc. | 10300 Town Park Drive<br>Houston, TX 77072 | Leased |
| CGG Services (U.S.) Inc. | 11102 West Airport<br>Suites 200-300<br>Stafford, TX 77477 | Leased |
| CGG Services (U.S.) Inc. | 10425 Okanella, Suite 100<br>Houston, TX 77041 | Leased |
| CGG Services (U.S.) Inc. | 1600 Wharf B<br>Galveston TX 77550 | Leased |
| CGG Services (U.S.) Inc. | 740 East Campbell Road<br>Suite 620<br>Richardson, TX 75081 | Leased |
| CGG Services (U.S.) Inc. | 11001 West 120th Avenue<br>Suite 110<br>Broomfield, CO 80021 | Leased |

---

[1]   The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

| Debtor/Lessee | Address | Type of Interest[1] |
|---|---|---|
| CGG Services (U.S.) Inc. | 3311 S US Hwy 77<br>Schulenburg TX 78956 | Owned |
| CGG Marine B.V. | Columbusstraat 25<br>3165AC Rotterdam-Albrandswaard<br>The Netherlands | Leased |
| CGG Holding B.V. | Bordewijklaan 58, 2591XR, The Hague<br>Netherlands | Leased |
| Sercel Inc. | 10570 Bissonnett Street<br>Suite 190<br>Houston, TX 77099 | Leased |
| Sercel Inc. | 10570 Kinghurst Street<br>Houston, TX 77099 | Leased |
| Sercel Inc. | 32209 Hoover Lane<br>Waller, TX 77484 | Leased |
| Sercel Canada Ltd. | #6 4393 14ST NE<br>Calgary AB T2E 7A9<br>Canada | Leased |
| Sercel Inc. | 1101 Arrow Point Drive<br>Cedar Park, TX 78613 | Leased |
| Sercel Inc. | Fallstone Building A<br>10502 Fallstone<br>Houston, TX 77099 | Owned |
| Sercel Inc. | 17150 Park Row<br>Houston, TX 77084 | Owned |
| Sercel Inc. | 17200 Park Row<br>Houston, TX 77084 | Owned |
| Sercel Inc. | 17300 Park Row<br>Houston, TX 77084 | Owned |
| Sercel-GRC Corp. | 6540 East Apache Street<br>Tulsa, OK  74115 | Leased |

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors' substantial physical assets are comprised of:

1.      Seismic streamers, located on 5 seismic vessels operated worldwide by non-Debtor affiliates as described in Schedule 6.

2.      Data Libraries of seismic and other geo data located at the Debtors' U.S. headquarters in Houston, Texas, and offsite at a third-party storage facility as described in Schedule 6.

3.      Manufacturing facilities and related machinery and equipment located in Houston, Texas and Tulsa, Oklahoma.

### Books and Records

The Debtors maintain their books and records on two different information technology systems.  The Oracle system is operated and maintained from the Group's worldwide headquarters located in Massy, France (address 27 Avenue Carnot, 91341 Massy Cedex France). The SAP system is operated and maintained in Nantes, France (address 16 Rue de Bel Air B.P. 30439 44474 Carquefou Cedex France).

Physical records are also maintained at the following locations:

- 10300 Town Park Drive Houston, TX 77072

- 17200 Park Row, Houston, TX 77084

- 6540 East Apache Street, Tulsa, OK 74115

- 2200, 715 - 5th Avenue SW Calgary, AlbertaT2P 2X6, Canada

- 2505 Meadowvale Boulevard, Mississauga, Ontario L5N 5S2, Canada

- Crompton Way, Manor Royal Estate, Crawley, West Sussex RH10 9QN, United Kingdowm

- Lilleakerveien 6A, PO Box 43 Lilleaker, 0216 Oslo, Norway

- Bordewijklaan 58, 2591 XR, The Hague, Netherlands

- 27 Avenue Carnot, 91341 Massy Cedex, France

**<u>Schedule 9</u>**

**Litigation**

     Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge, belief, and understanding, there are no actions or proceedings pending or threatened against the Debtors or their property, as of the Petition Date, where a judgment against the Debtors or a seizure of their property may be imminent.

## Schedule 10[1]

### Senior Management

### Pascal Rouiller

Mr. Pascal Rouiller is Chief Operating Officer of the CGG Group in charge of the Acquisition and Equipment Business Lines and of Risk Management/HSE/Sustainable Development for the Group.  As such he is also the Chief Operating Officer of the Sercel Group of companies, which includes Sercel Inc., Sercel-GRC Corp., and Sercel Canada Ltd., and has served as Chief Executive Officer of Sercel SAS since September 2005, after having served as Chief Operating Officer of the Sercel group since December 1999.  He is a Director and Officer of Sercel Inc. and Sercel (Canada) Ltd.  He is Director of Seabed Geosolutions B.V. (a Dutch company 40% held by the CGG Group). He was an officer of CGG SA from February 2012 to December 2016.

Mr. Rouiller was Vice President of Sercel's Product segment from October 1995 to December 1999 and Vice President for the Asia-Pacific region from May 1992 to September 1995. Mr. Rouiller is Chief Executive Officer of Sercel Holding SAS, Chairman of the Board of Directors of Sercel (Beijing) Technological Services Co. Ltd. and of Sercel Australia Pty. Ltd., Chairman of the Board of Sercel Canada Ltd., Chairman of the Board of Directors of Hebei Sercel Junfeng Geophysical Prospecting Equipment Co. Ltd., Director of Sercel Singapore Private Ltd., Director and Chief Executive Officer of Sercel Inc., and Director of Seabed Geosolutions B.V. (a Dutch company 40% held by the CGG Group).

Mr. Pascal Rouiller is a graduate of the École Centrale de Paris.

### Sophie Zurquiyah

Ms. Sophie Zurquiyah is the Senior Executive Vice President of Geology, Geophysics & Reservoir (GGR) within CGG Services (U.S.) Inc. and is Chief Operating Officer of the CGG Group, which includes CGG SA, CGG Holding B.V., CGG Marine B.V., CGG Holding I (UK) Ltd, CGG Holding II (UK) Ltd, CGG Holding (U.S.) Inc., CGG Services (U.S.) Inc., Alithea Resources Inc., Viking Maritime Inc., CGG Land (U.S.) Inc., CGG Canada Services Ltd., Sercel Inc., Sercel-GRC Corp., Sercel Canada Ltd., CGG Marine Resources Norge AS.

She joined the CGG entities after 21 years in the oilfield services industry, working for Schlumberger in P&L and in positions covering R&D and Operations, in France, the United States and Brazil. Her most recent roles include Chief Information Officer (CIO), President of Data and Consulting Services that provided Processing, Interpretation and Consulting services for most of Schlumberger's business lines, and Vice President of Sustaining Engineering that included all support and improvements to commercial products, services and technologies worldwide.

---

[1]    This schedule includes those key officers with decision making authority for the Debtor entities and excludes those who are officers of CGG S.A.

Sophie is a graduate of the Ecole Centrale de Paris and holds a Master of Science in Numerical Analysis from the Pierre and Marie Curie University (Paris 6), as well as a Master of Science in Aerospace Engineering from the University of Colorado.

## Colin Murdoch

Mr. Colin Murdoch is Executive Vice President of CGG Services (U.S.) Inc., where he directs the operations of the Subsurface Imaging Business Line. He is also an officer of CGG Holding (U.S.) Inc., CGG Land (U.S.) Inc., and Viking Maritime Inc. and a director of Alithea Resources, Viking Maritime Inc., CGG Land (U.S.) Inc., CGG Services (U.S.) Inc., and CGG Holdings (U.S.) Inc. Mr. Murdoch was previously employed by Veritas at the time of its acquisition by CGG.  He has held a variety of senior roles through the evolution of the organization to what it is today, including the roles of Executive Vice President of the U.S. and US and Latin America and Executive Vice President for North America.

Mr. Murdoch began his career in the industry as a Data Processing geophysicist with Seiscom Delta in Dublin, also spending time as an Assistant Party Chief on a field crew in Indonesia. He then joined McKinley Smith, a geological/geophysical consultant based in Ireland, where he was engaged in the interpretation of seismic data and prospect generation. In 1983 he joined Digicon Geophysical Corp. as a Data Processing Manager in Caracas, and after two years he transferred to Houston to run a dedicated processing center for UNOCAL. In 1985, he joined Entropic Geophysical, based in California, as Land Processing manager. In 1987 he returned to Digicon Geophysical, subsequently Veritas, where he held a number of positions in Data Processing including Manager for North and South America. In 1994 he became Vice President of Data Processing & Technology.

Mr. Murdoch is a graduate of Trinity College Dublin, Ireland. He graduated with a BA (mod) with Honors degree in Natural Sciences in 1977.

## Luc Schlumberger

Mr. Luc Schlumberger serves as Executive Vice President of CGG Services (U.S.) Inc., where he directs the operations of the Data Library Multi-Client business line. He is also an officer of CGG Land (U.S.) Inc. and is a member of the Executive Committee of CGG SA, the ultimate parent of the Debtors. Prior to his assignment as the head of the Multi-Client activities worldwide, Mr. Schlumberger led the Latin Americas region in 2009 and 2010, and before, the Processing and Imaging business unit in the Western Hemisphere.

A geologist by background, Mr. Schlumberger obtained a Master's degree in geophysics from Montpellier University – France.

## Arnaud van Goethem

Mr. Arnaud van Goethem is currently Senior Vice President of Sercel GRC. He is also a Director of Sercel-GRC, Director of Hebei Sercel Junfeng in China, Director of De Regt Marine Cables in the Netherlands and in charge of the VSP tools division in France. He has spent his entire career with the Sercel entities since 1978. He has been focused primarily in manufacturing positions including running the Sercel manufacturing organization in Nantes, France, acting as the

managing director of AMG, a Sercel subsidiary in Saint-Gaudens, leading the manufacturing coordination for the Sercel group globally, and serving as Vice President of Manufacturing for Sercel, Inc in Houston.

Mr. Arnaud van Goethem is a graduate of the Engineering school ECAM in France.

### Vince Thielen

Mr. Vincent Thielen has 36 years of experience in the oilfield service industry and has been the Senior Vice President of Finance and Strategy for the Geology, Geophysics & Reservoir (GGR) Division of the CGG entities since the formation of GGR in 2013.  He is an officer and director of CGG Holding (U.S.) Inc., CGG Land (U.S.) Inc., Viking Maritime Inc., Alithea Resources, and CGG Services (U.S.) Inc. Prior to his current positon, he held similar financial positions within the organization and was also the U.S. Geomarket Director.

Prior to Veritas DGC Inc.'s acquisition by CGG, he held positions of Vice President of Business Development (M&A), interim CFO and Corporate Controller.  Before joining Veritas he held numerous positions in finance, operations, technical services and field engineering at Baker Hughes Incorporated.

Mr. Thielen earned a Bachelor of Science in Biology & Chemistry from Pan American University in Edinburg, Texas. He is a Certified Public Accountant, licensed in Texas.

### Chad Meintel

Mr. Chad Meintel is Head of Legal Affairs - North America and Corporate Secretary - North America for Alithea Resources Inc., CGG Land (U.S.) Inc., CGG Holding (U.S.) Inc., CGG Services (U.S.) Inc., CGG Marine (U.S.) Inc. and Viking Maritime Inc.

Mr. Meintel joined the CGG Legal Department as a Senior Lawyer in 2013 before being promoted to his current role in 2015.  Mr. Meintel's legal experience includes various roles in mergers and acquisitions, commercial transactions, corporate governance, finance transactions, labor and employment law, and drafting and developing contracts, policies and procedures. Mr. Meintel began his legal career at Jones Day, and he practiced in the private sector for several years with a focus on commercial transactions, contracts and commercial real estate transactions.

Mr. Meintel holds a Juris Doctor from Texas Tech University School of Law (summa cum laude) and a Bachelor of Arts degree (summa cum laude) from the University of Texas-Arlington. Mr. Meintel is licensed to practice law in Texas.

### Richard Kelley

Richard Kelley has been with Sercel, Inc. in Houston, Texas for 10 years and currently serves as President of Sercel, Inc.  He was previously Vice President – Operations. Mr. Kelley is also a director of Sercel, Inc, Sercel Canada Ltd, Sercel-GRC.

Mr. Kelley previously served as Vice President-Operations for KMT, a Swedish company specializing in water-jetting technologies.   Mr. Kelley also served as Vice-President-

Manufacturing for Uson, a leader in leak detection equipment used in industrial applications where he had responsibility for US and UK manufacturing operations.  From 1997-2004 Mr. Kelley served in a variety of manufacturing roles, up to and including Director of Manufacturing for Varco, now a division of NationalOilwellVarco (NOV).

Mr. Kelley holds a Bachelor of Science in Mechanical Engineering from the University of Texas and a Master of Business Administration from the University of Houston.

### Gregory Paleolog

Mr. Gregory Paleolog is Senior Vice President of the Multi-Physics business line, joining CGG in 2013 as part of the acquisition of the businesses that presently form Multi-Physics.  Before joining CGG, he was the Global Service Line Manager of Airborne Geophysics for Fugro. He has 28 years of experience in the airborne geophysical industry in a variety of operational and management roles.

Mr. Paleolog holds a Bachelor of Science Honors degree in Earth Sciences from Carleton University, Canada

### Eva Rudin

Ms. Eva Rudin is Executive Vice President of Marine Business Line.  She joined CGG in 2009.

Ms. Rudin was Executive Vice President of Global Operational Excellence from 2012 to 2014 and Senior Vice President of Purchasing from 2009 to 2011.  Before joining CGG, she held various positions at Renault.

Ms. Rudin holds a Master of Science, Industrial Engineering from Chalmers University of Technology (Sweden).

### Dr. Peter Whiting

Dr. Whiting is Senior Vice President of Subsurface Imaging business activities in Europe, Africa and the Middle East.  Prior to this position which began in 2014, he held the position of Senior Vice President for Technology in Subsurface Imaging globally.  Trained as an Applied Mathematician / Geophysicist with extensive experience in seismic data processing, his career includes R&D, management of technology development, software development and management of business activities.

Dr. Whiting earned a Doctor of Philosophy in Applied Mathematics from the University of Sydney, a Master of Science in Geophysics from Macquarie University and a Bachelor of Science from University of Sydney.

### Agathe Cottin

Ms. Cottin is the Deputy Group Operations Treasurer.  Prior to this she held the role of Treasury Pooling Manager, Treasury Manager and Treasury Analyst.  Before joining CGG she held various treasury positions at the Alcatel Group in France.

Ms. Cottin holds a Post Graduate Degree in International Finance Management from DESS Management Financier International. Ms. Cottin also holds a Master Degree in Finance and Accounting and Bachelor degree in Economics, both from the Universite Aix-Marseille III in France.

## Beatrice Place-Faget

Ms. Place-Faget is Executive Vice President, General Secretary and Group General Counsel for CGG S.A.  She has served in her current capacities at CGG S.A. since 2012 and has been employed by CGG S.A. since 2002.  In addition, she is also the Managing Director of CGG Holding B.V.

Before joining CGG S.A., Ms. Place-Faget worked as a lawyer for France Cables et Radio (France Telecom Group) from 1995 to 2000 specializing in contracts, M&A and corporate law. She then joined Eridania Beghin Say in 2000 as senior lawyer specialized in corporate law and M&A and became General Counsel for Cerestar, one of the companies resulting from the demerger of Eridania Beghin Say.

Ms. Place-Faget holds a Doctorate in English and U.S. Business Law from Université Paris 1 Pantheon-Sorbonne and a Master in Common Law Studies from Georgetown University Law Center.

## Marianne Lefdal

Ms. Lefdal is the Vice President of Marine Business Development and the Country Manager for CGG in Norway.  Prior to this role she was the Geomarket Director for Norway.  Ms. Lefdal has also held roles including Vice President and Manager of Finance across various areas of the Marine business at CGG over the last eleven years.

Ms. Lefdal holds a degree as Master of Science of Economics and Business Administration (Siviløkonom) from BI Norwegian Business School.

## Schedule 11

**Payroll**

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees**[1] | $7,988,386 |
| **Payments to Officers, Directors and Stockholders**[2] | $349,025 |
| **Payments to Financial and Business Consultants** | $0 |

---

[1]    Amount includes estimated employee wages and salaries, incentive compensation and other various benefits.

[2]    Amount includes estimated employee wages and salaries, incentive compensation and other various benefits.

## Schedule 12

### Cash Receipts and Disbursements,
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petitions, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $45,672,553 |
| **Cash Disbursements** | $35,189,355 |
| **Net Cash Gain** | $10,483,198 |
| **Unpaid Obligations** | $31,483,296 |
| **Uncollected Receivables** | $37,016,612 |