**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                                                              :         Chapter 11

                                                                    :

CGG HOLDING (U.S.) INC., *et al.*,                                  :         Case No. 17-_____ (___)

                                                                    :

Debtors.[1]                                                         :         (Joint Administration Pending)

                                                                    :

------------------------------------------------------------x

## NOTICE OF FILING OF LOCK-UP AGREEMENT

**PLEASE TAKE NOTICE THAT**, as referenced in the *Declaration of Beatrice Place-Faget in Support of Chapter 11 Petitions and First Day Motions Pursuant to Local Bankruptcy Rule 1007-2*, attached hereto as <u>Exhibit A</u> is a copy of the executed Lock-Up Agreement. The Lock-Up Agreement will also be available on the Debtors' case website at *https://cases.primeclerk.com/cgg*.

### *[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: CGG Holding (U.S.) Inc. (6762); CGG Holding B.V. (4673); CGG Marine B.V. (1518); CGG Holding I (UK) Limited (2086); CGG Holding II (UK) Limited (2105); CGG Services (U.S.) Inc. (3790); Alitheia Resources Inc. (5147); Viking Maritime Inc. (7405); CGG Land (U.S.) Inc. (2437); Sercel, Inc. (6603); Sercel-GRC Corp. (1837); Sercel Canada Ltd. (9968); CGG Canada Services Ltd. (4132); and CGG Marine Resources Norge AS (7825). The location of the Debtors' and their non-Debtor affiliates' global corporate headquarters is Tour Maine-Montparnasse 33, Avenue du Maine, B.P. 191, 75755 Paris Cedex 15, France.

Dated:   June 14, 2017
         New York, New York

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP


*/s/ Alan W. Kornberg*
Alan W. Kornberg
Brian S. Hermann
Lauren Shumejda
1285 Avenue of the Americas
New York, New York  10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
akornberg@paulweiss.com
bhermann@paulweiss.com
lshumejda@paulweiss.com

*Proposed Counsel for Debtors and
Debtors in Possession*

# EXHIBIT A

**EXECUTION VERSION**

THIS LOCK-UP AGREEMENT IS NOT, AND SHALL NOT BE DEEMED, AN OFFER WITH RESPECT TO ANY SECURITIES, A SOLICITATION TO TENDER OR EXCHANGE OF ANY OF THE EXISTING BONDS OR EXISTING SHAREHOLDER EQUITY OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.


LOCK-UP AGREEMENT


dated 13 June 2017


CGG S.A.

as the Company

and

THE CALCULATION AGENT


# Linklaters

Ref: L-256673

Linklaters LLP

**Table of Contents**

**Contents**                                                                                      **Page**

1    Definitions and interpretation ........................................................................... 1

2    Effective Date and Accession ........................................................................... 16

3    Relationship with other documents ................................................................. 18

4    Participants' rights and obligations ................................................................. 18

5    General undertakings ....................................................................................... 18

6    Undertakings by the Company and the Obligors ............................................ 25

7    Undertakings by the Participating Secured Lenders ...................................... 30

8    Undertakings by the Participating Bondholders ............................................. 32

9    Limitations on undertakings ........................................................................... 35

10   Committees ...................................................................................................... 37

11   Relevant Counsel ............................................................................................ 41

12   Termination ...................................................................................................... 41

13   Representations ............................................................................................... 46

14   Disclosure of information ................................................................................ 49

15   Publicity ........................................................................................................... 51

16   Specific performance ...................................................................................... 51

17   Further assurance ........................................................................................... 52

18   No solicitation .................................................................................................. 52

19   Notices ............................................................................................................. 52

20   Partial invalidity ............................................................................................... 53

21   Remedies, waivers and hardship ................................................................... 53

22   Amendments and waivers ............................................................................... 54

23   Reservation of rights ....................................................................................... 55

24   Governing law .................................................................................................. 55

25   Settlement Discussions ................................................................................... 55

26   Jurisdiction ....................................................................................................... 56

Schedule 1 The Obligors .......................................................................................... 57

**Schedule 2 Chapter 11 Companies** ............................................................................ **59**

**Schedule 3 The Committees** ..................................................................................... **60**

**Schedule 4 Form of Accession Letter** ...................................................................... **62**

**Schedule 5 Form of Sub-Participant's Letter** ........................................................... **64**

**Schedule 6 Term Sheet** ............................................................................................. **65**

**Schedule 7 Group Structure Chart** .......................................................................... **104**

**Schedule 8 Notice Details** ....................................................................................... **105**

**Schedule 9 Milestones Schedule** ............................................................................ **110**

**Schedule 10 Form of Obligor Accession Letter** ....................................................... **111**

**Schedule 11 SN Private Placement Agreement** ........................................................ **112**

**Schedule 12 Cash Collateral Term Sheet** ................................................................. **113**

THIS AGREEMENT is dated 13 June 2017 and made between:

(1)    CGG S.A., a *société anonyme* incorporated under the laws of France whose registered office address is at Tour Maine Montparnasse, 33 avenue du Maine, 75015 Paris, France and with registration number 969 202 241 RCS Paris as the company (the "**Company**"); and

(2)    LUCID ISSUER SERVICES LIMITED, a company incorporated in England and Wales with registered number 5098454 (the "**Calculation Agent**").

**Background**

(A)    The Company has been in negotiations with the Committees and certain other stakeholders with the objective of reaching an agreement on the terms of a proposed financial restructuring, under the aegis of Maître Hélène Bourbouloux, in her capacity as *mandataire ad hoc* of the Company appointed by order of the President of the Commercial Court of Paris (*Tribunal de commerce de Paris*) dated 27 February 2017.

(B)    The Company and the members of each of the Committees have agreed in principle to the terms of a financial restructuring of the Group as set out in the Term Sheet involving, among other things, partially repaying and converting the Secured Debt into new bonds issued by CGG Holding (U.S.) Inc., the conversion of the principal amount of the Bond Debt into equity interests in the Company and the provision of new money to the Group by way of issuance of new debt and equity instruments.

(C)    The Company and the members of each of the Committees have agreed to enter into this Agreement in order to facilitate the implementation of the Financial Restructuring.

IT IS AGREED as follows:

# 1    Definitions and interpretation

## 1.1    Definitions

In this Agreement:

"**2019 Convertible Bonds**" means the €34,935,569 1.25% convertible bonds issued by the Company pursuant to the 2019 Offer Document.

"**2019 Offer Document**" means the offer document dated 13 November 2012 relating to the 2019 Convertible Bonds.

"**2020 Convertible Bonds**" means the €325,165,550 1.75% convertible bonds issued by the Company pursuant to the 2020 Offer Document.

"**2020 Indenture**" means the New York law indenture dated 23 April 2014 made between the Company as issuer, the Obligors as guarantors and the 2020 Senior Notes Trustee relating to the 2020 Senior Notes as amended from time to time.

"**2020 Offer Document**" means the offer document dated 28 May 2015 relating to the 2020 Convertible Bonds.

"**2020 Senior Notes Trustee**" means the Trustee as such term is defined in the 2020 Indenture.

"**2020 Senior Notes**" means the €400,000,000 5.875% guaranteed senior notes due 2020 issued by the Company pursuant to the 2020 Indenture.

"**2021 Indenture**" means the New York law indenture dated 31 May 2011 made between the Company as issuer, the Obligors as guarantors and the 2021 Senior Notes Trustee relating to the 2021 Senior Notes as amended from time to time.

"**2021 Senior Notes**" means the US$675,625,000 6.5% guaranteed senior notes due 2021 issued by the Company pursuant to the 2021 Indenture.

"**2021 Senior Notes Trustee**" means the Trustee as such term is defined in the 2021 Indenture.

"**2022 Indenture**" means the New York law indenture dated 1 May 2014 made between the Company as issuer, the Obligors as guarantors and the 2022 Senior Notes Trustee relating to the 2022 Senior Notes as amended from time to time.

"**2022 Senior Notes**" means the US$419,636,000 6.875% guaranteed Senior Notes due 2022 issued by the Company pursuant to the 2022 Indenture.

"**2022 Senior Notes Trustee**" means the Trustee as such term is defined in the 2022 Indenture.

"**Accession Letter**" means a document substantially in the form set out in Schedule 4 (*Form of Accession Letter*) or Schedule 5 (*Form of Sub-Participant's Letter*).

"**Ad Hoc Convert Holder Committee**" means the ad hoc committee of convertible bondholders, being the entities listed in Part C of Schedule 3 (*The Ad Hoc Convert Holder Committee*) on the date of this Agreement, subject to any change in the composition of such committee from time to time after the date of this Agreement, and provided that no Convert Holder may be a member of the Ad Hoc Convert Holder Committee if it, or any of its Affiliates, is also a Senior Noteholder, a Secured Lender or a shareholder of the Company.

"**Ad Hoc Convert Holder Committee's Counsel**" means Darrois Villey Maillot Brochier or any successor legal counsel to the Ad Hoc Convert Holder Committee.

"**Ad Hoc Secured Lender Committee**" means the ad hoc committee of secured lenders, being the entities listed in Part A of Schedule 3 (*The Ad Hoc Secured Lender Committee*) on the date of this Agreement, subject to any change in the composition of such committee from time to time after the date of this Agreement.

"**Ad Hoc Secured Lender Committee's Counsel**" means Kirkland & Ellis LLP and De Pardieu Brocas Maffei or any successor legal counsel to the Ad Hoc Secured Lender Committee.

"**Ad Hoc Senior Noteholder Committee**" means the ad hoc committee of Senior Noteholders, being the entities listed in Part B of Schedule 3 (*The Ad Hoc Senior Noteholder Committee*) on the date of this Agreement, subject to any change in the composition of such committee from time to time after the date of this Agreement.

"**Ad Hoc Senior Noteholder Committee's Counsel**" means Willkie Farr & Gallagher LLP and DLA Piper LLP or any successor legal counsel to the Ad Hoc Senior Noteholder Committee.

"**Additional Debt**" means, in relation to any Debt, any money, debt or liability due, owing or incurred under or in connection with:

(a)        any refinancing, deferral or extension of that Debt;

(b)   prior to execution of this Agreement, any further advance which may be made under any document, agreement or instrument supplemental to any relevant document together with any related interest, fees and costs;

(c)   any claim for damages or restitution in the event of rescission of that Debt or otherwise in connection with any relevant document;

(d)   any claim against the Company, any Obligor or other member of the Group flowing from any recovery by the Company, an Obligor or other member of the Group or any liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer of a payment or discharge in respect of that Debt on the grounds of preference or otherwise; and

(e)   any amount (such as post-insolvency interest) which would be included in any of the above but for any discharge, non-provability, unenforceability or non-allowability of the same in any insolvency or other proceedings.

"**Affiliate**" means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company and any Related Fund.

"**Alternative Proposal**" has the meaning given to that term in paragraph (a)(ii) of Clause 6.3 (*Restrictions on the Company and the Obligors*).

"**Approval Motion**" has the meaning given to such term in Clause 6.9 (*Chapter 11 fees motion*).

"**Authorisation**" means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended from time to time.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Bond Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by the Company or any Obligor to any Bondholder under or in connection with any Bond Document (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise) together with any related Additional Debt.

"**Bond Documents**" means the Indentures and the Offer Documents.

"**Bond Trustees**" means the 2020 Senior Notes Trustee, the 2021 Senior Notes Trustee and the 2022 Senior Notes Trustee.

"**Bondholders**" means the Senior Noteholders and the Convert Holders.

"**Bonds**" means the Convertible Bonds and the Senior Notes.

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Paris and New York.

"**Cash Collateral**" has the meaning set forth in section 363(a) of the Bankruptcy Code.

"**Cash Collateral Orders**" means the Interim Cash Collateral Order and the final cash collateral order (on materially the same terms and conditions as those set forth in the Interim Cash Collateral Order and in a form and substance, including with respect to any

amendments or supplements, reasonably acceptable to the Ad Hoc Secured Lender Committee) authorising the Chapter 11 Companies' use of Cash Collateral.

"**Chapter 11 Cases**" means any cases filed under chapter 11 of the Bankruptcy Code by the Chapter 11 Companies to implement the Financial Restructuring.

"**Chapter 11 Companies**" means the members of the Group listed in Schedule 2 (*Chapter 11 Companies*).

"**Chapter 11 Plan**" means any plan of reorganisation filed in the Chapter 11 Cases with respect to the Chapter 11 Companies (including all exhibits, supplements, appendices and schedules thereto), which shall be on terms consistent in all material respects with this Agreement and the SN Private Placement Agreement, as the same may be amended, supplemented or modified from time to time in accordance with the terms and conditions of this Agreement.

"**Chapter 15 Cases**" means any ancillary cases filed by the Company or any Obligor for the recognition of the Safeguard and/or any other process or proceedings that the Company considers is necessary to implement the Financial Restructuring, in each case under chapter 15 of the Bankruptcy Code and the granting of additional relief and assistance in the Bankruptcy Court.

"**Claim**" means all rights, obligations, liabilities and claims, counter-claims, cross-claims, causes or rights of action (whether present or future, whether actual, prospective or contingent) of whatsoever nature and howsoever arising and whether or not presently known or unknown, including, without limitation, any "claim" as such term is defined in section 101(5) of the Bankruptcy Code.

"**Collateral Agent**" has the meaning given to that term in the Intercreditor Agreement.

"**Commitment**" has the meaning given to the term "Subscription Commitment" in the SN Private Placement Agreement.

"**Commitment Funding Event**" means the funding by a Commitment Party of its Commitment in accordance with the terms of the SN Private Placement Agreement.

"**Committee Approval**" means, in relation to any matter or issue:

(a)    in respect of the Ad Hoc Secured Lender Committee, approval by members of the Ad Hoc Secured Lender Committee holding not less than 50.1% of the aggregate principal amount of the Secured Debt held by the Ad Hoc Secured Lender Committee at that time;

(b)    in respect of the Ad Hoc Senior Noteholder Committee, approval by members of the Ad Hoc Senior Noteholder Committee holding not less than 50.1% of the aggregate principal amount of the Senior Note Debt held by the Ad Hoc Senior Noteholder Committee at that time; or

(c)    in respect of the Ad Hoc Convert Holder Committee, solely to the extent the Ad Hoc Convert Holder Committee qualifies as a Committee under the terms of this Agreement, approval by members of the Ad Hoc Convert Holder Committee holding not less than 50.1% of the aggregate principal amount of the Convertible Bond Debt held by the Ad Hoc Convert Holder Committee at that time,

as applicable.

"**Committees**" means (i) the Ad Hoc Secured Lender Committee, (ii) the Ad Hoc Senior Noteholder Committee and (iii), provided that all members of the Ad Hoc Convert Holder

Committee as at the date of this Agreement are and remain from time to time a Participating Convert Holder, the Ad Hoc Convert Holder Committee, and "**Committee**" shall be constructed accordingly.

"**Company's Counsel**" means Linklaters LLP, Weil, Gotshal & Manges LLP, as counsel to the Company, and Paul Weiss, Rifkind, Wharton & Garrison LLP, as counsel to the Chapter 11 Companies, in each case or any successor legal counsel to the Company and its Subsidiaries.

"**Conciliation**" means the proceedings of *conciliation* under articles L.611-4 to L.611-16 of the French *Code de Commerce* in respect of the Company in order to implement and/or consummate the Financial Restructuring.

"**Confidentiality Undertaking**" means a confidentiality undertaking substantially in a recommended form of the Loan Market Association or in any other form agreed by the Company.

"**Convert Holders**" means the respective holders of the Convertible Bonds.

"**Convertible Bonds**" means the 2019 Convertible Bonds and the 2020 Convertible Bonds.

"**Convertible Bond Debt**" means Bond Debt incurred pursuant to the Convertible Bonds.

"**Debt**" means the Secured Debt and the Bond Debt.

"**December 2016 French RCF Waiver Letter**" means the letter from the Company to the Agent (as defined under the French RCF Facility Agreement) dated 22 December 2016 seeking certain waivers under the French RCF Facility Agreement.

"**Disclosure Statement**" means the disclosure statement, including any exhibits, appendices and related documents, for the Chapter 11 Plan, as amended, supplemented or otherwise modified from time to time by the Bankruptcy Court or otherwise, and which shall be on terms consistent in all material respects with this Agreement, and otherwise in form and substance reasonably acceptable to the Company, the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee.

"**DNCA**" means together funds, owned, managed or advised by DNCA Finance (19 place Vendôme, 75001 Paris, France) or DNCA Invest, each of 60 av. JF Kennedy, L-1855 Luxembourg, Luxembourg.

"**Documents**" means the Secured Finance Documents and the Bond Documents.

"**Effective Date**" means the date specified in the notice delivered by the Company under Clause 2.1 (*Effective Date*).

"**End Date**" means the earlier of the Termination Date, the Long-Stop Date and the Restructuring Effective Date.

"**Enforcement Action**" means, unless expressly permitted under the terms of this Agreement, any action of any kind to:

(a)     make a demand in relation to any Debt;

(b)     declare prematurely due and payable or otherwise seek to accelerate payment of all or any part of any Debt, including placing any such indebtedness on demand;

(c)     recover, or demand cash cover in respect of, all or any part of any Debt (including by exercising any set-off, save as required by law, each in accordance with the terms of the applicable Documents);

(d) take any steps to exercise or enforce any right under any guarantee or any right in respect of any Security, in each case granted in relation to (or given in support of) all or any part of any Debt;

(e) petition for (or take or support any other step which may lead to) any corporate action, legal process (including legal proceedings, execution, distress, diligence, or any of the enforcement proceedings provided for in the French *Code des Procédures Civiles d'Exécution*) or other procedure or step being taken to commence insolvency proceedings in respect of any member of the Group; or

(f) sue, claim or institute or continue legal process (including legal proceedings, execution, distress, diligence, or any of the enforcement proceedings provided for in the French *Code des Procédures Civiles d'Exécution*) against any member of the Group.

"**Financial Restructuring**" means the financial restructuring of the Group as set out in the Term Sheet involving, among other things, the partial repayment and conversion of the Secured Debt into new bonds issued by CGG Holding (U.S.) Inc., the conversion in full of the principal amount of the Bond Debt into equity interests in the Company and the provision of new money to the Group by way of issuance of new debt and equity instruments.

"**French RCF Agent**" means the Agent as such term is defined in the French RCF Facility Agreement.

"**French RCF Debt**" means Secured Debt incurred pursuant to the French RCF Facility Agreement.

"**French RCF Facility Agreement**" means the French law multicurrency revolving facility agreement dated 31 July 2013 made between, among others, the Company, certain of the Obligors and the French RCF Agent and as amended from time to time.

"**French RCF Finance Parties**" means the Finance Parties as such term is defined in the French RCF Facility Agreement.

"**French RCF Lenders**" means the Lenders as such term is defined in the French RCF Facility Agreement.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether federal, state, local or foreign, or any agency of such body, or any court or arbitrator (public or private).

"**Group**" means the Company and its Subsidiaries.

"**Group Structure Chart**" means the structure chart of the Group in the form set out in Schedule 7 (*Group Structure Chart*).

"**Holding Company**" means, in relation to a company or corporation, any other company, corporation or other legal entity in respect of which it is a Subsidiary.

"**Indentures**" means the 2020 Indenture, the 2021 Indenture and the 2022 Indenture.

"**Insolvency Event**" means, except as contemplated herein:

(a) the voluntary or involuntary winding-up, liquidation, dissolution, administration or reorganisation (by way of voluntary arrangement, bankruptcy, scheme of arrangement or otherwise) of the Company, any Obligor or any Material Subsidiary including *liquidation judiciaire*, *redressement judiciaire*, *sauvegarde*, *sauvegarde*

*accélérée*, or *sauvegarde financière accélérée* proceedings under *Livre Six* of the French *Code de Commerce*; or

(b)     the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Company, any Obligor or any Material Subsidiary including *liquidateur judiciaire*, *administrateur judiciaire*, *mandataire judiciaire*, *commissaire à l'exécution du plan* or any person appointed as a result of any proceedings described in paragraph (a) above; or

(c)     voluntary or involuntary petitions for relief under the Bankruptcy Code, any state court proceeding or remedy regarding a winding-up, liquidation, assignment for benefit of creditors, or reorganization of the Company, any Obligor, or any Material Subsidiary; or

(d)     the appointment of a trustee, receiver or responsible officer with enlarged powers relating to, among other things, the operation of the business in respect of the Company, any Obligor or any Material Subsidiary in the Chapter 11 Cases or in any other proceedings described in paragraph (c) above, the conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the dismissal of the Chapter 11 Cases or the Chapter 15 Cases by order of the Bankruptcy Court; or

(e)     any analogous procedure or step that is taken in any jurisdiction.

"**Intercreditor Agreement**" means the New York law intercreditor agreement entered into originally on 8 August 2013 and as amended, restated and/or supplemented from time to time (including on 3 November 2015 and 22 December 2015) between, amongst others, the Company, the Obligors and the Secured Agents.

"**Interim Cash Collateral Order**" means the interim order of the Bankruptcy Court authorising the Chapter 11 Companies' use of Cash Collateral, which shall be in a form and substance acceptable to the Ad Hoc Secured Lender Committee acting reasonably and in good faith and which shall be consistent with, and contain all the terms provided in, the cash collateral term sheet attached hereto as Schedule 12 (*Cash Collateral Term Sheet*).

"**Investment Manager**" means any entity that is an investment manager or investment adviser to a Participant.

"**Joint Venture**" means any joint venture entity, whether a company, unincorporated firm, undertaking, joint venture, association, partnership or any other entity.

"**Judicial Reorganisation**" means the entry of a judgment for and the proceedings of *redressement judiciare* under articles L.631-1 to L.632.-4 of the French *Code de Commerce* in respect of the Company in order to implement and consummate the Financial Restructuring.

"**Local Counsel**" means any local counsel appointed by the Ad Hoc Secured Lender Committee's Counsel and/or the Ad Hoc Senior Noteholder Committee's Counsel in connection with the Financial Restructuring (in each case on terms reasonably acceptable to the Company), provided that to the extent practicable and subject to conflict issues there shall be only one firm of lawyers in total per relevant jurisdiction in which the Ad Hoc Secured Lender Committee's Counsel and/or the Ad Hoc Senior Noteholder Committee's Counsel do not practice.

"**Locked-Up Bond Debt**" means the Locked-Up Senior Note Debt and the Locked-Up Convertible Bond Debt.

"**Locked-Up Convertible Bond Debt**" means, in relation to any Participating Convert Holder, the amount set opposite its name under the heading "Amount of Locked-Up Convertible Bond Debt" in any Accession Letter executed by it pursuant to paragraph (a) of Clause 2.2 (*Accession*) and the amount of any other Convertible Bond Debt transferred to it, other than by a person that is not a Participant to such Participating Convert Holder acting as a broker-dealer in its capacity as a Qualified Market-Maker of the Convertible Bond Debt, after the date of that Accession Letter, to the extent not reduced or transferred by it in accordance with this Agreement.

"**Locked-Up Debt**" means, in relation to a Participant, all of its Locked-Up Bond Debt and/or Locked-Up Secured Debt.

"**Locked-Up French RCF Debt**" means, in relation to any Participating French RCF Lender, the amount set opposite its name under the heading "Amount of Locked-Up French RCF Debt" in any Accession Letter executed by it pursuant to paragraph (a) of Clause 2.2 (*Accession*) and the amount of any other French RCF Debt transferred to it, other than by a person that is not a Participant to such Participating French RCF Lender acting as a broker-dealer in its capacity as a Qualified Market-Maker of the French RCF Debt, after the date of that Accession Letter, to the extent not reduced or transferred by it in accordance with this Agreement.

"**Locked-Up Secured Debt**" means the Locked-Up French RCF Debt, the Locked-Up US RCF Debt and the Locked-Up TLB Debt.

"**Locked-Up Senior Note Debt**" means, in relation to any Participating Senior Noteholder, the amount set opposite its name under the heading "Amount of Locked-Up Senior Note Debt" in any Accession Letter executed by it pursuant to paragraph (a) of Clause 2.2 (*Accession*) and the amount of any other Senior Note Debt transferred to it, other than by a person that is not a Participant to such Participating Senior Noteholder acting as a broker-dealer in its capacity as a Qualified Market-Maker of the Senior Note Debt, after the date of that Accession Letter, to the extent not reduced or transferred by it in accordance with this Agreement.

"**Locked-Up TLB Debt**" means, in relation to any Participating TLB Lender, the amount set opposite its name under the heading "Amount of Locked-Up TLB Debt" in any Accession Letter executed by it pursuant to paragraph (a) of Clause 2.2 (*Accession*) and the amount of any other TLB Debt transferred to it, other than by a person that is not a Participant to such Participating TLB Lender acting as a broker-dealer in its capacity as a Qualified Market-Maker of the TLB Debt, after the date of that Accession Letter, to the extent not reduced or transferred by it in accordance with this Agreement.

"**Locked-Up US RCF Debt**" means, in relation to any Participating US RCF Lender, the amount set opposite its name under the heading "Amount of Locked-Up US RCF Debt" in any Accession Letter executed by it pursuant to paragraph (a) of Clause 2.2 (*Accession*) and the amount of any other US RCF Debt transferred to it, other than by a person that is not a Participant to such Participating US RCF Lender acting as a broker-dealer in its capacity as a Qualified Market-Maker of the US RCF Debt, after the date of that Accession Letter, to the extent not reduced or transferred by it in accordance with this Agreement.

"**Long-Stop Date**" means 28 February 2018 or such later date as may be agreed in writing by the Company, the Ad Hoc Senior Noteholder Committee and the Ad Hoc Secured Lender Committee, provided that such date may not be later than 31 March 2018.

"**Majority Participating Bondholders**" means, at any time, those Participating Bondholders who hold in aggregate greater than 50% of the aggregate principal amount of the Locked-Up Bond Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard.

"**Majority Participating Secured Lenders**" means, at any time, those Participating Secured Lenders who hold in aggregate greater than 50% of the aggregate principal amount of the Locked-Up Secured Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard.

"**Majority Participating Senior Noteholders**" means, at any time, those Participating Bondholders who hold in aggregate greater than 50% of the aggregate principal amount of the Locked-Up Senior Note Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard.

"**Mandat Ad Hoc**" means the order appointing a *mandataire ad hoc* and the proceedings of *mandat ad hoc* under article L.611-3 of the French *Code de Commerce*.

"**March 2017 French RCF Waiver Letter**" means the letter from the Company to the Agent (as defined under the French RCF Facility Agreement) dated 20 March 2017 seeking certain waivers under the French RCF Facility Agreement.

"**Material Adverse Effect**" means, by reference to the position as at the date of this Agreement:

(a)      a material adverse effect on or material adverse change in the ability of the Company or the Group to implement or consummate the Financial Restructuring by the Long-Stop Date; or

(b)      the consolidated financial condition, assets or business of the Group taken as a whole,

in each case except to the extent arising out of, resulting from or attributable to the execution, announcement or performance of this Agreement or the other Restructuring Documents or the transactions contemplated hereby or thereby, including, without limitation, the Financial Restructuring.

"**Material Non-Public Information**" means information which qualifies as inside information within the meaning of Article 7 of Regulation (EU) No. 596/2014 on market abuse.

"**Material Restructuring Documents**" means the Chapter 11 Plan, the Safeguard Plan, the Rehabilitation Plan (if applicable), the indenture in respect of the First Lien Secured Notes (as defined in the Term sheet), the indenture in respect of the Second Lien Notes (as defined in the Term Sheet), the indenture in respect of the New SN Interest Second Lien Notes (if applicable), the intercreditor agreement specified in the Term Sheet and the key security documents in respect of the First Lien Secured Notes (as defined in the Term Sheet), the Second Lien Notes (as defined in the Term Sheet) and the New SN Interest Second Lien Notes (if applicable), and the Disclosure Statement, in each case in a form and substance reasonably acceptable to the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee.

"**Material Subsidiary**" has the meaning given to it in the TLB Credit Agreement.

"**Milestones Schedule**" means Schedule 9 (*Milestones Schedule*).

"**New Common Stock**" means new common stock of the Company issued pursuant to the Financial Restructuring.

"**Non-Disclosure Agreements**" means any non-disclosure agreement entered into between the Company and any Parties or their Affiliates in relation to discussions, negotiations and information flow in connection with the Financial Restructuring.

"**Obligor Accession Letter**" means a document substantially in the form set out in Schedule 10 (*Form of Obligor Accession Letter*).

"**Obligors**" mean the Subsidiaries of the Company listed in Schedule 1 (*The Obligors*).

"**Offer Documents**" means the 2019 Offer Document and the 2020 Offer Document.

"**Participants**" means the Participating Secured Lenders and/or the Participating Bondholders.

"**Participating Bondholders**" means the Participating Senior Noteholders and/or the Participating Convert Holders.

"**Participating Convert Holders**" means (i) any Convert Holder and/or, as the case may be, (ii) any person who has entered into with a Convert Holder, either directly or indirectly, an operation of sub-participation in relation to the Convertible Bond Debt, in each case that has acceded to this Agreement in accordance with paragraph (a) of Clause 2.2 (*Accession*).

"**Participating French RCF Lenders**" means (i) any French RCF Lender and/or, as the case may be, (ii) any person who has entered into with a French RCF Lender, either directly or indirectly, an operation of sub-participation in relation to the French RCF Debt, in each case that has acceded to this Agreement in accordance with paragraph (a) of Clause 2.2 (*Accession*).

"**Participating Secured Lender**" means the Participating French RCF Lenders, the Participating TLB Lenders and/or the Participating US RCF Lenders.

"**Participating Senior Noteholder**" means (i) any Senior Noteholder and/or, as the case may be, (ii) any person who has entered into with a Senior Noteholder, either directly or indirectly, an operation of sub-participation in relation to the Senior Note Debt, in each case that has acceded to this Agreement in accordance with paragraph (a) of Clause 2.2 (*Accession*).

"**Participating TLB Lenders**" means (i) any TLB Lender and/or, as the case may be, (ii) any person who has entered into with a TLB Lender, either directly or indirectly, an operation of sub-participation in relation to the TLB Debt, in each case that has acceded to this Agreement in accordance with paragraph (a) of Clause 2.2 (*Accession*).

"**Participating US RCF Lenders**" means (i) any US RCF Lender and/or, as the case may be, (ii) any person who has entered into with a US RCF Lender, either directly or indirectly, an operation of sub-participation in relation to the US RCF Debt, in each case that has acceded to this Agreement in accordance with paragraph (a) of Clause 2.2 (*Accession*).

"**Party**" means a party to this Agreement.

"**Permitted Disposal**" means any sale, transfer or other disposal of:

(a)    a real estate property owned by Sercel Inc. for approximately US$3,800,000;

(b)    an aircraft owned by CGG Canada Service Limited for approximately US$1,500,000;

(c)    assets of CGG Marine BV for cash that do not exceed US$10,000,000 (or its equivalent) in total during the term of this Agreement; and

(d)     non-material assets owned by the Company or any Obligor where the higher of the market value and the net consideration receivable does not exceed (i) US$1,000,000 (or its equivalent) in respect of any sale, transfer or other disposal or any series of sales, transfers or other disposals that relate to the same asset, or (ii) US$5,000,000 in aggregate in the period on and from the Effective Date to the End Date.

"**Qualified Market-Maker**" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Debt or Claims against any member of the Group (or enter with customers into long and short positions in Debt or Claims against any member of the Group), in its capacity as a dealer or market maker in Debt or Claims against any member of the Group and (ii) is, in fact, regularly in the business of making a market in Debt or Claims against issuers or borrowers (including debt securities or other debt).

"**Regulator**" means any merger control or tax authority or stock market authority (in particular the *Autorité des marchés financiers*) or any other regulatory body determined by the Company to have jurisdiction in respect of any material aspect of the Financial Restructuring.

"**Rehabilitation Plan**" has the meaning given to it in paragraph (b) of Clause 12.1 (*Voluntary termination by Participants*).

"**Related Fund**" in relation to a fund (the "**first fund**"), means a fund which is managed or advised by the same investment manager or investment adviser as the first fund or, if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund.

"**Relevant Counsel**" means the Company's Counsel, the Ad Hoc Secured Lender Committee's Counsel, the Ad Hoc Senior Noteholder Committee's Counsel and/or the Ad Hoc Convert Holder Committee's Counsel (as applicable and in the case of the Ad Hoc Convert Holder Committee, solely to the extent that it qualifies as a Committee hereunder).

"**Reservations**" means:

(a)     the principle that equitable remedies under applicable law may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under applicable limitations law and defences of set-off or counterclaim; and

(c)     similar principles, rights and defences under the laws of any relevant jurisdiction.

"**Restructuring Documents**" means this Agreement and all documents, agreements and instruments necessary to implement or consummate the Financial Restructuring in accordance with this Agreement including, without limitation, the Material Restructuring Documents, any order(s) approving any DIP financing, the order of Bankruptcy Court approving the Disclosure Statement (in each case other than any relevant court orders, applications, motions, pleadings made in connection with any Safeguard, Chapter 11 Cases or Chapter 15 Cases and any related agreements, exhibits, schedules and supplements and the *notes d'operations*, updates (*actualisations*) or the reference documents (*document de reférénce*) and any technical or administrative documents relating to the reduction in the share capital and the Restructuring Equity Steps (as defined in the Term Sheet) or the

Company's reporting obligations), in each case, in form and substance consistent with the Term Sheet and in a form and substance reasonably acceptable to the Company and the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee and, with regard to any order(s) approving any DIP financing, such consent also not to be unreasonably withheld or delayed.

"**Restructuring Effective Date**" means the date on which all of the conditions to effectiveness of (i)  the Chapter 11 Plan and (ii) the Safeguard Plan or the Rehabilitation Plan (if applicable) have been satisfied or waived in accordance with their terms and the Company has notified each other Party of the same, which (i) shall include (for the avoidance of doubt) completion of all steps and actions to implement and consummate the Financial Restructuring, including the issuances of all relevant debt instruments and securities and (ii) shall not include expiry of any applicable remedy or challenge period(s).

"**Safeguard**" means the proceedings of *sauvegarde* (including a *sauvegarde accélérée* or a *sauvegarde financière accelérée*) under articles L.620-1 to L.628-10 of the *French Code de Commerce* in respect of the Company and/or any other Obligor in order to implement and/or consummate the Financial Restructuring.

"**Safeguard Plan**" means the plan prepared in the course of, and implemented as a result of, the Safeguard of the Company (including all exhibits, supplements, appendices and schedules thereto), in form and substance materially consistent with this Agreement and the SN Private Placement Agreement.

"**Secured Agents**" means the French RCF Agent, the US RCF Agent and the TLB Agent.

"**Secured Debt**" means all present and future moneys, debts and liabilities due, owing or incurred from time to time by the Company or any Obligor to any Secured Finance Party under or in connection with any Secured Finance Document (in each case, whether alone or jointly, or jointly and severally, with any other person, whether actually or contingently, and whether as principal, surety or otherwise) together with any related Additional Debt.

"**Secured Finance Documents**" means the Secured Credit Documents (as defined in the Intercreditor Agreement).

"**Secured Finance Parties**" means the French RCF Finance Parties, the US RCF Finance Parties and the TLB Finance Parties.

"**Secured Lenders**" means the French RCF Lenders, the US RCF Lenders and the TLB Lenders.

"**Security**" means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

"**Senior Note Debt**" means Bond Debt incurred pursuant to the Senior Notes.

"**Senior Noteholders**" means the respective holders of the Senior Notes.

"**Senior Notes**" means the 2020 Senior Notes, the 2021 Senior Notes and the 2022 Senior Notes.

"**SN Commitment Party**" has the meaning given to that term in the SN Private Placement Agreement.

"**SN Private Placement**" means the private placement of US$375,000,000 in principal amount of newly issued second-lien senior notes (the "**SN Private Placement Notes**") and warrants for New Common Stock (the "**SN Private Placement Warrants**", and together

with the SN Private Placement Notes, the "**SN Private Placement Instruments**"), all subject to the terms of the SN Private Placement Agreement.

"**SN Private Placement Agreement**" means the agreement executed on or about the date hereof governing a US$375 million issuance of SN Private Placement Instruments by the Company and the rights and obligations of the SN Commitment Parties, including the members of the Ad Hoc Senior Noteholder Committee, in connection therewith in the form set out in Schedule 11 (*SN Private Placement Agreement*).

"**Solicitation**" means the solicitation of votes in connection with any Chapter 11 Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"**Sub-Participant's Letter**" means a document substantially in the form set out in Schedule 5 (*Form of Sub-Participant's Letter*).

"**Subsidiary**" means in relation to any company, corporation or other legal entity (a "holding company"), a company, corporation or other legal entity:

(a)     which is controlled, directly or indirectly, by the holding company;

(b)     more than half the issued share capital of which is beneficially owned, directly or indirectly, by the holding company; or

(c)     which is a subsidiary of another Subsidiary of the holding company,

and, for this purpose, a company or corporation shall be treated as being controlled by another if that other company or corporation is able to determine the composition of the majority of its board of directors or equivalent body or similarly directs its affairs.

"**Termination Date**" means the date on which this Agreement is terminated in accordance with Clause 12 (*Termination*).

"**Term Sheet**" means the term sheet in the form set out in Schedule 6 (*Term Sheet*).

"**Threshold Date**" means the date on which the following parties have acceded to this Agreement:

(a)     Participating Secured Lenders holding at least 66⅔% of the aggregate principal amount of the Secured Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard;

(b)     Participating Senior Noteholders holding at least 66⅔% of the aggregate principal amount of the Senior Note Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard; and

(c)     Participating Bondholders holding at least 66⅔% of the aggregate principal amount of the Bond Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard.

"**TLB Agent**" means the Collateral Agent as such term is defined in the TLB Credit Agreement.

"**TLB Credit Agreement**" means the Term Loan Credit Agreement, dated 19 November 2015 (as may be amended, restated, supplemented or otherwise modified from time to time), among, amongst others, CGG Holding (U.S.) Inc., as borrower, the Company, as parent, the lenders party thereto and Wilmington Trust, National Association (as successor to Jefferies Finance LLC), as administrative agent, and the Collateral Agent and as amended from time to time.

"**TLB Debt**" means Secured Debt incurred pursuant to the TLB Credit Agreement.

"**TLB Finance Parties**" means Finance Parties as such term is defined in the TLB Credit Agreement.

"**TLB Lenders**" means the Lenders as such term is defined in the TLB Credit Agreement.

"**US RCF Agent**" means the Collateral Agent as such term is defined in the US RCF Credit Agreement.

"**US RCF Credit Agreement**" means the Amended and Restated Credit Agreement, dated 10 January 2016, among, amongst others, CGG Holding (U.S.) Inc., as borrower, the Company, as parent, the lenders party thereto and Credit Suisse AG, as administrative agent and as collateral agent and as amended from time to time.

"**US RCF Debt**" means Secured Debt incurred pursuant to the US RCF Credit Agreement.

"**US RCF Finance Parties**" means the Finance Parties as such term is defined in the US RCF Credit Agreement.

"**US RCF Lenders**" means the Lenders as such term is defined in the US RCF Credit Agreement.

## 1.2    Construction

(a)    Unless a contrary indication appears, any reference in this Agreement to:

(i)     any "**Bondholder**", the "**Bond Trustee**", any "**Secured Finance Party**", any "**Secured Agent**", any "**Secured Lender**", the "**Calculation Agent**", the "**Collateral Agent**", any "**Party**" or any other person howsoever described herein, shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(ii)    the "**Ad Hoc Secured Lender Committee**", the "**Ad Hoc Senior Noteholder Committee**", the "**Ad Hoc Convert Holder Committee**" or the "**Committees**" includes, where the context requires, each member of that Committee;

(iii)   "**Committee**" includes, where the context requires, any of the Committees;

(iv)    "**assets**" includes present and future properties, revenues and rights of every description;

(v)     a "**Document**" or any other agreement or instrument is a reference to that Document or other agreement or instrument as amended, novated, supplemented, extended, restated or replaced;

(vi)    a "**composition, compromise, assignment or arrangement with any creditor**" includes *mandat ad hoc* and *conciliation* proceedings under *Livre Six* of the French *Code de Commerce*;

(vii)   "**gross negligence**" means *faute lourde*;

(viii)  "**guarantee**" means any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness and includes any "*cautionnement*", "*aval*" and any "*garantie*" which is independent from the debt to which it relates under French law;

(ix)    the words "**include**", "**includes**" and "**including**" when used herein shall be deemed in each case to be followed by the words "**without limitation**";

(x)     "**indebtedness**" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(xi)    a "**liquidator, receiver, administrative receiver, administrator, compulsory manager, trustee, examiner or other similar officer**" includes (a) *liquidateur judiciaire, administrateur judiciaire, mandataire judiciaire, commissaire à l'exécution du plan* in the meaning of *Livre Six* of the French *Code de Commerce* and (b) as such terms may be interpreted, referenced, defined and/or used in the Bankruptcy Code and any United States law, statute, provision or remedy related to an Insolvency Event;

(xii)   a "**person**" includes any individual, firm, company, corporation, government, state or agency of a state or any grouping (whether or not having separate legal personality);

(xiii)  a "**regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xiv)   a "**security interest**" includes any type of security ("*sûreté réelle*") and transfer by way of security;

(xv)    "**shares**" or "**share capital**" includes equivalent ownership interests (and "**shareholder**" and similar expressions shall be construed accordingly);

(xvi)   a "**transfer**" includes any means of transfer of rights and/or obligations under French law;

(xvii)  "**trustee, fiduciary and fiduciary duty**" has in each case the meaning given to such term under any applicable law;

(xviii) a "**winding-up, dissolution, administration or reorganisation**" includes *liquidation judiciaire, redressement judiciaire, sauvegarde, sauvegarde accélérée* or *sauvegarde financière accélérée* proceedings under *Livre Six* of the French *Code de Commerce*;

(xix)   "**wilful misconduct**" means "*dol*";

(xx)    a provision of law is a reference to that provision as amended or re-enacted;

(xxi)   a time of day is a reference to Paris (France) time;

(xxii)  any notification, consent or instruction under this Agreement shall be in writing;

(xxiii) references to "**this Agreement**" shall include the Term Sheet, unless stated otherwise; and

(xxiv)  Section, Clause and Schedule headings are for ease of reference only.

(b)     Any reference in this Agreement to the provision, signing, delivery, execution or entering into a document (including this Agreement) by a Participant (howsoever expressed) shall include the provision, signing, delivery or execution of such document by its Investment Manager on its behalf, as agent or otherwise.

**1.3    Execution by Participants**

(a)    Each of the Participants is entering into this Agreement in its capacity as a Participating Secured Lender and/or Participating Bondholder (as applicable) and only in respect of the Debt and the Claims against any member of the Group which it now or hereafter holds, and not in any other capacity or in respect of any other debt, equity or other instrument, provided that the Parties acknowledge and agree that:

(i)    any Party that is a Participating Secured Lender is also entering into this Agreement as a Participating Bondholder if such Participating Secured Lender is also a Bondholder; and

(ii)    any Party that is a Participating Bondholder is also entering into this Agreement as a Participating Secured Lender if such Participating Bondholder is also a Secured Lender,

and references in this Agreement to such Party's Locked-Up Debt shall be construed accordingly.

(b)    Notwithstanding any provision of this Agreement, where a Participant is a credit institution within the meaning of Regulation (EU) No 575/2013 dated 26 June 2013 on prudential requirement for credit institution and investment firms and amending Regulation (EU) No 648/2012 (a "**Credit Institution**") and each of each Credit Institution's Holding Companies and Subsidiaries and each subsidiary of each Credit Institution's Holding Companies or other bodies or partnerships controlling, controlled by or under common control with such Credit Institution enters into or accedes to this Agreement through an identified business unit (as specified in its signature block to this Agreement or its Accession Letter) (a "**Specific Business Unit**"), the terms of this Agreement shall apply only to that Specific Business Unit and the Locked-Up Debt, Debt and/or Claims held by such Specific Business Unit, and will not apply to any other business unit within that legal entity or the legal entity as a whole, unless such other business unit has signed or acceded to this Agreement, and references to "Locked-Up Debt", "Debt" and "Claims" in this Agreement shall be construed accordingly.

**2    Effective Date and Accession**

**2.1    Effective Date**

(a)    The Effective Date shall occur on the date on which the Calculation Agent confirms to the Company and the Participants that the Company has received a copy of this Agreement duly executed or acceded to by each of:

(i)    the Company and the Obligors;

(ii)    the Calculation Agent;

(iii)    the members of the Ad Hoc Secured Lender Committee;

(iv)    the members of the Ad Hoc Senior Noteholder Committee; and

(v)    DNCA.

(b)    The Company shall notify each of the other Parties promptly upon such receipt under paragraph (a) above and shall specify in that notice the Effective Date.

(c)    This Agreement shall become effective on the Effective Date, provided that the following provisions of this Agreement shall become effective in respect of an executing Party, and the

other Parties which have executed this Agreement, on the date on which the Company, the Calculation Agent and the Obligors execute or accede to this Agreement:

(i)     Clauses 1 (*Definitions and interpretation*) and 2 (*Effective Date and Accession*);

(ii)    paragraph (a)(i) of Clause 6.3 (*Restrictions on the Company and the Obligors*);

(iii)   paragraphs (a) and (b) of Clause 7.1 (*Restrictions on Participating Secured Lenders*) and Clause 7.2 (*Purchase and sale of Debt*), provided that these provisions will be void *ab initio* if the Effective Date does not occur within five (5) days of the relevant Party's execution of this Agreement;

(iv)    paragraphs (a) and (b) of Clause 8.1 (*Restrictions on Participating Bondholders*), Clause 8.2 (*Purchase and sale of Debt*) and Clause 8.3 (*Holding of the Convertible Bonds*), provided that these provisions will be void *ab initio* if the Effective Date does not occur within five (5) days of the relevant Party's execution of this Agreement;

(v)     paragraph (a)(xiv) of Clause 9 (*Limitation on undertakings*); and

(vi)    Clauses 14 (*Disclosure of information*), 15 (*Publicity*), 19 (*Notices*), 20 (*Partial invalidity*), 23 (Reservation of rights), 24 (*Governing law*), 25 (*Settlement Discussions*) and 26 (*Jurisdiction*).

## 2.2    Accession

(a)    A direct, or as the case may be, indirect holder of Debt will become a Party to this Agreement as a Participating Secured Lender and/or a Participating Bondholder (as applicable) on the date that it delivers a duly completed and signed Accession Letter addressed to the Company and to the Calculation Agent (stating whether such Participant accedes as a Participating French RCF Lender, Participating US RCF Lender, Participating TLB Lender, Participating Senior Noteholder and/or a Participating Convert Holder (as applicable)).

(b)    A Senior Noteholder's participation in the SN Private Placement Agreement shall be conditioned on execution of this Agreement or an Accession Letter. No Senior Noteholder who fails to deliver an Accession Letter pursuant to this Agreement and in accordance with the SN Private Placement Agreement may commit to participate in any portion of the SN Private Placement governed by the SN Private Placement Agreement.

(c)    By delivering an Accession Letter to the Company and to the Calculation Agent in accordance with paragraph (a) above, such person shall be bound by and shall comply with all the terms of this Agreement which are expressed to be binding on a Participant as if it had been a Party in its capacity as a Participant on and from the date of the relevant Accession Letter.

(d)    Each Obligor will become a Party to this Agreement as an Obligor on the date that it delivers a duly completed and signed Obligor Accession Letter addressed to the Company and to the Calculation Agent.

(e)    By delivering an Obligor Accession Letter to the Company and to the Calculation Agent in accordance with paragraph (d) above, such Obligor shall be bound by and shall comply with all the terms of this Agreement which are expressed to be binding on an Obligor as if it had been a Party in its capacity as an Obligor on and from the date of this Agreement.

**3      Relationship with other documents**

Until the End Date, unless a contrary indication appears in this Agreement, the relevant Parties shall continue to comply with any Document or any other document to which it is a party and the Company and the Obligors shall remain subject to their respective obligations under the relevant Documents, including, without limitation, the Intercreditor Agreement.

**4      Participants' rights and obligations**

(a)    The obligations of each Party under this Agreement are several (*conjointes et non solidaires*) but not joint. Failure by any Party to perform its obligations under this Agreement does not affect the obligations of any other Party under this Agreement. No Party is responsible for the obligations of any other Party under this Agreement.

(b)    No Party shall have any duty of trust or confidence or any fiduciary obligations with or to any other Party under or in connection with this Agreement.

(c)    The rights of each Participant under or in connection with this Agreement are separate and independent rights. A Participant may separately enforce its rights under this Agreement unless expressly stated otherwise and save for any right or action which is expressly reserved for the Majority Participating Bondholders, the Committees, the Majority Participating Secured Lenders or the Majority Participating Senior Noteholders.

**5      General undertakings**

**5.1    Support for the Financial Restructuring**

Until the End Date:

(a)    the Company, each Obligor and each Participant shall promptly take all reasonably necessary and appropriate actions within their reasonable control and ability in order to support, facilitate, implement, consummate or otherwise give effect to the Financial Restructuring in accordance with (and within the timeframes provided in) this Agreement, provided that such action is not inconsistent with the Term Sheet, including, without limitation:

    (i)     providing all information and taking all actions which it is reasonably requested to provide or take;

    (ii)    executing any document in a timely manner and giving any notice, order, instruction or direction reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Financial Restructuring;

    (iii)   providing confirmation that it supports the Financial Restructuring;

    (iv)    to the extent practical (and without prejudice to other terms of this Agreement), supporting the Financial Restructuring (including, but not limited to, any Chapter 11 Cases, Chapter 15 Cases, Conciliation, and/or Safeguard);

    (v)     with regard to the Participants only, supporting implementation of the Rehabilitation Plan through Judicial Reorganisation (if applicable);

(vi)    preparing, negotiating in good faith and (once agreed) executing and delivering in a timely manner those Restructuring Documents to which it will be a party;

(vii)   in relation to each relevant member of the Group, preparing and filing for any legal process or proceedings contemplated by (or necessary to implement the provisions or steps foreseen in) the Term Sheet (including, but not limited to, any Chapter 11 Cases, Chapter 15 Cases, Conciliation, and/or Safeguard) and/or any other local filings which are reasonably necessary to implement and/or consummate the Financial Restructuring provided that, without prejudice to the termination rights contemplated in paragraph (b) of Clause 12.1 (*Voluntary termination by Participants*), the Company shall not be required to file for Judicial Reorganisation;

(viii)  voting (or causing the relevant person to vote, to the extent it is legally entitled to cause that person to vote) and/or exercising any voting instruction, approval or similar powers or rights available to it irrevocably and unconditionally in favour of:

A.    any matter requiring approval under the relevant Documents that is necessary to implement and/or consummate the Financial Restructuring, including instructing any Secured Agents and/or Bond Trustee or the common depository or any other person authorised to vote (as applicable) to take such action or to refrain from taking such action, including instructing the Bond Trustee or the common depository or any other person authorised to vote (as applicable) in respect of any Bonds to vote in respect of the Safeguard and/or the Chapter 11 Cases (as applicable) and providing any relevant power of attorney, form of proxy or instruction in relation to the same, and taking all action reasonably required to ensure that any vote or instruction submitted is binding on any transferee;

B.    any amendment, waiver or consent that is necessary to implement and/or consummate the Financial Restructuring including, but not limited to, any amendment, waiver or consent required in connection with the Safeguard, Chapter 11 Case, Chapter 15 Case and/or any Conciliation and/or Judicial Reorganisation (if applicable) provided that such proceedings are commenced prior to the End Date;

C.    any petitions or applications to any court, in each case, which is necessary to give effect to the Financial Restructuring including in relation to any Conciliation, Safeguard, Chapter 11 Case and/or Chapter 15 Case;

D.    the Safeguard Plan the Rehabilitation Plan (if applicable), and/or the Chapter 11 Plan (when solicited to deliver such votes) in respect of any Debt and Claims it has against the Company and/or the Chapter 11 Companies as applicable and not changing, withdrawing or revoking such vote (or causing or directing such vote to be changed, withdrawn or revoked), to the extent such Chapter 11 Plan and/or Safeguard Plan and/or Rehabilitation Plan (if applicable) incorporates the terms of this Agreement); and

    E.    in the case of the Company and any Obligor, any matter requiring board approval or, in relation to any Obligor, any matter requiring shareholder approval, including all relevant shareholder meetings and board meetings and passing all shareholder and board resolutions;

(ix)    taking no action in any Chapter 11 Cases, Conciliation and/or Safeguard that is materially inconsistent with the Term Sheet including, without limitation, not voting in favour of any alternative plan proposed by creditors or supporting, directly or indirectly, any objection, opposition, rejection or impediment, or moving the Bankruptcy Court to modify the Chapter 11 Plan or the Disclosure Statement;

(x)    in the case of the Participants, taking no action in any Chapter 15 Cases that is materially inconsistent with the Term Sheet including, without limitation, not objecting to any recognition by the Bankruptcy Court of any Conciliation, Safeguard or any process or proceedings that the Company and the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee consider is necessary to implement or consummate the Financial Restructuring and/or the grant of any additional relief and assistance that the Company or any Obligor may seek (including, without limitation, the grant of relief under Section 1145 of the Bankruptcy Code in respect of the issuance of new equity interests by the Company or the grant of provisional relief);

(xi)    not challenging the proofs of claim filed by or on behalf of the Participating Secured Lenders or the Participating Bondholders, provided that the amounts are calculated by reference to, and in accordance with, the relevant Documents and that the Participating Secured Lenders and the Participating Bondholders (as applicable) are the valid holders of such claims;

(xii)    instructing any Committee to support petitions or applications to any court to facilitate, implement, consummate or otherwise give effect to the Financial Restructuring, so long as such petitions and applications are consistent with the terms of this Agreement (if appropriate);

(xiii)    providing other necessary instructions to the Secured Agents, the Bond Trustees and any Relevant Counsel(s) which are necessary to give effect to the terms of this Agreement;

(xiv)    not (a) challenging or supporting any other party in challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Bond Debt or the Secured Debt, (b) asserting or supporting any other party in asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims, and (c) asserting or supporting any other party in asserting any cause of action or claim against the Secured Finance Parties or the Bondholders; and

(xv)    in the case of the Company and the Obligors only, objecting on a timely basis to any motion, application, or adversary proceeding (a) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Secured Debt or the Bond Debt, or (b) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(b)      each Participating French RCF Lender unconditionally and irrevocably:

(i)      consents to the disapplication of the testing of the Total Leverage Ratio (as defined in the French RCF Facility Agreement) and the Interest Cover Ratio (as defined in the French RCF Facility Agreement) in respect of each and any Relevant Period (as defined in the French RCF Facility Agreement) ending on or before the End Date and shall deliver any instruction to the French RCF Agent in respect of the same and the Company agrees that the Margin Uplift Period (as such term is defined in the December 2016 French RCF Waiver Letter and the March 2017 French RCF Waiver Letter) shall continue to be applicable up to the End Date; and

(ii)     waives any obligation of the Company or any Obligor to deliver a Compliance Certificate (as defined in the French RCF Facility Agreement) at any time on or before the End Date and shall deliver any instruction to French RCF Agent in respect of the same;

(c)      each Participating US RCF Lender unconditionally and irrevocably:

(i)      consents to the disapplication of the testing of the Total Leverage Ratio (as defined in the US RCF Credit Agreement) and the Interest Cover Ratio (as defined in the US RCF Credit Agreement) in respect of each and any Relevant Period (as defined in the US RCF Credit Agreement) ending on or before the End Date and shall deliver any instruction to the US RCF Agent in respect of the same; and

(ii)     waives any obligation of the Company or any Obligor to deliver a Compliance Certificate (as defined in the US RCF Credit Agreement) at any time on or before the End Date and shall deliver any instruction to the US RCF Agent in respect of the same;

(d)      each Participating TLB Lender unconditionally and irrevocably:

(i)      consents to the disapplication of the testing of the Total Leverage Ratio (as defined in the TLB Credit Agreement) and the Interest Cover Ratio (as defined in the TLB Credit Agreement) in respect of each and any Relevant Period (as defined in the TLB Credit Agreement) ending on or before the End Date and shall deliver any instruction to the TLB Agent in respect of the same; and

(ii)     waives any obligation of the Company or any Obligor to deliver a Compliance Certificate (as defined in the TLB Credit Agreement) at any time on or before the End Date and shall deliver any instruction to the TLB Agent in respect of the same;

(e)      except as provided for herein and in the Cash Collateral Orders each Participant unconditionally and irrevocably:

(i)      waives any default, event of default or cross-default which may have occurred (whether or not any such default, event of default or cross-default is continuing) or which may in the future occur as a result of the implementation and/or consummation of the Financial Restructuring under any of the Documents until the End Date; and

(ii)   agrees that any requirement of the Company and/or any Obligor to pay any principal or interest under any of the Documents on any date on or before the End Date shall be deferred until the End Date or as otherwise provided for in the Financial Restructuring (and that no default interest or interest on interest that would otherwise be applicable to such deferred amounts shall be payable) and each Participant shall, on written request from the Company, promptly instruct the relevant Bond Trustee or the relevant Secured Agent (as appropriate) not to take any enforcement or other action in relation to the non-payment of interest by any Obligor at any time on or before the End Date,

for the avoidance of doubt, the Secured Agents and the Secured Lenders may receive all payments of adequate protection and other amounts provided pursuant to the Cash Collateral Orders and/or any order(s) of the Bankruptcy Court relating to DIP financing  including, to the extent approved by the Bankruptcy Court, periodic cash payments made by any of the Chapter 11 Companies equal to the non-default contract rate (including for the avoidance of doubt the utilisation fee set forth under clause 12.6 (*Utilisation fee*) of the French RCF Facility Agreement) as and when such payments would have become due under the Secured Finance Documents (including the French RCF Facility Agreement) had the Chapter 11 Cases and the Safeguard not been commenced (excluding payment of post-petition default interest, which the Secured Lenders reserve the right to accrue, and the Chapter 11 Companies reserve all rights to object to such accrual and payment);

(f)   no Obligor, nor the Company, nor any Participant shall take, encourage, assist or support (or procure that any other takes, encourages, assists or supports) any action which would breach or be inconsistent with this Agreement or the Term Sheet taken as a whole, or delay, impede or prevent the implementation and/or consummation of the Financial Restructuring (including, but not limited to, the Bankruptcy Court's approval of this Agreement, the Chapter 11 Plan and/or the Restructuring Documents, the Bankruptcy Court's recognition of any Safeguard or other process in connection with the Chapter 15 Cases or any process or proceedings that the Company and the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee considers necessary to implement and consummate the Financial Restructuring), including opposing the making of any temporary restraining order, or other similar injunctive relief, that the Company considers reasonably necessary to implement and/or consummate the Financial Restructuring; and

(g)   subject to the terms of the applicable Debt Documents, nothing in this Agreement shall prevent any Participant (or its counsel) from appearing in court in respect of any Chapter 11 Case, Chapter 15 Case, Judicial Reorganisation and/or Safeguard provided that such Participant complies with the terms of this Agreement.

## 5.2   Restructuring Documents

(a)   Subject to paragraph (b) below, the Company and each Committee shall enter into good faith negotiations with a view to agreeing on the terms and conditions of the Restructuring Documents on the basis that such Restructuring Documents shall be in a form consistent in all material respects with the Term Sheet taken as a whole, in order to implement and consummate the Financial Restructuring as soon as practicable and in any event before the Long-Stop Date.

(b)     The Company shall ensure, subject to Clause 5.6 (*Sharing of information*), that: (i) drafts of all Restructuring Documents are provided to the Committees (or the Relevant Counsel of such Committee, if such Restructuring Documents contain any Material Non-Public Information) as soon as reasonably practicable once they become available, such that the Committees (or their Relevant Counsel) have as much opportunity as is practicable to review such drafts prior to any deadlines for consents to be given or withheld by the Committees and/or Participants in respect of such draft Restructuring Documents, and (ii) drafts of all material pleadings (other than in relation to the Safeguard or any litigation initiated before the French Court on account of any breach of this Agreement by any Party) and any Restructuring Documents to be filed with any court (including, without limitation, first day motions, all plan filing documents and the plan supplement) in connection with the Chapter 11 Cases or Chapter 15 Cases, are provided to the Committees (or the Relevant Counsel of such Committee, if such documents contain any Material Non-Public Information) as soon as reasonably practicable once they become available and in any event, to the extent reasonably practicable, not less than two (2) Business Days before the deadline for such court filing.

(c)     The Company shall provide the Relevant Counsel of each Committee with copies of the draft *notes d'operations*, updates (*actualisations*) and reference documents (*document de reference*) and give the Relevant Counsel of each Committee a reasonable period to review such draft documents in order to give the Relevant Counsel the opportunity to comment on such draft documents to the extent that they do not consider that they are consistent with the terms of the Financial Restructuring.

(d)     If, and only if, the Majority Participating Bondholders and the Majority Participating Secured Lenders approve the Material Restructuring Documents as being in a form which is consistent in all material respects with the Term Sheet, the Company, each Obligor and each Participant shall, as soon as practicable and in advance of the Restructuring Effective Date, execute and deliver to the Company those Restructuring Documents to which it will be a party, provided that nothing in this paragraph (d) shall require a Participant to execute and deliver a Restructuring Document if, in that Participant's reasonable opinion, that Restructuring Document is not in a form which is consistent in all material respects with the Term Sheet. It is acknowledged and agreed that any failure of the Company and/or any Obligor to obtain any required approvals from the Majority Participating Bondholders and/or the Majority Participating Secured Lenders (as applicable) will constitute a material breach of this Agreement by the Company and/or any such Obligor.

(e)     The Company, each Obligor and each Participant shall make such amendments to the Documents to which it is a party as the Company on the one hand and (i) the Ad Hoc Senior Noteholder Committee in respect of the Indentures or (ii) the Ad Hoc Secured Lender Committee in respect of the Secured Finance Documents or the (iii) the Ad Hoc Convert Holder Committee (provided only that it is deemed to be a Committee in accordance with the definition thereof) in respect of the Offer Documents on the other hand consider are reasonably necessary to implement and/or consummate the Financial Restructuring.

## 5.3    Potential impediments to the Financial Restructuring

(a)     Each Participant shall promptly notify the Company of any matter or circumstance which it knows, or suspects would reasonably be expected, to be a material impediment to the implementation or consummation of the Financial Restructuring, unless any other person has already notified the Company of any such matter or circumstance.

(b)    The Company shall promptly notify all of the Participants of any matter or circumstance which it knows, or suspects would reasonably be expected, to be a material impediment to the implementation or consummation of the Financial Restructuring.

## 5.4    Restrictions on enforcement

(a)    Until the End Date, no Party shall:

(i)    take any Enforcement Action;

(ii)    direct or encourage any other person to take any Enforcement Action; or

(iii)    vote, or allow any proxy appointed by it to vote, in favour of any Enforcement Action,

except as permitted by paragraph (b) below.

(b)    Paragraph (a) above shall not (i) prevent or restrict any Party from bringing proceedings which have received the prior written approval of the Company and the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee as being necessary to implement or consummate the Financial Restructuring or (ii) affect any proceedings which are extant as at the date of this Agreement.

## 5.5    Notification of breaches

(a)    The Company, each Obligor and each Participant shall promptly notify the Company (if applicable) and each of the Committees of:

(i)    any representation or statement made or deemed to be made by it under this Agreement which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made; and

(ii)    the details of any breach by it of any undertaking given by it under this Agreement.

(b)    Subject to paragraph (b) of Clause 5.6 (*Sharing of information*), the Company and each of the Committees may disclose to any Participant any information supplied to it under paragraph (a) above which it considers appropriate to disclose.

## 5.6    Sharing of information

(a)    Subject to paragraph (b) of this Clause 5.6, each Party authorises the Secured Agents and the Bond Trustees to forward to, and otherwise share with, the Company, the Calculation Agent and each Committee any original and any copy of any document, instrument, correspondence, communication and any other information detailing each Secured Lender's beneficial ownership of amounts outstanding under the Secured Finance Documents at any time or the holdings of Convertible Bonds or Senior Notes of any Bondholder (as applicable) and the progress and result of any other Secured Lender or Bondholder consent or approval sought pursuant to paragraph (a)(viii) of Clause 5.1 (*Support for the Financial Restructuring*) of this Agreement.

(b)    Notwithstanding any other provisions of this Agreement, no Material Non-Public Information shall be disclosed to any Participant by any other Party, unless such Participant agrees to receive such information.

5.7     **The SN Private Placement Agreement**

(a)     The Company shall make a request to the supervisory judge (*juge-commissaire*) of the French court for approval of the SN Private Placement Agreement within three (3) Business Days of the date of the judgment of the French court opening the Safeguard.

(b)     The Company, each Obligor and each member of the Ad Hoc Senior Noteholder Committee (as at the date of this Agreement) shall execute the SN Private Placement Agreement within the period that commences on the date of the judgment of the supervisory judge (*juge-commissaire)* of the French court authorising the SN Private Placement Agreement and ends on the date that falls two (2) Business Days after such date.

# 6      Undertakings by the Company and the Obligors

## 6.1     Implementation of Financial Restructuring

Until the End Date, the Company and each Obligor shall (and the Company shall use all reasonable endeavours to ensure that each member of the Group shall) co-operate with and actively assist the Committees to implement or consummate the Financial Restructuring, including:

(a)     making such senior management and other representatives of the Company as any Committee may reasonably request available to assist in all matters in relation to implementation or consummation of the Financial Restructuring at such times as such Committee may reasonably request;

(b)     subject to paragraph (b) of Clause 5.6 (*Sharing of information*), providing the Participants (or, in the event that any such information contains Material Non-Public Information, the Relevant Counsel) with all information which could reasonably be expected to be material to the financial position or prospects of the Group or the implementation or consummation of the Financial Restructuring, including all material tax advice received by any member of the Group in relation to the likely tax consequences of the Financial Restructuring, as well as the financial information that is required to be delivered pursuant to the Cash Collateral Orders or any debtor-in-possession financing bankruptcy court orders, provided that the supply of such information would not cause a breach of legal privilege or a breach of binding confidentiality obligations, and no Obligor shall be required to provide any information to any Participant or Committee that the relevant Obligor considers (in its view, acting reasonably) to be of a particular commercially or legally sensitive nature;

(c)     subject to paragraph (b) of Clause 5.6 (*Sharing of information*), keeping the Participants (or, in the event that any such information contains Material Non-Public Information, the Relevant Counsel) reasonably informed in relation to the status and progress of the Financial Restructuring, including progress in relation to obtaining any necessary Authorisations, including any consents, from shareholders, the Secured Lenders, the Bondholders or any relevant Regulator;

(d)     using all reasonable endeavours to minimise any negative impact of the Financial Restructuring on the business of the Group, including dealing with any material contracts, licences, Authorisations or financing documents which could be terminated or breached as a result of the transactions contemplated by the Term Sheet;

(e)     taking all reasonable steps to obtain, or assist the Secured Lenders and the Bondholders to obtain, any necessary Authorisations, to implement or consummate the Financial Restructuring, including any necessary Authorisations, including any consents, from shareholders, the Secured Lenders, the Bondholders or any relevant Regulator;

(f)     promptly pay the costs, fees and expenses pursuant to Clause 6.2 (*Relevant advisers' costs, fees and expenses*); and

(g)     objecting on a timely basis to any motion filed with the Bankruptcy Court by a third party seeking entry of an order (i) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Chapter 11 Cases, or (iv) modifying or terminating the Chapter 11 Companies' exclusive right to file and/or solicit acceptances of a plan of reorganization.

## 6.2    Relevant advisers' costs, fees and expenses

Subject to applicable law and/or regulation and the terms of any applicable engagement letters entered into by the Company on or before the date of this Agreement, to the extent that the terms of such engagement letters are not inconsistent with sub-paragraphs (i) to (iv) below:

(i)     the Company and each Obligor (to the extent applicable under the relevant engagement letter entered into on or before the date of this Agreement) confirms that it shall pay the reasonable and properly incurred fees, costs and expenses of (i) the Company's Counsel, (ii) Morgan Stanley and Lazard as financial advisers to the Company and (iii) a director search consultant jointly engaged by the Ad Hoc Senior Noteholder Committee, DNCA, other Senior Noteholders holding at least 10% of the Senior Notes and the Company;

(ii)    following the commencement of the Chapter 11 Cases, subject to applicable law and orders of the Bankruptcy Court, but without the need to file fee or retention applications, each Obligor (to the extent applicable under the relevant engagement letter entered into on or before the date of this Agreement) confirms that it shall pay:

(a)     the costs, fees and expenses of (i) Orrick Herrington & Sutcliffe as legal adviser to DNCA, (ii) the Ad Hoc Secured Lender Committee's Counsel, (iii) the Ad Hoc Senior Noteholder Committee's Counsel, (iv) provided that all members of the Ad Hoc Convert Holder Committee are Participating Convert Holders, the Ad Hoc Convert Holder Committee's Counsel and (v) any Local Counsel (each a "**Legal Adviser**") in each case to the extent that such costs, fees and expenses relate to the Chapter 11 Cases, as certified by each Legal Adviser and on the basis that each Legal Adviser submits to the Company a breakdown of such time costs per fee earner and a description of the work undertaken generally (without waiving privilege) (such costs, fees and expenses of each Legal Adviser being its "**Chapter 11 Legal Work**") and in respect of which invoices and receipts are furnished to the Company on a timely basis; and

(b)     the costs, fees and expenses (to the extent that they are not a success fee) of (i) Rothschild & Cie as financial adviser to the Ad Hoc Secured Lender Committee, (ii) Messier Maris & Associés and Millco Advisors, LP as financial adviser to the Ad Hoc Senior Noteholder Committee (iii), provided that all members of the Ad Hoc Convert Holder Committee are Participating Convert Holders, AM Conseil as financial adviser to the Ad Hoc Convert Holder Committee and (iv) Zolfo Cooper as restructuring adviser to the Ad Hoc Secured Lender Committee (together the "**Financial Advisers**"), in each case to the extent that such costs, fees and expenses relate to the Chapter 11 Cases, as certified by each Financial Adviser and on the basis that each Financial Adviser submits to the Company a breakdown of such time costs and a description of the work undertaken (without waiving privilege) (such costs, fees and expenses of each Financial Adviser being its "**Chapter 11 Financial Work**") and in respect of which invoices and receipts are furnished to the Company on a timely basis;

(iii)    the Company and each Obligor (to the extent applicable under the relevant engagement letter entered into on or before the date of this Agreement) confirms that it shall pay on the Restructuring Effective Date the costs, fees and expenses of each Legal Adviser and Financial Adviser to the extent that they have not been incurred in relation to the Chapter 11 Legal Work or the Chapter 11 Financial Work (as applicable) and any success fee payable to any Financial Adviser, in each case for which invoices are furnished to the Company; and

(iv)    prior to the commencement of the Chapter 11 Cases and the Safeguard proceedings, the Company and each Obligor (if applicable) shall pay in cash all costs, fees, and expenses of each Legal Adviser and Financial Adviser for which invoices and receipts are furnished to the Company in accordance with the terms of the relevant engagement arrangements,

provided, in each case, that nothing contained herein shall limit the right of the Company or any Obligor (if applicable) to object to the reasonableness of any such costs, fees and expenses and to withhold payment pending resolution of such objection.

## 6.3    Restrictions on the Company and the Obligors

(a)    Subject to the exercise of its fiduciary duties in accordance with paragraph (a) of Clause 9 (*Limitations on undertakings*), until the End Date, neither the Company nor any Obligor shall (and the Company shall use all reasonable endeavours to ensure that no other member of the Group will):

(i)    assign any of its rights or transfer any of its rights or obligations under this Agreement;

(ii)    seek, solicit, support, propose, assist, encourage, vote for, consent to, or participate in any discussions regarding the negotiation or formulation of any proposed winding-up, dissolution, administration, liquidation, recapitalisation, merger, consolidation, joint venture, sale of assets, restructuring or reorganisation of any Obligor or any proposed composition, compromise, assignment or arrangement with any creditor of any Obligor, other than pursuant to the implementation and consummation of the Financial Restructuring (each, an "**Alternative Proposal**");

(iii)   publicly announce its intention not to pursue the Financial Restructuring;

(iv)   take or consent to the taking of any action which would breach, be materially inconsistent with, materially impede or materially delay the Financial Restructuring or any transaction or step contemplated by this Agreement or take any action which is materially inconsistent with any of the actions required pursuant to Clause 6.1 (*Implementation of Financial Restructuring*);

(v)   dispute that after the commencement of the Chapter 11 Cases, if applicable, giving notice of a termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company, the Chapter 11 Companies, the Obligors, and all members of the Group hereby waives to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); and

(vi)   take or consent to the taking of any material corporate action, including:

A.   changing the corporate structure of any Obligor, increasing the authorised share capital of any Obligor, issuing any share to any person, granting to any person any conditional or unconditional option, warrant or other right to call for the issue or allotment of, subscribe for, purchase or otherwise acquire any share of any Obligor (including any right of pre-emption, conversion or exchange), or altering any right attaching to any share capital of any Obligor; and

B.   entering into, amending or terminating any material contract, licence or financing document in a manner that is materially inconsistent with the Financial Restructuring.

(b)   Paragraph (a) above does not apply to any action:

(i)   which is in the ordinary course of business of the Group;

(ii)   which has the prior consent of the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee;

(iii)   which is a part of a Permitted Disposal; or

(iv)   which is expressly contemplated by this Agreement.

## 6.4    Ordinary course

Other than in accordance with the Financial Restructuring, until the End Date or in connection with a Permitted Disposal, the Company and each Obligor (and each Obligor shall use reasonable endeavours to procure that each of its Subsidiaries, if applicable) shall:

(a)   to the extent practicable, operate its business in the ordinary course substantially in accordance with past practices, its business plan and all applicable legal, contractual and administrative requirements and obligations and so as to maintain it as a going concern, and not do anything which is materially out of the ordinary course of business or not substantially in accordance with its business plan without the prior written consent of the Majority Participating Bondholders and the Majority Participating Secured Lenders;

(b)     take all reasonable steps to preserve their business organisations and relationships with material third parties (including creditors, lessors, licensors, suppliers, distributors and customers) and employees; and

(c)     take all reasonable steps, in the ordinary course of business, to preserve and protect its business and material assets.

## 6.5    Cleansing

(a)     Prior to each of (i) the announcement of the execution of the SN Private Placement Agreement, (ii) filing of a motion at the Bankruptcy Court for approval of any DIP financing in respect of the Group (iii) the launch of the subscription period in respect of the Rights Issue (as defined in the Term Sheet), (iv) the issuance of the Warrants (as defined in the Term Sheet) v) the filing of the Disclosure Statements (and any amendment thereto), (vi) the issuance of the New First Lien Secured Notes (as defined in the Term Sheet) and (vii) the issuance of the Second Lien Notes (as defined in the Term Sheet) (each a "**Relevant Cleansing Action**"), the Company undertakes to publicly disclose, or procure disclosure of, all Material Non-Public Information that has been provided to such Parties by the Company or any Obligor prior to the completion of such step.

(b)     To the extent that the Company does not make publicly available, in accordance with paragraph (a) above, all Material Non-Public Information provided by the Company or any Obligor to any Party that in such Party's reasonable opinion constitutes Material Non-Public Information, then such Party shall consult with the Company for a period of three (3) Business Days in order to determine in good faith whether such information constitutes Material Non-Public Information or not. In the event that the Company and the Party agree that such information constitutes Material Non-Public Information, the Company shall publicly disclose such Material Non-Public Information before the end of the subsequent two (2) Business Days. In the event that the Company and the Party disagree on the nature of the information, the relevant Party shall be entitled on two (2) Business Days' notice to the Company to make such Material Non-Public Information publicly available in accordance with normal market procedures for the dissemination of public information. This shall permit the Parties to publish such Material Non-Public Information on Bloomberg, Reuters, Debtwire, Reorg Research and/or any similar financial news outlet. Notwithstanding the foregoing, if any time period specified in this paragraph (b) is due to expire after any applicable Relevant Cleansing Action, then such Party shall not be obliged to comply with any such time period, provided that such Party shall inform and discuss the terms of such disclosure with the Company up to the date of the Relevant Cleansing Action.

## 6.6    Implementation by Judicial Reorganisation

In the event of (i) shareholder approval required in connection with the Financial Restructuring pursuant to number 10 of the Milestones Schedule not being obtained when sought and (ii) the filing for Judicial Reorganisation in respect of the Company, the Company shall use its best endeavours to implement the Financial Restructuring, including (but not limited to) not opposing the implementation of the shareholder cram-down mechanisms provided by article L.631-19-2 of the French *Code de Commerce* in a Judicial Reorganisation.

## 6.7    Coordination warrants

In consideration of each member of the Ad Hoc Senior Noteholder Committee's contribution in connection with the negotiation of the Financial Restructuring and the efforts to convince

other Bondholders to become a Participating Bondholders, the Company shall issue the Coordination Warrants (as defined in the Term Sheet) to each member of the Ad Hoc Senior Noteholder Committee its pro rata share of the Coordination Warrants in accordance with the terms and conditions of the Term Sheet.

### 6.8    Refinancing

If at any time following the date of this Agreement it transpires that, in the reasonable opinion of the Company, a refinancing of all (but not part) of the Secured Debt is available on terms that are more beneficial to the Company from an economic perspective than the terms of the Secured Debt as set out in the Term Sheet, the Company shall use all reasonable endeavours to seek to agree in good faith such a refinancing implemented by the relevant member(s) of the Group of all (but not part) of the Secured Debt.

### 6.9    Chapter 11 fees motion

Within seven (7) days of the Company obtaining approval from the supervisory judge (*juge-commissaire*) of the French court in respect of the SN Private Placement Agreement, the Chapter 11 Companies shall file a motion in the US Bankruptcy Court seeking approval of (a) the Chapter 11 Companies to pay the fees, costs and expenses specified in Clause 6.2 (*Relevant advisers' costs, fees and expenses*) herein to the extent that they relate to the Chapter 11 Legal Work and the Chapter 11 Financial Work (as each such term is defined in Clause 6.2 (*Relevant advisers' costs, fees and expenses*) and (b) the Chapter 11 Companies' obligations under the indemnification provisions (Article 9) of the SN Private Placement Agreement (the "**Approval Motion**"), and shall use commercially reasonable efforts thereafter to diligently prosecute such motion to seek approval thereof.

### 6.10    Approval of the SN Private Placement Agreement

In the event that the supervisory judge of the French court gives (a) any written indication that it does not have jurisdiction to approve the SN Private Placement Agreement on or before 5 July 2017 without the Bankruptcy Court approving in advance entry by the Chapter 11 Companies into the SN Private Placement Agreement or (b) has not entered an order in respect of the SN Private Placement Agreement on or before 5 July 2017, then (i) the Chapter 11 Companies will make an application to the Bankruptcy Court for approval of the SN Private Placement Agreement on the basis that the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee waive any termination right that has been or may be triggered under paragraph (o) of Clause 12.1 (*Voluntary termination by Participants*); and (ii) the Company, the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee shall negotiate in good faith regarding any amendments and/or waivers to the Milestones Schedule and/or any other provisions of this Agreement in connection with such action.

## 7    Undertakings by the Participating Secured Lenders

### 7.1    Restrictions on Participating Secured Lenders

Subject to applicable law and/or regulation, until the End Date:

(a)    no Participating Secured Lender may assign any of its rights or transfer any of its rights or obligations in respect of, or declare or create any trust of any of its rights, title, interest or benefits in respect of, its Locked-Up Secured Debt or any other Claims against any member of the Group, or this Agreement (including any monies

and other assets owing to it under or in connection with its Locked-Up Secured Debt or any other Claims against any member of the Group, or this Agreement) to, or in favour of, any person:

(i)     except as permitted under the relevant Secured Finance Documents; and

(ii)    unless the proposed transferee is another Participant and provided that such Participant shall promptly notify the Calculation Agent on behalf of the Company of the revised amount of the Locked-Up Debt following the transfer or, if the proposed transferee is not a Participant, unless and until that person delivers to the Calculation Agent on behalf of the Company a duly completed and signed Accession Letter, in which event the transferee shall be deemed to be a Participating Secured Lender hereunder with respect to all Debt and Claims against any member of the Group held by such transferee,

provided that any assignment by a Participating Secured Lender of any of its rights or any transfer of its rights or obligations in respect of, or declaration or creation of any trust of any of its rights, title, interest or benefits in respect of, its Locked-Up Secured Debt to any person at any time in the period that commences eight (8) days before the relevant voting date in respect of the Safeguard and ends on the date immediately after such vote shall not be taken into account for the purpose of such voting;

(b)    no Participating Secured Lender shall sub-participate any of its rights in respect of its Locked-Up Secured Debt or any other Claims against any member of the Group:

(i)     except as permitted under the relevant Secured Finance Document, including, without limitation, the Intercreditor Agreement; and

(ii)    unless the proposed sub-participant is another Participant and provided that such Participant shall promptly notify the Calculation Agent on behalf of the Company of the revised amount of the Locked-Up Debt following the sub-participation or, if the proposed sub-participant is not a Participant, unless and until that person delivers to the Calculation Agent on behalf of the Company a duly completed and signed Sub-Participant's Letter, in which event the sub-participant shall be deemed to be a Participating Secured Lender hereunder with respect to all Debt and Claims against any member of the Group held by such sub-participant,

provided that any sub-participation by a Participating Secured Lender of any of its rights in respect of its Locked-Up Secured Debt or any other Claims against any member of the Group to any person at any time in the period that commences eight (8) days before the relevant voting date in respect of the Safeguard and ends on the date immediately after such vote shall not be taken into account for the purpose of such voting;

(c)    no Participating Secured Lender shall seek, solicit, support, propose, assist, encourage, vote for, consent to, or participate in any discussions regarding the negotiation or formulation of Alternative Proposal;

(d)    no Participating Secured Lender shall publicly announce its intention not to pursue the Financial Restructuring;

(e)     each Participating Secured Lender shall on reasonable request by the Company or the Calculation Agent from time to time promptly notify the Calculation Agent on behalf of the Company of the amount of Debt and, if different, Locked-Up Secured Debt held by it (provided that where such Participating Secured Lender has entered into or acceded to this Agreement through a Specific Business Unit, it shall not be required to notify the Company of any Debt held by it other than any Locked Up Secured Debt held by its Specific Business Unit); and

(f)     each Participating Secured Lender shall notify the Calculation Agent (on behalf of the Company) of any increase or decrease in the amount of its Locked-Up Secured Debt as set out opposite its name in any Accession Letter or in any Sub-Participant's Letter as soon as reasonably practicable and, in any event, within ten (10) Business Days of such increase/decrease, provided that each Participating Secured Lender shall notify the Calculation Agent (on behalf of the Company) on written request from the Calculation Agent (on behalf of the Company) from time to time of the amount of its Locked-Up Secured Debt within three (3) Business Days of such request.

## 7.2     Purchase and sale of Debt

Nothing in this Agreement shall:

(a)     prevent any Participating Secured Lender from buying Debt in addition to the Locked-Up Secured Debt set out opposite its name in any Accession Letter or in any Sub-Participant's Letter, provided that (i) such Participating Secured Lender shall as soon as practicable notify the Calculation Agent on behalf of the Company of such acquisition, including the amount of such acquisition, and (ii) any such Debt shall, subject to paragraph (b) below, become Locked-Up Debt; or

(b)     limit the ability of a Participating Secured Lender which is a broker-dealer (but only when acting in its capacity as a Qualified Market-Maker in respect of any Debt which is not Locked-Up Debt), after the date it executes this Agreement or an Accession Letter, to buy Debt from a person that is not or has not been a Participant and sell such Debt to a person that is not a Participant at the time of such sale.

## 8     Undertakings by the Participating Bondholders

## 8.1     Restrictions on Participating Bondholders

Subject to applicable law and/or regulation and the terms set out in the Term Sheet, until the End Date:

(a)     Subject to paragraph (b) of this Clause 8.1, no Participating Bondholder may assign any of its rights or transfer any of its rights or obligations in respect of, or declare or create any trust of any of its rights, title, interest or benefits in respect of, its Locked-Up Bond Debt, any Claims against any member of the Group, or this Agreement (including any monies and other assets owing to it under or in connection with its Locked-Up Bond Debt, any Claims against any member of the Group, or this Agreement) (collectively, a "**Transfer**") to, or in favour of, any person, and no such Transfer shall be effective:

(i)     except as permitted under the relevant Bond Documents; and

(ii)     unless the proposed transferee is another Participant and provided that such Participant shall promptly notify the Calculation Agent on behalf of the

Company of the revised amount of its Locked-Up Debt following the transfer or, if the proposed transferee is not a Participant, (i) unless the proposed transferee delivers to the Calculation Agent on behalf of the Company a duly completed and signed Accession Letter within three (3) Business Days of execution of an agreement or trade confirmation in respect of such Transfer or (ii), to the extent that such Transfer occurs within the period of three (3) Business Days immediately prior to the voting date in respect of the Safeguard or the Chapter 11 Cases, unless and until the proposed transferee delivers to the Calculation Agent on behalf of the Company a duly completed and signed Accession Letter prior to the date of such vote, in which event the transferee shall be deemed to be a Participating Bondholder hereunder with respect to all Debt and Claims against any member of the Group held by such transferee,

provided that any assignment by a Participating Bondholder of any of its rights or any transfer of its rights or obligations in respect of, or declaration or creation of any trust of any of its rights, title, interest or benefits in respect of, its Locked-Up Bond Debt to any person at any time in the period that commences eight (8) days before the relevant voting date in respect of the Safeguard and ends on the date immediately after such vote shall not be taken into account for the purpose of such voting;

(b)   no Participating Bondholder shall sub-participate any of its rights in respect of its Locked-Up Bond Debt or any other Claims against any member of the Group:

(i)   except as permitted under the relevant Bond Documents, including, without limitation, the Intercreditor Agreement; and

(ii)   unless the proposed sub-participant is another Participant and provided that such Participant shall promptly notify the Calculation Agent on behalf of the Company of the revised amount of the Locked-Up Debt following the sub-participation or, if the proposed sub-participant is not a Participant, unless and until that person delivers to the Calculation Agent on behalf of the Company a duly completed and signed Sub-Participant's Letter, in which event the sub-participant shall be deemed to be a Participating Bondholder hereunder with respect to all Debt and Claims against any member of the Group held by such sub-participant,

provided that any sub-participation by a Participating Bondholder of any of its rights in respect of its Locked-Up Bond Debt or any other Claims against any member of the Group to any person at any time in the period that commences eight (8) days before the relevant voting date in respect of the Safeguard and ends on the date immediately after such vote shall not be taken into account for the purpose of such voting;

(c)   at any time prior to a Commitment Funding Event, no Participating Bondholder that is also a Commitment Party under the SN Private Placement Agreement may assign any of its rights or transfer any of its rights or obligations in respect of its Locked-Up Bond Debt with respect to which it has a Commitment under the SN Private Placement Agreement unless:

(i)   at the same time it assigns or transfers a pro rata amount of its Commitment to the proposed transferee in accordance with the terms of the SN Private Placement Agreement; and

(ii)   the proposed transferee notifies the Calculation Agent on behalf of the Company of the amount of the Commitment which has been assigned or transferred to it;

(d)   no Participating Convert Holder shall exercise any right to convert any Convertible Bonds held by it into shares in the Company other than pursuant to the implementation and consummation of the Financial Restructuring;

(e)   no Participating Bondholder shall seek, solicit, support, propose, assist, encourage, vote for, consent to, or participate in any discussions regarding the negotiation or formulation of any Alternative Proposal (other than in relation to the refinancing referred in Clause 6.8 (*Refinancing*));

(f)   no Participating Bondholder shall publicly announce its intention not to pursue the Financial Restructuring;

(g)   each Participating Bondholder shall on reasonable request by the Company or the Calculation Agent on behalf of the Company promptly notify the Calculation Agent on behalf of the Company of the amount of Debt and, if different, Locked-Up Bond Debt held by it; and

(h)   each Participating Bondholder shall notify the Calculation Agent (on behalf of the Company) of any increase or decrease in the amount of its Locked-Up Bond Debt as set out opposite its name in any Accession Letter as soon as reasonably practicable and, in any event, within three (3) Business Days of such increase/decrease, provided that each Participating Bondholder shall notify the Calculation Agent (on behalf of the Company) on written request from the Calculation Agent (on behalf of the Company) from time to time of the amount of its Locked-Up Bond Debt within three (3) Business Days of such request.

## 8.2   Purchase and sale of Debt

Nothing in this Agreement shall:

(a)   prevent any Participating Bondholder from buying Debt in addition to the Locked-Up Bond Debt set out opposite its name in any Accession Letter; provided that (i) such Participating Bondholder shall promptly notify the Calculation Agent on behalf of the Company of such acquisition, including the amount of such acquisition, and (ii) any such Debt shall, subject to paragraph (b) below, become Locked-Up Debt; or

(b)   limit the ability of a Participating Bondholder which is a broker-dealer (but only when acting in its capacity as a Qualified Market-Maker in respect of any Debt which is not Locked-Up Debt), after the date it executes this Agreement or an Accession Letter, to buy Debt from a person that is not or has not been a Participant and sell such Debt to a person that is not a Participant at the time of such sale.

## 8.3   Holding of Convertible Bonds

Each Participating Bondholder that is a Convert Holder shall take the appropriate steps so that the Convertible Bonds corresponding to the Locked-Up Convertible Bond Debt set out opposite its name in any Accession Letter be held under the pure registered form (*nominatif*

*pur*) or administrated registered form (*nominatif administré*) within a reasonable timeframe as soon as practicable and in any event no later than ten (10) Business Days from the date it executed this Agreement. Such registration shall also indicate that such Convertible Bonds are subject to transfer restrictions in favour of the Company.

## 9    Limitations on undertakings

(a)    Nothing in this Agreement shall:

    (i)    require any Party to take any action which would breach any legal or regulatory requirement or any order or direction of any relevant court or Governmental Body or Regulator and which impediment cannot be avoided or removed by taking reasonable steps;

    (ii)    prevent any Participant from taking any action that is required by applicable law or regulation or direction of any governmental authority;

    (iii)    prevent any Participant from commencing litigation or taking any other action to enforce its rights as a Participating Bondholder and/or a Participating Secured Lender (as applicable) provided that such action is not inconsistent with the terms of this Agreement;

    (iv)    require any Party to waive or forgo the benefit of any legal advice or professional privilege;

    (v)    restrict, or attempt to restrict, any officer of any member of the Group from commencing insolvency proceedings in respect of that member of the Group if that officer reasonably considers it is required to do so by any law, regulation or fiduciary duty, and such officer may take any steps which may be necessary to comply with any such law, regulation or fiduciary duty;

    (vi)    restrict, or attempt to restrict, any officer of any member of the Group from complying with any applicable securities laws;

    (vii)    except as otherwise set forth herein or in any Restructuring Document, require any Party (other than the Company or any Obligor) to incur any material out-of-pocket costs or expenses unless the Company has agreed to meet those costs or expenses;

    (viii)    require any Party or any member of the Group to bring proceedings or take any action or steps (including, without limitation, any Enforcement Action) which the Company reasonably believes to be inconsistent with this Agreement;

    (ix)    require any Party to take or refrain from taking any action if doing so is likely to, in the reasonable opinion of such person having obtained legal professional advice and such other advice as the circumstances may require: (i) result in any officer, director or employee of that Party incurring personal liability or sanction due to a breach of its fiduciary duties or obligations of that Party; or (ii) result in a breach of law or statue binding on such Party;

    (x)    require any Participant to (i) commence litigation against any of the Secured Agents or Bond Trustees, or (ii) indemnify any of the Secured Agents or Bond Trustees or incur any similar reimbursement obligation, otherwise than in accordance with the terms of the relevant Documents;

(xi)    require any Party to make any additional equity or debt financing available to the Company or any other member of the Group except as expressly contemplated by the Term Sheet and/or the SN Private Placement Agreement;

(xii)    require any Participant (or any of its Affiliates) to increase or extend any existing debt financing or to make any additional equity and/or debt financing available to the Company or any other member of the Group except as expressly contemplated by the SN Private Placement Agreement and/or the Term Sheet;

(xiii)    require any Participant (or any of its Affiliates) to commence or become party to any litigation, court proceedings, arbitration or similar proceedings (whether or not) brought against such Participant (nor any of its Affiliates) by any other Party except as expressly contemplated by the Term Sheet; or

(xiv)    prevent any Participants from buying and selling shares in the Company or any of its Affiliates, subject to the terms and provisions of: (i) the Market Abuse Regulation; and (ii) any relevant Non-Disclosure Agreements.

(b)    Notwithstanding any other provision of this Agreement, if on or before the date that falls two Business Days after the end of the first new money commitment solicitation period in respect of the SN Private Placement Agreement (the "**Relevant Date**"),

(i)    the Company considers (acting reasonably and in good faith and based on objective criteria) that the Financial Restructuring will not be supported by Secured Lenders holding at least 66⅔% of the aggregate principal amount of the Secured Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard, provided that the Parties acknowledge and agree that any failure to satisfy limb (a) of the definition of Threshold Date on or before the Relevant Date shall not constitute such an objective criteria; and/or

(ii)    Participating Senior Noteholders hold less than 66⅔% of the aggregate principal amount of the Senior Note Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard; and/or

(iii)    Participating Bondholders hold less than 66⅔% of the aggregate principal amount of the Bond Debt and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard;

then, the  Company, the Obligors and any other Party may after the Relevant Date and up to the Threshold Date discuss and consider any alternative contingency arrangements to the extent that such arrangements are only to be implemented or consummated if this Agreement is terminated in accordance with Clause 12 (*Termination*), provided that such alternative contingency proposal(s) be disclosed to the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee (or, in event that any such information contains Material Non-Public Information, to the Ad Hoc Secured Lender Committee's Counsel and the Ad Hoc Senior Noteholder Committee's Counsel). In such a situation, the Company shall first inform and discuss with each of the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee to the extent practicable prior to commencing any such discussions. Clause 6 (*Undertakings by the Company and the Obligors*) accordingly shall not apply to, and shall not serve to restrict the taking of, any action which is taken in accordance with this paragraph (b).

(c)    The Company and the Obligors may terminate this Agreement on five (5) days' written notice to the Participants if the board of directors, board of managers or such similar governing

body of the Company and/or any Obligor reasonably determines, with the benefit of legal and/or financial professional advice, that not proceeding with an unsolicited Alternative Proposal would be inconsistent with their respective fiduciary obligations because, taking material implementation risks into account, such Alternative Proposal would be reasonably likely to provide for a higher or better economic recovery for the stakeholders of the Company and/or the Obligors (as applicable), and in any case the Bondholders and the Secured Lenders, than the Financial Restructuring.

(d)     Upon a termination of the Agreement pursuant to paragraph (c) above, except as expressly set forth herein, all obligations of each Party hereunder shall immediately terminate without further action or notice by such Party, and there shall be no liability or obligation on the part of any Party under this Agreement. For the avoidance of doubt, without prejudice to paragraph (b) above or paragraph (a)(ii) of Clause 6.3 (*Restrictions on the Company and the Obligors*) and notwithstanding any provisions to the contrary herein, in order to fulfil the fiduciary obligations of the Company and/or the Obligors, the Chapter 11 Companies may receive, but may not solicit, Alternative Proposal proposed by other parties and discuss and analyse such alternative plans received without breaching or terminating this Agreement, provided that the Company and/or the Obligors in receipt of an Alternative Proposal disclose the terms and nature of such Alternative Proposal to the Committees (or, in the event that any such proposal contains Material Non-Public Information, to the Relevant Counsel) on or before the date that falls five (5) Business Days after the date of receipt of such Alternative Proposal by the Company and/or any Obligor if the Company and/or any Obligor has engaged in discussions regarding such Alternative Proposal for a period of three (3) Business Days. Clause 6 (*Undertakings by the Company and the Obligors*) does not apply to, and shall not serve to restrict the taking of, any action which has received approval from each of the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee.

## 10     Committees

### 10.1    Notification of changes to Committees

From the date of this Agreement, any Participant that becomes or ceases to be a member of a Committee shall within a reasonable timeframe notify the Company in writing of that fact.

### 10.2    Procedure for Committee or Participant decisions

(a)     Where this Agreement contemplates that a particular matter requires the approval, consent, determination, acceptance or election of a Committee or any sub-category or majority of Participants, the Company or other person seeking that approval, consent, determination, acceptance or election (the "**Requesting Party**") shall send its request to the relevant Committee and/or Participants (as applicable) in writing and a copy shall be sent to the Relevant Counsel.

(b)     The Requesting Party shall ensure that a copy of the relevant request has been received by each member of the relevant Committee and/or Participants (as applicable), unless any Committee member or Participant has previously notified such Requesting Party that it does not wish to receive a copy of any such request.

(c)     The Requesting Party shall specify in its request the matter in respect of which that approval, consent, determination, acceptance or election is sought and provide as much information in relation to that matter as is reasonably practicable.

(d)     Within five (5) Business Days of the Requesting Party having notified such request to each member of the relevant Committee and/or Participants, each member of the relevant Committee and/or Participants (as applicable) shall confirm to the Requesting Party its response to the relevant request.

(e)     The Requesting Party (if not the Company) shall notify the Company whether the requisite approval (including a Committee Approval) has been achieved in relation to the relevant request. If the Requesting Party is the Company, the Requesting Party shall notify the Committees whether the requisite approval has been achieved in relation to the relevant request. Unless otherwise specified, any consent approval required to be given by a Committee shall be given on a Committee Approval basis.

(f)     Where the request relates to a matter that does not require Committee Approval:

(i)     if any Participant fails to respond to such a request within the period prescribed in paragraph (d) above, their aggregate amount of Locked-Up Debt shall not be included for the purpose of calculating whether the approval, consent, determination, acceptance or election of the relevant majority of Participants (or sub-category of Participants) has been obtained; and

(ii)    if no Participant responds to such request within the period prescribed in paragraph (d) above, the relevant approval, consent, determination, acceptance or election sought shall be deemed to be given.

## 10.3    Committees do not represent Participants

The Committees will not "act for" the Participants in any representative capacity, will have no fiduciary duties to the Participants or any other person and will have no authority to act for, represent, or commit the Participants. The Committees will have no obligations other than those for which express provision is made in this Agreement (and, for the avoidance of doubt, the Committees are under no obligation to advise or to consult with any Participant on any matter related to this Agreement).

## 10.4    Committees may continue to deal with the Company

The members of the Committees will remain free to deal with the Company and the Group each on its own account and will therefore not be bound to account to any Participant for any sum, or the profit element of any sum, received by it for its own account.

## 10.5    Committees not required to disclose information received in other capacities

No information or knowledge regarding the Company or the Group or its affairs received or produced by any member of Committees in its capacity as a Participant shall be imputed to any member of the Committees.

## 10.6    Committee members can seek their own advice

The Committee members will remain free to seek advice from their own professional advisers regarding their exposure as Participants and will as regards their exposure as Participants at all times continue to be solely responsible for making their own independent

investigation and appraisal of the business, financial condition, creditworthiness, status and affairs of the Company and the Group.

**10.7   Assumptions as to authorisation**

The Committees may assume (and shall not be required to verify) that:

(a)    any representation, notice or document delivered to them is genuine, correct and appropriately authorised;

(b)    any statement made by a director, authorised signatory or employee of any person regarding any matters is within that person's knowledge or within that person's power to verify; and

(c)    any communication made by the Company is made on behalf of and with the consent and knowledge of all the Obligors.

**10.8   Responsibility for documentation**

The Committees:

(a)    will not be responsible for the adequacy, accuracy and/or completeness of any information (whether oral or written) supplied by any Participants, the Company or any member of the Group or any other person given in or in connection with the Financial Restructuring and any associated documentation or the transactions contemplated therein;

(b)    will not be responsible for the legality, validity, effectiveness, completeness, adequacy or enforceability of the Financial Restructuring or any agreement, arrangement or document entered into, made or executed in anticipation of or in connection with the Financial Restructuring;

(c)    will not be responsible for any determination as to whether any information provided or to be provided to any Participant is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise;

(d)    will not be responsible for verifying that any information provided to the Participants (using reasonable endeavours and usual methods of transmission such as email or post) has actually been received and/or considered by each Participant. The Committees shall not be liable for any accidental failure to provide information to any Participant;

(e)    shall not be bound to distribute to any Participant or to any other person, Information received by it in a capacity other than as a member of a Committee; and

(f)    shall not be bound to enquire as to the absence, occurrence or continuation of any Default (as defined under any Document) or the performance by any member of the Group of its obligations under any Document or any other document or agreement.

**10.9   Own responsibility**

(a)    Subject in each case to the terms of Clause 5.2 (*Restructuring Documents*), it is understood and agreed by each Participant that at all times it has itself been, and will continue to be, solely responsible for making its own independent appraisal of an investigation into all risks arising in respect of the business of the Company and the Group or under or in connection

with the Financial Restructuring and any associated documentation (including the SN Private Placement Agreement) including, but not limited to:

(i)    the financial condition, creditworthiness, condition, affairs, status and nature of each member of the Group/the Company;

(ii)    the legality, validity, effectiveness, completeness, adequacy and enforceability of any document entered into by any person in connection with the business or operations of the Company or the Group or any other agreement, arrangement or document entered into, made or executed in anticipation of, pursuant to or in connection with the Financial Restructuring;

(iii)    whether such Participant has recourse (and the nature and extent of that recourse) against the Company or any other person or any of their respective assets under or in connection with the Financial Restructuring and/or any associated documentation, the transactions therein contemplated or any other agreement, arrangement or document entered into, made or executed in anticipation of, pursuant to or in connection with the Financial Restructuring;

(iv)    the adequacy, accuracy and/or completeness of any information provided by the Committees, the Company and advisers or by any other person in connection with the Financial Restructuring, and/or any associated documentation, the transactions contemplated therein or any other agreement, arrangement or document entered into, made or executed in anticipation of, pursuant to or in connection with the Financial Restructuring; and

(v)    the adequacy, accuracy and/or completeness of any advice obtained by the Committees in connection with the Financial Restructuring or in connection with the business or operations of the Company or the Group.

(b)    Accordingly, each Participant acknowledges to the Committees that it has not relied on, and will not hereafter rely on, the Committees or any member of them in respect of any of the matters referred to in paragraph (a) above and that consequently no Committee member shall have any liability (whether direct or indirect, in contract, tort or otherwise) or responsibility to any Participant or any other person in respect of such matters.

(c)    Each Participant acknowledges that it has been represented by, or provided a reasonable period of time to obtain access to and advice by, counsel with respect to the Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Participant with a defence to the enforcement of the terms of this Agreement against such Participant based upon lack of legal counsel shall have no application and is expressly waived.

**10.10  Exclusion of liability**

(a)    Without limiting paragraph (b) below, no Committee member will be liable for any action taken by it (or any inaction) under or in connection with the Financial Restructuring or this Agreement or any other Restructuring Document or owe any duty of care to any Party to this Agreement or any other Restructuring Document, unless directly caused by its gross negligence, fraud or wilful misconduct.

(b)    No Party (other than a member of a Committee) may take any proceedings against any managing member, partner, shareholder, director, officer, employee or agent of any member of such Committee, in respect of any claim it might have against such Committee member

or in respect of any act or omission of any kind by that managing member, partner, shareholder, director, officer, employee or agent in relation to the Financial Restructuring and any director, officer, employee or agent of any Committee member may rely on this paragraph.

## 11    Relevant Counsel

To the extent that the Ad Hoc Secured Lender Committee's Counsel, the Ad Hoc Senior Noteholder Committee's Counsel or the Ad Hoc Convert Holder Committee's Counsel, with the prior consent of the relevant Committee, acts as co-ordinating counsel to any one or more of the Parties in relation to this Agreement, the Financial Restructuring, any of the transactions contemplated by this Agreement or the Financial Restructuring or any post-Financial Restructuring activities of the Company or any other member of the Group, each Party:

(a)    acknowledges that the relevant law firm may, subject to its absolute discretion to determine otherwise, in accordance with applicable professional conduct rules, act in any or all of such capacities and shall not be required to disclose to any person any information it may receive in any or all of such capabilities;

(b)    waives any claim that the relevant law firm's representation of any or all of them or in any or all of such capacities represents a conflict of interest; and

(c)    confirms that it consents to the relevant law firm acting for any or all of them.

## 12    Termination

## 12.1    Voluntary termination by Participants

This Agreement may be terminated with immediate effect by written notification to the Company:

(a)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders if all of the Obligors have not executed this Agreement or acceded to it pursuant to Clause 2.2 (*Accession*) within five (5) Business Days of the date of this Agreement;

(b)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if any of the events set out in the Milestones Schedule has not occurred by the date specified in respect of such event in the Milestones Schedule, provided that (i) the Milestones Schedule may be amended from time to time with the written agreement of each of the Company and the Majority Participating Secured Lenders and the Majority Participating Bondholders and (ii) Milestone 10 in the Milestones Schedule and/or Milestone 12 in the Milestones Schedule shall have been remedied, and will not give rise to a termination right pursuant to this paragraph (b), if within fifteen (15) days from any negative shareholder vote the Company commences Judicial Reorganisation with a view to implementing the Financial Restructuring or an alternative restructuring plan approved by the Company, the Ad Hoc Senior Noteholder Committee, the Ad Hoc Secured Lender Committee, the Majority Participating Secured Lenders and the Majority Participating Bondholders (the "**Rehabilitation Plan**");

(c)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if a final, non-appealable order of a Governmental Body or court of competent jurisdiction restraining or otherwise preventing the implementation of the Financial Restructuring has been made and has not been revoked or dismissed within 35 days of it being made (other than an order made at the instigation of, or on the application of, the Party (or any of its Affiliates) purporting to terminate this Agreement under this paragraph (c));

(d)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if an Insolvency Event occurs (other than (i) an Insolvency Event instigated or commenced by any Participant (or any of its Affiliates) purporting to terminate this Agreement under this paragraph (d) or (ii) an Insolvency Event required to implement and/or consummate the Financial Restructuring);

(e)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if they, acting reasonably, determine that a Material Adverse Effect exists or has occurred since the date of this Agreement;

(f)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if the Company has expressly stated in writing that it will no longer be supporting the Financial Restructuring;

(g)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if an event of default (howsoever defined) is continuing after the Effective Date under any of the Documents and such event of default is not waived, subject to a forbearance agreement or as otherwise contemplated hereby;

(h)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, if the Company takes any action to implement an Alternative Proposal as contemplated by paragraph (c) of Clause 9 (*Limitation on undertakings*);

(i)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders upon the termination of the SN Private Placement in accordance with its terms, provided that if the SN Private Placement is terminated as result of any breach by any Participating Bondholder(s), the Locked-Up Bond Debt of such Participating Bondholder(s) shall not be included for the purposes of calculating the Majority Participating Bondholders for the purposes of this paragraph (i) only;

(j)    at the election of the Majority Participating Secured Lenders or the Majority Participating Senior Noteholders in the event of any change to the economic terms offered to (i) the Senior Noteholders without the prior written approval of a simple majority of the members of Ad Hoc Senior Noteholder Committee (calculated by reference to the principal value of the Senior Notes) and/or (ii) the Secured Lenders without the prior written approval of a simple majority of the members of the Ad Hoc Secured Lender Committee (calculated by reference to the principal value of the Secured Debt);

(k)    at the election of the Majority Participating Secured Lenders or the Majority Participating Bondholders, upon any material breach of this Agreement by the Company or any Obligor if such breach is not cured or remedied within five (5) Business Days of written notice from any Participant to the Company (if such breach is capable of being cured or remedied);

(l)     (A) at the election of the Majority Participating Bondholders, upon any material breach of this Agreement by one or more Participating Secured Lenders, or (B) at the election of the Majority Participating Secured Lenders, upon any material breach of this Agreement by one or more Participating Bondholders, provided, in each case, that with respect to any such breach by a Participating Bondholder or Participating Secured Lender, so long as the non-breaching Participating Bondholders or Participating Secured Lenders (as applicable) at the time of, and subsequent to, such breach hold at least 66⅔% of the aggregate principal amount of all outstanding Bonds or Secured Debt (as applicable), and such breach would not have a material adverse effect on the implementation or consummation of the Financial Restructuring, then this Agreement shall not be terminated except solely with respect to such breaching Secured Lender or Bondholder; provided further that the notice of termination shall include the details of any such breach, and if such breach is capable of being cured or remedied, the breaching Party shall have five (5) Business Days after receiving such notice to cure or remedy any such breach;

(m)     at the election of the Majority Participating Senior Noteholders if the AMF confirms in writing to the Ad Hoc Senior Noteholder Committee and/or the Company that it will not issue an unconditional waiver to launch a mandatory tender offer if needed (at the discretion of the Ad Hoc Senior Noteholder Committee) or in the case of any challenge of such a waiver within ten (10) calendar days of its publication, the French court orders that such waiver be revoked or cancelled;

(n)     at the election of the Majority Participating Senior Noteholders or the Majority Participating Secured Lenders at any time within the period that falls seven (7) Business Days from the date of termination of the restructuring support agreement entered in on or about the date of this Agreement between the Company and DNCA in accordance with its terms (or such longer period as may be agreed by the Company), provided that the Company shall notify the Participants within two (2) Business Days of the date of such termination of the restructuring support agreement;

(o)     at the election of the Ad Hoc Secured Lender Committee or the Ad Hoc Senior Noteholder Committee if (A) the supervisory judge (*juge-commissaire)* of the French court has not authorised the SN Private Placement Agreement on or before 5 July 2017 or (B) the SN Private Placement Agreement has not been executed by the Company and the Obligors within two (2) Business Days of such authorisation; or

(p)     at the election of the Majority Participating Bondholders after 10 August 2017 (or such later date as may be agreed between the Company and the Ad Hoc Senior Noteholder Committee) if by such date both of the following conditions are satisfied: (i) the Bankruptcy Court has not approved the Approval Motion and (ii) the Bankruptcy Court has not approved the SN Private Placement Agreement in full.

## 12.2    Voluntary termination by the Company and/or any Obligor

This Agreement may be terminated with immediate effect by written notification to the Parties:

(a)     at the election of the Company and/or any Obligor, if a final, non-appealable order of a Governmental Body or court of competent jurisdiction restraining or otherwise preventing the implementation of the Financial Restructuring has been made and has not been revoked or dismissed within 35 days of it being made (other than an

order made at the instigation of, or on the application of, the Company or any Obligor);

(b)     at the election of the Company and/or any Obligor, at any time after the occurrence of the breach by any Participating Secured Lender or Participating Bondholder of any of their respective obligations or covenants set forth in this Agreement or any representation or warranty of such Participating Secured Lenders or Participating Bondholders, where such breach has a material adverse impact on the implementation or consummation of the Financial Restructuring, if such breach remains uncured for three (3) Business Days after the receipt by the breaching Participating Secured Lenders or Participating Bondholders, as applicable, of written notice of such breach delivered in accordance herewith, provided in each case, that with respect to any such breach, so long as the non-breaching Participating Bondholders or Participating Secured Lenders (as applicable), at the time of, and subsequent to, such breach hold at least 66⅔% of the aggregate principal amount of all outstanding Bonds or Secured Debt (as applicable), and such breach would not have a material adverse effect on consummation of the Financial Restructuring, then this Agreement shall not be terminated except solely with respect to such breaching Secured Lender or Bondholder;

(c)     at the election of the Company and/or any Obligor, if the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee seek, solicit, propose or support an Alternative Proposal or publicly announce their intention to pursue an Alternative Proposal;

(d)     at the election of the Company and/or any Obligor in accordance with paragraph (c) of Clause 9 (*Limitations on Undertakings*);

(e)     at the election of the Company and/or any Obligor after the date that falls 15 days after the date specified at number 10 of the Milestones Schedule if Judicial Reorganisation has not been commenced on or before such date, provided that the shareholders have not provided the requisite approvals in respect of the Financial Restructuring by such date;

(f)     at the election of the Company and/or any Obligor if any of the events set out at numbers 9, 11 or 12 of the Milestones Schedule has not occurred by the date specified in respect of such event in the Milestones Schedule, provided that such non-occurrence is not the result of any breach by the Company and/or any Obligor of this Agreement;

(g)     at the election of the Company and/or any Obligor if (i) the independent financial expert (*expert indépendant*) appointed by the Company confirms in writing to the Company that the Restructuring Equity Steps are not fair from a financial perspective in accordance with the AMF General Regulation; (ii) any governmental or regulatory body confirms in writing to the Company that it shall not provide any authorizations and/or clearances as may be required for the Company to implement and consummate the Financial Restructuring (including from stock market authorities such as the visa of the AMF on the prospectus(es)) or (iii) the AMF confirms in writing to the Ad Hoc Senior Noteholder Committee and/or the Company that it will not issue an unconditional waiver to launch a mandatory tender offer if needed (at the discretion of the Ad Hoc Senior Noteholder Committee) or in the case of any challenge of such a waiver within ten (10) calendar days of its publication, the French court orders that such waiver be revoked or cancelled;

(h)     at the election of the Company and/or any Obligor if the SN Private Placement Agreement is terminated in accordance with its terms, other than as a result of a breach of the SN Private Placement Agreement by the Company and/or any Obligor; or

(i)     at the election of the Company and/or any Obligor if the SN Private Placement Agreement has not been executed by the members of the Ad Hoc Senior Noteholder Committee (as at the date of this Agreement) within two (2) Business Days of the date on which the supervisory judge (*juge-commissaire)* of the French court has authorised the SN Private Placement Agreement.

## 12.3    Termination by the Ad Hoc Convert Holder Committee

The Ad Hoc Convert Holders shall be entitled to terminate all (but not part) of their rights and obligations under this Agreement, without prejudice to the rights and obligations of any other Parties under this Agreement, if there is any amendment or waiver to the terms of this Agreement (including, for the avoidance of doubt, the Term Sheet) which adversely affects the economics of the Financial Restructuring with respect to the Convert Holders and the Ad Hoc Convert Holder Committee (as at the date of this Agreement or as otherwise agreed by the Company) has not provided its prior written consent in respect of such amendment or waiver.

## 12.4    Automatic termination

(a)     This Agreement shall automatically terminate on the earlier of the Restructuring Effective Date and the Long-Stop Date.

(b)     This Agreement shall automatically terminate if any Cash Collateral Order is terminated and the relevant US Bankruptcy Court has not made a further order permitting the use of Cash Collateral, on terms that have been agreed with the Ad Hoc Secured Lender Committee (acting reasonably and in good faith) within seven (7) Business Days of such termination.

## 12.5    Mutual termination

This Agreement may be terminated at any time by the mutual written agreement of each of the Company, the Obligors, the Majority Participating Secured Lenders and the Majority Participating Bondholders.

## 12.6    Effect of termination

On the date on which this Agreement is terminated under paragraph (c) of Clause 9(b) *(Limitations on undertakings)*, Clause 12.1 (*Voluntary termination by Participants*), Clause 12.2 (*Voluntary termination by the Company and/or any Obligor*), Clause 12.4 (*Automatic termination*) or Clause 12.5 (*Mutual termination*),

(a)     this Agreement shall forthwith become void and of no further force or effect;

(b)     except as expressly set forth in Clause 12.8 (*Surviving obligations*), each Party shall be immediately released from its commitments, obligations, undertakings, and agreements under or related to this Agreement;

(c)     there shall be no liability or obligation on the part of any Party under this Agreement (without prejudice to any rights, liabilities and/or obligations under any Document); and

(d)      each Party shall have all the rights and remedies that it would have had and shall be entitled to take all actions that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived and otherwise provided that (i) the provisions of Clauses 2 (*Effective Date and Accession*), 4 (*Participants' rights and obligations*), 10 (*Committees*), this Clause 12.6 (*Effect of Termination*), 14 (*Disclosure of information*), 15 (*Publicity*), 16 (*Specific performance*), 19 (*Notices*), 21 (*Remedies, waivers and hardship*), 23 (*Reservation of rights*), 24 (*Governing law*), 25 (*Settlement discussions*) and 26 (*Jurisdiction*) shall survive such termination and shall remain in full force and effect and (ii) in no event shall any such termination relieve a Party from breaches of this Agreement which occurred prior to such termination.

## 12.7    Notification of termination

The Company shall promptly notify each Party if it becomes aware that this Agreement may be, or has been, terminated under Clause 12.1 (*Voluntary termination by Participants*) or Clause 12.4 (*Automatic termination*).

## 12.8    Surviving obligations

(a)      In the event of termination of this Agreement prior to entry of an order approving the Disclosure Statement, the Group shall withdraw the Chapter 11 Plan and Disclosure Statement.

(b)      In the event of termination of this Agreement after entry of an order approving the Disclosure Statement, should the Group not withdraw the Chapter 11 Plan and Disclosure Statement, the order approving the Disclosure Statement shall provide (i) that all votes previously submitted in support of the Chapter 11 Plan shall be deemed void ab initio or (ii) alternatively, a reasonable opportunity for the votes previously cast by Participants in favour of the Chapter 11 Plan to be changed to votes against the Chapter 11 Plan.

## 13      Representations

## 13.1    Representations of the Participants

Each Participant makes the representations and warranties set out in this Clause 13.1 to each other Party on the date on which it becomes a Party by reference to the facts and circumstances then existing on that date:

(a)      it is duly incorporated (if a corporate person) or duly established (in any other case) and validly existing under the law of its jurisdiction of incorporation or formation;

(b)      it has the power to own its assets and carry on its business as it is being, and is proposed to be, conducted;

(c)      the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable, subject to any applicable Reservations;

(d)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not conflict with any law or regulation applicable to it or its constitutional documents where such conflict would have a material adverse effect on its ability to implement and consummate the Financial Restructuring or otherwise comply with the terms of this Agreement;

(e)     it has, or will have on the applicable date, the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of this Agreement and (subject to the fulfilment of the conditions to the implementation and consummation of the Financial Restructuring specified in the Term Sheet or the Restructuring Documents) the transactions contemplated by this Agreement;

(f)     where this Agreement is entered into by an Investment Manager as agent for or otherwise on behalf of a Participant, such Investment Manager has the power and is authorised to enter into, perform and deliver this Agreement on behalf of such Participant;

(g)     all necessary Authorisations required for the performance by it of this Agreement and the transactions contemplated by this Agreement have been obtained or effected and are in full force and effect;

(h)     it has the power to vote, deal with, approve changes to, dispose of and transfer all its Locked-Up Debt as contemplated by this Agreement; and

(i)     (except for any Locked-Up Debt held by it in its capacity as a Qualified Market-Maker of Debt where expressly permitted by this Agreement) the Locked-Up Secured Debt and the Locked-Up Bond Debt (as applicable) set out in relation to it in any Accession Letter constitutes all the Debt legally or beneficially held by such Participant (after taking into account any pending transfers).

## 13.2   Repetition

(a)     The representations and warranties set out in Clause 13.1 (*Representations of the Participants*) are deemed to be made by each Participant by reference to the facts and circumstances then existing on the day on which the person becomes (and on which it is proposed that the person becomes) a Participant.

(b)     Delivery of an Accession Letter constitutes confirmation by the relevant person that the representations and warranties set out in Clause 13.1 (*Representations of the Participants*) are true and correct in relation to it as at the date of delivery as if made by reference to the facts and circumstances then existing.

## 13.3   Representations of the Company and Obligors

The Company and each Obligor makes the representations and warranties set out in this Clause 13.3 to each other Party on the date of this Agreement:

(a)     it is duly incorporated and validly existing under the law of its jurisdiction of incorporation;

(b)     it has the power to own its assets and carry on its business as it is being, and is proposed to be, conducted;

(c)     the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable, subject to any applicable Reservations;

(d)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not conflict with any law or regulation applicable to it or its constitutional documents where such conflict would have a material adverse effect

on its ability to implement and consummate the Financial Restructuring or otherwise comply with the terms of this Agreement;

(e)     it has, or will have on the applicable date, the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of this Agreement and (subject to the fulfilment of the conditions to the implementation and consummation of the Financial Restructuring specified in the Term Sheet or the Restructuring Documents) the transactions contemplated by this Agreement;

(f)     subject to any Bankruptcy Court approval that may be required in relation to the Chapter 11 Companies, all necessary Authorisations required for the performance by it of this Agreement and the transactions contemplated by this Agreement have been obtained or effected and are in full force and effect;

(g)     no member of the Group is the legal owner of, or has any beneficial interest in, any Debt as at the date of this Agreement;

(h)     no order has been made, petition presented or resolution passed for the winding-up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any Obligor or Material Subsidiary, and no analogous procedure has been commenced in any jurisdiction, with the exception of any Mandat Ad Hoc and/or Conciliation opened in respect of the Company;

(i)     the Group Structure Chart shows:

        (i)     each member of the Group, any person in whose shares any member of the Group has an interest and any person which has an interest in any member of the Group (excluding the Company) (and, in each case, the percentage of the issued share capital held by that member or person);

        (ii)    the jurisdiction of incorporation or establishment of each person shown in it;

        (iii)   the status of each person shown in it which is not a limited liability company or corporation; and

        (iv)    each Joint Venture in which any member of the Group has an interest or in respect of which any member of the Group has any liability (whether actual or contingent and whether, present or future);

(j)     no litigation, arbitration or administrative proceedings of or before any court, arbitral body or agency which, if adversely determined, would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief) threatened against it or any of its Subsidiaries;

(k)     no labour disputes which would reasonably be expected to have a Material Adverse Effect have been started or (to the best of its knowledge and belief) threatened against it or any of its Subsidiaries, nor are there any circumstances likely to give rise to any such disputes;

(l)     except as previously disclosed expressly in writing to each of the Committees, no event of default or default is continuing as at the date of this Agreement;

(m)     there is no Security over any of its present or future assets which is not permitted under the Documents; and

(n)     all Material Non-Public Information provided by it to a Committee in connection with the Financial Restructuring on or before the date of this Agreement and not superseded before that date has been provided to all Committees (to the extent that the members of the Committee have entered into the relevant Non-Disclosure Agreement with the Company) and is accurate and not misleading in any material respect and all projections provided to any Participant on or before the date of this Agreement have been prepared in good faith on the basis of assumptions which were reasonable at the time at which they were prepared and supplied.

## 14     Disclosure of information

### 14.1     Disclosure by Participants

Subject to the terms of any applicable Non-Disclosure Agreement(s), confidential information about any Obligor, the Group, the Financial Restructuring, this Agreement and any of the transactions contemplated in this Agreement, other than (i) information in the public domain prior to the date of this Agreement or (ii) information which is in the public domain after the date of this Agreement (provided that such information has not been published in breach of this Clause 14), shall not be disclosed by any Participant to any person other than to:

(a)     that Participant's Affiliates, and that Participant's and its Affiliates' officers, directors, employees, professional advisers (including, where applicable, investment managers who manage and/or advise such Participant or its Affiliates), fund administrators and auditors who are bound by duties of confidentiality to the same Participant for the purpose of discussing, negotiating, preparing, executing, implementing or consummating the transactions contemplated by the Financial Restructuring, the Term Sheet and this Agreement;

(b)     the Committees, any member of the respective Committees, any of their officers, directors, employees and professional advisers for the purpose of discussing, negotiating, preparing, executing, implementing or consummating the transactions contemplated by the Financial Restructuring, the Term Sheet and this Agreement;

(c)     any *mandataire ad hoc*, conciliator, judicial administrator, trustee in bankruptcy, creditors' representative and/or any other court appointed officer in a relevant jurisdiction;

(d)     any person to whom information is required or requested to be disclosed by any competent governmental, banking, taxation or other regulatory authority (including stock market authority) or similar body, the rules of any relevant stock exchange or stock market pursuant to any applicable law or regulation or by a court of competent jurisdiction; or

(e)     any other person:

(i)     to (or through) whom that Participant assigns or transfers (or may potentially assign or transfer) all or any of its rights and obligations under this Agreement or any Document as permitted by this Agreement;

(ii)     with (or through) whom that Participant enters into (or may potentially enter into) any sub-participation in relation to, or any other transaction under which payments are to be made by reference to, this Agreement, any Document or any Obligor as permitted by this Agreement,

provided that the person to whom the information is to be given has, prior to any such disclosure, entered into a Confidentiality Undertaking in favour of the Participants and the Company; or

(f)     subject to the Company's approval, any Secured Lender and/or Bondholder in order to seek the execution of or accession to this Agreement by such Secured Lender and/or Bondholder, provided that the person to whom the information is to be given has, prior to any such disclosure, entered into a Confidentiality Undertaking in favour of the Company.

## 14.2    Disclosure by members of the Group

(a)     Subject to the terms of any applicable Non-Disclosure Agreement(s), confidential information about any Obligor, the Group, the Financial Restructuring, the Term Sheet, this Agreement and any of the transactions contemplated by this Agreement other than information in the public domain prior to the date of this Agreement shall not be disclosed by any member of the Group to any person other than:

(i)     to the Bondholders in order to seek the execution of or accession to this Agreement by the Bondholders;

(ii)    to the Secured Lenders in order to seek the execution of or accession to this Agreement by the Secured Lenders;

(iii)   to the Company's managers, officers, directors, employees and professional advisers for the purpose of discussing, negotiating, preparing, executing, implementing or consummating the transactions contemplated by the Financial Restructuring, the Term Sheet and this Agreement;

(iv)    to the Company's and any Obligor's auditors;

(v)     to any person to whom information is required or requested to be disclosed by any competent governmental, banking, taxation or other regulatory authority (including stock market authority), the Bankruptcy Court or similar body, the rules of any relevant stock exchange or stock market pursuant to any applicable law or regulation or by a court of competent jurisdiction;

(vi)    any mandataire ad hoc, conciliator, judicial administrator, trustee in bankruptcy, creditors' representative and/or any other court appointed officer in a relevant jurisdiction; or

(vii)   with the prior consent of each of the Committees.

(b)     Subject to paragraph (f) of Clause 15 (*Publicity*), it is acknowledged and agreed by the Parties that the Company may publish this Agreement and any Restructuring Document to the extent that it considers such action necessary or desirable to comply with applicable disclosure requirements in accordance with paragraph (a)(v) above.

## 14.3    Disclosure by the Committees

No Committee shall be obliged to disclose any information supplied to it to any Participant which has notified the relevant Committee that it does not wish to receive any confidential information from such Committee relating to the Financial Restructuring or the business of the Group.

**15    Publicity**

(c)    Until the End Date, no announcement regarding this Agreement or the Financial Restructuring, including the identity of any Participant, will be made by or on behalf of any Participant without the prior consent of the Company and the Committees, except as permitted by paragraph (c) below.

(d)    The Company shall use reasonable endeavours to supply a copy of any proposed announcement referred to in paragraph (c) above to be made by the Company to the Ad Hoc Secured Lender Committee's Counsel and the Ad Hoc Senior Noteholder Committee's Counsel as soon as reasonably practicable prior to any such announcement and will consider in good faith any comments received from any such Relevant Counsel.

(e)    Paragraph (c) above does not apply to any announcement by any Party required by law or regulation (including, for the avoidance of doubt, the Bankruptcy Code) or any applicable stock exchange, any market authority or any announcement made on or about the date of this Agreement regarding the key terms of the Financial Restructuring and the arrangements and transactions contemplated in this Agreement. Where any Party is required to make such an announcement:

(i)    and such announcement references individual members of any Committee, the Party required to make the announcement shall provide a copy of the proposed announcement to any such Committee members before making the relevant announcement to the extent reasonably practicable; and

(ii)    unless the requirement is to make an immediate announcement with no time for consultation, shall consult with the Company before making the relevant announcement.

(f)    Notwithstanding paragraphs (c) to (e) above, unless required by law or regulation (including, for the avoidance of doubt, the Bankruptcy Code) or any applicable stock exchange or any market authority (including the AMF), the Company and/or any of its Subsidiaries shall not be entitled to disclose the percentage or principal amount of Locked-Up Debt held by any Participant and the names of any Participant (the "**Confidential Information**") without the approval of the relevant Participant. In the event that the Company or any of its Subsidiaries is required or requested by law or regulation, the AMF, or by any court of competent jurisdiction or any enquiry or investigation by any governmental, official or regulatory body which is lawfully entitled to request or require any such disclosure, to disclose or communicate any of the Confidential Information, the Company and/or any of its Subsidiaries shall, before making any disclosure of such Confidential Information to the entity which has requested it, to the extent legally permissible and reasonably practicable, provide the relevant Participant with prompt prior written notice thereof in order to enable such Participant to take all reasonable protective measures or actions and to provide for, to the extent legally permitted and reasonably practicable, a prior consultation with such Participant in respect of the scope and form of the proposed disclosure.

**16    Specific performance**

Without prejudice to any other remedy available to any Party, the obligations under Clause 5.1 (*Support for the Financial Restructuring*), Clause 5.2 (*Restructuring Documents*) and Clause 5.4 (*Restrictions on enforcement*) shall be the subject of specific performance by the relevant Parties pursuant to articles 1221 *et seq.* of the French *Code civil*. Each Party acknowledges that damages shall not be an adequate remedy for breach of the obligations

under Clause 5.1 (*Support for the Financial Restructuring*), Clause 5.2 (*Restructuring Documents*) and Clause 5.4 (*Restrictions on enforcement*).

## 17    Further assurance

The Company and each of the Participants shall promptly execute and deliver such other documents or agreements and take such other action as may be reasonably necessary for the implementation of this Agreement and the consummation of the transactions contemplated by this Agreement.

## 18    No solicitation

This Agreement is not, and shall not be deemed, a solicitation for votes in favour of a Chapter 11 Plan or a solicitation to tender or exchange any of securities. Votes in acceptance of a Chapter 11 Plan by Participants will not be solicited until such Participants have received a Disclosure Statement and related ballot(s) as approved by the Bankruptcy Court or such solicitation otherwise complies with section 1125 of the Bankruptcy Code. Each Party further acknowledges that no securities of any Obligor are being offered or sold hereby and that this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of any Obligor. Notwithstanding the foregoing provisions, nothing in this Agreement shall require any Party to take any action prohibited by the Bankruptcy Code, the Securities Act of 1933 (as amended), the Securities Exchange Act of 1934 (as amended), any rule or regulation promulgated thereunder, any other applicable law or regulation, an order or direction from any court, or any state or federal governmental authority.

## 19    Notices

### 19.1    Communications in writing

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by fax, letter or email.

### 19.2    Addresses

(a)    The address and email address of each Party for any communication or document to be made or delivered under or in connection with this Agreement is that set out opposite its name in Schedule 8 (*Notice Details*) or (if applicable) its Accession Letter, which address may be of its Investment Manager (or any substitute address, email address and fax number as a Party may notify to all other Parties by not less than five (5) Business Days' notice).

(b)    In the absence of any address, email address and/or fax number being given on the relevant signature page or Accession Letter, the relevant details shall be those applicable to it under the Intercreditor Agreement.

### 19.3    Delivery

(a)    Subject to Clause 19.4 (*English language*), any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

(i)        if by way of fax, when received in legible form;

(ii) if by way of letter, when it has been left at the relevant address or five (5) Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address; and

(iii) if by way of electronic communication, by electronic mail or other electronic means, when actually received in readable form,

and, if a particular department or officer is specified as part of its address details provided under Clause 19.2 (*Addresses*), if addressed to that department or officer.

(b) Any communication or document to be made or delivered to a Committee will be effective only when actually received by the relevant Committee and then only if it is expressly marked for the attention of the department or officer identified in Schedule 8 (*Notice Details*) to this Agreement (or any substitute department or officer specified in accordance with Clause 19.2 above)).

(c) Any communication or document to be made or delivered by the Company to a Committee shall also be copied to the Relevant Counsel (as applicable).

(d) Any communication or document made or delivered to an Investment Manager identified with a Participant's name in Schedule 8 (*Notice Details*) or (if applicable) its Accession Letter as acting on behalf of a Participant as agent or otherwise will be deemed to have been made or delivered to the Participant.

(e) Any communication or document made or delivered to the Company in accordance with this Clause will be deemed to have been made or delivered to each of the Obligors.

## 19.4 English language

(a) Any notice given under or in connection with this Agreement must be in English.

(b) All other documents provided under or in connection with this Agreement must be:

(i) in English; or

(ii) if not in English, and if so required by any Committee, accompanied by a free English translation and, in this case, the English translation will prevail other than in respect of the Safeguard Plan, the Rehabilitation Plan (if applicable), any other documents relating to the Safeguard, the Rehabilitation Plan (if applicable), any document that is constitutional, statutory, corporate or any other official document.

## 20 Partial invalidity

If, at any time, any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 21 Remedies, waivers and hardship

## 21.1 Remedies and waivers

No failure to exercise, nor any delay in exercising, on the part of any Participant, any right or remedy under any document in relation to any Debt shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in this

Agreement are cumulative and not exclusive of any rights or remedies provided by law, subject to Clause 21.2 (*No hardship*).

## 21.2    No hardship

Each Party hereby acknowledges that the provisions of article 1195 of the French *Code civil* shall not apply to it with respect to its obligations under this Agreement and that it shall not be entitled to make any claim under article 1195 of the French *Code civil*.

## 21.3    Interest accrued

Nothing in this Agreement shall constitute a waiver on the part of any Participating Senior Noteholder or Participating Secured Lender of their rights to any interest that may accrue on the Senior Note Debt or the Secured Debt (as applicable), including (but not limited to) during the Safeguard.

## 22    Amendments and waivers

## 22.1    Required consents

(a)    Subject to Clause 22.2 (*Exceptions and other amendments*), any term of this Agreement in respect of which an amendment or waiver which, in each case, is minor or technical is requested may be amended or waived only with the consent of the Ad Hoc Secured Lender Committee and the Ad Hoc Senior Noteholder Committee and the Company and any such amendment or waiver will be binding on all Parties.

(b)    The Company may effect, on behalf of any Participant, any amendment or waiver permitted by this Clause 22.

(c)    The Majority Participating Secured Lenders and/or the Company shall not amend the terms of the Cash Collateral Orders in a manner that is inconsistent in substance with the terms of the Cash Collateral Term Sheet in the form scheduled to this Agreement without the prior written consent of the Majority Participating Bondholders (such consent not to be unreasonably withheld).

(d)    The Majority Participating Bondholders and/or the Company shall not amend the SN Private Placement Agreement in a manner that is inconsistent in substance with the form of the SN Private Placement Agreement scheduled to this Agreement without the prior written consent of the Majority Participating Secured Lenders (such consent not to be unreasonably withheld).

(e)    The Parties acknowledge and agree that any amendment of the Cash Collateral Term Sheet which is minor or technical may be made with the consent of the Company and/or the relevant Obligor(s) (as applicable) and the Ad Hoc Secured Lender Committee.

(f)    The Parties acknowledge and agree that any amendment of the SN Private Placement Agreement which is minor or technical may be made with the consent of the Company and the Ad Hoc Senior Noteholder Committee.

## 22.2    Exceptions and other amendments

(a)    No amendment or waiver of this Agreement which is not minor or technical shall be made without the prior consent of the Company and the Majority Participating Secured Lenders and the Majority Participating Bondholders.

(b)     No amendment or waiver of Clause 6.7 (*Coordination warrants*) or Clause 12.8 (*Surviving obligations*) can be made without the consent of the Company and the Ad Hoc Senior Noteholder Committee.

(c)     An amendment or waiver which imposes a more onerous obligation on any Participant or adversely affects any Participant disproportionately in comparison to other Participants may not be effected without the consent of that Participant.

## 23     Reservation of rights

(a)     Unless expressly provided to the contrary, this Agreement does not amend or waive any Party's rights under the Documents or any other documents and agreements, or any Party's rights as creditors of the Company or any member of the Group unless and until the Financial Restructuring is consummated (and then only to the extent provided under the terms of the Restructuring Documents).

(b)     The Parties fully reserve any and all of their rights until such time as the Financial Restructuring is implemented.

(c)     If this Agreement is terminated by any Party for any reason, the rights of that Party against the other Parties to this Agreement and those other Parties' rights against the terminating Party shall be fully reserved.

(d)     This Agreement and all communications and negotiations relating thereto and the subject matter thereof constitute settlement discussions under Federal Rule of Evidence 408 and any similar rule of evidence under any other applicable law in connection with a proposed settlement among the Parties with respect to the claims held by the Participants and shall in no event be construed as or be deemed to be evidence of, an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defences which it has asserted or could assert. In the event the Financial Restructuring is not implemented, nothing contained in this Agreement or any negotiations or writings in connection herewith shall in any way be construed as, or be deemed to be evidence of an admission, concession, or agreement as to the merits or legal positions of any of the Parties with respect to the Term Sheet or any other Restructuring Document, and the Parties shall not use this Agreement or any negotiations or writings in connection herewith as evidence of any such admission, concession or agreement.

## 24     Governing law

Without overriding the governing law of the relevant Documents, this Agreement and any non-contractual obligations arising out of or in connection with it is governed by French law, provided that paragraph (a) of Clause 8.1 (*Restrictions on Participating Bondholders*) to the extent that it relates to the Senior Notes shall be governed by New York law.

## 25     Settlement Discussions

All communications and negotiations relating to this Agreement, the Financial Restructuring and the subject matter thereof constitute settlement discussions under Federal Rule of Evidence 408 and any similar rule of evidence under any other applicable law in connection with a proposed settlement among the Parties with respect to the claims held by the Participants. Nothing herein shall be deemed an admission of any kind.

**26    Jurisdiction**

The Commercial Court of Paris (*Tribunal de commerce de Paris*) shall have exclusive
jurisdiction to settle any dispute arising out of or in connection with this Agreement (including
a dispute relating to the existence, validity or termination of this Agreement), provided that
the Bankruptcy Court shall have exclusive jurisdiction to settle any dispute arising out of or
in connection with this Agreement with respect to the Cash Collateral Orders, the Chapter
11 Plan, any of the pleadings in respect of the Chapter 11 Cases and/or paragraph (a) of
Clause 8.1 (*Restrictions on Participating Bondholders*) to the extent that it relates to the
Senior Notes.

**This Agreement has been entered into on the date stated at the beginning of this Agreement.**

EXECUTION VERSION

**Schedule 1**
**The Obligors**

| Name of Obligor | Jurisdiction of incorporation | Registration number (or equivalent, if any) | Obligor capacity |
|---|---|---|---|
| CGG Holding B.V. | Netherlands | Trade register number 34314931 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| CGG Holding (US) Inc. | Delaware | 4214483 | Borrower under US RCF Credit Agreement and TLB Credit Agreement; Guarantor under French RCF Facility Agreement and Senior Notes |
| CGG Marine B.V. | Netherlands | Trade register number 34349332 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| CGG Services (US) Inc. | Delaware | 0807452 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| Viking Maritime Inc. | Delaware | 3374834 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| Alitheia Resources Inc. | Delaware | 3822770 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| CGG Land (U.S.) Inc. | Delaware | 2731242 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| CGG Marine Resources Norge AS | Norway | 980 464 989 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| Sercel, Inc. | Oklahoma | 1900502517 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |

A33619158

| Name of Obligor | Jurisdiction of incorporation | Registration number (or equivalent, if any) | Obligor capacity |
|---|---|---|---|
| Sercel-GRC Corp. | Oklahoma | 1912329139 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| CGG Canada Services Ltd. | Canada | 208641803 | Guarantor under Senior Notes |
| Sercel Australia PTY Ltd. | Australia | ACN 107 312 041 | Guarantor under Senior Notes |
| CGG Holding I (UK) Limited | England | 09883009 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |
| Sercel Canada Ltd. | Canada | 512684 | Guarantor under Senior Notes |
| CGG Holding II (UK) Limited | England | 09881926 | Guarantor under French RCF Facility Agreement, US RCF Credit Agreement, TLB Credit Agreement and Senior Notes |

**Schedule 2**
**Chapter 11 Companies**

| Company Name |
| --- |
| Alitheia Resources Inc. |
| CGG Canada Services Ltd. |
| CGG Holding (U.S.) Inc. |
| CGG Holding B.V. |
| CGG Holding I (UK) Ltd. |
| CGG Holding II (UK) Ltd. |
| CGG Land (U.S.) Inc. |
| CGG Marine B.V. |
| CGG Marine Resources Norge AS |
| CGG Services (U.S.) Inc. |
| Sercel Canada Ltd. |
| Sercel Inc. |
| Sercel-GRC Corp. |
| Viking Maritime Inc. |

## Schedule 3
## The Committees

**PART A: AD HOC SECURED LENDER COMMITTEE**

| Ad Hoc Secured Lender Committee Member | Notice Details |
| --- | --- |
| Makuria Investment Management (UK) LLP | 30 Charles II Street<br>London<br>SW1Y 4AE |
| Goldman Sachs International<br>133 Fleet Street<br>London, UK<br>EC4A 2BB<br>Attention: European Special Situations Group | 133 Fleet Street<br>London, UK<br>EC4A 2BB<br>Attention: European Special Situations Group |
| Sculptor Investments S.à.r.l | 6D route de Trèves<br>L-2633 Senningerberg<br>Luxembourg |

**PART B: AD HOC SENIOR NOTEHOLDER COMMITTEE**

| Ad Hoc Senior Noteholder Committee Member | Notice Details |
| --- | --- |
| Alden Global Capital, LLC | Alden Global Capital, LLC<br>885 Third Avenue, 34th Floor<br>New York, NY 10022<br>United States of America<br>Attn: Chief Legal Officer<br>Email: notices@aldenglobal.com<br>Tel: 212-888-5500 |
| Attestor Capital LLP | Attestor Capital LLP<br>20 Balderton Street<br>London W1K 6TL<br>United Kingdom<br>Attn: Operations team / Isobelle White<br>Email: ops@attestorcapital.com<br>Tel: +44 20 7074 9610<br>Fax: +44 20 7074 9611 |
| Aurelius Capital Management, LP | Aurelius Capital Management, LP<br>535 Madison Avenue, 22nd Floor<br>New York, NY 10022 |

| Ad Hoc Senior Noteholder Committee Member | Notice Details |
|---|---|
| | United States of America<br>Attn: Legal<br>Email: jrubin@aurelius-capital.com ; dtiomkin@aurelius-capital.com<br>Tel: 646-445-6590 |
| Boussard & Gavaudan Asset Management, LP | Boussard & Gavaudan Asset Management, LP<br>One Vine Street<br>London W1J 0AH<br>United Kingdom<br>Attn: Compliance and Legal<br>Email: BG.legal@bgam-fr.com<br>Tel: +44 20 3751 5400<br>Fax: +44 20 7287 5746 |
| Contrarian Capital Management, L.L.C. solely in its representative capacity as advisor to each of:<br>Contrarian Capital Fund I, L.P.<br>Contrarian Dome du Gouter Master Fund, LP<br>Contrarian Centre Street Partnership, L.P.<br>Contrarian Opportunity Fund, L.P.<br>Contrarian Capital Senior Secured, L.P.<br>Contrarian Emerging Markets, L.P.<br>Contrarian EM SIF Master L.P.<br>Boston Patriot Summer St LLC | Contrarian Capital Management, L.L.C.<br>411 West Putnam Avenue<br>Greenwich, CT 06830<br>Attn: Josh Weisser ; Jeff Bauer<br>Email: jweisser@contrariancapital.com ; jeffbauer@contrariancapital.com<br>Tel: 203-832-8278<br>Fax: 203-629-1977 |
| Third Point LLC | Third Point LLC<br>390 Park Avenue, 18th Floor<br>New York, NY 10022<br>United States of America<br>Attn:  Operations<br>Email: operations@thirdpoint.com<br>Tel: 212-715-3488 |

**PART C: THE AD HOC CONVERT HOLDER COMMITTEE**

| Ad Hoc Convert Holder Committee | Notice Details |
|---|---|

**Schedule 4**
**Form of Accession Letter**

To:      (1)        CGG S.A. as the Company

         (2)        Lucid Issuer Services Limited as Calculation Agent

From:    [*Proposed Participating Secured Lender /Participating Bondholder*]

Dated:

Dear Sirs

**CGG S.A. - Lock-Up Agreement**

**dated [_____] (the "Agreement")**

**1**       We refer to the Agreement. This is an Accession Letter. Terms defined in the Agreement have the same meaning in this Accession Letter unless given a different meaning in this Accession Letter.

**2**       [*Proposed Participating Secured Lender/ Participating Bondholder*] hereby agrees to be bound by the terms of the Agreement as a [Participating French RCF Lender/Participating US RCF Lender/Participating TLB Lender/ Participating Senior Noteholder/ Participating Convert Holder] and (with respect to the Placement Period (as defined in the SN Private Placement Agreement) only) confirms (if it is a Participating Senior Noteholder) by checking the appropriate box in the right-hand column that **EITHER**:

| | Check (✓) appropriate box |
|---|---|
| **OPTION A**<br><br>It agrees to accede to the Agreement in accordance with this Accession Letter but does not wish to enter into the SN Private Placement Agreement | |
| **OR** | |
| **OPTION B**<br><br>It agrees to accede to the Agreement in accordance with this Accession Letter and agrees to enter into the SN Private Placement Agreement. (A copy of the Joinder Agreement (as defined in the SN Private Placement Agreement must be enclosed) if the SN Private Placement has been signed by the Compay). | |

[EITHER]

**3**       [*Proposed Participating Secured Lender's/ Participating Bondholder's*] Locked-Up Debt is as follows:

| [Proposed Participating Secured Lender]/ [Proposed Participating Bondholder] | Type of Locked-Up Debt | [Principal amount of Locked-Up Secured Debt]/ [Amount of Locked-Up Bond Debt] |
|---|---|---|
| | [Locked-Up French RCF Debt/ Locked-Up US RCF Debt/ Locked-Up TLB Debt/ Locked-Up Senior Note Debt/ Locked-Up Convertible Bond Debt] | |

**[OR]**

4    *[Proposed Participating Secured Lender/ Participating Bondholder]* has acquired the following *[Locked-Up Secured Debt]/[Locked-Up Bond Debt]* from *[details of transferor Participant]*:

| [Proposed Participating Secured Lender]/ [Proposed Participating Bondholder] | Type of Locked-Up Debt | [Principal amount of Locked-Up Secured Debt]/ [Amount of Locked-Up Bond Debt] [Backstop Commitment and Backstop Percentage and/or Subscription Commitment and Backstop Percentage] |
|---|---|---|
| | [Locked-Up French RCF Debt/ Locked-Up US RCF Debt/ Locked-Up TLB Debt/ Locked-Up Senior Note Debt/ Locked-Up Convertible Bond Debt] | |

5    **[DELETE IF NOT APPLICABLE]** [[*Senior Noteholder*] has entered into the Private Participation Agreement on or around the date of this Accession Letter.]

6    *[Proposed Participating Secured Lender's/ Participating Bondholder's]* administrative details are as follows:

Address:

Fax No:

Attention:

7    This Accession Letter is governed by French law.

*[Proposed Participating Secured Lender/ Participating Bondholder or investment manager on behalf of such party]*

By:

**Schedule 5**
**Form of Sub-Participant's Letter**

To:    (1)     CGG S.A. as the Company

       (2)     Lucid Issuer Services Limited as Calculation Agent

From:   [*Proposed Sub-Participant*]

Dated:

Dear Sirs

**CGG S.A. - Lock-Up Agreement**

**dated [_____] (the "Agreement")**

1     We refer to the Agreement. This is a Sub-Participant's Letter. Terms defined in the Agreement have the same meaning in this Sub-Participant's Letter unless given a different meaning in this Sub-Participant's Letter.

2     [*Proposed Sub-Participant*] agrees to exercise all of its rights in respect of Locked-Up Secured Debt as if it was a Participating Secured Lender.

3     [*Proposed Sub-Participant's*] sub-participation in the Locked-Up Debt is as follows:

| Participating Secured Lender / Particpating Bondholder | Principal amount of locked-Up Secured Debt / Locked-Up Bond Debt |
|---|---|
|  |  |

4     [*Proposed Sub-Participant's*] administrative details are as follows:

Address:

Fax No:

Attention:

5     This Sub-Participant's Letter is governed by French law.

[*Proposed Sub-Participant or investment manager on behalf of such party*]

By:

**Schedule 6**
**Term Sheet**

THIS TERM SHEET IS NOT AN OFFER OR THE SOLICITATION OF AN OFFER WITH RESPECT TO ANY SECURITIES. ANY SUCH OFFER WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED TRANSACTION.

**CGG S.A.**
**PROPOSED HIGH-LEVEL TERMS FOR BALANCE SHEET RESTRUCTURING**

**Definitions and transaction summary**

Part A: Definitions and construction

| | |
|---|---|
| **Accrued Convertible Bond Interest Payment:** | means the payment in cash by the Company of the EUR equivalent of an amount of USD5 million of accrued and unpaid interest in respect of the Convertible Bonds. |
| **Accrued Interest Payments:** | means the Accrued Convertible Bond Interest Payment and the Accrued Senior Note Interest Payment. |
| **Accrued Senior Note Interest Payment:** | means the payment by way of New SN Interest Second Lien Notes of an amount of up to USD86 million of accrued and unpaid interest in respect of the Senior Notes. |
| **Ad Hoc Secured Lender Committee:** | shall have the meaning ascribed to it in the Debt Lock-up Agreement. |
| **Ad Hoc Senior Noteholder Committee:** | shall have the meaning ascribed to it in the Debt Lock-up Agreement. |
| **Backstop Issue:** | means the issuance of Backstop Warrants to be implemented pursuant to Step 10 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Backstop Warrants:** | means the Warrants to be issued pursuant to Step 10 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Business Day:** | means a day (other than a Saturday or Sunday) on which banks are open for general business in London, Luxembourg, Paris and New York. |
| **Commitment Period:** | shall mean a period of ten calendar days that will start two business days after the issuance by the supervising judge of an order authorising the entering into of the private placement under the SN Private Placement Agreement, provided that the SN Private Placement Agreement has been signed by the Company, the private placement agent named therein, and all the members of the Ad Hoc |

Senior Noteholder Committee as at the date of the Debt Lock-up Agreement, and during which accession to the SN Private Placement Agreement is opened.

| | |
|---|---|
| **Company:** | means CGG S.A. |
| **Company Debt:** | (i)   Convertible Bonds;<br>(ii)   Senior Notes; and<br>(iii)   Secured Debt. |
| **Convert Holder:** | means the holders of the Convertible Bonds. |
| **Convertible Bond Claim:** | means the amount in principal (in EUR) together with accrued and unpaid interest under the Convertible Bonds as of the Reference Date |
| **Convertible Bond Equitization:** | means the equitization of the Convertible Bonds pursuant to Step 4 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Convertible Bonds:** | (i)   EUR325,165,550 1.75% obligations à option de conversion et/ou d'échange en actions nouvelles ou existantes with the Company as issuer; and<br>(ii)   EUR34,935,569 1.25% obligations à option de conversion et/ou d'échange en actions nouvelles ou existantes with the Company as issuer. |
| **Coordination Issue:** | means the issuance of Warrants to be implemented pursuant to Step 9 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Coordination Warrants:** | means the Warrants to be issued pursuant to Step 9 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Debt Lock-up Agreement:** | means the lock-up agreement dated the date hereof between the Company, the companies named in Schedule 1 thereto, the Calculation Agent (as defined therein) and certain entities as Participating Secured Lenders and Participating Bondholders (as those terms are defined therein) to which this Term Sheet is attached. |
| **Eligible Senior Note Holders:** | shall have the meaning ascribed to it in the SN Private Placement Agreement. |
| **Excluded Guarantors:** | shall have the meaning given to it in paragraph 15 of <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **French RCF:** | means the USD325,000,000 Revolving Credit Facility dated 31 July 2013 with the Company as borrower (as amended, supplemented and/or restated from time to time, most recently on 4 February 2016). |
| **Group:** | means the Company and its subsidiaries. |
| **Historical Shareholders:** | mean all the holders of Shares entitled to receive the preferential subscription rights relating to the Rights Issue. |
| **Holding US:** | means CGG Holding (U.S.) Inc. |

| | |
|---|---|
| **Long-Stop Date:** | means the latest date on which the Restructuring Effective Date shall occur, which is 28 February 2018 or as otherwise extended in accordance with the Debt Lock-up agreement. |
| **New First Lien Secured Notes:** | means the New First Lien Secured Notes issued to the holders of the Secured Debt in exchange for their debt claims, as set out in <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **New Money:** | means USD375 million gross cash proceeds of the Second Lien Notes Issue plus the EUR equivalent of USD125 million of the Rights Issue. |
| **New SN Interest Second Lien Notes** | means the New SN Interest Second Lien Notes issued to Senior Noteholders pursuant to Step 8 of the Restructuring as described in Part B (Summary of the Restructuring) below |
| **Outstanding Amount:** | shall have the meaning given to it in paragraph 7 of <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **Permitted Junior Debt Refinancing:** | shall have the meaning given to it in paragraph 8 of <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **Reference Date:** | means the last day of the subscription period of the Rights Issue as it may be amended. |
| **Restructuring:** | means the balance sheet restructuring transactions of the Company and its subsidiaries contemplated in this term sheet. |
| **Restructuring Effective Date:** | shall have the meaning given to it in the Debt Lock-up Agreement. |
| **Restructuring Equity Steps:** | mean Step 2 to Step 10 (other than Step 6) of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Restructuring Steps:** | mean the Share Capital Reduction, the Restructuring Equity Steps as well as the exchange of the Secured Debt for New First Lien Secured Notes in accordance with Step 6 of the Restructuring as described in Part B (Summary of the Restructuring) below and <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **Restructuring Support Agreement:** | means any restructuring support agreement between the Company, and certain shareholder(s) of the Company signed or to be signed with the Company to which this Term Sheet is or will be attached and pursuant to which such shareholder(s) support(s) the Restructuring. |
| **Rights Issue:** | means the rights issue with preferential subscription rights in favour of Historical Shareholders (augmentation de capital avec maintien du droit préférentiel de souscription) by way of issuance of new Shares with Warrants #2 (bons de souscription d'actions) pursuant to Step 3 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Rollover Fee:** | shall have the meaning given to it in paragraph 18 of <u>Appendix 2</u> (Summary of terms of New First Lien Secured Notes). |
| **Second Lien Notes:** | mean the second lien notes, the subscribers of which will be allocated Warrants #3 as described in Step 7 of the Restructuring as |

described in Part B (Summary of the Restructuring) below and
Appendix 1.

| | |
|---|---|
| **Second Lien Note Issue:** | means the issuance of Second Lien Notes to be implemented pursuant to Step 7 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Secured Debt:** | means the French RCF, the US RCF and the TLB. |
| **Secured Lenders:** | mean the Company Debt holders under:<br>(i)     French RCF;<br>(ii)    TLB; and<br>(iii)   US RCF. |
| **Senior Note Claim:** | means the amount in principal together with accrued and unpaid interest under the Senior Notes as of the Reference Date. |
| **Senior Note Equitization:** | means the equitization of the Senior Notes pursuant to Step 5 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Senior Noteholders:** | means the holders of the Senior Notes. |
| **Senior Notes:** | (i)     EUR400,000,000 5.875% guaranteed Senior Notes due 2020 with the Company as issuer (the "2020 Senior Notes");<br>(ii)    USD675,625,000 6.5% guaranteed Senior Notes due 2021 with the Company as issuer (the "2021 Senior Notes"); and<br>(iii)   USD419,636,000 6.875% guaranteed Senior Notes due 2022 with the Company as issuer (the "2022 Senior Notes"). |
| **Shares:** | mean ordinary shares in the capital of the Company.<br>(As of 31 May 2017, the issued share capital of the Company was €17,706,519.2 divided into 22,133,149 ordinary shares, with a nominal value of €0.8.) |
| **SN Private Placement Agreement:** | shall have the meaning ascribed to it in the Debt Lock-up Agreement. |
| **SN Private Placement Percentage:** | shall have the meaning ascribed to Private Placement Percentage in the SN Private Placement Agreement. |
| **Termed Out French RCF Lender:** | shall have the meaning given to it in paragraph 2 of Appendix 2 (Summary of terms of New First Lien Secured Notes). |
| **TLB:** | means the USD500,000,000 US Term Loan B dated November 19, 2015 with Holding US as borrower (as amended, supplemented and/or restated from time to time). |
| **Upfront Pay Down:** | shall have the meaning given to it in paragraph 19 of Appendix 2 (Summary of terms of New First Lien Secured Notes). |
| **US RCF:** | means the USD165,000,000 Revolving Credit Facility dated July 15, 2013 with Holding US as borrower (as amended, supplemented and/or restated from time to time, most recently on 10 January 2016). |

| | |
|---|---|
| **Warrants:** | mean Share warrants (bons de souscription d'actions) giving the right to subscribe to newly issued Shares. |
| **Warrants #1:** | means Warrants (bons de souscription d'actions) granted for free to Historical Shareholders giving the right to subscribe to newly issued Shares pursuant to Step 2 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Warrants #2:** | means Warrants (bons de souscription d'actions) issued with new Shares with respect to the Rights Issue pursuant to Step 3 of the Restructuring as described in Part B (Summary of the Restructuring) below. |
| **Warrants #3:** | means Warrants (bons de souscription d'actions) issued with new Second Lien Notes pursuant to Step 7 of the Restructuring as described in Part B (Summary of the Restructuring) below. |

**Currency conversions**: Save where indicated to the contrary in this term sheet, any USD amount that is required to be converted into a EUR amount will be converted using the Reuters USD/EUR exchange rate applicable as at midday (CET) on the date of the judgment opening the safeguard in respect of the Company.

**Chapter 11 and safeguard plan:** note that the chapter 11 plan (if any) relating to certain Company Subsidiaries and the safeguard plan relating to the Company shall contain such other provisions as are customary for restructuring transactions of this type, including, without limitation, provisions respecting releases, exculpation, discharge, avoidance action retention, jurisdiction retention and assumption and rejection of executory contracts, where applicable to the chapter 11 plan and the safeguard plan, respectively.

Part B: Summary of the Restructuring

| | **Description of the Restructuring Equity Steps** |
|---|---|
| **1. Reduction in the share capital of the Company** | The Company will implement a share capital reduction not justified by losses (*non motivée par des pertes*) by way of reduction of the nominal value of the Shares from EUR 0.80 to EUR 0.01, the difference between the previous and the new amount of the share capital being booked as unavailable reserves (*réserves indisponibles*). |
| **2. Grant of free Warrants (bons de souscription d'actions) to Historical Shareholders** | The Company will grant Warrants #1 with the following main terms and conditions: <br><br> (a)  Issuer: the Company; <br><br> (b)  Instruments: Warrants (bons de souscription d'actions); <br><br> (c)  Issue price: Warrants #1 are allocated for free; <br><br> (d)  Beneficiaries: Historical Shareholders; <br><br> (e)  Quantity: each Share existing on the record date for the allocation of Warrants #1 shall receive 1 Warrant #1; |

|  | Description of the Restructuring Equity Steps |
|---|---|
|  | (f) Exercise ratio: 3 Warrants #1 shall give the right to subscribe to 4 new Shares; |
|  | (g) Strike price: EUR equivalent of USD 3.5 per new Share; |
|  | (h) Strike price payment: in cash only (i.e. not by way of set-off of claims); |
|  | (i) Exercise period: 4-year period starting on the Restructuring Effective Date; |
|  | Other main terms and conditions: see paragraph 14 below. |
| **3. Rights issue with preferential subscription rights in favour of Historical Shareholders (augmentation de capital avec maintien du droit préférentiel de souscription) by way of issuance of new Shares with Warrants (bons de souscription d'actions)** | The Company will implement the Rights Issue, with Warrants #2 (i) attached and detached after issuance or (ii) issued simultaneously but not attached, at the election of the Company: |
|  | (a) Issuer: the Company; |
|  | (b) Instruments: Shares with Warrants; |
|  | (c) Amount (including share premium): EUR equivalent of USD125 million (before exercise of Warrants #2); |
|  | (d) Issue price per Share (including share premium): EUR equivalent of USD 1.75 (irrespective of trading price of the Shares); |
|  | (e) Beneficiaries: Historical Shareholders as holder of preferential subscription rights (as well as transferees of preferential subscription rights) which may subscribe during 1 to 2 week-subscription period, as decided by the Company: |
|  | (i) on a pro rata basis (à titre irréductible), and |
|  | (ii) with over subscription (à titre réductible); |
|  | (f) Backstop: |
|  | (i) DNCA undertakes to fund in cash the amount of the Rights Issue which has not been subscribed on a pro rata basis (souscription à titre irréductible) and on an over subscription basis (souscription à titre réductible), up to an amount of EUR equivalent of USD80 million. No later than 21 days prior to the date of the Company's shareholders' general meeting called to approve the resolutions relating to the Restructuring Equity Steps and the share capital reduction, the Company, at its election, may propose to, and agree with one or more significant shareholders to backstop all or part of the Rights Issue in cash not already backstopped by DNCA, provided that they enter into the Restructuring Support Agreement. The Rights |

|  | **Description of the Restructuring Equity Steps** |
|---|---|

|  |  | Issue amount not backstopped in cash will be backstopped by the Senior Noteholders by way of set off against their Senior Note Claims on a pro rata basis; |
|---|---|---|
|  | (ii) | Backstop fee: 10% cash of the Rights Issue amount backstopped in cash (i.e. EUR equivalent of USD8 million of backstop fee in cash with respect to DNCA) whether or not the backstop is called, provided that the relevant backstop undertaking(s) is(are) in place. The amount of the backstop fee will be paid to these parties who provide the backstop in cash on a pro rata to the backstop basis. For the avoidance of doubt, there will be no backstop fee in the event the Restructuring Effective Date does not occur. No backstop fee will be paid to Senior Noteholders providing their backstop by way of set-off of their Senior Note Claims; |
| (g) |  | Payment of subscription price: in cash only (i.e. not by way of set-off of claims), except for the subscription that would occur by way of set off of Senior Note Claims if Senior Noteholders are required to backstop and such backstop is triggered; |
| (h) |  | Warrants #2 |
|  | (i) | Quantity: each new Share issued pursuant to the Rights Issue shall carry one Warrant #2; |
|  | (ii) | Exercise ratio: 3 Warrants #2 give the right to subscribe to 2 new Shares; |
|  | (iii) | Strike price: EUR equivalent of USD 4.5 per new Share; |
|  | (iv) | Strike price payment: in cash only (i.e. not by way of set-off of claims); |
|  | (v) | Exercise period: 5-year period starting on the Restructuring Effective Date; |
|  | (vi) | Other main terms and conditions: see paragraph 14 below. |
| (i) |  | Public offer: the Rights Issue will be opened to the public in France only and in private placements outside of France; |
| (j) |  | Use of proceeds of the Rights Issue and the Second Lien Note Issue: the cash proceeds (net of backstop and commitment costs and fees and other fees related |

| | **Description of the Restructuring Equity Steps** |
|---|---|
| | to the Rights Issue and the Second Lien Note Issue) used as follows: |
| | (i)   first, for the financing of the Group's corporate and financial needs (including the repayment of any DIP facility on the Restructuring Effective Date if such DIP facility has been drawn during the chapter 11 proceedings, payment of the Accrued Convertible Bond Interest Payment on the Restructuring Effective Date, and payment of costs and fees in connection with the Restructuring, other than backstop costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue) up to USD250 million; |
| | (ii)   second, to pay down Secured Lenders in accordance with Appendix 2, the amount of the pay-down to Secured Lenders being limited to the maximum aggregate amount of USD150 million; and |
| | (iii)   the remainder (if any) for Group's corporate and financial needs (including the costs and fees in connection with the Restructuring, other than backstop costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue). |
| **4. Convertible Bond Equitization through a reserved share capital increase (augmentation de capital avec suppression du droit préférentiel de souscription en faveur d'une catégorie de personnes)** | The Convertible Bond Claim (reduced as described below) with respect to the Convertible Bonds shall be equitized through a reserved share capital increase of the Company: <br><br>(a)   Issuer: the Company; <br><br>(b)   Instruments: Shares; <br><br>(c)   Amount (including share premium): Convertible Bond Claim reduced by the amount of the Accrued Convertible Bond Interest Payment; <br><br>(d)   Issue price per Share (including share premium): EUR equivalent of USD 11.5 (irrespective of trading price of the Shares); <br><br>(e)   Beneficiaries: Convert Holders on the Reference Date; <br><br>(f)   Payment of subscription price: by way of partial set off against the required portion of the Convertible Bond Claim (as described above), which will become due and payable (créances certaines, liquides et exigibles) on the date of the completion of the Convertible Bond Equitization, for the sole purposes of such completion; |

|  | Description of the Restructuring Equity Steps |
|---|---|
|  | (g)    The Convertible Bonds will cease to accrue interest as from the Reference Date. |
| **5. Senior Note Equitization through a reserved share capital increase (*augmentation de capital avec suppression du droit préférentiel de souscription en faveur d'une catégorie de personnes*)** | The Senior Notes Claim (reduced as described below) shall be equitized through a reserved share capital increase of the Company: <br><br> (a)    <u>Issuer</u>: the Company; <br><br> (b)    <u>Instruments:</u> Shares; <br><br> (c)    <u>Amount (including share premium):</u> Senior Note Claim, reduced by (i) any amount used to subscribe for the Rights Issue pursuant to the Senior Noteholders' backstop undertaking thereof and (ii) the amount of the Accrued Senior Note Interest Payment; <br><br> (d)    <u>Issue price per Share (including share premium):</u> EUR equivalent of USD 3.5 (irrespective of trading price of the Shares); <br><br> (e)    <u>Beneficiaries:</u> Senior Noteholders on the Reference Date; <br><br> (f)    <u>Payment of subscription price:</u> by way of partial set off against the required portion of Senior Note Claim (as described above), which will become due and payable (créances certaines, liquides et exigibles) on the date of the completion of the Senior Note Equitization, for the sole purposes of such completion; <br><br> (g)    The Senior Notes will cease to accrue interest as from the Reference Date. |
| **6. Exchange of Secured Debt** | Principal amount of Secured Debt exchanged into New First Lien Secured Notes as set out in accordance with <u>Appendix 2</u> (*Summary of terms of New First Lien Secured Notes*) (unless the Secured Debt has been fully repaid in cash at the option of the Company prior to the issue of the New First Lien Secured Notes), provided that all other accrued and unpaid interest, fees, expenses and other amounts due to the Secured Lenders shall be repaid in cash on the Restructuring Effective Date. |
| **7. Second Lien Note Issue** | The Company will issue Second Lien Notes for an amount in cash (or, to the extent applicable, by way of set off as described below) of USD375 million (including a tranche of up to USD100 million denominated in EUR depending on the demand for subscription in EUR). Warrants #3 will be allocated to each subscriber of the Second Lien Notes pro rata to the principal amount of the Second Lien Notes so subscribed: <br> a)    <u>Issuer</u>: the Company; <br> b)    <u>Instrument</u>: bonds, it being understood that Warrants #3 will be allocated to each subscriber of such bonds pro rata to the principal amount of the Second Lien Notes  so subscribed; <br> c)    Amount: |

a)   *Tranche 1*: USD375 million less *Tranche 2*;

b)   *Tranche 2*: EUR equivalent of up to USD100 million, depending on the demand for subscription in EUR;

As regards Tranche 2, the EUR amount will be calculated using the exchange rate described in <u>Appendix 1</u> (*Summary Second Lien Notes and New SN Interest Second Lien Notes terms and conditions*).

d)   <u>Issue Price</u>: Par

e)   <u>Denominations</u>:

a)   *Tranche 1*: Minimum denominations of USD200,000 and multiples of USD1,000 in excess;

b)   *Tranche 2*: Minimum denominations of EUR100,000 and multiples of EUR1,000 in excess;

f)   <u>Rate</u>:

a)   *Tranche 1*: floating LIBOR (subject to a floor of 1%) + 4% cash + 8.5% PIK;

*b)   Tranche 2*: floating EURIBOR (subject to a floor of 1%) + 4% cash + 8.5% PIK;

g)   <u>Beneficiaries</u>: allocation of the Second Lien Notes will be made by way of a private placement open to all Eligible Senior Noteholders during the Commitment Period, in accordance with, and subject to, the terms and conditions of the SN Private Placement Agreement. Eligible Senior Noteholders will be allowed to subscribe to the Second Lien Notes if, during the Commitment Period, they have (x) executed an Accession Letter (as defined in the Debt Lock-up Agreement) to the Debt Lock-up Agreement and a Joinder Agreement (as defined in the SN Private Placement Agreement) to the SN Private Placement Agreement and (y) agreed to subscribe in cash to the Second Lien Notes, in accordance with, and subject to, the terms and conditions of the SN Private Placement Agreement.

Subject to the backstop provisions below and other terms and conditions of the SN Private Placement Agreement, the principal amount of Second Lien Notes that may be subscribed by each Eligible Senior Noteholder can only be the exact pro rata amount, calculated as follows: USD 375 million multiplied by the SN Private Placement Percentage (subject to rounding down) (provided that it exceeds the minimum amount set forth below). Each Eligible Senior Noteholder may elect to subscribe to Tranche 1 and/or Tranche 2, subject to the size limits of Tranche 2 set out above and in accordance with, and subject to, the terms and conditions of the SN Private Placement Agreement. In the event that subscriptions of the euro-denominated Tranche 2 exceed its size limits, priority will be given to holders of the 2020 Senior Notes.

The minimum principal amount that may be subscribed by an Eligible Senior Noteholder under Tranche 1 Senior Notes is USD200,000 (with multiples of USD1,000 in excess), provided that all the other conditions required under the SN Private Placement Agreement are met. The minimum principal amount for a subscription of Tranche 2 Senior Notes by an Eligible Senior Noteholder is

EUR100,000 (with multiples of EUR1,000 in excess), provided that all the other conditions required under the SN Private Placement Agreement are met. Any amount not subscribed by Eligible Senior Noteholders will be subscribed in full by backstoppers.

h)   Commitment fee: 7% of the amounts that the beneficiaries have accepted to commit to subscribe to Second Lien Notes as described above paid by the Company to such beneficiaries on the date of settlement of the Second Lien Notes, at its election, in cash or by way of set-off of the amount to be paid for the purposes of the subscription of the Second Lien Notes. For the avoidance of doubt, there will be no commitment fee paid in the event the Second Lien Notes Issue is not settled;

i)   Backstop: Tranche 1 and Tranche 2 backstopped by Ad Hoc Senior Noteholder Committee members, in accordance with the SN Private Placement Agreement in exchange for a backstop fee of 3% of the USD 375 million (paid by the Company on the date of settlement of the Second Lien Notes in cash or by way of set-off of the amount to be paid for the purposes of the subscription of the Second Lien Notes at the election of the Company) plus Backstop Warrants. For the avoidance of doubt, there will be no backstop fee paid in the event the Second Lien Notes Issue is not settled;

j)   Second Lien Notes Subscription Payment: in cash only (i.e. not by way of set-off of claims) other than (x) by way of set-off, at the election of both the Company and the relevant Eligible Senior Noteholder(s), against any DIP facility provided by such Eligible Senior Noteholder(s), and (y) in respect of the commitment and backstop fees, as described in paragraphs (h) and (i) above;

k)   Warrants #3:

a)   *Number of new Shares to which Warrants #3 give right to subscribe*: All the Warrants #3 shall in aggregate give the right to subscribe to 16% of the share capital of the Company after dilution resulting from the Rights Issue, the Convertible Bond Equitization, the Senior Notes Equitization, the exercise of the Coordination Warrants, the exercise of the Backstop Warrants and the exercise of the Warrants #3 but prior to the exercise of Warrants #1 and Warrants #2;

b)   The Warrants #3 will be allocated pro rata to the principal amount of the Second Lien Notes, whether in Tranche 1 or Tranche 2 (if feasible, the Company may elect to attach the Warrants #3 to the Second Lien Notes);

c)   *Strike price*: EUR 0.01;

d)   *Strike price payment*: in cash only (i.e. not by way of set-off of claims);

e)   *Exercise period*: 6-month period starting on the Restructuring Effective Date;

f)   *Other main terms and conditions*: see paragraph 14 below.

l)   Use of proceeds of the Rights Issue and the Second Lien Note Issue: the cash proceeds (net of backstop and commitment costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue) used as follows:

|  | Description of the Restructuring Equity Steps |
|---|---|
|  | a) first, for the financing of the Group's corporate and financial needs (including the repayment of any DIP facility on the Restructuring Effective Date if such DIP facility has been drawn during the chapter 11 proceedings, payment of the Accrued Convertible Bond Interest Payment on the Restructuring Effective Date, and payment of costs and fees in connection with the Restructuring, other than backstop costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue) up to USD250 million; <br><br> b) second, to pay down Secured Lenders in accordance with Appendix 2, the amount of the pay-down to Secured Lenders being limited to the maximum aggregate amount of USD150 million; and <br><br> c) the remainder (if any) for Group's corporate and financial needs (including the costs and fees in connection with the Restructuring, other than backstop costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue). <br><br> m) Detailed terms of the Second Lien Notes are set out in Appendix 1. |
| **8. New SN Interest Second Lien Notes** | In relation to the Accrued Senior Note Interest Payment, each Senior Noteholder is offered the option to either: (i) subscribe for New SN Interest Second Lien Notes as set out below, or (ii) retain its claim in respect of its Accrued Senior Note Interest Payment, amended as follows: <br><br> (a)    maturity extended by 10 years: <br><br> (b)    rescheduling of payments as follows: <br><br>     (i)    1% p.a. in Y1 to Y2; <br><br>     (ii)    5% p.a. in Y3 to Y9; and <br><br>     (iii)    63% in Y10; <br><br> (c)    existing guarantee package released (in the chapter 11 proceedings); <br><br> (d)    for the avoidance of doubt, does not benefit from the security and guarantee package granted in respect of the Second Lien Notes. <br><br> The Company will issue New SN Interest Second Lien Notes for a maximum total amount of USD86 million, as Accrued Senior Note Interest Payment, to be subscribed by way of set-off of claims by the Senior Noteholders with a portion of their Senior Notes Claim on a pro rata basis as described below: <br><br> (a)    Issuer: the Company; <br><br> (b)    Instrument: bonds; <br><br> (c)    Amount: up to USD86 million; |

|  | **Description of the Restructuring Equity Steps** |
|---|---|
|  | (d)   <u>Beneficiaries</u>: allocation to those Senior Noteholders who accept to receive such New SN Interest Second Lien Notes, on a pro rata basis to their interest claim in respect of the relevant series of Senior Notes (in minimum denominations of USD200,000 and multiples of USD1,000 in excess thereof), based on the unpaid interest accrued on such series as at 31 October 2017 (an illustrative calculation of the pro rata split of the Accrued Senior Note Interest Payment is set forth in Schedule 2 to this Term Sheet); |
|  | (e)   <u>Second Lien Notes Subscription Payment</u>: by way of set-off of claims only; |
|  | (f)   <u>Other terms and conditions of the New SN Interest Second Lien Notes</u>: identical to the Second Lien Notes save that no Warrants #3 allocated to the beneficiaries of the New SN Interest Second Lien Notes, no commitment fee and no backstop fee.  The New SN Interest Second Lien Notes are expected to be a separate series from, and not fungible with, the Second Lien Notes.  The Company will use its best efforts to provide for the fungibility of the Second Lien Notes with the New SN Interest Second Lien Notes if reasonably possible in the light of applicable restrictions (including those related to US tax laws and rules) and without deviating from the terms of the instruments set out in this Term Sheet.  Receipt of the New SN Interest Second Lien Notes may be subject to applicable securities law restrictions. |
| **9. Coordination Issue** | As compensation for their global coordinator role in the context of the Restructuring, members of the Ad Hoc Senior Noteholder Committee will receive free Coordination Warrants: |
|  | (a)   <u>Issuer</u>: the Company; |
|  | (b)   <u>Instruments</u>: Warrants (*bons de souscription d'actions*); |
|  | (c)   <u>Issue price</u>: Coordination Warrants are allocated for free; |
|  | (d)   <u>Beneficiaries</u>: members of the Ad Hoc Senior Noteholder Committee on the date hereof; |
|  | (e)   <u>Allocation</u>: The percentage of share capital of the Company attributed to each member of the Ad Hoc Senior Noteholder Committee pursuant to the Coordination Warrants will be calculated as (a) 1% of the share capital of the Company multiplied by (b) the lower of such member's Holdings on (i) 1 June 2017 multiplied by 100% and (ii) the Success Date multiplied |

| | **Description of the Restructuring Equity Steps** |
|---|---|
| | by 150%, divided by (c) the aggregate Holdings of the Ad Hoc Senior Noteholder Committee on 1 June 2017.

"**Holdings**" for the purposes of the preceding paragraph will include the aggregate principal amount of Senior Notes held by such member or its affiliates listed in the Debt Lock-up Agreement as members of the Ad Hoc Senior Noteholder Committee on the relevant date. Coordination Warrants not allocated as a result of the foregoing calculation shall be deemed null and void.

"**Success Date**" shall mean the date upon which Participating Senior Noteholders (as defined in the Debt Lock-up Agreement) holding at least 66⅔% of the aggregate principal amount of the Senior Note Debt (as defined in the Debt Lock-up Agreement) and accrued and unpaid interest up to the date of the judgment of the French court opening the Safeguard have acceded to the Debt Lock-up Agreement. The Company or Lucid will calculate the percentage of Participating Senior Noteholders on each date until such time as the 66⅔% threshold is met, and make available such tabulations to the public no later than 10:00 AM Paris time on any subsequent business day.

The percentage Holdings of each member of the Ad Hoc Senior Noteholder Committee as at 1 June 2017 are set out below:

| Alden Global Capital, LLC | 14.9978% |
|---|---|
| Attestor Capital LLP | 14.6096% |
| Aurelius Capital Management, LP | 15.2479% |
| Boussard & Gavaudan Asset Management, LP | 21.5151% |
| Contrarian Capital Management, L.L.C. | 20.4085% |
| Third Point LLC | 13.2212% |

(f)  Exercise ratio: All Coordination Warrants shall give the right to subscribe in aggregate for 1% of the share capital of the Company after dilution resulting from the Rights Issue, the Convertible Bond Equitization, the Senior Notes Equitization, the exercise of the Coordination Warrants, the exercise of the Backstop |

| | Description of the Restructuring Equity Steps |
|---|---|
| | Warrants and exercise of the Warrants #3, but prior to the exercise of Warrants #1 and Warrants #2; |
| | (g) Strike price: EUR 0.01; |
| | (h) Strike price payment: in cash only (i.e. not by way of set-off of claims); |
| | (i) Exercise period: 6-month period starting on the Restructuring Effective Date; |
| | (j) Other main terms and conditions: see paragraph 14 below; |
| | (k) For the avoidance of doubt, no member of the Ad Hoc Senior Noteholder Committee will receive any Coordination Warrants unless the Restructuring Effective Date occurs. |
| | It is acknowledged that the Company and the Ad Hoc Senior Noteholder Committee as of the date hereof acting unanimously may decide to procure the delivery of Coordination Warrants or underlying shares through alternative means (excluding any cash payment). |
| **10. Backstop Issue** | As partial compensation for backstop services for the Second Lien Notes Issue (other than, for the avoidance of doubt, in respect of the SN Interest Second Lien Notes), members of the Ad Hoc Senior Noteholder Committee will receive Backstop Warrants: |
| | (a) Issuer: the Company; |
| | (b) Instruments: Warrants (*bons de souscription d'actions*); |
| | (c) Issue price: Backstop Warrants are allocated for free; |
| | (d) Beneficiaries: members of the Ad Hoc Senior Noteholder Committee as of the date hereof or their transferees as authorised under the SN Private Placement Agreement; |
| | (e) Allocation: each beneficiary will be allocated its Backstop Percentage (as defined in the SN Private Placement Agreement) of the total number of Backstop Warrants as set forth in the SN Private Placement Agreement; |
| | (f) Exercise ratio: All Backstop Warrants shall give the right to subscribe in aggregate 1.5% of the share capital of the Company after dilution resulting from the Rights Issue, the Convertible Bond Equitization, the Senior Notes Equitization, the exercise of the Coordination Warrants, the exercise of the Backstop Warrants and exercise of the Warrants #3, but prior to the exercise of Warrants #1 and Warrants #2; |
| | (g) Strike price: EUR 0.01; |

|  | Description of the Restructuring Equity Steps |
|---|---|
|  | (h) <u>Strike price payment</u>: in cash only (i.e. not by way of set-off of claims); |
|  | (i) <u>Exercise period</u>: 6-month period starting on the Restructuring Effective Date; |
|  | (j) <u>Other main terms and conditions</u>: see paragraph 14 below; |
|  | (k) For the avoidance of doubt, no member of the Ad Hoc Senior Noteholder Committee will receive such Backstop Warrants unless the Restructuring Effective Date occurs. |
|  | It is acknowledged that the Company and the above-mentioned beneficiaries acting unanimously may decide to procure the delivery of Backstop Warrants or underlying shares through alternative means (excluding any cash payment). |
| **11. Accrued Interest Payments** | The Accrued Convertible Bond Interest Payment with respect to the relevant Convertible Bonds shall be made in cash in EUR on the Restructuring Effective Date at the latest, to the Convert Holders as of the Reference Date. |
|  | The Accrued Convertible Bond Interest Payment will be paid to those Convert Holders pro rata to their interest claim in respect of the relevant series of Convertible Bonds based on the unpaid interest accrued on such series as at 31 October 2017. |
|  | To the extent Senior Noteholders have elected to receive New SN Interest Second Lien Notes in settlement of the Accrued Senior Note Interest Payment, the Accrued Senior Note Interest Payment with respect to the relevant Senior Notes shall be made as described in Step 8 above. |
|  | For the avoidance of doubt, such Accrued Interest Payments shall not be made unless the Restructuring Effective Date occurs. |
| **12. Secured Debt Paydown** | Partially paid in cash up to an amount of USD150 million out of the net cash proceeds of the New Money post fees in relation to such issuances as described in Steps 3 and 7. |
| **13. Common terms of the Restructuring** | New Shares issued as part of the Restructuring Equity Steps (including new Shares to be issued upon exercise of Warrants) shall be fully assimilated to existing Shares as from issuance (jouissance courante); either in registered or bearer form and shall be listed on the regulated market of Euronext in Paris and will be freely tradable. |
| **14. Common terms applicable to Warrants issued in the context of the Restructuring** | (a) Anti-dilution adjustments: |
|  | a) Transactions described in articles L.228-98 and L.228-101 of the French Commercial Code can be |

| | Description of the Restructuring Equity Steps |
|---|---|
| | carried out without the prior authorization of any of the holders of the Warrants; |
| | b) Standard anti-dilution adjustments of the exercise ratios provided for by the French Commercial Code (no additional contractual protections); |
| | c) For the avoidance of doubt, exercise ratio of the Warrants shall not be adjusted as a result of the Restructuring Equity Steps as the terms and conditions thereof already take into account such issuances; |
| | (b) <u>Suspension of the exercise of the Warrants:</u> the Company will have the possibility to suspend the exercise of the Warrants for a maximum period of 3 months or any other period provided for by applicable regulation in the case of increase in the share capital, merger, spin off or issuance of new shares or securities, or financial transactions conferring preferential subscription rights or reserving a priority subscription period for shareholders. |
| | (c) <u>Purchases:</u> the Company will have the possibility to carry out purchases (on market / off market) or launch a public tender or exchange offer in respect of Warrants #1 and Warrants #2, and if listed Warrants #3, Coordination Warrants and Backstop Warrants. If the Warrants #3, Coordination Warrants and/or Backstop Warrants are not listed, the Company will have the possibility to carry out purchases of such Warrants (directly or through offer to all holders).  For the avoidance of doubt, the Company may not impose on the holders the sale or redemption of their Warrants; |
| | (d) <u>Listing:</u> Warrants #1 and Warrants #2 will be listed on the regulated market of Euronext in Paris and will be freely tradable. Coordination Warrants, Backstop Warrants and/or Warrants #3 will not be listed on any regulated or non-regulated market except, at the election of the Company, if useful to facilitate the settlement and delivery transactions; Coordination Warrants, Backstop Warrants and/or Warrants #3 will be freely tradable; |
| | (e) <u>Governing law:</u> Warrants #1, #2, #3, Coordination Warrants and Backstop Warrants shall be governed by French law; |
| | (f) Other terms and conditions: in accordance with French market practice. |
| **15. Authority to proceed to issuances** | (a) the Share Capital Reduction will be decided by the Company shareholders' general meeting; |

| | Description of the Restructuring Equity Steps |
|---|---|
| | (b) the authority to decide and implement (délégation de competence) the Restructuring Equity Steps will be delegated by the Company shareholders' general meeting (to the extent the authorization of the shareholders' general meeting is required by law) to the board of directors (with authority to subdelegate to the chief executive officer (*directeur général*)). |
| | The implementation of each of the Restructuring Equity Steps shall be conditional upon the due authorisation by the shareholders (to the extent the authorization of the shareholders' general meeting is required by law) of all the other Restructuring Equity Steps and the Share Capital Reduction, failing which no Restructuring Step may be implemented. |
| **16. Determination of numbers of each securities to be issued, rounding and fractional Shares/ Settlement and delivery** | The definitive number of Shares to be allocated under the Convertible Bond Equitization and the Senior Note Equitization pursuant to the provisions of this Term Sheet will be determined based on the actual Convertible Bond Claim and the Senior Note Claim as of the Reference Date reduced in each case by the respective amounts of the Accrued Interest Payments. |
| | The exact number of securities to be issued pursuant to the provisions of this Part B (*Summary of the Restructuring*), the related size of each issuance, and with respect to Warrants #1, Warrants #2 and Warrants #3, Coordination Warrants, Backstop Warrants, the number of Shares to which they give access, may be adjusted by the Company to take into account (i) rounding issues, in particular in respect of the preferential subscription rights of the Rights Issue, (ii) application of the necessary currency conversions, (iii) fractional shares issues and/or (iv) other technical issues. |
| | No fractional securities will be allocated to the beneficiaries of the various issuances of the Restructuring Equity Steps (including among others, Convert Holders and the Senior Noteholders as a result of the Convertible Bond Equitization and the Senior Note Equitization or the backstop of the Rights Issue, as applicable), therefore the number of the relevant kind of securities to be allocated to each beneficiary will be rounded down to the nearest round number. |
| | As from the Reference Date, Convert Holders and Senior Note Holders shall not be allowed to transfer any of the Senior Notes or Convertible Bonds they hold to anyone. |
| | Convert Holders and Senior Noteholders will provide the appropriate information (including evidence of their holdings), representations, signed documents, and take the appropriate steps (including among others transferring into an existing Euroclear/Clearstream securities account) requested by the Company, acting reasonably, for the purposes of carrying out |

| | Description of the Restructuring Equity Steps |
|---|---|
| | the settlement and delivery of the securities referred to in this Term Sheet. Should they fail to do so in a timely manner, they will not be allocated the relevant securities on the relevant settlement and delivery date but at a later stage, if and when the appropriate conditions are met. |
| **17. Calculation example** | Schedule 1 to this Term Sheet sets forth an illustrative example of the equity allocation (in number of shares and percentage) as of the Restructuring Effective Date (on a diluted and non-diluted basis), assuming full take-up and no take-up of the Rights Issue, on the basis of the amount of debt (inclusive of accrued but unpaid interest) under the Convertible Bonds and the Senior Notes to be outstanding as of 31 October 2017. This date shall not be construed as giving any indication as to the date on which any of the Restructuring Equity Steps will be completed, as they can be completed until the Long-Stop Date (included). |
| **18. Timing** | The Share Capital Reduction and all the Restructuring Equity Steps shall occur in the sequence described in this Term Sheet. The Company may elect to have all or part of the securities issuances under the Restructuring Equity Steps be settled and delivered on the same date or on different dates, within a maximum period of six weeks from the Reference Date. |
| **19. Selling restrictions** | The securities to be issued as a result of the Restructuring Equity Steps under Steps 2 to 5 and 8 will be offered to the public in France only and in private placements to eligible investors in the EEA and in the US (or to the public in the US in reliance on Section 1145 of the Bankruptcy Code, if available). The securities to be issued as a result of the Restructuring Equity Steps under Step 7 will be offered as part of a private placement to eligible investors as described in the SN Private Placement Agreement. The securities to be issued as a result of the Restructuring Equity Steps under Steps 9 and 10 will be offered to the members of the Ad Hoc Senior Noteholder Committee only, who must be qualified investors within the meaning of French laws and regulations and eligible investors in the US. |
| **20. Governance** | The structure and composition of the Company's board of directors after completion of the Restructuring will be determined in consultation with DNCA and the members of the Ad Hoc Senior Noteholder Committee who will have become and remain shareholders of the Company. Such proposed structure and composition of the board shall comply with the AFEP-MEDEF Code and be implemented as soon as practicable, but in any case no longer than 3 months after completion of the Restructuring. |

Part C: Miscellaneous

| **1. Conditions precedent to the completion of Restructuring** | Full list of conditions precedent to be agreed but to include at least the following: |
|---|---|
| | (a) Obtaining a fairness opinion from an independent financial expert (*expert indépendant*) appointed by the Company confirming that the Restructuring Equity Steps are fair from a financial perspective in accordance with the AMF General Regulation. |
| | (b) Approval by the Company's shareholders of the resolutions necessary to implement the Share Capital Reduction and the Restructuring Equity Steps, in accordance with applicable majority (to the extent the authorization of the shareholders' general meeting is required by law). |
| | (c) Evidence that the Chapter 11 Debtors have made an application to the Bankruptcy Court requesting an Order, on terms and conditions acceptable to the Ad Hoc Senior Noteholder Committee, approving the Chapter 11 Debtors' entry into the provisions relating to the payment of advisors' fees and indemnification provisions under the SN Private Placement Agreement; |
| | (d) Authorization of the SN Private Placement Agreement by the supervisory judge in the context of the safeguard proceedings; |
| | (e) Obtaining all prior governmental authorizations and/or clearances as may be required for the Company to implement the Restructuring (including from stock market authorities such as the visa of the AMF on the prospectus(es)) and final waiver (i.e. in the absence of challenge ten days after the publication of the waiver or after any decision of the Paris court of appeals in the case of a challenge of the waiver within the ten day deadline (if any)) from the AMF to launch a mandatory tender offer if needed (at the discretion of the Ad Hoc Senior Noteholder Committee). |
| | (f) Sanctioning of the Safeguard Plan (as defined in the Debt Lock-up Agreement) by the Commercial Court of Paris or the sanctioning of a reorganisation plan in *redressement judiciaire* in respect of the Company, provided such reorganisation plan is in form and substance consistent with the terms provided herein and with the Debt Lock-up Agreement, which orders shall be unstayed. |
| | (g) Entry of (i) the Chapter 11 confirmation order, such order being consistent with the terms provided herein and (ii) the Chapter 15 enforcement order of the |

| | safeguard plan sanctioning ruling, which orders shall be unstayed. |
|---|---|
| **2. Long-Stop Date** | The Restructuring Effective Date shall occur on or prior to 28 February 2018 or as otherwise extended in accordance with the Debt Lock-Up Agreement and Restructuring Support Agreement. |

EXECUTION VERSION

**Appendix 1: Summary Second Lien Notes and New SN Interest Second Lien Notes terms and conditions**

| | | |
|---|---|---|
| A. | **Issuer** | The Company |
| B. | **Instruments** | Bond with Warrants #3 allocated to each subscriber of such bonds (other than New SN Interest Second Lien Notes) (for terms and conditions of the Warrants, refer to Step 7 of Part B (*Summary of the Restructuring*) above) |
| C. | **Amount** | USD375 million of Second Lien Notes (including a tranche of up to USD100 million denominated in EUR depending on the demand for subscription in EUR), plus up to USD86 million of New SN Interest Second Lien Notes |
| D. | **Currency** | Tranche 1 USD (USD375 million less the amount of Tranche 2 of Second Lien Notes) |
| | | Tranche 2 EUR (EUR equivalent of up to USD 100 million, depending on the demand for subscription in EUR) |
| | | As regards Tranche 2, the EUR amount will be calculated using the Reuters USD/EUR exchange rate applicable as at midday (CET) on the second Business Day prior to the Reference Date. |
| | | The New SN Interest Second Lien Notes are expected to be a separate series from, and not fungible with, the Second Lien Notes. |
| E. | **Maturity** | 6 years after the Restructuring Effective Date |
| F. | **Repayment** | Bullet repayment at maturity |
| G. | **Coupon** | USD Second Lien Notes: cash coupon of floating LIBOR (subject to a floor of 1%) plus 4% per annum, payable quarterly and PIK of 8.5% per annum capitalised quarterly. |
| | | EUR Second Lien Notes: cash coupon of floating EURIBOR (subject to a floor of 1%) plus 4% per annum, payable quarterly and PIK of 8.5% per annum capitalised quarterly. |
| | | Coupon to be paid on a quarterly basis commencing on the date that falls three months after the Restructuring Effective Date or capitalised (as applicable) on a quarterly basis. |
| | | Principal amount: the initial principal amount of the Second Lien Notes and New SN Interest Second Lien Notes will accrue to the extent of the capitalized PIK interest on a quarterly basis (the "Second Lien Notes Principal Amount"). |
| H. | **Redemption** | Voluntarily redeemable by the Issuer on the following basis (expressed as a percentage of the Second Lien Notes Principal Amount at any relevant redemption date): |
| | | (a)      Within the first year after issuance, at 120%; |

|  |  | (b) | Between the first and second year after issuance, at 120%; |
|---|---|---|---|
|  |  | (c) | Between the second and third year after issuance, at 112.5%; |
|  |  | (d) | After the third year, at 100%. |
|  |  | | No mandatory redemption provisions save for: |
|  |  | (i) | Change of Control (same definition as in existing TLB Credit Agreement, provided that (A) threshold for voting shares set at 50%, and (B) it will be clarified in paragraph (c) of the definition that 'any person, or persons acting in concert' shall not include "Permitted Shareholders", being the members of the Ad Hoc Senior Noteholder Committee) to be a put at 101%; and |
|  |  | (ii) | asset sales covenant, with same reinvestment/asset sale offer mechanics as existing Senior Notes (which, for avoidance of doubt, shall permit repayment/reinvestment in the New First Lien Secured Notes). |
| I. | Covenants | | Incurrence based covenants only, which shall be consistent with the types of covenants set forth in the 2022 Senior Notes (with levels of baskets to be mutually agreed and incurrence of USD200 million additional flex for new senior secured financing). |
| J. | Events of Default | | Customary events of default based on those set out in the 2022 Senior Notes indenture and in any event no more restrictive than those in the New First Lien Secured Notes. |
| K. | Information Undertakings | | Identical to New First Lien Secured Notes. |
| L. | Security package | | Obligations of the Company with a 'silent second lien' on all of the US and French collateral granted to the New First Lien Secured Notes (and collateral granted to the New First Lien Secured Notes in other jurisdictions if legally feasible to have 'silent second lien' under local laws). |
|  |  | | The Second Lien Notes and New SN Interest Second Lien Notes will have no additional security than the security granted to the New First Lien Secured Notes as at the Restructuring Effective Date (and as may be supplemented thereafter to the extent permitted under the finance documents, subject to corporate benefit and other legal limitations). |
| M. | Guarantee package | | Subject to any restrictions under applicable law, the same guarantee package as the existing Senior Notes, save that no guarantees shall be provided by the following group companies: |
|  |  | (i) | CGG Marine Resources Norge AS; |
|  |  | (ii) | CGG Holding UK I; |

(iii)    CGG Holding UK II;

(iv)    Sercel Inc;

(v)    Sercel GRC;

(vi)    Sercel Australia;

(vii)    Sercel Canada;

(viii)    CGG Canada Services Ltd.

It is intended that the group of Obligors in respect of the Second Lien Notes, the New SN Interest Second Lien Notes and the New First Lien Secured Notes will be the same on the Restructuring Effective Date and thereafter as may be supplemented to the extent permitted under the finance documents, subject to corporate benefit and other legal limitations.

| | | |
|---|---|---|
| **N.** | **Intercreditor Agreement** | A new New York law intercreditor agreement with respect to the Second Lien Notes and New SN Interest Second Lien Notes to be entered into based on intercreditor principles set forth in <u>Appendix 4</u> (*Intercreditor principles*). |
| **O.** | **Listing** | Same as Senior Notes. |
| **P.** | **Documentation** | Indenture consistent with the 2022 Senior Notes indenture. |
| **Q.** | **Governing law** | New York law. |
| **R.** | **Selling restrictions** | Private placement to institutional investors, including in the US and France; no public offering in any jurisdiction. Distribution of the New SN Interest Second Lien Notes to the public in the US if Section 1145 of the Bankruptcy Code is available. |

**Appendix 2: Summary of terms of New First Lien Secured Notes**

| | | |
|---|---|---|
| **A.** | **Issuer:** | **All New First Lien Secured Notes will be issued by Holding US** |
| **B.** | **Conversion of French RCF, US RCF and TLB into New First Lien Secured Notes:** | In relation to the French RCF, each French RCF Lender is offered the option to either: (i) convert its debt claims into the New First Lien Secured Notes in accordance with this Appendix 2, or (ii) remain a French RCF Lender (a "**Termed Out French RCF Lender**") pursuant to the terms of the French RCF, amended as follows: |

(a)     maturity extended by 10 years;

(b)     rescheduling of principal and interest payments as follows:

    (i)     1% p.a. in Y1 to Y2;

    (ii)     5% p.a. in Y3 to Y9: and

    (iii)     63% in Y10;

(c)     existing security and guarantee package released;

(d)     benefits from the security and guarantee package granted in respect of the New First Lien Secured Notes (on a pari passu basis).

Termed Out French RCF Lenders will not be entitled to receive any portion of the Upfront Pay Down.

The USD amount of the debt claims in respect of the current EUR drawings under the French RCF will be calculated using the Reuters EUR/USD exchange rate applicable as at midday (CET) five business days prior to the exchange of the French RCF into New First Lien Secured Notes.

In relation to the US RCF and the TLB, exchange into New First Lien Secured Notes in accordance with this Appendix 2.

| | | |
|---|---|---|
| **C.** | **Amount:** | The New First Lien Secured Notes will be issued to the lenders in respect of the Secured Debt on a pari passu and pro rata basis in the principal amount that reflects the aggregate principal amount, subject to the Rollover Fee and repayment from the New Money, each as detailed below.  Any accrued and unpaid interest as at the Restructuring Effective Date in respect of the Secured Debt shall be repaid in cash on such date. |
| **D.** | **Currency:** | USD |
| **E.** | **Maturity:** | 5 years after the Restructuring Effective Date. |
| **F.** | **Repayment** | Bullet repayment on maturity. |
| **G.** | **Coupon:** | The cash coupon shall be (i) floating LIBOR (subject to a floor of 1%) plus 6.50% per annum and (ii) a grid in respect of additional PIK interest determined based on the aggregate principal amount outstanding under the New First Lien Secured |

Notes immediately following the Restructuring Effective Date after taking into account the pay down to be effected pursuant to paragraph 19 of this Appendix 2 (the "**Outstanding Amount**") in accordance with the following linear ratchet:

(a)   2.50% per annum PIK if the Outstanding Amount is greater than or equal to USD700 million;

(b)   between 1.25% and 2.5% per annum PIK if the Outstanding Amount is equal to or greater than USD600 million but less than USD700 million; and

(c)   between 0% and 1.25% per annum PIK if the Outstanding Amount is equal to or greater than USD500 million but less than USD600 million.

No PIK interest if the Outstanding Amount is less than USD500 million.

Coupon to be paid or capitalised (as applicable) on a quarterly basis, commencing on the date that falls 3 months after the Restructuring Effective Date.

| | | | |
|---|---|---|---|
| **H.** | **Redemption:** | (a) | Optional redemption by the Issuer: |

(i)   from the Restructuring Effective Date up to the date that falls 6 months after the Restructuring Effective Date: New First Lien Secured Notes are fully (but not partially) redeemable at par without any fee (for the avoidance of doubt, any redemption after the date that falls 3 months after the Restructuring Effective Date up to the date that falls 6 months after the Restructuring Effective Date shall include the PIK in respect of the 3% Rollover Fee, as detailed below);

(i)   from the date that falls 6 months and 1 day after the Restructuring Effective Date to the date that falls 36 months after the Restructuring Effective Date: New First Lien Secured Notes are not redeemable without payment of a customary make whole fee; and

(ii)   from the date that falls 36 months and 1 day after the Restructuring Effective Date onwards: New First Lien Secured Notes are fully or partially redeemable at par without any fee.

(b)   Mandatory redemption at par on the same terms as the mandatory prepayment provisions in the US RCF Credit Agreement, save that:

(iii)   Change of Control (same definition as in the existing TLB Credit Agreement, provided that (A) threshold for voting shares set at 50%, and (B) it will be clarified in paragraph (c) of the definition

that 'any person, or persons acting in concert' shall not include "Permitted Shareholders", being the members of the Ad Hoc Senior Noteholder Committee) to be a put at 101% (for the avoidance of doubt, if following the Change of Control the Issuer exercises instead the call provisions set out above during the non-call period, then the non-call make whole payment will apply);

(iv) mandatory redemption from the proceeds of junior debt (and not, for the avoidance of doubt, any other debt), other than a Permitted Junior Debt Refinancing; and

(v) undertaking regarding disposals to be agreed and provided that as an alternative to majority lender consent, further disposals will be permitted provided that there will be a requirement for the Issuer to use the proceeds therefrom to offer to repay the New First Lien Secured Notes at par (for the avoidance of doubt with no non call premium) and (at the option of the Issuer) any other Secured Financial Debt (as defined below) at par on a pro rata basis (in each case provided that to the extent the holder(s) of such debt elect not to accept such offer, the Issuer shall be entitled to retain the proceeds), in each case within 60 days of receipt thereof, if such proceeds have not been used to optionally redeem the New First Lien Secured Notes.

Any mandatory redemptions (including as a result of an acceleration of the New First Lien Secured Notes, whether by operation of law or otherwise) shall be treated as an optional redemption for the purposes of the Rollover Fee.

Any mandatory redemption:

(a) described in paragraph (ii) above, or

(b) as a result of an acceleration of the New First Lien Secured Notes, whether by operation of law or otherwise,

shall be treated as an optional redemption for the purposes of any make whole premium; provided that the make whole premium payable as a result of an acceleration of the New First Lien Secured Notes shall be capped at an amount no greater than 10% of the aggregate principal amount (including, for the avoidance of doubt any interest accreted as PIK interest) of the New First Lien Secured Notes then outstanding, except that no such cap shall apply in connection with an acceleration of the

New First Lien Secured Notes resulting from (x) a voluntary or intentional breach of the terms of the New First Lien Secured Notes or their indenture with the purpose of avoiding the payment of such make whole premium or (y) for failing to pay the make whole premium when due following any election to redeem the New First Lien Secured Notes pursuant to the optional redemption provisions described above. For the avoidance of doubt, the make whole premium shall not become due and payable as a result of an acceleration that occurs on or before the six month anniversary of the Restructuring Effective Date or after the three year anniversary of the Restructuring Effective Date.

"**Permitted Junior Debt Refinancing**" means a financing of the Group (i) with a cash coupon payable in an amount no higher per annum than that in respect of the Second Lien Notes, (ii) maturing not earlier than the Second Lien Notes and not having amortization or mandatory redemption rights greater than those in respect of the Second Lien Notes, (iii) which does not benefit from a better security or guarantee package than the Second Lien Notes, and (iv) the proceeds of which are applied to refinance the Second Lien Notes (or any refinancing debt thereof).

No excess cashflow sweep.

| | | |
|---|---|---|
| C. | **Covenants:** | No maintenance covenants with the exception of a minimum liquidity covenant (to be tested on the last day of each quarter) requiring that cash and cash equivalents (as determined under IFRS) must be at least USD185 million (or its equivalent in other currencies) as at each quarter date. |

Incurrence-based covenants only, based substantially on the negative covenants and related definitions in the US RCF. The parties acknowledge that the negative covenants in the US RCF will be conformed to reflect terms suitable for senior secured notes, and amended to reflect the terms hereof.

| | | | |
|---|---|---|---|
| D. | **Information undertakings:** | (a) | Within the time periods specified in the SEC's rules and regulations and no later than 120 days after the end of each fiscal year (or if such day is not a Business Day, the first Business Day thereafter), all annual financial and other information with respect to the Company and its subsidiaries that would be required to be contained in a filing with the SEC on Form 20-F, including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and a report thereon by the Company's certified independent accountants. |
| | | (b) | Unaudited consolidated financial statements for the relevant financial quarter within 60 days of the end of the first and third quarter of each fiscal year (and within 75 days of the end of the second quarter of each fiscal year). |
| | | (c) | A compliance certificate with each set of financial statements referred to in paragraphs (a) and (b) above, containing the confirmations currently set out in Section 5.02 of the existing TLB Credit Agreement. The financial statements shall comply with Section 5.03 of the existing TLB Credit Agreement. |
| | | (d) | For so long as any New First Lien Secured Notes remain outstanding and during any period during which the Company is not subject to Section 13 or 15(d) of the Exchange Act nor exempt therefrom pursuant to Rule 12g3-2(b) under the Exchange Act, the Company and the Guarantors shall furnish to the holders of the New First Lien Secured Notes and prospective purchasers of the New First Lien Secured Notes upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. |
| | | (e) | For so long as the New First Lien Secured Notes are listed on the Luxembourg Stock Exchange, the Company shall comply with the information requirements of the Luxembourg Stock Exchange. |
| E. | **Covenants:** | Permitted baskets to be mutually agreed. | |
| F. | **Events of Default:** | Customary events of default based on those set out in the 2022 Senior Notes, amended as necessary to reflect the terms hereof (including the minimum liquidity covenant). | |
| G. | **Pari passu secured debt** | Ability to issue/borrow additional pari passu secured debt in an aggregate principal amount not to exceed USD200 million, subject to the following conditions: | |
| | | (a) | the maximum aggregate amount of pari passu secured debt plus the aggregate principal outstanding indebtedness in respect of the New First Lien Secured |

Notes from time to time (together the "Secured Financial Debt") shall not exceed USD900 million at any time;

(b) absence of a default or event of default on a pro forma basis;

(c) an interest coverage ratio (to be mutually defined) of at least 3x on a pro forma basis, as certified by the CEO or the CFO;

(d) a first lien leverage ratio (which shall be defined as the ratio of (i) consolidated first lien indebtedness of the Company and its subsidiaries (which, for the avoidance of doubt, shall include any lease or hire purchase contract, a liability under which would, in accordance with the accounting principles, be treated as a balance sheet liability (other than a lease or hire purchase contract which would, in accordance with the accounting principles in force on the date hereof, have been treated as an operating lease)) to (ii) trailing four-quarter Consolidated EBITDA of the Company and its subsidiaries) not to exceed 2.5x on a pro forma basis, as certified by the CEO or the CFO;

(e) if the aggregate amount of the Secured Financial Debt exceeds USD800 million at any time, an amount of additional collateral with fair market value equal to or exceeding 1.5x the principal amount of the portion of the Secured Financial Debt that exceeds USD800 million must be pledged in favour of the Secured Financial Debt (for the avoidance of doubt, in addition and incremental to any existing collateral in favour of the Secured Financial Debt) at the time that such additional pari passu secured debt is incurred after giving effect to such incurrence on a pro forma basis, as certified by the CEO or the CFO;

(f) the permitted pari passu secured debt shall share no greater than rateably in any prepayments of the Secured Financial Debt, provided that this shall not prevent the refinancing of any tranche;

(g) the permitted pari passu secured debt shall have no better security or guarantee package than any Secured Financial Debt (and be subject to customary intercreditor arrangements with any Secured Financial Debt and junior debt (including the Second Lien Notes));

(h) the maturity date of any permitted pari passu debt (subject to an exception for one revolving credit facility providing availability no greater than USD100m (the

"USD100m Revolver")) shall be no earlier than the latest maturity of any existing Secured Financial Debt;

(i)　the weighted average life to maturity of pari passu debt (subject to an exception for the USD100m Revolver a revolving credit facility with a principal amount of up to USD100m) shall be no shorter than the weighted average life to maturity of any existing Secured Financial Debt; and

(j)　such pari passu secured debt shall not contain any restrictions on making payments on, or distributing cash within the group to pay, the New First Lien Secured Notes, except mirroring the limitation to pro rata prepayment provisions in the New First Lien Secured Notes.

Holders of the New First Lien Secured Notes to have a right of first refusal to provide pari passu secured debt if the all-in yield (as defined in Appendix 5 (Right of first refusal mechanics)) applicable to such pari passu secured debt exceeds the all-in yield of the New First Lien Secured Notes.

In addition, if any pari passu secured debt includes any of the following terms, such will also be granted to holders of the New First Lien Secured Notes:

amortization, mandatory redemption, sinking funds; and

a more creditor-friendly cross-default trigger.

Right of first refusal mechanics to be (in summary) as set forth in Appendix 5 (Right of first refusal mechanics).

| H. | Junior Debt | Ability to issue/borrow additional junior debt subject to the following conditions: |
|---|---|---|

(a)　absence of a default or event of default on a pro forma basis;

(b)　an interest coverage ratio (to be mutually defined) of at least 3x on a pro forma basis, as certified by the CEO or CFO; and

(c)　a total leverage ratio (which shall be defined as the ratio of (i) consolidated total indebtedness of the Company and its subsidiaries (which, for the avoidance of doubt, shall include any lease or hire purchase contract, a liability under which would, in accordance with the accounting principles, be treated as a balance sheet liability (other than a lease or hire purchase contract which would, in accordance with the accounting principles in force on the date hereof, have been treated as an operating lease)) to (ii) trailing four-quarter Consolidated EBITDA of the Company and its subsidiaries) not to exceed 4x on a pro forma basis, as certified by the CEO or CFO;

(d) an all-in yield payable in an amount no higher per annum than that payable in respect of the Second Lien Notes (with the all-in yield calculated in a manner consistent with the all-in yield calculation in Appendix 5 (Right of first refusal mechanics) for pari passu secured debt);

(e) a maturity not earlier than 91 days after the latest maturity of any existing Secured Financial Debt;

(f) no amortization and no better security or guarantee package than any Secured Financial Debt; and

(g) to the extent secured, such junior debt shall be subject to a junior lien intercreditor agreement with respect to any existing Secured Financial Debt.

| | | |
|---|---|---|
| I. | **Security package:** | Same as the existing security package in respect of the Secured Debt, save for (i) a release of the security granted by the Excluded Guarantors (as defined below), (ii) a release of security over streamers and other marine equipment granted by CGG Marine BV, (iii) pledges of the shares of CGG Marine Resources Norge AS and, to the extent owned by obligors, shares of Excluded Guarantors, (iv) account control agreements shall be required with respect to bank accounts and securities accounts (other than in respect of (A) payroll accounts and withholding tax accounts, (B) escrow, fiduciary and trust accounts to the extent held for other persons and (C) accounts below a threshold to be agreed) in the United States of obligors located in the United States or any state or territory thereof and (v) short form intellectual property security agreements shall be required to be filed with the U.S. Copyright Office or U.S. Patent & Trademark Office with respect to copyrights, patents and trademarks, as applicable, in each case which are registered in the U.S., of obligors.<br><br>Negative pledge on unencumbered assets, subject to permitted security. |
| J. | **Guarantee package:** | Same as the existing guarantee package in respect of the Secured Debt, save that the following group companies will not be guarantors (together the "**Excluded Guarantors**"): |

        (i)     CGG Marine Resources Norge AS;

        (i)     CGG Holding UK I;

        (ii)    CGG Holding UK II;

        (iii)   Sercel Inc;

        (iv)   Sercel GRC.

Limitations to be agreed on the ability of Excluded Guarantors to raise external financial indebtedness and to grant security and

|   |   | other limitations as may be agreed, in each case with customary ordinary course of business exceptions. |
|---|---|---|
| K. | **Intercreditor arrangements:** | A new New York law intercreditor agreement with respect to the Second Lien Notes and the New SN Interest Second Lien Notes to be entered into based on the intercreditor principles set forth in <u>Appendix 4</u> (Intercreditor Principles). |
| L. | **Rollover fee** | If the New First Lien Secured Notes have not been refinanced in full on or before the date that falls 3 months after the Restructuring Effective Date, a PIK fee capitalised on the date that falls 3 months after the Restructuring Effective Date in the amount that represents 3% of the principal amount of the New First Lien Secured Notes issued on or before the Restructuring Effective Date, after taking into account any upfront pay down (as detailed below) (the "**Rollover Fee**"). |
| M. | **Upfront pay down** | The cash proceeds of the Rights Issue and the Second Lien Note Issue (net of backstop and commitment costs and fees and other fees related to the Rights Issue and the Second Lien Note Issue) in excess of USD250 million shall be applied to pay down the Secured Debt (on a pro rata and pari passu basis) on the Restructuring Effective Date, up to the maximum principal aggregate amount of USD150 million (such pay down of the Secured Debt being the "Upfront Pay Down"). |
|   |   | For the avoidance of doubt, Termed Out French RCF Lenders will not be entitled to receive any portion of the Upfront Pay Down. |
| N. | **Listing, Registration:** | New First Lien Secured Notes to be listed on the Euro MTF of the Luxembourg Stock Exchange. |
| O. | **Full implementation date:** | The Restructuring Effective Date. |
| P. | **Documentation:** | Single indenture in respect of the New First Lien Secured Notes consistent with the 2022 Senior Notes indenture, except that the incurrence covenants (including in respect of asset sales) and related definitions will be substantially based on the negative covenants and related definitions in the US RCF (although the parties acknowledge that they need to be conformed to reflect terms suitable for senior secured notes) and as described herein, together with customary collateral documents and collateral agency agreement. |
| Q. | **Amendments and waivers:** | To be adapted to customary standards for high yield bonds but in any event to include the consent of each holder affected for amendment of money terms. |
| R. | **Governing law** | New York |

**Appendix 4: Intercreditor Principles**

1.  <u>Priority & Scope</u>.  Liens securing the senior debt shall be senior in all respects to the liens securing the subordinated debt notwithstanding time, manner or order of creation or perfection of any lien, any conflicting provision of law or defect or deficiency in, or non- perfection of, any lien. The subordinated creditors shall not contest the validity, enforceability, perfection or priority of any liens securing the senior debt. No liens shall be granted to the subordinated creditors unless a prior lien shall have been granted to the senior lenders.  Subject to the lien priorities set forth herein, collateral securing the subordinated debt shall be substantially the same as the collateral securing the senior debt in the United States, France and each other jurisdiction where an intercreditor agreement can be obtained that effectively puts the senior debt in the same or better positions as they would be with respect to assets owned by obligors organized in the United States or any state or province thereof.

2.  <u>Lien Enforcement Standstill</u>.  There shall be a customary 180-day standstill on lien enforcement actions by the subordinated creditors prior to payment in full in cash of the senior debt. Without limiting the foregoing or any debt subordination terms, any collateral or proceeds  of collateral received by subordinated creditors in violation of the subordination agreement shall be turned over to the agent for the senior lenders.

3.  <u>Lien Releases</u>.  The subordinated creditors shall, in connection with any disposition of collateral (i) permitted under senior debt documents as in effect on the closing date or as amended in a manner not inconsistent with the terms of the subordination agreement,  (ii) consented  to  by  the  required senior lenders, (iii) pursuant to an exercise of remedies by the senior lenders and/or (iv) in connection with a sale under Section 363 of the Bankruptcy Code, consent to said sale and terminate and release their liens on, and guarantees with respect to, the collateral subject to such collateral sale (but not release or waive any default or event of default otherwise existing under the subordinated debt documents or arising under the subordinated debt documents as a result of such sale), provided that the liens attach to the proceeds in the priority set forth in the subordination agreement.

4.  <u>Management of Collateral</u>.  Prior to the payment in full in cash of the senior debt, the senior lenders shall have the exclusive right (as between the senior lenders and the subordinated creditors) to manage, perform and enforce the terms of the senior loan documents with respect to the collateral, to exercise and enforce all privileges and rights thereunder according to their sole discretion and the exercise of their sole business judgment, including the exclusive right to adjust and settle insurance proceeds and condemnation awards, to take  or retake control or possession of the collateral and to hold, prepare for sale, process, dispose of, or  liquidate the collateral and to incur expenses in connection with such disposition and to exercise  all the rights and remedies of a secured lender under the UCC. Subordinated creditors shall issue customary waivers of marshaling, appraisal, valuation and similar rights.

**5.**     <u>Bankruptcy Issues</u>:

(i)     Subordinated creditors will not object to cash collateral usage consented to by the requisite senior lenders as long as (i) subordinated creditors are not required to release their liens unless the senior lenders release their liens and (ii) subordinated creditors may seek adequate protection in the form of replacement liens to the extent the senior lenders shall have been granted such liens, subject to the priorities set forth in the subordination agreement (and senior lenders shall consent to such adequate protection);

(ii)     Subordinated creditors will not object to DIP financing provided by an senior lender or consented to by the agent for the senior lenders;

(iii)     Subordinated creditors may not offer DIP financing, except that the Subordinated creditors may offer DIP financing if (i) none of the senior lenders provide DIP financing and (ii) any such DIP financing does not (A) provide for liens or claims that are senior or equal to the liens or adequate protection claims relating to the senior debt, (B) exceed 50% of the principal amount of subordinated debt, (C) require a specific plan of reorganization or the sale of assets prior to a default, (D) require payment in cash upon plan confirmation (but instead will provide for payment in any form having value equal to the amount of the DIP financing unless the senior debt is required to be first paid in full in cash), (E) prohibit the senior lenders from objecting to same or (F) have provisions that are otherwise inconsistent with terms of subordination agreement.

(iv)     Subordinated creditors will not object to relief from stay or adequate protection requested by the senior lenders;

(v)     Subordinated creditors will not request relief from the stay except and to the extent the senior lenders request and obtain relief from stay or except to the extent the subordinated creditors have provided the DIP financing in accordance with clause (c) above and are entitled to exercise such rights in accordance therewith (and proceeds of enforcement are first paid to the senior lenders);

(vi)     Subordinated creditors may not request adequate protection, except that the subordinated creditors may request adequate protection in the form of replacement liens and a super-priority claim if the senior lenders are granted replacement liens and a super-priority claim senior to any replacement liens and super-priority claim granted to subordinated creditors;

(vii)     Subordinated creditors waive the right to oppose a 363 sale that has been approved by the requisite senior lenders and shall consent to such sale, provided, that the liens attach to the proceeds in the priority set forth in the subordination agreement and provided that the motion to approve such sale does not seek to restrict the subordinated creditors from asserting their right to credit bid so long as such bid provides for the payment in full in cash of all senior debt at consummation of such sale;

(viii)    Subordinated creditors will not propose or vote for any plan that does not require the payment in full in cash of the senior lenders unless consented to by the requisite senior lenders;

(ix)    Subordinated creditors will (i) be entitled to retain reorganization securities, received in respect of any claim classified as an unsecured claim, that are subordinated to the reorganization securities provided to the senior lenders and otherwise do not permit any payment thereunder until payment in full of the senior debt and any replacement reorganization securities provided to the senior lenders and (ii) turn over to agent for the senior lenders, in payment of senior debt, such reorganization securities received in respect of any claim classified as a secured claim.

(x)    Such additional terms as are customary for transactions of this type, including with respect to mutual waiver of any claims under Sections 506(c), 552 and 1111(b) of the Bankruptcy Code and the accrual of post-petition interest under Section 506(b) of the Bankruptcy Code.

6.    Amendment Restrictions.  To include (i) a cap on senior debt in an amount equal to the amount permitted under the junior debt indenture as in existence on the closing date (as such junior debt indenture may be amended, restated, supplemented or modified to increase (but not decrease) such amount), (ii) a cap on subordinated debt in an amount equal to the amount permitted under the senior debt indenture as in existence on the closing date (as such senior debt indenture may be amended, restated, supplemented or modified to increase (but not decrease) such amount), and (iii) a restriction on changes to subordinated debt payment dates.

7.    Anti-layering.  Anti-layering provisions to be included to provide that, prior to the discharge in full of the Second Lien Notes, no debt shall be incurred to the extent that it would rank senior to the Second Lien Notes unless such ranking arises as a matter of law or such debt is subject to the terms of the Intercreditor Agreement.

## Appendix 5: Right of first refusal mechanics

1.    Three business days prior to the launch of any debt syndication (which, for the avoidance of doubt, shall include a debt syndication pursuant to Rule 144A under the U.S. Securities Act of 1933) or placement using capacity to incur pari passu secured debt under the USD200M basket ("**new debt**"), the Company shall provide written notice to the trustee and holders of the New First Lien Secured Notes of its intention to hold meetings with potential debt investors and will invite holders of New First Lien Secured Notes to participate in the syndication or placement process by contacting the Company or its investment banking representative at an address specified in the notice; *provided* that in any placement where the Company has agreed with the financing providers to a pricing (as defined below) that does not exceed the all-in yield in respect of the New First Lien Secured Notes (a "**direct placement**"), such written notice shall not be required.

2.    At any time during the debt syndication or placement process in respect of the new debt (other than a direct placement), upon the request of any person that represents that it is a holder of New First Lien Secured Notes (a screen shot of the holder's custodian account, a recently-dated letter from its custodian and/or proof of the custodian's holding in the relevant clearing system shall constitute sufficient evidence for this purpose) and that its participation

in such syndication or placement process will not be in violation of applicable securities laws, the Company shall promptly provide such person with any marketing or syndication materials used in the syndication or placement of the new debt to other potential investors, and invite such person to attend any roadshow or other marketing meetings held with senior management of the Company and other potential investors at reasonable times and locations.

3.    Prior to the signing of a definitive underwriting, purchase, or placement agreement, or definitive loan documentation, in respect of new debt ("pricing"), where the market-clearing price for such new debt represents an all-in yield (determined as described below, the "all-in yield") that exceeds the all-in yield in respect of the New First Lien Secured Notes, the Company shall set the market-clearing price based on indications of interest from all potential investors (including holders of the New First Lien Secured Notes) and shall accept orders to subscribe for such new debt at such price from holders of the New First Lien Secured Notes in priority to other potential investors' orders. Pricing of the new debt (other than a direct placement) shall occur no earlier than the third business day following launch of any syndication, or the fifth business day following launch of any private placement, in respect of the new debt.

4.    In determining the all-in yield of both the new debt and the New First Lien Secured Notes, (i) original issue discount, arrangement fees, underwriting fees, upfront fees or any other similar fees paid in connection with the new debt (based on a four-year life to maturity or lesser remaining life to maturity) shall be included and (ii) any interest rate floor applicable to the new debt and/or the New First Lien Secured Notes (as the case may be) on the date of pricing shall be equated to interest margin for determining the applicable all-in yield; provided that any original issue discount, arrangement, underwriting, upfront or any other similar fees ("fees") payable in connection with the new debt shall be excluded from such determination to the extent such amounts are (x) paid as consideration for arranging or underwriting the syndication or placement of the new debt, and not paid as compensation for lending and (y) not shared generally with, or paid away to, other lenders. Any fees that are not excluded pursuant to clause (x) or (y) of the immediately preceding sentence shall be paid to holders of the New First Lien Secured Notes subscribing for the new debt on a pro rata basis to their subscription for the new debt at the same time and on the same terms as which such fees are paid to other lenders under the new debt.

5.    In the event that there is oversubscription from the holders of the New First Lien Secured Notes and a holder of the New First Lien Secured Notes elects to subscribe for an amount of new debt (other than a direct placement) that exceeds it pro rata holding, such holders' subscription amount shall be scaled back to its pro rata holding (it being understood and agreed that any third parties shall be scaled back in full before there is any scale back to the holders of New First Lien Secured Notes).

**Schedule 1: Illustrative example of the number of shares to be issued depending on the level of take up**

| | Initial | NM Injection | | HYB & CB Equitisation | | Penny Shares / Penny Warrants | | Post Warrants 1 | | Post Warrants 1 & 2 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | No Take-up | Full Take-up | No Take-up | Full Take-up | No Take-up | Full Take-up | No Take-up | Full Take-up | No Take-up | Full Take-up |
| **HYB** | 0.0 | 71.4 | 0.0 | 468.6 | 432.9 | 587.5 | 559.9 | 587.5 | 559.9 | 635.1 | 559.9 |
| *of which new money (paper)* | | 71.4 | 0.0 | 71.4 | 0.0 | 71.4 | 0.0 | 71.4 | 0.0 | 119.0 | 0.0 |
| **Convert. Bonds** | 0.0 | 0.0 | 0.0 | 32.9 | 32.9 | 32.9 | 32.9 | 32.9 | 32.9 | 32.9 | 32.9 |
| **Existing shareholders** | 22.1 | 22.1 | 93.6 | 22.1 | 93.6 | 22.1 | 93.6 | 51.6 | 123.1 | 51.6 | 170.7 |
| *of which from new money (cash)* | 0.0 | 0.0 | 71.4 | 0.0 | 71.4 | 0.0 | 71.4 | 0.0 | 71.4 | 0.0 | 119.0 |
| *of which from existing shares* | 22.1 | 22.1 | 22.1 | 22.1 | 22.1 | 22.1 | 22.1 | 51.6 | 51.6 | 51.6 | 51.6 |
| **Total** | 22.1 | 93.6 | 93.6 | 523.7 | 559.4 | 642.5 | 686.4 | 672.1 | 715.9 | 719.7 | 763.5 |
| | | | | | | | | | | | |
| **HYB** | 0.0% | 76.3% | 0.0% | 89.5% | 77.4% | 91.4% | 81.6% | 87.4% | 78.2% | 88.3% | 73.3% |
| *of which new money (paper)* | 0.0% | 76.3% | 0.0% | 13.6% | 0.0% | 11.1% | 0.0% | 10.6% | 0.0% | 16.5% | 0.0% |
| **Convert. Bonds** | 0.0% | 0.0% | 0.0% | 6.3% | 5.9% | 5.1% | 4.8% | 4.9% | 4.6% | 4.6% | 4.3% |
| **Existing shareholders** | 100.0% | 23.7% | 100.0% | 4.2% | 16.7% | 3.4% | 13.6% | 7.7% | 17.2% | 7.2% | 22.4% |
| *of which from new money (cash)* | 0.0% | 0.0% | 76.3% | 0.0% | 12.8% | 0.0% | 10.4% | 0.0% | 10.0% | 0.0% | 15.6% |
| *of which from existing shares* | 100.0% | 23.7% | 23.7% | 4.2% | 4.0% | 3.4% | 3.2% | 7.7% | 7.2% | 7.2% | 6.8% |
| **Total** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

27

**Schedule 2: calculation of the pro rata split of the Accrued Senior Note Interest Payment**

| 31/10/17 | Principal w/o Coupon | | | Principal (with Coupon) | | | Theoretical amounts | Reinstated coupon | To be converted |
|---|---|---|---|---|---|---|---|---|---|
| | USD | EUR | Last Coupon | USD | EUR | Interest R. | USD | USD | USD |
| **HYB** | **$1,515** | **€1,443** | | **$1,601** | **€1,525** | **6.430%** | **$86.06** | **$86.00** | **$1,515** |
| *2021 HYB* | *$605* | €576 | *01/12/16 LC* | *$641* | *€610* | *6.50%* | $35.98 | *$35.96* | *$605* |
| *2021 HYB (ML)* | *$71* | €67 | *20/01/17 LC* | *$74* | *€71* | *6.50%* | $3.58 | *$3.57* | *$71* |
| *2022 HYB* | *$420* | €400 | *15/01/17 LC* | *$442* | *€421* | *6.875%* | $22.84 | *$22.83* | *$420* |
| *2020 HYB* | *$420* | *€400* | *15/11/16 LC* | *$444* | *€423* | *5.875%* | $23.66 | *$23.65* | *$420* |
| **CB** | **$378** | **€360** | | **$383** | **€365** | **1.70%** | **$5.32** | **$5.00** | **$378** |
| *2019 CB* | *$37* | *€35* | *02/01/17 LC* | *$37* | *€35* | *1.25%* | $0.38 | *$0.36* | *$37* |
| *2020 CB* | *$341* | *€325* | *02/01/17 LC* | *$346* | *€330* | *1.75%* | $4.94 | *$4.64* | *$342* |
| **TOTAL** | **$1,893** | **$1,803** | | **$1,985** | **€1,890** | | **$91.38** | **$91.0** | **$1,894** |

**Schedule 7**
**Group Structure Chart**

CGG (France)

CGG HOLDING B.V. (The Netherlands)

**APAC REGION**

- COGVERITAS SERVICES (B) SDN BHD (Brunei)
- CGG TECHNOLOGY SERVICES (BEIJING) CO. LTD (China)
- CGG GEOSCIENCE (BEIJING) LTD. (China)
- CGG SERVICES (MALAYSIA) SDN BHD (Malaysia)
- CGG JASON (MALAYSIA) SDN. BHD. (Malaysia)
- PTSC CGGV GEOPHYSICAL SURVEY COMPANY LIMITED (Vietnam)
- CGG SERVICES INDIA PRIVATE LTD (India)
- CGG SERVICES (AUSTRALIA) PTY. LTD. (Australia)
- CGG GROUND GEOPHYSICS (AUSTRALIA) PTY. LTD. (Australia)
- CGG AVIATION (AUSTRALIA) PTY. LTD. (Australia)
- CGG SERVICES (SINGAPORE) PTE LTD (Singapore)
- CGG SERVICES (MYANMAR) CO. LTD (Myanmar)
- P.T. ELNUSA CGGVERITAS SEISMIC (Indonesia)
- P.T. CGG SERVICES INDONESIA (Indonesia)

- ARGAS (Saudi Arabia)
- ARDISEIS FZCO (United Arab Emirates)
- SEABED GEOSOLUTIONS B.V. (The Netherlands)
- CGG SERVICES (NL) B.V. (The Netherlands)
- CGG MARINE B.V. (The Netherlands)
- CGG DATA MANAGEMENT (NETHERLANDS) B.V. (The Netherlands)

- CGG SERVICES (NORWAY) AS (Norway)
- CGG EIDESVIK SHIP MANAGEMENT AS (Norway)
- CGG MARINE RESOURCES NORGE AS (Norway)
- EXPLORATION INVESTMENT RESOURCES II AS (Norway)
- GLOBAL SEISMIC SHIPPING AS (Norway)
- OCEANIC SEISMIC VESSELS AS (Norway)
- EIDESVIK SEISMIC VESSELS AS (Norway)
- CGG GEO VESSELS AS (Norway)
- WAVEFIELD INSEIS AS (Norway)
- EXPLORATION VESSEL RESOURCES II AS (Norway)

- CGG HOLDING SOUTH AFRICA (PTY.) LTD. (South Africa)
- CGG AIRBORNE SURVEY (PTY.) LTD. (South Africa)
- CGG VOSTOK (Russia)
- ARKTIC GEOPHYSICAL EXPLORATION LLC (Russia)
- SEVOTEAM ZAO (Russia)
- ERGION (NIGERIA) LTD (Nigeria)
- VERITAS GEOPHYSICAL (NIGERIA) LTD (Nigeria)
- COMPAGNIE GENERALE DE GEOPHYSIQUE (NIGERIA) LIMITED (Nigeria)
- CGG SERVICES SAS (France)
- Geo Ship Management Services sas (France)
- CGG SERVICES (GABON) (Gabon)
- GEOMAR SAS (France)
- CGG EXPLO SARL (France)
- GOSCO Geoscience Services Limited (Ghana)
- CGG GEOSCIENCE GMBH (Switzerland)
- CGG DATA SERVICES (Switzerland)
- CGG INTERNATIONAL SA (Switzerland)
- CGG ELECTRO MAGNETICS (GERMANY) GMBH (Germany)
- GRIAL TECH S.R.L. (Italy)
- CGG ELECTROMAGNETICS (ITALY) SRL (Italy)
- RESERVOIR EVALUATION SERVICES LLP (Kazakhstan)
- GEOEXPLO LLP (Kazakhstan)
- VERITAS CASPIAN LLP (Kazakhstan)
- CGG HOLDING (U.K.) LIMITED (UK)
- CGG HOLDING II (UK) LIMITED (UK)
- CGG HOLDING IV (UK) LIMITED (UK)
- CGG HOLDING III (UK) LIMITED (UK) (all shares owned by CGG Holding IV (UK) Limited have been pledged)
- CGG SERVICES (UK) LTD (UK)

**EAME REGION**

- ROBERTSON (UK) LIMITED (United Kingdom)
- ROBERTSON RESEARCH INTERNATIONAL LIMITED (United Kingdom)
- ROBERTSON GEOSPEC INTERNATIONAL LIMITED (United Kingdom)
- PETROLEUM EDGE LIMITED (United Kingdom)
- VERITAS GEOPHYSICAL LIMITED (United Kingdom)
- VERITAS DGC LTD (UK)
- CGG DATA MANAGEMENT (UK) LIMITED (United Kingdom)

**LAM REGION**

- LASA Prospecções SA (Brazil)
- CBG GEOFISICA LTDA (Brazil)
- CGG DO BRASIL PARTICIPACOES (Brazil)
- TECNICA BRASILEIRA DE GEOFISICA LTDA. (Brazil)
- VERITAS DO BRASIL LTDA (Brazil)
- EXGEO C.A. (Venezuela)
- VERITAS DGC LAND GUATEMALA SA (Guatemala)
- VERITAS GEOPHYSICAL (CHILE) SA (Chile)
- EXPLORACIONES GEOFISICAS VERITAS GEOPHYSICAL CHILE CIA (Chile)
- CGG MEXICO, S.A. DE C.V. (Mexico)
- GEONOVACION CORPORATIVA S. DE R.L. DE C.V. (Mexico)
- CGG GEOSCIENCE MEXICO S.A. DE C.V. (Mexico)
- VITZEL S.A. DE C.V. (Mexico)

**NAM REGION**

- CGG HOLDING (U.S.) INC. (USA)
- CGG MARINE (U.S.) INC. (USA)
- CGG SERVICES (U.S.) INC. (USA)
- VERITAS GEOPHYSICAL III (Cayman Islands)
- VERITAS GEOPHYSICAL IV (Cayman Islands)
- VIKING MARITIME INC. (USA)
- ALITHEIA RESOURCES INC. (USA)
- CGG LAND (US) INC. (USA)
- GEOKINETICS INC. (USA)
- CGG SERVICES (CANADA) INC. (Canada)
- VERI KLUGG GEOPHYSICAL LTD (Canada)
- VIAMORIA GEOPHYSICAL LTD (Canada)
- CGG CANADA SERVICES LTD (Canada)
- CGG AVIATION (CANADA) LIMITED (Canada)

**EQUIPMENT DIVISION**

- RESERVOIR IMAGING LTD (UK)
- SERCEL HOLDING SAS (France)
- SERCEL SAS (France)
- SERCEL INC. (USA)
- SERCEL CANADA LTD (Canada)
- STX CORP. (USA)
- GEOSENSOR CORP. (USA)
- INTERACTIVE NETWORK TECHNOLOGIES INC. (USA)
- SERCEL - GRC (USA)
- DE REGT MARINE CABLES B.V. (The Netherlands)
- DE REGT GERMANY GMBH (Germany)
- GRC MEXICO LLC (USA)
- GRC DUBAI LLC (USA)
- GEOPHYSICAL RESEARCH MEXICO S.A. DE C.V. (MEXICO)
- GEOPHYSICAL RESEARCH CORPORATION (Dubai) (USA)
- GRC SINGAPORE LLC (USA)
- SERCEL AUSTRALIA PTY. LTD (Australia)
- SERCEL ENGLAND LTD (UK)
- SERCEL SINGAPORE PRIVATE LTD (Singapore)
- (OOO) SERCEL SUPPORT SERVICES (Russia)
- SERCEL (BEIJING) TECHNOLOGICAL SERVICES CO. LTD(China)
- HEBEI SERCEL-JUNFENG GEOPHYSICAL PROSPECTING EQUIPMENT CO. LTD. (China)
- XIAN SERCEL (China)

Legend:

- Companies to be liquidated
- G — Companies that are guarantors/obligors under our credit agreements and/or senior notes
- XXXX — Companies whose shares are pledged under our credit agreements

**Schedule 8**
**Notice Details**

**The Company and Obligors**

| Entity | Notice Details |
|---|---|
| CGG S.A. | |
| CGG Holding B.V. (formerly known as CGG Veritas Holding B.V.) | |
| CGG Marine B.V. (formerly known as CGG Veritas Marine B.V.) | |
| CGG Holding (US) Inc. | |
| CGG Services (US) Inc. | |
| Viking Maritime Inc. | |
| Alitheia Resources Inc. | |
| CGG Land (U.S.) Inc. | |
| CGG Marine Resources Norge AS | |
| Sercel, Inc. | |
| Sercel-GRC Corp. | |
| CGG Canada Services Ltd. | |
| Sercel Australia PTY Ltd. | |
| CGG Holding I (UK) Limited | |
| Sercel Canada Ltd. | |
| CGG Holding II (UK) Limited | |

**Part B**

**Ad Hoc Secured Lender Committee Members**

| Ad Hoc Secured Lender Committee Member | Notice Details |
|---|---|
| Makuria Investment Management (UK) LLP | 30 Charles II Street<br>London<br>SW1Y 4AE |
| Goldman Sachs International<br>133 Fleet Street<br>London, UK<br>EC4A 2BB<br>Attention: European Special Situations Group | 133 Fleet Street<br>London, UK<br>EC4A 2BB<br>Attention: European Special Situations Group |
| Sculptor Investments S.à.r.l | 6D route de Trèves<br>L-2633 Senningerberg |

| Ad Hoc Secured Lender Committee Member | Notice Details |
|---|---|
| | Luxembourg |

### Part C

### Ad Hoc Senior Noteholder Committee Members

| Ad Hoc Senior Noteholder Committee Member | Notice Details |
|---|---|
| Alden Global Capital, LLC | Alden Global Capital, LLC<br>885 Third Avenue, 34th Floor<br>New York, NY 10022<br>United States of America<br>Attn: Chief Legal Officer<br>Email: notices@aldenglobal.com<br><br>Tel: 212-888-5500 |
| Attestor Capital LLP | Attestor Capital LLP<br>20 Balderton Street<br>London W1K 6TL<br>United Kingdom<br>Attn: Operations team / Isobelle White<br>Email: ops@attestorcapital.com<br>Tel: +44 20 7074 9610<br>Fax: +44 20 7074 9611 |
| Aurelius Capital Management, LP | Aurelius Capital Management, LP<br>535 Madison Avenue, 22nd Floor<br>New York, NY 10022<br>United States of America<br>Attn: Legal<br>Email: jrubin@aurelius-capital.com ; dtiomkin@aurelius-capital.com<br>Tel: 646-445-6590 |
| Boussard & Gavaudan Asset Management, LP | Boussard & Gavaudan Asset Management, LP<br>One Vine Street<br>London W1J 0AH<br>United Kingdom<br>Attn: Compliance and Legal<br>Email: BG.legal@bgam-fr.com<br>Tel: +44 20 3751 5400<br>Fax: +44 20 7287 5746 |
| Contrarian Capital Management, L.L.C.<br><br>solely in its representative capacity as advisor to each of: | Contrarian Capital Management, L.L.C.<br>411 West Putnam Avenue<br>Greenwich, CT 06830<br>Attn: Josh Weisser ; Jeff Bauer |

| Ad Hoc Senior Noteholder Committee Member | Notice Details |
| --- | --- |
| Contrarian Capital Fund I, L.P.<br>Contrarian Dome du Gouter Master Fund, LP<br>Contrarian Centre Street Partnership, L.P.<br>Contrarian Opportunity Fund, L.P.<br>Contrarian Capital Senior Secured, L.P.<br>Contrarian Emerging Markets, L.P.<br>Contrarian EM SIF Master L.P.<br>Boston Patriot Summer St LLC | Email: jweisser@contrariancapital.com ;<br>jeffbauer@contrariancapital.com<br>Tel: 203-832-8278<br>Fax: 203-629-1977 |
| Third Point LLC | Third Point LLC<br>390 Park Avenue, 18th Floor<br>New York, NY 10022<br>United States of America<br>Attn:  Operations<br>Email: operations@thirdpoint.com<br>Tel: 212-715-3488 |

**Part D**

**Ad Hoc Convert Holder Committee Members**

| Ad Hoc Convert Holder Committee Member | Notice Details |
|---|---|

**Part E**

**Calculation Agent**

| Calculation Agent | Notice Details |
|---|---|
| Lucid Issuer Services Limited | cgg@lucid-is.com |
| Tankerton Works | Tel: + 44 20 7704 0880 |
| 12 Argyle Walk | Fax: + 44 20 3004 1590 |
| London | |
| WC1H 8HA | |

**Schedule 9**
**Milestones Schedule**

| No. | Milestone | Long-stop date |
|---|---|---|
| 1. | Company commences Safeguard (i.e. safeguard proceedings are opened in respect of CGG SA) | 30 June 2017, such date being "T" |
| 2. | Chapter 11 Companies commence Chapter 11 Cases | T+ 0 |
| 3. | Company commences Chapter 15 Case | T+ 5 |
| 4. | Bankruptcy Court enters Order approving Interim Cash Collateral Order in form and substance acceptable to the Ad Hoc Secured Lender Committee | T+ 5 |
| 5. | Chapter 11 Companies jointly file Chapter 11 Plan and Disclosure Statement consistent with this Agreement | T+ 30 |
| 6. | Bankruptcy Court shall enter a Final Cash Collateral Order in form and substance acceptable to the Ad Hoc Secured Lender Committee | T+ 40 |
| 7. | Chapter 11 Companies file their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court | T+ 60 |
| 8. | Bankruptcy Court enters an order approving the adequacy of the Chapter 11 Companies' Disclosure Statement | T+ 60 |
| 9. | Creditors classes (i.e. "comités de créanciers" and "assemblée générale des obligataires") approve the draft Safeguard Plan | T+ 70 |
| 10. | The shareholders of the Company approve all resolutions necessary to implement the Financial Restructuring | T+123 |
| 11. | Bankruptcy Court enters order confirming the Chapter 11 Companies' Plan | T+ 130 |
| 12. | French Judgment Date: French Court gives its judgment in respect of the Safeguard Plan | T+ 160 |

## Schedule 10
## Form of Obligor Accession Letter

To:      (1)        CGG S.A. as the Company

         (2)        Lucid Issuer Services Limited as Calculation Agent

From:    [*Proposed Acceding Obligor*]

Dated:

Dear Sirs

### CGG S.A. - Lock-Up Agreement

### dated [_____] (the "Agreement")

**1**     We refer to the Agreement. This is an Obligor Accession Letter. Terms defined in the Agreement have the same meaning in this Obligor Accession Letter unless given a different meaning in this Obligor Accession Letter.

**2**     [*Proposed Acceding Obligor*] hereby agrees to be bound by the terms of the Agreement as an Obligor.

**3**     [*Proposed Acceding Obligor's*] administrative details are as follows:

         Address:

         Fax No:

         Attention:

**4**     This Accession Letter is governed by French law.

         Signed:

         [*Proposed Acceding Obligor*]

         By:

**Schedule 11**
**SN Private Placement Agreement**

**PRIVATE PLACEMENT AGREEMENT**

THIS AGREEMENT (including any exhibits, supplements and schedules hereto, this "Agreement"), dated as of [●], 2017, is by and among CGG S.A., a French *société anonyme* (the "Company"), each of undersigned Subsidiaries of the Company that will guarantee the Company's obligations under the Private Placement Notes (as defined below) (together with the Company, the "Obligors"), Lucid Issuer Services Limited, as Private Placement Agent and each Commitment Party (as defined below).  The Obligors and Commitment Parties are referred to herein, individually, as a "Party" and, collectively, as the "Parties."  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Lock-Up Agreement (as defined below).

**RECITALS**

WHEREAS, on June [13], 2017, the Obligors, the Backstop Parties and certain other parties entered into the Lock-Up Agreement, which provides for the terms of a financial restructuring (the "Financial Restructuring") of the Group as contemplated by and set forth in the Lock-Up Agreement;

WHEREAS, in accordance with the Milestones Schedule, the Company has opened a safeguard procedure (*procédure de sauvegarde*) before the Paris Commercial Court (the "French Court") under articles L.620-1 *ff.* of the French *Code de commerce* (the "Safeguard") to implement the Financial Restructuring;

WHEREAS, in accordance with the Milestones Schedule, certain Subsidiaries of the Company (collectively, the "Chapter 11 Debtors") have filed voluntary petitions commencing cases ("Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to implement the Financial Restructuring;

WHEREAS the Safeguard supervisory judge ("*juge-commissaire*") issued an order on [●] 2017 authorizing the entering into of this Agreement;

WHEREAS, each Backstop Party holds, or funds, entities or accounts that are managed, advised or sub-advised by the undersigned or its Affiliates hold, Senior Notes and is a party to the Lock-Up Agreement;

WHEREAS, in connection with the Financial Restructuring, and pursuant to the terms and conditions herein, the Company will conduct the Private Placement of $375,000,000 (the "Private Placement Amount") in principal amount of newly issued Private Placement Notes and Private Placement Warrants (together, the "Private Placement Instruments") to be subscribed by the Commitment Parties for an aggregate subscription price equal to the Private Placement Amount;

WHEREAS, to facilitate the consummation of the Financial Restructuring and the Company's receipt of the full amount of the Private Placement Amount, subject to the terms and conditions herein, each Backstop Party has agreed to subscribe, on a several but not joint basis, its Private Placement Percentage of the Private Placement Instruments, and each Additional

Commitment Party (if any) has the ability to subscribe to its Private Placement Percentage of the Private Placement Instruments, pursuant to the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the premises and the mutual agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties and the Private Placement Agent agree as follows:

Section 1.        **DEFINITIONS**.

1.1        <u>Definitions</u>.  As used in this Agreement (including any exhibits, supplements or schedules hereto), the following terms shall have the following meanings:

"<u>Accession Letter</u>" has the meaning assigned to such term in the Lock-Up Agreement.

"<u>Additional Commitment Claim Amount</u>" means, with respect to an Additional Commitment Party that became a Commitment Party hereto during the Placement Period, the lower of the aggregate principal amount of all of the Senior Notes held by such Additional Commitment Party as of (i) the Record Date and (ii) the Commitment Date, in each case to the satisfaction of the Company and the Private Placement Agent, each acting in their sole discretion (in consultation with the Ad Hoc Group Advisors), that such Additional Commitment Party held the corresponding principal amount of Senior Notes as of each date, in accordance with this Agreement.

"<u>Additional Commitment Party</u>" means each Party, other than a Backstop Party, that is (a) an Eligible Holder that agrees to participate in the Private Placement by executing this Agreement and the Lock-Up Agreement in accordance with <u>Section 2.3</u> or (b) the transferee or designee of the Subscription Commitment (in whole or in part) of a Commitment Party in accordance with <u>Section 2.7</u>.

"<u>Ad Hoc Group Advisors</u>" means Messier Maris & Associés and Millco Advisors, LP, as financial advisors to the Ad Hoc Noteholder Group, and Willkie Farr & Gallagher LLP and DLA Piper LLP, as legal counsel to the Ad Hoc Noteholder Group, and any successors thereto.

"<u>Ad Hoc Noteholder Group</u>" means (a) Alden Global Capital, on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates; (b) Attestor Capital LLP, on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates; (c) Aurelius Capital Management, LP, on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates; (d) Boussard & Gavaudan Asset Management, LP, on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates; (e) Contrarian Capital Management, L.L.C., on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates, as identified on the Backstop Commitment Schedule; and (f) Third Point LLC, on behalf of itself and funds, entities or accounts managed, advised or sub-advised by it or its Affiliates.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person.

"<u>Agreement</u>" has the meaning assigned to it in the preamble hereto.

"<u>Alternative Proposal</u>" means any proposed winding-up, dissolution, administration, liquidation, recapitalization, merger, consolidation, joint venture, sale of assets, restructuring or reorganization of any Obligor or any proposed composition, compromise, assignment or arrangement with any creditor of any Obligor, other than pursuant to the implementation and consummation of the Financial Restructuring.

"<u>AMF</u>" has the meaning assigned to it in <u>Section 3.2</u>.

"<u>AMF General Regulations</u>" means the general regulation of the French *Autorité des marchés financiers*, as may be amended from time to time.

"<u>Anti-Money Laundering Laws</u>" has the meaning assigned to it in <u>Section 3.25</u>.

"<u>Approval Motion</u>" means a motion filed by the Chapter 11 Debtors seeking entry of the Approval Order, which motion shall be in form and substance consistent with the Lock-Up Agreement and reasonably acceptable to the Company and the Required Backstop Parties.

"<u>Approval Order</u>" means an Order of the Bankruptcy Court in form and substance consistent with the Lock-Up Agreement and acceptable to the Company and the Required Backstop Parties, approving (a) the payment of the fees, costs and expenses of the Ad Hoc Group Advisors by the Chapter 11 Obligors pursuant to <u>Section 5.6</u> hereof, and (b) the indemnification obligations of the Chapter 11 Obligors under <u>Section 9</u> of this Agreement, which shall constitute allowed administrative expenses of the Chapter 11 Obligors' estates under Sections 503(b) and 507 of the Bankruptcy Code and shall be payable as provided herein without further order of the Bankruptcy Court.

"<u>Audited Financial Statements</u>" has the meaning assigned to it in <u>Section 3.8</u>.

"<u>Available Commitment</u>" means the Commitment for which any Defaulting Commitment Party fails to subscribe as a result of a Commitment Party Default by such Defaulting Commitment Party.

"<u>Backstop Commitment</u>" has the meaning assigned to it in <u>Section 2.4(a)</u>. For the avoidance of doubt, in the formula under the <u>clause (a)</u> of the "Private Placement Percentage" definition, the Backstop Commitment of a Backstop Party is the amount attributable to "B x (100% - (C + D))," which together with its commitment to subscribe for its pro rata share of any Available Commitment pursuant to <u>Section 2.6</u>, comprises its "Backstop Commitment."

"<u>Backstop Fee</u>" means, in respect of each Backstop Party (that is not a Defaulting Commitment Party), subject to <u>Section 2.6</u>, (i) an amount equal to its Backstop Percentage of 3.0% of the full Private Placement Amount which amount shall be payable as set forth in <u>Section 2.4</u> and (ii) its Backstop Percentage of the Backstop Fee Instruments.

"<u>Backstop Fee Instruments</u>" means the Backstop Warrants (as such term is defined in the Term Sheet) and any replacing instruments as would be agreed in accordance with the Term

Sheet, in form and substance consistent with the Lock-Up Agreement and reasonably acceptable to the Company and the Required Backstop Parties.

"Backstop Party" means each Party set forth on the Backstop Commitment Schedule.

"Backstop Percentage" means, with respect to a Backstop Party, the percentage identified on the Backstop Commitment Schedule opposite such Backstop Party's name (subject to adjustment pursuant to Section 2.6).

"Backstop Commitment Schedule" means Schedule 1 hereto listing each Backstop Party and its Backstop Percentage, as such schedule may be updated from time to time in accordance herewith.

"Backstop Transferee" means a Person who meets all of the criteria set forth in Schedule 4 hereto on (i) the date on which such Person becomes a Backstop Party as a result of a Transfer of a Backstop Commitment (expressed as a Backstop Percentage) in accordance with the terms hereof and (ii) the Closing Date.

"Bankruptcy Code" means title 11 of the United States Code, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" has the meaning assigned to it in the Recitals.

"Bankruptcy Rules" means the U.S. Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases.

"Business Day" has the meaning assigned to such term in the Lock-Up Agreement.

"Canadian Cases" means proceedings commenced under the Companies' Creditors Arrangement Act in the Court of Queen's Bench of Alberta, Judicial District of Calgary in Calgary, Alberta, Canada on behalf of Chapter 11 Debtors CGG Canada Services Ltd. and Sercel Canada Ltd. seeking recognition of the Chapter 11 Cases in Canada.

"Chapter 11 Cases" has the meaning assigned to it in the Recitals.

"Chapter 11 Debtors" has the meaning assigned to it in the Recitals, and are Alitheia Resources Inc., CGG Canada Services Ltd., CGG Holding (U.S.) Inc., CGG Holding B.V., CGG Holding I (UK) Ltd., CGG Holding II (UK) Ltd., CGG Land (U.S.) Inc., CGG Marine B.V., CGG Marine Resources Norge AS, CGG Services (U.S.) Inc., Sercel Canada Ltd., Sercel Inc., Sercel-GRC Corp. and Viking Maritime Inc.

"Chapter 11 Obligors" means the Obligors that are Chapter 11 Debtors.

"Chapter 11 Plan" means the plan of reorganization to be filed in the Chapter 11 Cases with respect to the Chapter 11 Debtors (including all exhibits, supplements, appendices and schedules thereto), in form and substance consistent with this Agreement and the Lock-Up Agreement in all material respects and reasonably acceptable to the Company and the Required

Commitment Parties, as may be amended, supplemented or modified from time to time in accordance with the terms and conditions of the Lock-Up Agreement.

"Chapter 15 Case" has the meaning assigned to "Chapter 15 Cases" in the Lock-Up Agreement.

"Chapter 15 Enforcement Order" means the Order in form and substance reasonably acceptable to the Company and the Required Commitment Parties entered by the Bankruptcy Court in the Chapter 15 Case recognizing and enforcing the French Plan Sanction Order.

"Closing" has the meaning assigned to it in Section 2.2(c).

"Closing Date" means the date of the Closing.

"Commitment" has the meaning assigned to it in Section 2.2(a).  For the avoidance of doubt, for an Additional Commitment Party, its Commitment is its Subscription Commitment, and for a Backstop Party, its Commitment is its Subscription Commitment and its Backstop Commitment.

"Commitment Date" means, with respect to an Eligible Holder electing to become an Additional Commitment Party during the Placement Period, the date of such Additional Commitment Party's valid, binding, executed and timely received Joinder Agreement and Accession Letter; provided that such date shall be within the Placement Period.  For the avoidance of doubt, the Commitment Date shall be the date on which such Additional Commitment Party is deemed to become a Party to this Agreement

"Commitment Fee" means, for each Commitment Party (other than a Defaulting Commitment Party), an amount equal to 7.0% of its respective Commitment which amount shall be payable as set forth in Sections 2.4 and 2.6.

"Commitment Outside Date" means February 28, 2018 or such later Long-Stop Date (as defined in the Lock-Up Agreement) as may be agreed in accordance with the terms and conditions of the Lock-Up Agreement; provided that such date may not be later than March 31, 2018.

"Commitment Party" means a Backstop Party or an Additional Commitment Party.

"Commitment Party Default" means the failure by any Commitment Party (a "Defaulting Commitment Party") to deliver and pay all amounts required to be paid by such Commitment Party to the Third-Party Escrow Accounts by the applicable funding date in accordance with Sections 2.5(b) or 2.6, or to comply with the requirements of Sections 2.5(c) or 5.8 by the dates specified therein.

"Commitment Party Expenses" has the meaning assigned to it in Section 5.6.

"Commitment Party Material Adverse Effect" means any event, circumstance, development, change or effect that, individually or in the aggregate with all other events, circumstances, developments, changes or effects, has prevented, materially delayed or materially

impaired the ability of the applicable Commitment Party to consummate the transactions contemplated hereby, or would reasonably be expected to have the same effect.

"Commitment Party Termination Event" has the meaning assigned to it in Section 8(a).

"Company" has the meaning assigned to it in the preamble hereto.

"Company Benefit Plan" means any "employee benefit plan," as defined in Section 3(3) of ERISA (other than a Multiemployer Plan), which is maintained or contributed to by the Company, any of its Subsidiaries or any of their respective ERISA Affiliates, or with respect to which any such entity has any actual or contingent liability or obligation.

"Company SEC Documents" means all of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed or submitted with the SEC by the Company and publicly available via the SEC's Electronic Data Gathering, Analysis and Retrieval system at http://www.sec.gov.

"Confirmation Order" means the Order of the Bankruptcy Court confirming the Chapter 11 Plan pursuant to Section 1129 of the Bankruptcy Code, which Order shall be in form and substance reasonably acceptable to the Company and the Required Commitment Parties.

"Contract" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation (and any exhibits, schedules, amendments, modifications, or supplements to any of the foregoing), whether written or oral.

"Control" (including the terms "control," "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs, policies or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Debtors" means, collectively, the Company and the Chapter 11 Debtors.

"Defaulting Commitment Party" has the meaning assigned to it in the definition of "Commitment Party Default."

"Definitive Documentation" means this Agreement and all agreements, instruments and other documents that are contemplated or necessary to implement the Private Placement including: (a) the Term Sheet, Milestones Schedule, the Approval Motion, Approval Order, the Chapter 11 Plan, the Confirmation Order, the Disclosure Statement, the Order approving the Disclosure Statement, the French Restructuring Plan, the Chapter 15 Enforcement Order, the indenture and key security documents in respect of the First Lien Secured Notes (as defined in the Term Sheet), any agreements, instruments and other documents in respect of the New Securities (including the indenture, key security documents, intercreditor agreement and warrant agreements, in each case related to the New Securities), and (b) any relevant material Orders, or

material applications, motions or other pleadings made in any U.S. case by the Chapter 11 Debtors, to approve any of the foregoing, in each case: (x) in form and substance consistent with the Lock-Up Agreement and (y)(i) in the case of the Approval Motion, the Backstop Fee Instruments and the documents under <u>clause (b)</u>, are reasonably acceptable to the Company and the Required Backstop Parties; (ii) in the case of the Approval Order is acceptable to the Company and the Required Backstop Parties; and (iii) in the case of any other Definitive Documentation, are reasonably acceptable to the Company and the Required Commitment Parties; <u>provided</u> that, notwithstanding anything to the contrary in this Agreement, the documents referred to in Clause 5.2(c) of the Lock-Up Agreement and any order approving any debtor in possession financing shall not require the approval or consent of any of the Commitment Parties pursuant to this Agreement. The Chapter 11 Debtors shall consult in good faith (to the extent reasonably practicable) with the Required Backstop Parties with respect to any material applications, motions or pleadings made in any U.S. case by the Chapter 11 Debtors in connection with any Definitive Documentation under <u>clause (a)</u>. For the avoidance of doubt, (i) other than the Term Sheet and the Milestones Schedule, the Lock-Up Agreement shall not be deemed Definitive Documentation hereunder, and (ii) the Term Sheet and the Milestones Schedule are accepted by a Commitment Party on the date on which it becomes a Commitment Party.

"<u>Disclosure Statement</u>" has the meaning assigned to it in the Lock-Up Agreement.

"<u>DTC Participant</u>" means, with respect to a Commitment Party, the participant (as such term is defined in the rules of The Depositary Trust Company) having one or more participant accounts with The Depositary Trust Company that holds the Senior Notes held by the Commitment Party.

"<u>EEA</u>" has the meaning assigned to it in <u>Paragraph 6</u> of <u>Schedule 4</u> hereto.

"<u>Effective Date</u>" means the date on which all of the conditions to effectiveness of (i) the Chapter 11 Plan and (ii) the Safeguard Plan have been satisfied or waived in accordance with their terms and the Company has notified each other Party of the same, which (i) shall include (for the avoidance of doubt) completion of all steps and actions to implement and consummate the Financial Restructuring, including the issuances of all relevant debt instruments and securities and (ii) shall not include expiry of any applicable remedy or challenge period(s).

"<u>EGM</u>" has the meaning assigned to it in <u>Section 3.2</u>.

"<u>Eligible Holder</u>" means a holder of Senior Notes that meets all of the criteria set forth in <u>Schedule 4</u> on (i) the date on which such holder becomes a Commitment Party and (ii) the Closing Date.

"<u>Encumbrance</u>" means any security interest, pledge, mortgage, lien, claim, option, charge or encumbrance and, without limiting the foregoing, other rights of whatever nature relating thereto, whether legal or equitable and whether vested or contingent.

"<u>Environmental Laws</u>" has the meaning assigned to it in <u>Section 3.20</u>.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Company or any of its Subsidiaries, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Internal Revenue Code of 1986.

"Escrow Account Funding Date" has the meaning assigned to it in Section 2.5(b).

"Euro Option" has the meaning assigned to it in Section 2.11.

"Exchange Act" means the U.S. Securities Exchange Act of 1934.

"Filing Date" means the date the Chapter 11 Cases were commenced.

"Final Order" means an Order of the Bankruptcy Court entered by the clerk of the court on the docket, which has not been reversed, stayed, modified, amended, or vacated, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such Order shall have become final in accordance with any applicable judicial rules (including Bankruptcy Rule 8002); provided that an Order may be a Final Order notwithstanding the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous judicial rule, may be filed relating to such Order.

"Financial Restructuring" has the meaning assigned to it in the Recitals.

"Financial Statements" has the meaning assigned to it in Section 3.8.

"FPO" has the meaning assigned to it in Paragraph 6 of Schedule 4 hereto.

"French Cases" mean the Safeguard or the Judicial Reorganization, as applicable.

"French Court" has the meaning assigned to it in the Recitals.

"French Plan Sanction Order" means the Safeguard Plan Order or Judicial Reorganization Plan Order, as applicable.

"French Restructuring Plan" means the Safeguard Plan or Judicial Reorganization Plan, as applicable.

"Funding Notice" has the meaning assigned to it in Section 2.5(a).

"Governmental Authority" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or other government, any governmental, regulatory or

administrative authority, agency, department, bureau, board, commission or official or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority, or any court, tribunal, judicial or arbitral body, or any Self-Regulatory Organization.

"Group" shall mean the Company and each of its direct and indirect Subsidiaries.

"held" shall mean, with respect to a Commitment Party, beneficially owned by such Commitment Party or funds, entities or accounts that are managed, advised or sub-advised by such Commitment Party or its Affiliates, and "holding," "hold," "holdings" and similar terms shall have corresponding meanings; provided that solely for the purposes of calculating the holdings as of the Record Date, the net positive position of Senior Notes that are subject to binding trades that have not yet been settled on such date may be deemed as "held" on the Record Date for the purposes of this Agreement, provided that such Party can provide evidence satisfactory to the Company and the Private Placement Agent of such positive net position.

"IFRS" means International Financial Reporting Standards as adopted by the European Union.

"Indemnified Claim" has the meaning assigned to it in Section 9.1.

"Indemnified Party" means the Commitment Parties and the Private Placement Agent, and each of their respective Affiliates and each of their and their respective Affiliates' respective directors, managing members, investment advisors, managers, officers, principals, partners, members, equity holders (regardless of whether such interests are held directly or indirectly), trustees, controlling persons, predecessors, successors and assigns, subsidiaries, employees, agents, advisors, attorneys and representatives.

"Indemnifying Party" has the meaning assigned to it in Section 9.1.

"Initial Commitment Claim Amount" means, with respect to a Commitment Party that was a Backstop Party on the date of this Agreement, the amount identified on the Subscription Commitment Schedule as of the date of this Agreement, which equals the lower of the aggregate principal amount of the Senior Notes held by the Backstop Party as of (i) the Record Date and (ii) the date of this Agreement.

"Intellectual Property Rights" has the meaning assigned to it in Section 3.16.

"Investment Company Act" means the Investment Company Act of 1940.

"Joinder Agreement" has the meaning assigned to it in Section 2.7(a).

"Judicial Reorganization" means the judicial reorganization procedure under article L. 631-1 ff. of the French Commercial Code to be entered in regards to the Company in order to implement and consummate the Financial Restructuring.

"Judicial Reorganization Plan" means the plan prepared in the course and implemented as a result of the Judicial Reorganization of the Company (including all exhibits, supplements,

appendices and schedules thereto), in form and substance materially consistent with the Lock-Up Agreement and reasonably acceptable to the Company and Required Commitment Parties.

"Judicial Reorganization Plan Order" means the Order of the French Court sanctioning the Judicial Reorganization Plan, including any provisions related to the issuance of the Private Placement Notes and the issuance of the Private Placement Warrants and Backstop Fee Instruments for New Common Stock and all other warrants for new common stock of the Company issued pursuant to the Financial Restructuring.

"Law" means any federal, national, supranational, foreign, state, provincial, local, county, municipal or similar statute, law, common law, writ, injunction, decree, guideline, policy, ordinance, regulation, rule, code, Order, constitution, treaty, requirement, judgment or judicial or administrative doctrines enacted, promulgated, issued, enforced or entered by any Governmental Authority.

"Legal Proceedings" has the meaning assigned to it in Section 3.14.

"Lock-Up Agreement" means that certain Lock-Up Agreement, dated June [13], 2017 (including the Term Sheet, the Milestones Schedule and all other schedules and exhibits thereto), as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and, with respect to the Term Sheet and the Milestones Schedule only, with the reasonable consent of the Required Commitment Parties.

"Loss" has the meaning assigned to it in Section 9.1.

"Material Adverse Effect" means a material adverse effect on or material adverse change in:

(a) the ability of the Company or the Group to implement or consummate the Financial Restructuring by the Commitment Outside Date; or

(b) the consolidated financial condition, assets or business of the Group taken as a whole,

in each case, except to the extent arising out of, resulting from or attributable to the execution, announcement or performance of this Agreement or the other Restructuring Documents (as defined in the Lock-Up Agreement) or the transactions contemplated hereby or thereby, including, without limitation, the Financial Restructuring.

"Milestones Schedule" means that certain Milestones Schedule attached as Schedule 9 to the Lock-Up Agreement, as such Milestones Schedule may be amended, supplemented or otherwise modified from time to time in accordance with the terms of the Lock-Up Agreement, such amendment, supplement, or modification to be reasonably acceptable to the Company and Required Commitment Parties.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which the Company, any of its Subsidiaries or any of their respective ERISA Affiliates is making or accruing an obligation to make contributions, has within any of the preceding six

plan years made or accrued an obligation to make contributions, or each such plan with respect to which any such entity has any actual or contingent liability or obligation.

"New Common Stock" means new common stock of the Company to be issued following exercise of the Backstop Fee Instruments or the Private Placement Warrants.

"New Securities" means the Private Placement Notes, the Private Placement Warrants or the Backstop Fee Instruments.

"Obligors" has the meaning assigned to it in the preamble hereto and shall consist of CGG S.A. and CGG Holding B.V., CGG Holding (U.S.) Inc., CGG Marine B.V., CGG Services (U.S.) Inc., Viking Maritime Inc., Alitheia Resources Inc. and CGG Land (U.S.) Inc.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, stipulation, determination or award made, issued or entered by or with any Governmental Authority, whether preliminary, interlocutory or final.

"Party" has the meaning assigned to it in the preamble hereto.

"Permitted Encumbrances" means (a) Encumbrances for Taxes that (i) are not due and payable or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) mechanics' liens and similar Encumbrances for labor, materials or supplies provided with respect to any Real Property or personal property incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement, for amounts that do not materially detract from the value of, or materially impair the use of, any of the Real Property or personal property of the Company or any of its Subsidiaries; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Authority having jurisdiction over such Real Property; provided that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property; (d) easements, covenants, conditions, restrictions and other similar matters adversely affecting title to any Real Property and other title defects that do not or would not materially impair the use or occupancy of such Real Property or the operation of the Company's or any of its Subsidiaries' business; (e) from and after the occurrence of the Effective Date, Encumbrances granted in connection with the Financial Restructuring; (f) liens granted pursuant to existing indebtedness arrangements of the Obligors described in the Chapter 11 Plan or Disclosure Statement; and (g) Encumbrances that, pursuant to the Confirmation Order or the French Plan Sanction Order, will survive beyond the Effective Date.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, unincorporated organization or other entity or organization.

"Placement End Date" means the date that is ten (10) calendar days after the date on which the Placement Period shall have begun.

"<u>Placement Period</u>" means the period (i) starting on [●][1] and (ii) ending at 5 p.m., New York City time on the Placement End Date.

"<u>Private Placement</u>" means the subscription by the Commitment Parties of the Private Placement Instruments for the Private Placement Amount in connection with the Financial Restructuring substantially on the terms reflected in this Agreement, the Lock-Up Agreement, the Chapter 11 Plan and the French Restructuring Plan.

"<u>Private Placement Agent</u>" means Lucid Issuer Services Limited or an agent appointed by the Company to administer the Private Placement.

"<u>Private Placement Amount</u>" has the meaning assigned to it in the Recitals.

"<u>Private Placement Claim Amount</u>" means, with respect to a Commitment Party, the amount set forth in the Subscription Commitment Schedule, reflecting its Initial Commitment Claim Amount or Additional Commitment Claim Amount and any claim amount resulting from Subscription Commitments Transferred to or from such Commitment Party in accordance with the terms hereof.

"<u>Private Placement Instruments</u>" has the meaning assigned to it in the Recitals, except as otherwise provided in <u>Schedule 4</u> hereto.

"<u>Private Placement Notes</u>" means the $375 million aggregate principal amount of new second-lien senior notes, in form and substance consistent with the terms and conditions set forth in the Term Sheet and reasonably acceptable to the Company and the Required Commitment Parties.

"<u>Private Placement Percentage</u>" means:

(a)        for each Backstop Party, a percentage X calculated in accordance with the following formula:

$$X = A + B \times (100\% - (C + D)) \text{ where:}$$

"<u>A</u>" means its Subscription Commitment Percentage;

"<u>B</u>" means its Backstop Percentage;

"<u>C</u>" means the aggregate Subscription Commitment Percentages of all Additional Commitment Parties;

"<u>D</u>" means the aggregate Subscription Commitment Percentages of all Backstop Parties; and

---

[1]        [Such date to be two (2) Business Days after the issuance by the Safeguard supervisory judge of the order authorizing the entering into of this Agreement.  All Backstop Parties, the Obligors and the Private Placement Agent must execute this Agreement prior to launch.]

(b)     for each Additional Commitment Party, its Subscription Commitment Percentage.

"Private Placement Warrants" means "Warrants #3" (as such term is defined in the Term Sheet), in form and substance consistent with the terms and conditions set forth in the Term Sheet and reasonably acceptable to the Company and the Required Commitment Parties.

"Prospectus Directive" has the meaning assigned to it in Paragraph 4 of Schedule 4 hereto.

"QIB" has the meaning assigned to it in Paragraph 4 of Schedule 4 hereto.

"Qualified Investor" has the meaning assigned to it in Paragraph 6 of Schedule 4 hereto.

"Qualified Market-Maker" has the meaning assigned to it in the Lock-Up Agreement.

"Real Property" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by the Company or any of its Subsidiaries, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or leases thereof.

"Record Date" means 5 p.m. New York City time on June 1, 2017.

"Reference Date" has the meaning assigned to it in the Term Sheet.

"Related Purchaser" has the meaning assigned to it in Section 2.7(c).

"Required Backstop Parties" means, as of any date of determination, the Backstop Parties holding more than 50% of the aggregate Backstop Percentages as set forth in the Backstop Commitment Schedule (other than in respect of any Defaulting Commitment Party).

"Required Commitment Parties" means, as of any date of determination, the Commitment Parties committed to subscribe to more than 50% of the Private Placement Amount as set forth in the Subscription Commitment Schedule and the Backstop Commitment Schedule at such time (excluding any Defaulting Commitment Party); provided that prior to finalization of the update to the Subscription Commitment Schedule following the Placement End Date, the Required Commitment Parties shall be the Required Backstop Parties.

"Restructuring Equity Steps" has the meaning assigned to it in the Term Sheet.

"Restructuring Proceedings" means, collectively, the French Cases, Chapter 11 Cases, Chapter 15 Cases and Canadian Cases.

"Restructuring Steps" has the meaning assigned to it in the Term Sheet.

"Safeguard" has the meaning assigned to it in the Recitals hereto.

"Safeguard Plan" means the plan prepared in the course of, and implemented as a result of, the Safeguard of the Company (including all exhibits, supplements, appendices and schedules thereto), in form and substance materially consistent with the Lock-Up Agreement and reasonably acceptable to the Company and the Required Commitment Parties.

"Safeguard Plan Order" means the Order of the French Court sanctioning the Safeguard Plan including any provisions related to the issuance of the Private Placement Notes and the issuance of the Private Placement Warrants and Backstop Fee Instruments for New Common Stock and all other warrants for new common stock of the Company issued pursuant to the Financial Restructuring.

"Sanctions" has the meaning assigned to it in Section 3.26.

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Self-Regulatory Organization" means any securities exchange, futures exchange, contract market, any other exchange or corporation or similar self-regulatory body or organization applicable to a Party to this Agreement.

"Senior Notes" means (a) the 5.875% senior notes due 2020 issued by the Company pursuant to the Indenture dated as of April 23, 2014, as amended, supplemented or otherwise modified from time to time; (b) the 6.5% senior notes due 2021 issued by the Company pursuant to the Indenture dated as of May 31, 2011, as amended, supplemented or otherwise modified from time to time; and (c) the 6.875% senior notes due 2022 issued by the Company pursuant to the Indenture dated as of May 1, 2014, as amended, supplemented or otherwise modified from time to time.

"Share Capital Reduction" has the meaning assigned to it in the Term Sheet.

"SOX" has the meaning assigned to it in Section 3.11.

"Subscription Commitment" means, with respect to a Commitment Party, the portion of its Commitment equal to the Subscription Commitment Percentage multiplied by the Private Placement Amount.

"Subscription Commitment Percentage" means, with respect to a Commitment Party, the percentage calculated by dividing its Private Placement Claim Amount by the aggregate principal amount of all outstanding Senior Notes as of the Record Date.

"Subscription Commitment Schedule" means Schedule 2 hereto, established by the Company and the Private Placement Agent (in consultation with the Ad Hoc Group Advisors) reflecting the Private Placement Claim Amounts, Subscription Commitment Percentages and Private Placement Percentages of the Commitment Parties, as such schedule may be updated from time to time in accordance herewith.

"Subsidiary" means, in relation to a Person, a partnership, firm, corporation, limited liability company, association, joint venture, trust, Governmental Authority, unincorporated organization or other entity or organization as to which such Person (either along or through or together with any other Subsidiary) (a) owns, directly or indirectly, more than fifty percent (50%) of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies.

"Taxes" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Authority, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"Term Sheet" means that certain Term Sheet attached as Schedule 7 to the Lock-Up Agreement, as such Term Sheet may be amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions of the Lock-Up Agreement, such amendment, supplement, or modification to be reasonably acceptable to the Company and Required Commitment Parties.

"Terminated Commitment Party" has the meaning assigned to it in Section 8(c)(iii).

"Terminating Commitment Party" means a Commitment Party that validly terminates this Agreement pursuant to the terms of Section 8(b).

"Third-Party Escrow Accounts" means the third-party escrow accounts in U.S. dollars and euros designated in escrow agreements (pursuant to which the Private Placement Agent will act as escrow agent) reasonably acceptable to the Company and the Required Backstop Parties.

"Transfer" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in any Senior Note or any New Security or any premiums, fees or expense reimbursements contemplated herein).  "Transfer" used as a noun has a correlative meaning.

"Transfer Commencement Date" means one (1) Business Day after the notification made by the Private Placement Agent pursuant to Section 2.3(d).

"Transfer Notice" has the meaning assigned to it in Section 2.7.

1.2    Rules of Construction.

(a)    The Parties and their respective legal counsel and the Private Placement Agent participated in the preparation of this Agreement, and therefore this

Agreement shall be construed neither against nor in favor of any of the Parties or the Private Placement Agent, but rather in accordance with the fair meaning thereof.

(b)      Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "include," "includes" and "including" are not limiting, the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or," and whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

(c)      The words "hereof," "herein," "hereto," "hereby," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)      Section, subsection, clause, schedule, annex and exhibit references are to this Agreement unless otherwise specified.

(e)      Any reference to this Agreement shall include all alterations, amendments, changes, extensions, modifications, novations, renewals, replacements, substitutions, and supplements hereto and hereof, from time to time.

(f)      References to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication.

(g)      Unless otherwise specified, references to a statute mean such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time.

Section 2.      **PRIVATE PLACEMENT**.

2.1      _Private Placement_.   Subject to the terms and conditions set forth herein, the Company shall issue the Private Placement Instruments to each of the Commitment Parties pursuant to and in accordance with the terms of this Agreement.   Subject to the terms and conditions hereof, the offer and/or sale of the Private Placement Instruments and the Backstop Fee Instruments pursuant to this Agreement will be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act or another available exemption from registration under the Securities Act, and the Disclosure Statement shall include a statement to such effect.

2.2      _Private Placement Commitment_.

(a)      Subject to the terms and conditions set forth herein, each Commitment Party irrevocably agrees, severally and not jointly, to subscribe at Closing to such Commitment Party's Private Placement Percentage of the Private Placement Instruments by paying to the Company an amount in cash (less, at the election of the Company, any set off against the Commitment Fee and the cash portion of the Backstop fee as indicated in _Section 2.2 (c) and_ Section 2.4 _and/or the set off as indicated in_ Section 2.5

(d)) equal to its Private Placement Percentage of the Private Placement Amount, as adjusted, as the case may be, pursuant to Section 2.8 (such amount, such Commitment Party's "Commitment").

(b)     Subject to the terms and conditions set forth herein, the Company agrees to issue and sell at Closing, to each Commitment Party, its Private Placement Percentage of the Private Placement Notes and Private Placement Warrants as adjusted, as the case may be, pursuant to Section 2.8, corresponding to such Commitment Party's Commitment, and in connection therewith, each Obligor agrees to enter into and deliver any Definitive Documentation necessary to or contemplated in respect of the New Securities to which is to be a party (including any indentures, notes, security documents, intercreditor agreements and guarantees in respect of the Private Placement Notes, the warrant agreements and warrants in respect of the other New Securities and any other agreement, instruments or documents related thereto).

(c)     The closing of the transactions contemplated hereby (the "Closing") will occur no later than the Effective Date.  The funds held in the Third-Party Escrow Accounts pursuant to Section 2.5 will be released and used in accordance with the Chapter 11 Plan and the French Restructuring Plan, in exchange for delivery of the Private Placement Notes and the Private Placement Warrants and payment of the Commitment Fee (in cash or by way of set-off, at the Company's election, against the amount to be paid by the Commitment Parties) to which each Commitment Party is entitled and the Backstop Fee (in cash or by way of set-off, in the Company's election, against the amount to be paid by the Backstop Parties, other than the Backstop Fee Instruments which will be delivered separately) to which each Backstop Party is entitled.

2.3     Additional Commitment Parties.  Eligible Holders of Senior Notes as of the Record Date may, in their sole discretion, elect to participate in the rights and obligations set forth by this Agreement as Additional Commitment Parties (if they meet the qualifications set forth in the definition of "Eligible Holders") during the Placement Period.  All Eligible Holders electing to become Additional Commitment Parties must execute and deliver to the Private Placement Agent and the Company, so as to be received by 5 p.m. New York City time on the Placement End Date, a Joinder Agreement and an Accession Letter to the Lock-Up Agreement.

(a)     Each Additional Commitment Party shall report in writing its Additional Commitment Claim Amount (detailed by series of Senior Notes) to the Private Placement Agent when it becomes an Additional Commitment Party, and in no event later than the Placement End Date; provided that such Additional Commitment Party shall instruct its custodian in no event later than the Placement End Date to provide evidence to the Private Placement Agent of such Additional Commitment Party's holdings of Senior Notes as of the Record Date (other than Senior Notes that are subject to binding trades that have not yet been settled) by submitting an electronic instruction through either Euroclear Bank S.A./N.V. or Clearstream Banking, société anonyme, or by directing its DTC Participant to complete a confirmation form and return it to the Private Placement Agent; provided, further, that, each Additional Commitment Party shall provide evidence to the Private Placement Agent of its net position and binding trades trades that have not been settled (including both acquisitions and sales) as of the Record Date by such evidence as the

Private Placement Agent and the Company (in consultation with the Ad Hoc Group Advisors) determine to be satisfactory, in their sole determination, to confirm such holdings; provided, further, that such Additional Commitment Party shall provide evidence to the Private Placement Agent of its holdings of Senior Notes as of the Commitment Date (which for the avoidance of doubt shall not include any Senior Notes subject to binding trades made on or before the Commitment Date and that have not been settled on the Commitment Date) by such other evidence as the Private Placement Agent and the Company (in consultation with the Ad Hoc Group Advisors) determine to be reasonably satisfactory to confirm its holdings as of the Commitment Date.

(b)        If requested by a Backstop Party or the Ad Hoc Group Advisors, from time to time, the Company shall notify, or cause its professionals or Private Placement Agent to notify, within one (1) Business Day of such request, the Private Placement Parties of the aggregate amount of the Additional Commitment Claim Amounts of the Additional Commitment Parties as of such date.

(c)        In the event that the total Private Placement Claim Amount of all of the Commitment Parties based on the evidence provided by each of them in accordance with Section 2.3(a) exceeds the total principal amount of the Senior Notes, the Private Placement Agent will have seven (7) Business Days in order to investigate the origin of such discrepancy(ies) and determine with the Company, in their sole determination (in consultation with the Ad Hoc Group Advisors), the applicable Private Placement Claim Amount of each Commitment Party.

(d)        As promptly as practicable, but in no event later than three (3) Business Days plus the amount of time provided in Section 2.3(c) (if necessary), following the Placement End Date, the Private Placement Agent at the instruction of the Company (in consultation with the Ad Hoc Group Advisors) shall update the Subscription Commitment Schedule to reflect the Private Placement Claim Amounts and Private Placement Percentages of the Commitment Parties and indicate to each Commitment Party its Private Placement Claim Amount and Private Placement Percentage, as of the Placement End Date.

2.4    Backstop and Commitment Fees.

(a)        Backstop Fee.  Subject to the terms and conditions set forth herein, each Backstop Party irrevocably agrees, severally and not jointly, to backstop the Private Placement Amount in full in accordance with the terms hereof by subscribing for its Backstop Percentage of any unsubscribed Private Placement Instruments and any Available Commitments of any Defaulting Commitment Parties (such obligation, a "Backstop Commitment").  In consideration of the Backstop Commitment by the Backstop Parties to backstop the full amount of the Private Placement Amount in accordance with the terms hereof, the Company agrees to pay each Backstop Party its Backstop Fee in accordance with the terms hereof.

(b)        Commitment Fee.  Subject to the terms and conditions set forth herein, each Commitment Party irrevocably agrees, severally and not jointly, to subscribe to the Private Placement Instruments in an amount of its Commitment.  In consideration of

each Commitment Party's Commitment, subject to being effectively called upon and completed at the Closing (for the avoidance of doubt, no Commitment Fee will be paid if there is no Closing), the Company agrees to pay each Commitment Party its Commitment Fee in accordance with the terms hereof.

(c)　　The Backstop Fee of each Backstop Party and the Commitment Fee of each Commitment Party shall be fully vested, nonrefundable and non-avoidable by the Company, and, subject to Closing, shall be paid or distributed, as applicable, on the Closing Date; provided that no portion of the Commitment Fee or the Backstop Fee shall be payable or distributable to a Defaulting Commitment Party; provided further that the cash portion of the Backstop Fee and the Commitment Fee shall be paid by the Company, at its election, to the Commitment Party in cash or by way of set-off against the amount payable on account of its Commitment.

(d)　　The Company acknowledges and agrees that the provisions for the payment of the Commitment Fee, the Backstop Fee and the Commitment Party Expenses are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement, and the Commitment Party Expense shall be entitled to priority as administrative expenses of the Chapter 11 Obligors in their respective Chapter 11 Cases, subject to entry of the Approval Order.

2.5　　Escrow Account Funding.

(a)　　Funding Notice.  No later than the seventh (7th) Business Day following the Reference Date (as defined in the Term Sheet), the Private Placement Agent shall, on behalf of the Company, deliver to each Commitment Party a written notice (the "Funding Notice" and the date of such delivery, the "Funding Notice Date") setting forth (i) the aggregate amount of Private Placement Instruments committed to be subscribed by or issued to the Backstop Parties and the Additional Commitment Parties, respectively, (ii) the calculation of each Commitment Party's (A) Private Placement Percentage and (B) Commitment, which calculation shall be made by the Company in consultation with the Ad Hoc Group Advisors and in accordance with Section 2.8, (iii) the amount of the Commitment such Commitment Party shall be required to fund in cash (after applying the set-offs contemplated herein and amounts previously paid in respect of the Commitments, if any) and (iv) the wiring or other funding information for the Third-Party Escrow Accounts.

(b)　　On or prior to the date agreed by the Company and the Required Backstop Parties pursuant to escrow agreements (pursuant to which the Private Placement Agent will act as escrow agent) satisfactory to the Company and the Required Backstop Parties, each acting reasonably (the "Escrow Account Funding Date"), each Commitment Party shall arrange to deliver and pay the amount of such Commitment Party's Commitment by wire transfer of immediately available funds in U.S. dollars or euros (as applicable) into the Third-Party Escrow Accounts in satisfaction of such Commitment Party's Commitment; provided that in no event shall the Escrow Account Funding Date be more than ten (10) Business Days or fewer than five (5) Business Days prior to the Closing Date.

(c)      Upon request of the Private Placement Agent, each Commitment Party shall present evidence of holding of Senior Notes corresponding to its Subscription Commitment as of the Reference Date, at the latest on the Reference Date, in a form satisfactory to the Private Placement Agent and the Company. Failing which, such Commitment Party shall be deemed a Defaulting Commitment Party.

(d)      Notwithstanding anything to the contrary, the Company, at its election, may decide that the Commitment of a Commitment Party may be paid by way of set-off against any amount that would be due to such Commitment Party under a debtor in possession credit agreement that may be entered into, among others, between certain Chapter 11 Debtors and such Commitment Party (if any), provided that such amount is due and payable on the Closing Date (*créance certaine, liquide et exigible*), and in any case subject to the terms and conditions of such debtor in possession credit agreement.

2.6      <u>Commitment Party Default</u>.

(a)      Upon the occurrence of a Commitment Party Default, the Company shall give prompt written notice thereof to each of the Backstop Parties (other than any Defaulting Commitment Party) and each such Backstop Party shall have the obligation, within three (3) Business Days after receipt of such notice to arrange to deliver and pay (i) its respective Backstop Percentage or (ii) in the case of a Commitment Party Default by one or more other Backstop Parties, the percentage calculated by dividing its Backstop Percentage by the aggregate Backstop Percentages of all Backstop Parties excluding any defaulting Backstop Party, of the Available Commitment by wire transfer of immediately available funds in U.S. dollars or euros (as applicable) into the Third-Party Escrow Accounts in satisfaction of the Available Commitment. For the avoidance of doubt, nothing in this <u>Section 2.6(a)</u> shall relieve any Commitment Party of its obligation to fulfill its Commitment and all conditions in this <u>Section 2.6(a)</u> shall be several and not joint.

(b)      Any Private Placement Notes purchased by such Backstop Party with the payment for the Available Commitment in accordance with <u>Section 2.6(a)</u> (and any commitment and applicable aggregate subscription price associated therewith) shall be included, among other things, in the determination of (x) the Private Placement Notes of such Backstop Party for all purposes hereunder; (y) the Private Placement Percentage or Backstop Percentage of such Backstop Party for all purposes hereof, including, but not limited to, such Backstop Party's share of any Commitment Fee and Backstop Fee (with the share of the Defaulting Commitment Party being reduced accordingly).

(c)      The Parties agree that any Defaulting Commitment Party will be liable to the Backstop Parties and the Company for the consequences to the Backstop Parties or the Company, as applicable, of its breach and that the Backstop Parties and the Company can enforce rights of damages and/or specific performance pursuant to <u>Section 10.17</u>.

2.7      <u>Designation and Assignment Rights</u>.   Other than as expressly set forth in this <u>Section 2.7</u>, no Commitment Party shall be permitted to Transfer its Subscription Commitment or Backstop Commitment.

(a)    <u>Transfers of Subscription Commitments</u>.

(i)    A Commitment Party may Transfer the entire amount, or any portion, of its Subscription Commitment pursuant to the terms of this Agreement if and only if at the same time it Transfers the Senior Notes corresponding to the portion of the Subscription Commitment so Transferred pursuant to and in accordance with the terms of the Lock-Up Agreement and this <u>Section 2.7</u>, including:

a.    Subscription Commitments (together with all of the rights, obligations and interests hereunder in respect thereto, including the related Commitment Fee) are stapled to the Senior Notes corresponding to the Private Placement Claim Amount;

b.    No Transfers (including through a Qualified Market-Maker transaction) may be settled and delivered any earlier than the Transfer Commencement Date or later than one (1) Business Day prior to the Reference Date;

c.    No Subscription Commitment may be Transferred to the Company or any member of the Group;

d.    The transferee must be an Eligible Holder (except such transferee need not be a holder of the Senior Notes prior to such Transfer);

e.    In addition to being or becoming a party to the Lock-Up Agreement (by executing and delivering an Accession Letter thereto), the transferee must be or become a Commitment Party to this Agreement by executing an assumption and joinder agreement in substantially the form set forth in <u>Exhibit B</u> hereto (the "<u>Joinder Agreement</u>");

f.    Promptly, but in no event later than three (3) Business Days after settlement and delivery of the Transfer of the Subscription Commitment (and in no event later than one (1) Business Day prior to the Reference Date), the transferee must deliver a transfer notice substantially in the form set forth in <u>Exhibit C</u> (the "<u>Transfer Notice</u>") together with any Joinder Agreement to the Private Placement Agent and the Company in accordance with Section 10.6 hereof; and

g.    The Transfer of Subscription Commitment shall be void and of no effect if it does not comply with the terms and conditions of this Agreement and the terms and conditions of the Lock-Up Agreement; <u>provided</u> that nothing herein shall create any duty or obligation by the Company or the Private Placement Agent with respect to such Transfer (including any duty or obligation to review, conduct any diligence or investigation or make any determination or provide any approvals of such Transfers or transferees) and any such duties or obligations are expressly disclaimed.

(ii)     A Commitment Party may Transfer Subscription Commitments and corresponding Senior Notes to an entity that is acting in its capacity as a Qualified Market-Maker without the requirement that the Qualified Market-Maker become a Commitment Party or a party to the Lock-Up Agreement; provided that the terms of the Lock-Up Agreement with respect to Qualified Market-Makers and the other terms of this Section 2.7 are satisfied; provided further that such Qualified Market-Maker subsequently Transfers, directly or through one or more other Qualified Market-Makers, such Subscription Commitment and corresponding Senior Notes within five (5) Business Days (but in no event shall later than one (1) Business Day prior to the Reference Date) to a transferee that is or becomes a Commitment Party and satisfies the terms of this Section 2.7.

(b)     Transfer of Backstop Commitments.

(i)     A Backstop Party may Transfer its entire Backstop Commitment, and only its entire Backstop Commitment to a single Backstop Transferee pursuant to the terms of this Agreement pursuant to and in accordance with the terms of this Section 2.7, including:

a.     Backstop Commitments may only be Transferred together with all of the rights, obligations and interests hereunder in respect thereto, including the related Backstop Fee and Commitment Fee; for the avoidance of doubt, Backstop Commitments are not stapled to any Subscription Commitments or Senior Notes and a Backstop Party shall have the right to Transfer its Backstop Commitment pursuant to the terms hereof either alone or in connection with a Transfer of Subscription Commitments and Senior Notes in accordance with Section 2.7(a);

b.     No Transfers (including through a Qualified Market-Maker transaction) may be settled and delivered any earlier than the Transfer Commencement Date or later than one (1) Business Day prior to the Reference Date;

c.     No Backstop Commitments may be Transferred to the Company or any member of the Group;

d.     The transferee must be a Backstop Transferee;

e.     No later than five (5) Business Days prior to the Transfer of the Backstop Commitment, the transferor and transferee must notify the Private Placement Agent, the Company and counsel to the Ad Hoc Noteholder Group in accordance with Section 10.6 hereof of the proposed Transfer;

f.     The proposed transferee shall reasonably cooperate with the Company and the Required Backstop Parties with respect to any information requests, including financial information concerning the credit

worthiness of the proposed transferee (but not including any pricing or sensitive information concerning the terms of the Transfer);

g.    As a condition to such Transfer, such Transfer must have been consented to in writing by the Company and all of the Backstop Parties, each acting in good faith (such response not to be unreasonably withheld, conditioned or delayed; <u>provided</u> that unless any reasonable information requests are pending, a party shall be deemed to have consented if it fails to deliver an objection in writing by the close of the fifth (5th) Business Day following delivery of the notice in <u>clause (e)</u>);

h.    As a condition to the Transfer of a Backstop Commitment to the Backstop Transferee, the Backstop Transferee must complete and deliver certain "know your customer" requirements to the satisfaction of the Private Placement Agent prior to such Transfer (and in no event later than one (1) Business Day prior to the Reference Date);

i.    The Backstop Transferee must be or become a party to the Lock-Up Agreement (by executing and delivering an Accession Letter thereto) and be or become a Commitment Party to this Agreement by executing a Joinder Agreement; and

j.    Promptly, but in no event later than three (3) Business Days after the Transfer of the Backstop Commitment (and in no event later than one (1) Business Day prior to the Reference Date), the transferee must execute and deliver a Transfer Notice dated the date of settlement and delivery of this Transfer together with any Joinder Agreement to the Private Placement Agent and the Company in accordance with <u>Section 10.6</u> hereof.

(ii)    The Transfer of the Backstop Commitment shall be void and of no effect if it does not comply with the terms and conditions of this Agreement and the terms and conditions of the Lock-Up Agreement. Nothing herein shall create any duty or obligation by the Company, the Backstop Parties or the Private Placement Agent with respect to such Transfer (including any duty or obligation to review, conduct any diligence or investigation or make any determination or provide any approvals of such Transfers or transferees) and any such duties or obligations are expressly disclaimed.

(c)    <u>Designation to Related Purchasers</u>.  Each Commitment Party shall have the right to designate by written notice to the Company and the Private Placement Agent no later than the Reference Date, that some or all of the New Securities to which it is obligated to subscribe hereunder or entitled to receive hereunder be issued in the name of, and delivered to, one or more of its Affiliates or entities, funds or accounts managed, advised or sub-advised by such Commitment Party or its Affiliates (other than any portfolio company of such Commitment Party (or its Affiliates) or any Subsidiary thereof) (each, a "<u>Related Purchaser</u>") upon receipt by the Company and the Private Placement Agent of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to the Company and the Private

Placement Agent and signed by such Commitment Party and each such Related Purchaser, (ii) specify the number of New Securities to be delivered to or issued in the name of such Related Purchaser and (iii) contain a confirmation by each such Related Purchaser of the accuracy of the representations set forth in <u>Section 4.5</u> through <u>4.6</u> as applied to such Related Purchaser; <u>provided</u> that no such designation pursuant to this <u>Section 2.7(c)</u> shall relieve such Commitment Party from its obligations under this Agreement.

(d)       Any Transfer of a Commitment made (or attempted to be made) in violation of this Agreement (i) shall be deemed null and void *ab initio* and of no force or effect, and the Company shall have the right to enforce the voiding of such Transfer; and (ii) shall not create (or be deemed to create) any obligation or liability of any other Commitment Party or the Company to the purported transferee or limit, alter or impair any agreements, covenants, or obligations of the proposed transferor under this Agreement.  Nothing in this Agreement shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer, after the Closing, any New Securities or any interest therein.

(e)       Following any assignment of a Commitment Party's Subscription Commitments or Backstop Commitments in accordance with this Agreement, the Backstop Commitment Schedule and/or Subscription Commitment Schedule hereto shall be updated by the Private Placement Agent acting at the direction of the Company (in consultation with the Ad Hoc Group Advisors) to reflect the Backstop Percentage, Subscription Commitment Percentage, Private Placement Claim Amount and Private Placement Percentage (and any other information on such Schedules) that shall apply to such transferee, and any corresponding changes applicable to the assigning Commitment Party, and, if necessary, <u>Schedule 3</u> shall be updated to reflect the name and address of the applicable transferee.

2.8       <u>Denominations; Rounding of New Securities</u>.  The principal amount of Private Placement Notes and the number of Private Placement Warrants and Backstop Fee Instruments allocated to each Commitment Party hereunder in respect of the Commitments shall be rounded among the applicable Commitment Parties, as determined by the Company, acting reasonably and in consultation with the Ad Hoc Group Advisors, solely to (i) avoid any rounding issues, (ii) apply the necessary currency conversions, (iii) avoid fractional units and/or (iv) address other technical issues.   The principal amount of Private Placement Notes shall be in minimum denominations of $200,000 or €100,000, as the case may be, and, for any portion in excess thereof, rounded down to the nearest integral multiple of $1,000 or €1,000, as the case may be. For purposes of the Schedules and calculations hereunder, percentages shall be calculated to four decimal points of a percent (0.0001%) and Commitments shall be calculated to two decimal points of a U.S. Dollar or Euro, as applicable ($0.01), and amounts shall be rounded down in connection with such calculations or Transfers.

2.9       <u>Transfer Taxes</u>.  All of the New Securities issued to the Commitment Parties pursuant to this Agreement will be delivered by the Company to the Commitment Parties with any and all documentary, stamp or similar issuance taxes imposed by the United States, Luxembourg or the Republic of France and payable in connection with such delivery duly paid by the Company.  For the avoidance of doubt, the above will not apply to any subsequent operations in connection with the New Securities, nor to any subsequent transfer of ownership in

the New Securities, for which the Company will not be responsible to pay any documentary, stamp or similar taxes, which may be applicable.

2.10    Foreign Exchange Conversion.    All calculations relating to each Commitment Party's Private Placement Percentage and each Backstop Party's Backstop Percentage shall be carried out in U.S. dollars, with all euro-denominated amounts converted into U.S. dollars using the Reuters exchange rate applicable as at midday (CET) on [●], 2017[2] of [$[●]= €1.0000].

2.11    Euro-denominated Notes.    At the time an Additional Commitment Party commits to subscribe to the Private Placement Instruments, each Commitment Party will have the option to elect to receive in whole or in part its Private Placement Notes on account of its Subscription Commitment in a separate series denominated in euros at Closing (the "Euro Option"), which amount shall be converted from U.S. dollars using the Reuters U.S. dollar/euro exchange rate applicable as at midday (CET) on the second (2nd) Business Day prior to the Reference Date; provided that if the aggregate principal amount of Private Placement Notes with respect to which the Euro Option has been exercised by the Commitment Parties is greater than $100 million, the Company may, in its discretion exercised in good faith, allocate the euro-denominated Private Placement Notes first to the Commitment Parties who are holders of existing euro-denominated Senior Notes (pro rata to their holding in such Senior Notes as indicated in the Subscription Commitment Schedule) and subsequently allocate pro rata the remaining euro-denominated Private Placement Notes to the holders of U.S. dollar-denominated Senior Notes (subject to minimum denominations).    Such holders of U.S. dollar-denominated Senior Notes whose Euro Option is not fully satisfied will receive the remaining amount of its Subscription Commitment in U.S. dollar-denominated Private Placement Notes, unless the Company elects at its sole option to increase the maximum amount of euro-denominated Private Placement Notes to be issued; provided further that the Commitment Party will need to indicate the portion of its Subscription Commitment it wishes to receive in Euro-denominated Notes.

Section 3.    **REPRESENTATIONS AND WARRANTIES OF THE DEBTORS**. The Company and, to the extent applicable to the other Obligors, each such Obligor, hereby represents and warrants to each of the Commitment Parties as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), as follows:

3.1    Organization and Qualification; Subsidiaries.    Each Obligor (a) has been duly organized, is validly existing and (to the extent such concept is applicable) is in good standing under the laws of its respective jurisdiction of organization or formation, (b) has the requisite power and authority to own its properties and assets and to conduct its business as currently conducted and (c) is duly qualified and is authorized to conduct business and is in good standing in each jurisdiction in which the nature of its business as currently conducted requires such authority or qualifications, except, in the case of this clause (c), where the failure to have such authority or qualifications would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

---

[2]    Date of the opening of the Safeguard

3.2     <u>Authorization; Enforcement; Validity</u>.  Subject, in the case of any Chapter 11 Debtor, to the entry of the Approval Order and the Confirmation Order, in the case of the Company, to the entry of the French Plan Sanction Order by the French Court and the entry of the Chapter 15 Enforcement Order by the Bankruptcy Court, and in all cases to the approval of the resolutions submitted to the shareholders' meeting of the Company for the implementation the Restructuring Equity Steps and the Share Capital Reduction (such meeting, the "EGM"), any related board resolutions of the Company or resolutions of the *Directeur Général* being taken and the receipt of the visa from *Autorité des marchés financiers* (the "<u>AMF</u>") on French-language prospectuses used in connection with the Restructuring Equity Steps and the fairness opinion from an independent financial expert designated by the Company (*expert indépendant*) confirming that the Restructuring Equity Steps are fair from a financial perspective in accordance with the AMF General Regulation:

(a)     the Obligors have all necessary corporate power and authority to enter into this Agreement and to carry out their respective obligations hereunder (including with respect to the Company (i) the issuance, offer, sale and distribution of the Private Placement Instruments and the issuance, offer and distribution of the other New Securities; and (ii) the payment, as applicable, of the Commitment Fee, the Backstop Fee, and with respect to the Obligors other than the Company, the payment or reimbursement of the Commitment Party Expenses) in accordance with the terms hereof;

(b)     the execution and delivery by the Obligors of this Agreement and the performance by each Obligor of its obligations hereunder have been duly authorized by all requisite action on the part of such Obligor, and no other action on the part of such Obligor is necessary to authorize its execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement; and

(c)     this Agreement has been duly executed and delivered by the Company, and assuming due authorization, execution and delivery by the other Parties, constitutes the legal, valid and binding obligation of each Obligor, enforceable against each Obligor in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium or similar Laws now or hereafter in effect relating to or affecting creditors' rights generally and subject to general principles of equity and except in connection with rights to indemnification and contribution thereunder that may be limited by federal or state securities laws or public policy relating thereto.

3.3     <u>No Conflicts</u>.  Assuming that all consents, approvals, authorizations and other actions described in <u>Sections 3.2</u> and <u>3.4</u> have been obtained, and except as may result from any facts or circumstances relating solely to the Commitment Parties, the execution, delivery and performance by the Obligors of this Agreement and the consummation of the transactions contemplated hereby do not and will not: (a) violate, conflict with or result in the breach of the certificate of incorporation, articles of incorporation, bylaws, certificate of formation, operating agreement, limited liability company agreement or similar formation or organizational documents of the Obligor or any of its Subsidiaries; (b) conflict with or violate any Law or Order applicable to the Obligor or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any note, bond, mortgage or indenture, contract,

agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Obligor or any of its Subsidiaries is a party or to which any of their respective assets or properties are subject, except, in the case of <u>clauses (b)</u> and <u>(c)</u>, for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.4    <u>Consents and Approvals</u>.    The execution, delivery and performance by the Company of this Agreement do not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to the Company or by which any of its respective assets or properties may be bound, except for (a) the entry of the Approval Order, the Confirmation Order and the Chapter 15 Enforcement Order, which Orders shall not be stayed, and the entry of the French Plan Sanction Order, the enforcement of which shall not be stayed, (b) the entry of the French Plan Sanction Order whose enforcement shall not be stayed, (c) the receipt of the visa from the AMF on French-language prospectuses used in connection with the Restructuring Equity Steps, (c) the fairness opinion from an independent financial expert designated by the Company (*expert indépendant*) confirming that the Restructuring Steps are fair from a financial perspective in accordance with the AMF General Regulation, (d) any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person in connection therewith, (e) any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law applicable to the Company with respect to the Restructuring Steps and (f) any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law applicable to the Company that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.5    <u>Capitalization</u>.    The Company has 26,855,775 authorized shares of common stock with nominal value €0.80 per share, of which 22,133,149 shares are issued and outstanding as of March 31, 2017.  As of the date hereof, all of the issued shares of capital stock of the Company have been duly and validly authorized, issued and delivered, and are fully paid and non-assessable and conform in all respects to the descriptions thereof contained in the Form 8-A of the Company relating thereto dated May 6, 1997 (as amended by Amendment No. 1 thereto on Form 8-A/A, dated July 20, 2016) and filed with the SEC, as further updated by the Company's annual report on Form 20-F filed with the SEC on May 1, 2017.  As of the date hereof, all of the issued and outstanding shares of capital stock or equity interests of each Subsidiary of the Company have been duly and validly authorized, issued and delivered, are fully paid and non-assessable, and are wholly owned, directly or indirectly through Subsidiaries, by the Company, free and clear of any Encumbrances (other than current and anticipated pledges of such shares or equity interests pursuant to the Definitive Documentation) except as shown on <u>Schedule 5</u> hereto, which sets forth a complete list of each subsidiary (excluding dormant or insignificant subsidiaries) with the relevant jurisdiction of incorporation or organization, the Company's direct and indirect ownership thereof and the applicable Encumbrances.

3.6    <u>Issuance; Valid Issuance</u>.    The New Securities to be issued in connection with consummation of the Private Placement and pursuant to the terms of this Agreement and the

New Common Stock, will, if and when issued and delivered on Closing (or the applicable date of exercise with respect to any Backstop Fee Instruments or Private Placement Warrants), be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and shall be free and clear of all Taxes, Encumbrances (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in or contemplated by this Agreement, the Chapter 11 Plan, the French Restructuring Plan or the Lock-Up Agreement.  Assuming the accuracy of the representations and warranties of the Commitment Parties set forth in <u>Section 4</u>, it is not necessary in connection with the issuance of the Backstop Fee Instruments, and the issuance and sale of the New Common Stock and Private Placement Instruments to the Commitment Parties in the manner contemplated by this Agreement to register such New Common Stock or New Securities under the Securities Act.

3.7    <u>Arm's-Length</u>.    Each Obligor acknowledges and agrees that (a) each of the Commitment Parties is acting solely in the capacity of an arm's-length contractual counterparty to the Company and the Obligors with respect to the transactions contemplated hereby and not as a financial advisor or a fiduciary to, or an agent of, the Company or any of its Subsidiaries and (b) no Commitment Party is advising the Company or any of its Subsidiaries as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.

3.8    <u>Financial Statements</u>.    The (a) audited consolidated balance sheet of the Company as at December 31, 2016 and the related consolidated statements of operations and of cash flows for the fiscal year then ended, accompanied by a report thereon by Ernst & Young et Autres (the "<u>Audited Financial Statements</u>") and (b) unaudited consolidated balance sheet of the Company as at March 31, 2017 and the related consolidated statements of operations and cash flows for the fiscal quarter then ended (together with the Audited Financial Statements, the "<u>Financial Statements</u>"), in each case, fairly present in all material respects the consolidated financial position of the Company as at such respective dates and the consolidated results of its operations and its consolidated cash flows for the fiscal year or fiscal quarter, as applicable, then ended.  All such Financial Statements, including the related schedules and notes thereto, have been prepared in accordance with IFRS applied consistently throughout the periods involved.

3.9    <u>Accounting Controls</u>.    The Company maintains systems of internal accounting controls sufficient to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and that are sufficient to provide reasonable assurance that (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with IFRS and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences, except in each case as previously disclosed in the Company SEC Documents.  Except as disclosed in the Financial Statements or as previously disclosed in the Company SEC Documents, there are no material weaknesses or significant deficiencies in the Company's or any of its Subsidiaries' internal controls.

3.10    <u>Disclosure Controls and Procedures</u>.    The Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the

Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, as applicable to the Company, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

3.11    <u>Company SEC Documents</u>.  The Company has filed with or furnished to the SEC all reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) required to be filed or furnished by it since December 31, 2016 under the Exchange Act or the Securities Act.  As of their respective dates, and, if amended, as of the date of the last such amendment, each of the Company SEC Documents, including any financial statements or schedules included therein, (i) did not, when taken together with the other Company SEC Documents, contain any untrue statement of a material fact or omit to state a material fact required to be stated in such Company SEC Document or necessary in order to make the statements in such Company SEC Document, in light of the circumstances under which they were made, not misleading and (ii) except as previously disclosed in the Company SEC Documents, complied in all material respects with the applicable requirements of the Exchange Act, the Securities Act and the Sarbanes-Oxley Act of 2002 ("<u>SOX</u>"), as the case may be, and the applicable rules and regulations of the SEC under the Exchange Act, the Securities Act and SOX, in each case, as applicable to the Company, as the case may be.

3.12    <u>Absence of Certain Changes</u>.  Except as previously disclosed in the Company SEC Documents, since December 31, 2016, no change, event, occurrence, development, or state of facts has occurred or exists that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.13    <u>No Violation; Compliance with Laws</u>.  Neither the Company nor any of its Subsidiaries is in violation of its certificate of incorporation or equivalent constitutional document.  Except as previously disclosed in the Company SEC Documents, neither the Company nor any of its Subsidiaries is or has been at any time since January 1, 2016 in violation of any Law, except for any such violations that have not resulted and would not reasonably be expected to result, individually or in the aggregate, in material liability to the Group taken as a whole.

3.14    <u>Legal Proceedings</u>.  Except as previously disclosed in the Company SEC Documents and other than the Restructuring Proceedings and any adversary proceedings or contested motions commenced in connection therewith, there are no material legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suits, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings ("<u>Legal Proceedings</u>") pending or, to the Company's knowledge, threatened to which the Company or any of its Subsidiaries is a party or to which any property of the Company or any of its Subsidiaries is the subject, in each case that would reasonably be expected to materially and adversely impact the validity or enforceability of this Agreement, the Chapter 11 Plan, the French Restructuring Plan, the Lock-Up Agreement or any of the Definitive Documentation or that, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.15    Labor Relations.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or, to the Company's knowledge, threatened against the Company or any of its Subsidiaries, (b) the hours worked and payments made to employees of the Company or any of its Subsidiaries have not been in violation the U.S. Fair Labor Standards Act or any other applicable Law dealing with such matters and (c) all payments due from the Company or any of its Subsidiaries or for which any claim may be made against the Company or any of its Subsidiaries on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of the Company and its Subsidiaries to the extent required by IFRS.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the Financial Restructuring will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which the Company or any of its Subsidiaries (or any predecessor) is a party or by which the Company or any of its Subsidiaries (or any predecessor) is bound.

3.16    Intellectual Property.    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) each of the Company and its Subsidiaries owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, domain names, and any and all applications or registrations for any of the foregoing (collectively, "Intellectual Property Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person, (b) to the Company's knowledge, none of the Company or any of its Subsidiaries nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person and (c) no claim or litigation regarding any of the foregoing is pending or, to the Company's knowledge, threatened.

3.17    Title to Real and Personal Property.

(a)    Real Property.    Except as previously disclosed in the Company SEC Documents, each of the Company and each of its Subsidiaries has valid fee simple title to, or valid leasehold interest in, or easements or other limited property interests in, all of its Real Properties and has valid title to its personal property and assets, in each case, free and clear of any Encumbrances except for Permitted Encumbrances and except for defects in title that would not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes or that would not materially affect the value thereof; provided, however, that the enforceability of such leased Real Properties may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other Laws now or hereafter in effect relating to or affecting creditor's rights generally or general principles of equity, including the Restructuring Proceedings.

(b)    Leased Real Property.    Each of the Company and each of its Subsidiaries is in compliance in all material respects with all obligations under all leases to which it is a party that have not been rejected in the Restructuring Proceedings, and neither the Company nor any of its Subsidiaries has received written notice of any good faith claim asserting that such leases are

not in full force and effect, that, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to materially interfere with its ability to conduct its business as currently conducted. Each of the Company and each of its Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted.

(c)     Personal Property.  Each of the Company and each of its Subsidiaries owns or possesses the right to use all Intellectual Property Rights and all licenses and rights with respect to any of the foregoing that are material to the conduct of its business, without any conflict (of which the Company or any of its Subsidiaries has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Company and its Subsidiaries, as the case may be, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.18   No Undisclosed Relationships.  Other than Contracts or other direct or indirect relationships between or among the Company and any of its Subsidiaries, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among the Company and any of its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described, except for the transactions contemplated by this Agreement.  Any Contract existing as of the date hereof between or among the Company and its Subsidiaries, on the one hand, and any director, officer or greater than five percent (5%) stockholder of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 20-F for the year ended December 31, 2016 that the Company filed on May 1, 2017, or any other Company SEC Document filed between May 1, 2017 and the date hereof.

3.19   Licenses and Permits.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Authorities that are necessary for the ownership or lease of their respective properties and the conduct of their respective businesses, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries (i) has received notice in writing from the applicable Governmental Authority of any revocation or modification of any such license, certificate, permit or authorization or (ii) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.20   Certain Environmental Matters.  (a) The Company and each of its Subsidiaries (i) are in compliance with all, and have not violated any, applicable federal, state, local and foreign laws (including common law), rules, regulations, requirements, decisions, judgments, decrees, orders and other legally enforceable requirements relating to pollution or the protection of human

health or safety, the environment, natural resources, hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "Environmental Laws"); (ii) have received and are in compliance with all, and have not violated any, permits, licenses, certificates or other authorizations or approvals required of them under any Environmental Laws to conduct their respective businesses; and (iii) have not received notice of any actual or potential liability or obligation under or relating to, or any actual or potential violation of, any Environmental Laws, including for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, and have no knowledge of any event or condition that would reasonably be expected to result in any such notice; (b) there are no costs or liabilities associated with Environmental Laws of or relating to the Company or any of its subsidiaries, except in the case of each of clauses (a) and (b) above, for any such matter as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; (c) there is no Legal Proceeding that is pending under any Environmental Laws, that would reasonably be expected to have a Material Adverse Effect; (d) the Company and each of its Subsidiaries are not aware of any facts or issues regarding compliance with Environmental Laws, or liabilities or other obligations under Environmental Laws or concerning hazardous or toxic substances or wastes, pollutants or contaminants, that would reasonably be expected to have a Material Adverse Effect; and (e) neither the Company nor any of its Subsidiaries anticipates material capital expenditures relating to any Environmental Laws.

3.21    Tax Returns.

(a)    Except as would not reasonably be expected to result in material liability to the Company and its Subsidiaries taken as a whole, each of the Company and the Subsidiaries has timely filed all non-U.S., U.S. federal, state and local tax returns that are required to be filed, or has validly requested extensions thereof.

(b)    Except (i) as would not reasonably be expected to result in material liability to the Company and its Subsidiaries taken as a whole, (ii) for Taxes, assessments, fines or penalties that are being contested in good faith by appropriate proceedings or for which adequate reserves or provisions have been set aside on the Company's books in accordance with IFRS and (iii) to the extent that non-payment is permitted by the Bankruptcy Code or the French Cases, each of the Company and the Subsidiaries has timely paid all Taxes required to be paid by it and any other assessment, fine or penalty levied against it.

3.22    Employee Benefit Plans.

(a)    Neither the Company nor any of its Subsidiaries nor any of their ERISA Affiliates sponsors, maintains or contributes to any Multiemployer Plan or a plan that is subject to Title IV of ERISA and, in the last six years, neither the Company nor any of its Subsidiaries nor any of their ERISA Affiliates has sponsored, maintained or contributed to any Multiemployer Plan or plan that is subject to Title IV of ERISA.  No condition exists that could reasonably be expected to result in any material liability to the Group taken as a whole under Title IV of ERISA.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, there are no pending or threatened claims, sanctions,

actions or lawsuits, asserted or instituted against any Company Benefit Plan or any Person as fiduciary or sponsor of any Company Benefit Plan, in each case other than claims for benefits in the normal course.

(c)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all compensation and benefit arrangements of the Company and its Subsidiaries and all Company Benefit Plans comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements in all material respects, and neither the Company nor any of its Subsidiaries has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Section 409A or 4999 of the United States Internal Revenue Code.

(d)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, all liabilities (including all employer contributions and payments required to have been made by the Company or any of its Subsidiaries) under or with respect to any compensation or benefit arrangement of the Company or any of its Subsidiaries have been properly accounted for in the Company's financial statements in accordance with IFRS.

(e)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Company and each of its Subsidiaries has complied and is currently in compliance with all Laws and legal requirements in respect of personnel, employment and employment practices; (ii) all service providers of each of the Company and each of its Subsidiaries are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable tax and employment policies or law); and (iii) the Company and its Subsidiaries have not and are not engaged in any unfair labor practice.

3.23    Insurance.  The Company and each of its Subsidiaries have insurance covering their respective properties, including business interruption insurance, operations, personnel and businesses, which insurance is in amounts and insures against such losses and risks as are prudent and customary in the businesses in which they are engaged taking into account the Company and its Subsidiaries' level of risk and the cost of insurance coverage; and neither the Company nor any of its Subsidiaries has (a) received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue such insurance or (b) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

3.24    No Unlawful Payments.  Neither the Company nor any of its Subsidiaries, nor, to the knowledge of the Company, any director, officer or employee of the Company or any of its Subsidiaries, or any agent, affiliate or other person associated with or acting on behalf of the Company or any of its Subsidiaries has (a) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (b) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government official or employee, including of any government-owned or controlled entity or of a public international organization,

or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (c) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or committed an offence under the Bribery Act 2010 of the United Kingdom, or any other applicable anti-bribery or anti-corruption law; or (d) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit, except, in each case, with regard to matters previously disclosed in the Company SEC Documents. The Company and its Subsidiaries have instituted, maintain and enforce, and will continue to maintain and enforce, policies and procedures reasonably designed to promote and ensure compliance with all applicable anti-bribery and anti-corruption laws.

3.25   Compliance with Anti-Money Laundering Laws. The operations of the Company and each of its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of all jurisdictions where the Company or any of its Subsidiaries conducts business, the rules and regulations thereunder and any related or similar applicable rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Anti-Money Laundering Laws"), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

3.26   Compliance with Sanctions Laws. Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any of its or their directors or officers, nor any employee, agent, affiliate or other person associated with or acting on behalf of the Company or any of its Subsidiaries is currently the subject or the target of any sanctions administered or enforced by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant European sanctions authority (collectively, "Sanctions"); and the Company will not directly or indirectly use the proceeds of the Private Placement, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity (a) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or target of Sanctions, (b) to fund or facilitate any activities of or business in country or territory that is currently the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Syria and Crimea where this will be in violation of Sanctions, or (c) in any other manner that will result in a violation by any person (including any person participating in the Financial Restructuring, whether as an advisor, investor or otherwise) of Sanctions. To the knowledge of the Company, the Company and its Subsidiaries operate, and have operated for the past five years, without violating any applicable Sanctions.

3.27   Transfer Taxes. There are no documentary, stamp or similar issuance taxes imposed by the United States, Luxembourg or the Republic of France required to be paid by the

Commitment Parties in connection with the issuance of the New Securities to the Commitment Parties.

3.28    No Broker's Fees.  Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties for a brokerage commission, finder's fee or like payment in connection with the Private Placement or the other transactions comprising the Financial Restructuring.

3.29    Investment Company Act.  Neither the Company nor any of its Subsidiaries is, and after giving effect to the offering and sale of the Private Placement Instruments, the issuance of the other New Securities and the application of the proceeds therefrom, none of them will be, an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act.

3.30    No Alternative Proposals.  As of the date hereof, the Company is not pursuing, or in discussions or negotiations regarding, any solicitation, offer or proposal from any Person concerning any actual or proposed Alternative Proposal and, as applicable, has terminated any existing discussions or negotiations regarding any actual or proposed Alternative Proposal.

Section 4.    **REPRESENTATIONS    AND    WARRANTIES    OF    THE COMMITMENT PARTIES**.  Each Commitment Party represents and warrants, severally and not jointly, to each Obligor as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date), as follows:

4.1    Organization and Qualification; Subsidiaries.  Such Commitment Party has been duly organized and is validly existing and, except as would not reasonably be expected to have, individually or in the aggregate, a Commitment Party Material Adverse Effect with respect to such Commitment Party, is in good standing under the laws of its jurisdiction of organization, with the requisite power and authority to own its properties and conduct its business as currently conducted.

4.2    Authorization; Enforcement; Validity.  Such Commitment Party has all necessary corporate, limited liability company or equivalent power and authority to enter into this Agreement and to carry out, or cause to be carried out, its obligations hereunder in accordance with the terms hereof.  The execution and delivery by such Commitment Party of this Agreement and the performance by such Commitment Party of its obligations hereunder have been duly authorized by all requisite action on the part of such Commitment Party, and no other action on the part of such Commitment Party is necessary to authorize the execution and delivery by such Commitment Party of this Agreement or the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by such Commitment Party, and assuming due authorization, execution and delivery by the other Parties, this Agreement constitutes the legal, valid and binding obligation of such Commitment Party, enforceable against such Commitment Party in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally and subject to general principles of equity.

4.3     <u>No Conflicts</u>.  The execution, delivery, and performance by such Commitment Party of this Agreement do not and will not (a) violate any provision of the organizational documents of such Commitment Party; (b) conflict with or violate any Law or Order applicable to such Commitment Party or any of its respective assets or properties; (c) violate, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which such Commitment Party is a party or to which any of its assets or properties are subject, or result in the creation of any Encumbrance on any of its assets or properties, except, in the case of <u>clauses (b)</u> and <u>(c)</u>, for any such conflict, violation, breach or default that would not reasonably be expected to have, individually or in the aggregate, a Commitment Party Material Adverse Effect on such Commitment Party.

4.4     <u>Consents and Approvals</u>.  The execution, delivery and performance by such Commitment Party of this Agreement do not require any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to such Commitment Party or by which any of its assets or properties may be bound, any contract to which such Commitment Party is a party or by which such Commitment Party may be bound, except for any consent, approval, authorization or other Order of, action by, filing with or notification to, any Governmental Authority or any other Person under any of the terms, conditions or provisions of any Law or Order applicable to such Commitment Party that, if not made or obtained, would not reasonably be expected to have, individually or in the aggregate, a Commitment Party Material Adverse Effect with respect to such Commitment Party.

4.5     <u>Investor Representation</u>.  It is an Eligible Holder that makes the representations and warranties set out in <u>Schedule 4</u> hereto.

4.6     <u>Sufficient Funds</u>.  Such Commitment Party has sufficient assets and the financial capacity to perform all of its obligations under this Agreement, including the ability to fully fund such Commitment Party's Commitment.

4.7     <u>Senior Notes Debt</u>.  As of the date such Commitment Party enters this Agreement, such Commitment Party beneficially holds, or manages, advises or sub-advises funds, entities or accounts that beneficially hold, the Senior Notes identified on its signature page to this Agreement,  and in any Joinder Agreement or Transfer Notices hereto.

4.8     <u>Execution of Lock-Up Agreement and Joinder Agreement</u>.  Solely with respect to any Additional Commitment Party, such Additional Commitment Party has executed a Joinder Agreement and an Accession Letter to the Lock-Up Agreement.

4.9     <u>French Tax</u>.  Each Commitment Party represents, warrants and agrees it is neither incorporated nor acting through an office or through affiliates situated in a non-cooperative state or territory as defined under Article 238-0 A of the French Tax Code for the purpose of this Agreement.

4.10    No Shareholding in the Company.  As of the Closing Date, each entity designated by a Commitment Party to receive the Private Placement Notes is not and will not be, as a result of the Financial Restructuring or otherwise, a shareholder of the Company.

Section 5.        **ADDITIONAL COVENANTS**.

5.1    Approval Motion and Approval Order.  The Chapter 11 Debtors shall file by [●],[3] and use commercially reasonable efforts thereafter to diligently prosecute, the Approval Motion seeking entry of the Approval Order.

5.2    Lock-Up Agreement.  Each Party agrees to comply with its respective obligations under the Lock-Up Agreement in accordance with the terms thereof.

5.3    Commercially Reasonable Efforts.  Each Party hereby agrees to use its commercially reasonable efforts to timely satisfy (if applicable) each of the conditions under Sections 6 and 7 of this Agreement.

5.4    Further Assurances.  Each Party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as any other Party may reasonably request to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.  Nothing in this Agreement shall require any Commitment Party to incur any out of pocket fees, costs or expenses unless the Company has agreed to reimburse such fees, costs or expenses.

5.5    Use of Proceeds.  The Group shall use the net proceeds from the transactions contemplated hereby solely as provided herein and in the Term Sheet.

5.6    Commitment Party Expenses.  To the extent not otherwise paid pursuant to other Orders of the Bankruptcy Court, and to the extent permitted by applicable law, the Chapter 11 Obligors (subject to entry of the Approval Order) agree to reimburse all reasonable fees, costs and expenses of the Ad Hoc Group Advisors to the extent that they relate to the Chapter 11 Legal Work and the Chapter 11 Financial Work (as such terms are defined in the Lock-Up Agreement) ("Commitment Party Expenses") in accordance with Clause 6.2 of the Lock-Up Agreement, and no later than the later of the Effective Date or the Closing Date.

5.7    Conduct of the Business of Group.  From the date hereof until the Closing Date, each of the Obligors shall operate its business and take reasonable steps to preserve its business in accordance with Clause 6.4 of the Lock-Up Agreement.

5.8    KYC Disclosures.  In no event later than one (1) Business Day prior to the Reference Date, any Commitment Party that does not hold its Senior Notes in Euroclear Bank or Clearstream Luxembourg shall be required to complete and deliver certain "know your

---

[3]        Seven (7) days of the supervisory judge's order per Clause 6.9 of the Lock-Up Agreement.

customer" requirements to the satisfaction of the Private Placement Agent. Any Commitment Party failing to comply with this Section 5.8 shall be deemed a Defaulting Commitment Party.

Section 6.    **CONDITIONS    TO    THE    COMMITMENT    PARTIES'
OBLIGATIONS**.  The Closing shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived in writing by the Required Commitment Parties and the Required Backstop Parties:

6.1    Representations and Warranties.    (a) All of the representations and warranties made by the Obligors in this Agreement shall be true and correct in all material respects as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date); and (b) the Obligors and their respective Subsidiaries shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by them on or prior to the Closing Date or such earlier date as may be applicable.

6.2    Chapter 11 Plan.  The Chapter 11 Plan shall not have been modified, amended or supplemented in any manner that is materially inconsistent with the Lock-Up Agreement (including the Term Sheet and the Milestones Schedule).

6.3    Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court, which Order shall not be stayed.

6.4    French Plan Sanction Order.  The French Court shall have sanctioned the French Restructuring Plan pursuant to the French Plan Sanction Order, the enforcement of which is not stayed.

6.5    Chapter 15 Enforcement Order.  The Chapter 15 Enforcement Order shall have been entered by the Bankruptcy Court, which Order shall not be stayed.

6.6    Definitive Documentation.    The Definitive Documentation (except for any applications, motions or other pleadings) have been entered into, approved or released.

6.7    Effective Date.  The Effective Date (subject to the Closing) shall have occurred, in accordance with the terms and conditions in the Chapter 11 Plan, the French Restructuring Plan, the Confirmation Order and the French Plan Sanction Order.

6.8    Material Adverse Effect.  Since the date of this Agreement, there shall not have occurred, and there shall not exist, any event that constitutes, individually or in the aggregate, a Material Adverse Effect.

6.9    Lock-Up Agreement.  The Lock-Up Agreement must remain in effect through the Effective Date.

Section 7.    **CONDITIONS TO THE COMPANY'S OBLIGATIONS**.  The Closing shall be subject to the satisfaction at or prior to the Closing Date of each of the following conditions, any one or more of which may be waived in writing by the Company:

7.1    Representations and Warranties.  (a) All of the representations and warranties made by the applicable Commitment Party in this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing Date as though made at and as of the Closing Date (except to the extent such representations and warranties expressly speak as of an earlier date, which shall be true and correct as of such date) and (b) the applicable Commitment Party shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed by such Commitment Party on or prior to the Closing Date.

7.2    Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court, which Order shall not be stayed.

7.3    French Plan Sanction Order.  The French Court shall have sanctioned the French Restructuring Plan pursuant to the French Plan Sanction Order, the enforcement of which is not stayed.

7.4    Chapter 15 Enforcement Order.  The Chapter 15 Enforcement Order shall have been entered by the Bankruptcy Court, which Order shall not be stayed.

7.5    The EGM.  The EGM shall have approved all of the resolutions necessary to implement the Financial Restructuring.

7.6    Independent Expert Report.  A Company-designated independent financial expert designated by the Company (*expert indépendant)* within the meaning of the AMF General Regulations shall have confirmed that the Restructuring Equity Steps are fair, in accordance with the AMF General Regulations.

7.7    Stock Market Authorities and other Authorization.  The Company shall have obtained all prior stock market authorities' authorization(s) and all other prior governmental authorizations necessary to implement the Financial Restructuring, including the visa of the AMF on the relevant French prospectuses used in connection with the Restructuring Equity Steps.

7.8    Effective Date.  The Effective Date (subject only to the Closing) shall have occurred in accordance with the terms and conditions in the Chapter 11 Plan, the French Restructuring Plan, the Confirmation Order and the French Plan Sanction Order.

7.9    No Legal Impediment to Issuance.  No Law or Order shall have become effective or been enacted, adopted or issued by any Governmental Authority that prohibits the implementation of the Chapter 11 Plan or the transactions contemplated by this Agreement.

7.10    AMF Waiver.  The members of the Ad Hoc Senior Noteholder Committee (as such term is defined in the Lock-Up Agreement), if they deem necessary, shall have obtained a final waiver (i.e. in the absence of challenge ten days after the publication of the waiver or after

any decision of the Paris court of appeals in the case of a challenge of the waiver within the ten day deadline (if any)) from the AMF to launch a mandatory tender offer.

Section 8.    **TERMINATION**.

(a)    <u>Termination by the Required Commitment Parties</u>.  This Agreement may be terminated following the occurrence of any of the following events (each a "<u>Commitment Party Termination Event</u>") at any time (x) automatically upon the occurrence of the Commitment Party Termination Event under <u>clause (iii)</u> hereof, or (y) by the Required Commitment Parties immediately upon delivery of written notice to the Parties:

(i)    the failure of any of the conditions set forth in <u>Section 6</u> hereof to be satisfied or waived, which failure cannot be cured or is not cured before the later of (A) ten (10) Business Days after receipt of written notice thereof by the Company from such Commitment Party and (B) the Commitment Outside Date;

(ii)    an Obligor breaches any representation or warranty or breaches any covenant applicable to it in any material respect under this Agreement, and if such breach is curable, it is not cured or waived before the later of (A) ten (10) Business Days after receipt of written notice by the Company from such Commitment Party and (B) the Commitment Outside Date;

(iii)    the Lock-Up Agreement is terminated in accordance with its terms;

(iv)    if any of the events set forth in the Milestones Schedule has not occurred by the date specified in respect of such event in the Milestones Schedule, except as otherwise provided in the provisos to Clause 12.1(b) of the Lock-Up Agreement.

(v)    the shareholder vote in respect of the Safeguard Plan is not held on or prior to October 31, 2017;

(vi)    after the date any Definitive Documentation is filed in the Chapter 11 Cases or the French Cases or entered into, if the versions of such documents are modified, amended or supplemented without the required consents of the applicable parties described in the definition of "Definitive Documentation" hereto (except for minor or technical amendments that do not materially adversely affect the Commitment Parties);

(vii)    the Bankruptcy Court shall have entered an order appointing, in respect of any of the Debtors, (A) a trustee under Section 1104(a) of the Bankruptcy Code or (B) an examiner under Section 1104(c) of the Bankruptcy Code with enlarged powers beyond those set forth in Section 1106(a)(3)-(4) under Section 1106(b) of the Bankruptcy Code; <u>provided</u> that the appointment of any of the parties identified in the immediately preceding <u>clauses (A)</u> and <u>(B)</u> shall not result in a Commitment Party Termination Event enforceable by any Commitment Party that requested or supported such appointment;

(viii)    the Debtors' Chapter 11 Cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code;

(ix)    any Governmental Authority of competent jurisdiction, including the Bankruptcy Court, enters an Order (A) declaring this Agreement or any material portion hereof to be unenforceable or (B) preventing consummation of the Chapter 11 Plan or any material portion thereof, which, in each case, has not been revoked or dismissed within fourteen (14) days of it being made;

(x)    the Chapter 11 Plan is withdrawn or any of the Debtors or the Ad Hoc Secured Lender Committee (as defined in the Lock-Up Agreement) publicly announces its intention not to support the Chapter 11 Plan or the French Restructuring Plan, or the Debtors file any motion or pleading with the Bankruptcy Court or French Court that is materially inconsistent with this Agreement, the Lock-Up Agreement or the transactions contemplated by any of the foregoing and materially adverse to the Commitment Parties;

(xi)    the Company consents to or supports an Alternative Proposal, including but not limited to (x) filing with the Bankruptcy Court or publicly announcing that it will file with the Bankruptcy Court, any plan of reorganization or liquidation other than the Chapter 11 Plan, (y) becoming party to any plan support, restructuring or similar agreement that provides for a restructuring or plan that is not, in the reasonable determination of the Required Commitment Parties, consistent in all material respects with this Agreement, the Lock-Up Agreement or the transactions contemplated by any of the foregoing, or (z) entering into or supporting alternative debt financing from the same or alternative sources as the Private Placement (including alternative backstop arrangements) the proceeds of which would be used for purposes similar to or to replace those contemplated by the Private Placement; provided that none of the actions or steps taken by the Obligors in accordance with Clause 9(b) of the Lock-Up Agreement shall be deemed to trigger a Commitment Party Termination Event under this clause (xi); or

(xii)    the Bankruptcy Court denies the Approval Motion.

(b)    Termination by Individual Commitment Parties.  Any Commitment Party shall have the right to terminate this Agreement with respect to itself (and not with respect to any other Commitment Party) upon written notice to the other Parties if the Closing Date has not occurred by the Commitment Outside Date (a "Terminating Commitment Party").

(c)    Termination by the Company.  This Agreement may be terminated by the Company following the occurrence of any of the following events immediately upon delivery of written notice to the Parties:

(i)    the Closing Date has not occurred by the Commitment Outside Date;

(ii)    the failure of any of the conditions set forth in Section 7 hereof to be satisfied or waived, which failure cannot be cured or is not cured before the later of (A) ten (10) Business Days after receipt of written notice thereof by the Commitment Parties from the Company and (B) the Commitment Outside Date;

(iii)    other than a Commitment Party Default, any Commitment Party breaches any representation or warranty or breaches any covenant applicable to it in any material respect under this Agreement and if such breach is curable, it is not cured before the later of (A) ten (10) Business Days after receipt of written notice by such Commitment Party from the Company and

(B) the Commitment Outside Date; _provided_ that any termination under this _clause (iii)_ shall be effective only with respect to such breaching Commitment Party (a "_Terminated Commitment Party_");

(iv)    a Commitment Party Default that has not been cured by such Defaulting Commitment Party or the Backstop Parties in accordance with the terms of _Section 2.6_ hereof;

(v)    in the event any of the resolutions submitted to the EGM for the implementation of the Restructuring Equity Steps and the Share Capital Reduction is rejected by the shareholders, if a Judicial Reorganization has not been commenced on or before the date that is fifteen (15) days after the date of such rejection;

(vi)    the fairness opinion from the Company-designated independent financial expert (_expert indépendant)_ does not confirm that the Restructuring Equity Steps are fair from a financial perspective in accordance with the AMF General Regulations or such fairness opinion is not rendered by the Company-designated independent financial expert (_expert indépendant)_;

(vii)    the visas on French-language prospectuses used in connection with the Restructuring Equity Steps are not delivered by the AMF;

(viii)    the Lock-Up Agreement is terminated in accordance with its terms;

(ix)    (a) the French Court rejects the Safeguard Plan and the Company does not subsequently enter into a Judicial Reorganization or (b) the Bankruptcy Court denies the confirmation of the Chapter 11 Plan;

(x)    any Governmental Authority of competent jurisdiction, including the Bankruptcy Court or the French Court, enters an Order (A) declaring this Agreement, the Lock-Up Agreement or any material portion hereof or thereof to be unenforceable or (B) preventing consummation of the Chapter 11 Plan, the French Restructuring Plan or any material portion thereof;

(xi)    an order converting all of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court; or

(xii)    the entry of an order dismissing all of the Debtors' Chapter 11 Cases.

(d)    _Mutual Termination_.  This Agreement may be terminated by the mutual written consent of the Company and the Required Commitment Parties.

(e)    _Effect of Individual Commitment Party Termination_.  Upon a termination of this Agreement in accordance with _Section 8(b)_ with respect to a Terminating Commitment Party, such Terminating Commitment Party shall have no continuing liability or obligation to any other Party hereunder and the provisions of this Agreement shall have no further force or effect with respect to such Terminating Commitment Party, except for the provisions in _Sections 9_, _10_, and this _Section 8_, each of which shall survive termination of this Agreement; _provided_, _however_, that no such termination (including the updating of the Schedules hereto in accordance with _Section 8(g)_) shall relieve any Terminating Commitment Party from liability for its breach or

non-performance of its obligations hereunder prior to the date of such termination and the rights of any Party as it relates to such breach or non-performance by any Commitment Party shall be preserved in the event of the occurrence of such breach or non-performance.

(f)    Effect of Company, Required Commitment Parties or Mutual Termination.  Upon a termination of this Agreement in accordance with Sections 8(a), 8(c) or 8(d), no Party shall have any continuing liability or obligation to any other Party hereunder and the provisions of this Agreement shall have no further force or effect except for the provisions in Sections 5.6, 9, 10, and this Section 8, each of which shall survive termination of this Agreement; provided that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination and the rights of any Party as it relates to such breach or non-performance by any Party shall be preserved in the event of the occurrence of such breach or non-performance.

(g)    Updated Schedules.  Upon a termination of this Agreement in accordance with Sections 8(b) or 8(c)(iii), the applicable Schedules hereto shall be updated by the Company (in consultation with the Ad Hoc Group Advisors) to reflect that (a) such Terminated Commitment Party or Terminating Commitment Party's Private Placement Claim Amount shall be $0 and its Private Placement Percentage shall be 0% and (b) the Backstop Parties' Private Placement Percentages and/or Backstop Percentages shall be adjusted accordingly to reflect their commitment to backstop such amounts.

Section 9.    **INDEMNIFICATION; EXCULPATION**.

9.1    Indemnification by Chapter 11 Obligors.  Subject to entry of the Approval Order, each Chapter 11 Obligor (each an "Indemnifying Party") jointly and severally agrees to indemnify and hold harmless the Indemnified Parties from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel but excluding Taxes of the Commitment Parties except to the extent otherwise provided for in this Agreement) (collectively, "Losses"), that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or relating to this Agreement or the transactions contemplated hereby, the payment of the Commitment Party Expenses or performance of any other obligations of the Chapter 11 Obligors hereunder, any use made or proposed to be made with the proceeds of the Commitments, or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Party is a party thereto (an "Indemnified Claim"), and the Chapter 11 Obligors shall reimburse each Indemnified Party within five (5) Business Days for reasonable and documented fees and expenses of counsel (which, so long as there are no conflicts among such Indemnified Parties, shall be limited to one law firm serving as counsel for the Indemnified Parties) and other reasonable and documented expenses incurred by it in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including, without limitation, in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Financial Restructuring are consummated or whether or not this Agreement is terminated; provided that the foregoing indemnity will not, as to any Indemnified Party, apply to Losses (a) solely arising out of, in connection with or relating to the

Safeguard, the Judicial Reorganization, any other French insolvency proceedings of Book VI of the French commercial code or any other judicial proceeding opened in France, or the rights or obligations of the Company hereunder; (b) as to a Defaulting Commitment Party (unless such Party cures the default within the three (3) Business Day period referred to in Section 2.6(a)) or any Indemnified Party related thereto, caused by a Commitment Party Default by such Defaulting Commitment Party, (c) as to a Terminated Commitment Party or any Indemnified Party related thereto, caused by its material and uncured breach or non-performance of its material obligations hereunder prior to the date of its termination, or (d) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, actual fraud, willful misconduct or gross negligence of such Indemnified Party.  In no event, however, shall any Indemnifying Party be liable on any theory of liability for any special, indirect, consequential or punitive damages.   Without the prior written consent of the Indemnified Parties, each Chapter 11 Obligor agrees that it will not enter into any settlement of any lawsuit, claim or other proceeding arising out of this Agreement, the Definitive Documentation, or the transactions contemplated hereby or thereby, unless such settlement (i) includes an explicit and unconditional release from the party bringing such lawsuit, claim or other proceeding of all Indemnified Parties and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of any Indemnified Party.  No Indemnified Party shall settle any lawsuit, claim, or other proceeding arising out of this Agreement, the Definitive Documentation, or the transactions contemplated hereby or thereby without the prior written consent of the Chapter 11 Obligors.  This provision will be in addition to the rights of each and all of the Indemnified Parties with respect to any action against the Chapter 11 Obligors for breach of any term of this Agreement.  The Chapter 11 Obligors acknowledge and agree that each and all of the Indemnified Parties shall be treated as third-party beneficiaries with rights to bring an action against any Obligor under this Section 9.

9.2    Indemnification Procedure.  Promptly after receipt by an Indemnified Party of notice of the commencement of any claim, challenge, litigation, investigation or proceeding regarding an Indemnified Claim, such Indemnified Party will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; provided that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent the Indemnified Party has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Party otherwise than on account of this Section 9.  In case any such Indemnified Claims are brought against any Indemnified Party and the Indemnified Party notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Party, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Party; provided that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Party and the Indemnifying Party and based on advice of such Indemnified Party's counsel there is a potential conflict of interest or there are legal defenses available to such Indemnified Party that are different from or additional to those available to the Indemnifying Party, such Indemnified Party shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Party of the Indemnifying Party's election to so assume

the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Party, the Indemnifying Party shall not be liable to such Indemnified Party for expenses incurred by such Indemnified Party in connection with the defense thereof or participation therein (other than reasonable costs of investigation, discovery, production and preparation for litigation or settlement thereof) unless (i) such Indemnified Party shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Parties who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Party to represent such Indemnified Party within two (2) Business Days after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Party, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Party determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within five (5) Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Party.  Notwithstanding anything herein to the contrary, the Obligors shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Obligors.

Section 10.    **MISCELLANEOUS**.

10.1    Payments.  All payments made by or on behalf of the Company or any of its Affiliates to a Commitment Party or its assigns, successors or designees pursuant to this Agreement shall be without withholding, set-off, counterclaim or deduction of any kind, unless such withholding, set-off, counterclaim or deduction is required by law or expressly provided herein.

10.2    Arm's-Length Transaction.  The Obligors acknowledge and agree that (i) the Commitments, the Private Placement and any other transactions described in this Agreement are an arm's-length commercial transaction between the Parties and (ii) the Commitment Parties have not assumed nor will they assume an advisory or fiduciary responsibility in the Group's favor with respect to any of the transactions contemplated hereby or the process leading thereto, and no Commitment Party shall have any obligation to the Group with respect to the transactions contemplated hereby except those obligations expressly set forth in this Agreement or the Definitive Documentation to which it is a party.

10.3    Confidentiality.  The Parties agree that the Backstop Commitment Schedule and Subscription Commitment Schedule, which are intentionally redacted herefrom, the name of the Commitment Parties (other than those disclosed in the body of this Agreement) and the Senior Note holdings of the Commitment Parties shall not be disclosed to any Party other than (i) the Company and the Backstop Parties and their respective applicable officers, directors, employees, Affiliates, members, partners, attorneys, accountants, agents and advisors on a need-to-know and confidential basis, (ii) the Committees (as defined in the Lock-Up Agreement) (on an advisors' eyes-only basis) and (iii) in any legal, judicial or administrative proceeding (including, to the

extent required, in connection with the Restructuring Proceedings) solely as required by law or regulation (including disclosure in offering documents to be prepared for the Restructuring Steps, which may require disclosure relating to large holders of shares or warrants issued by the Company) or as requested by a Governmental Authority (in which case the Company and each Commitment Party agree, to the extent permitted by law, to inform each other promptly in advance thereof (other than in connection with any audit or examination by bank accountants or any governmental, regulatory or self-regulatory authority exercising examination or regulatory authority)); provided that the form of this Agreement (but not the Schedules hereto) may be disclosed by the Company in connection with seeking entry of the Approval Order, confirmation of the Chapter 11 Plan or as otherwise required by Order of the Bankruptcy Court.

10.4   Survival.  The representations and warranties made in this Agreement will not survive Closing and shall expire and be of no further force and effect simultaneously therewith.

10.5   No Waiver of Rights.  All waivers hereunder must be made in writing, and the failure of any Party at any time to require another Party's performance of any obligation under this Agreement shall not affect the right subsequently to require performance of that obligation. Any waiver of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision or a waiver or modification of any other provision.

10.6   Notices.  The notice information for each Commitment Party shall be set forth in Schedule 3 hereto, and shall be modified from time to time as necessary.  All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by facsimile, by electronic mail or registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for any Party as shall be specified by such Party in a notice given in accordance with this Section).

(a)   If to the Company, to:

CGG S.A.
Tour Maine Montparnasse
33, avenue du Maine
75015 Paris, France
Fax: +33 1 64 47 34 29
beatrice.place-faget@CGG.com
Attention: General Counsel

With a copy to:

Linklaters LLP
25 rue de Marignan
75008 Paris, France
Fax: +33 1 43 59 41 96
luis.roth@linklaters.com

Attention: Luis Roth

(b)      If to the Chapter 11 Debtors, to:

CGG S.A.
Tour Maine Montparnasse
33, avenue du Maine
75015 Paris, France
Fax: +33 1 64 47 34 29
beatrice.place-faget@CGG.com
Attention: General Counsel

     With a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP1285 Avenue of the Americas
New York, NY 10019-6064
Fax: +1 212 492 0545
bhermann@paulweiss.com
Attention: Brian S. Hermann

(c)      If to a Commitment Party, to the mailing address or facsimile number set forth on
Schedule 3 hereto (as such schedule may be updated).

     With a copy (which shall not constitute notice to such Commitment Party) to
counsel to the Ad Hoc Noteholder Group:

Willkie Farr & Gallagher LLP
21-23 rue de la Ville-l'Evêque
75008 Paris, France
Fax: +33 1 40 06 96 06
lspizzichino@willkie.com
gflandin@willkie.com
Attention:      Lionel Spizzichino
            Gabriel Flandin

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
Fax: (212) 728-8111
jlongmire@willkie.com
weguchi@willkie.com
Attention:      John Longmire
            Weston T. Eguchi

(d)      If to the Private Placement Agent, to:

Lucid Issuer Services Limited

Tankerton Works
12 Argyle Walk
London WC1H 8HA
United Kingdom
Fax: +44 (0) 20 3004 1590
VParzyjagla@lucid-is.com
Attention: Victor Parzyjagla

Any of the foregoing addresses or facsimile numbers may be changed by giving notice of such change in the foregoing manner, except that notices for changes of address or facsimile number shall be effective only upon receipt.

10.7    <u>Headings</u>.  The section and subsection headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

10.8    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

10.9    <u>Entire Agreement</u>.  This Agreement (including the Schedules and Exhibits hereto) and the agreements and documents referenced herein constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof.

10.10    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Except as set forth in <u>Section 2.7</u> hereof, neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties.

10.11    <u>No Third-Party Beneficiaries</u>.  This Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and, except as expressly set forth in <u>Section 9</u>, nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever.

10.12    <u>Amendment</u>.  This Agreement may not be altered, amended, or modified except by a written instrument executed by or on behalf of the Obligors, the Required Backstop Parties and the Required Commitment Parties; <u>provided</u> that (a) if an amendment or waiver which, in

each case, is minor or technical is requested, the Obligors and the Required Backstop Parties may amend or waive the relevant provisions of this Agreement without the consent of any other Commitment Party and any such amendment or waiver will be binding on all Parties; and (b) any waiver, change, modification or amendment that disproportionately adversely affects the rights or treatment of any Commitment Party (in any capacity) under this Agreement, may not be made without the written consent of each such disproportionately adversely affected Commitment Party. For the avoidance of doubt, any waiver, modification, amendment or supplement that would have the effect of (i) increasing any Commitment Party's aggregate Commitment, or (ii) extending any Commitment Party's obligations in respect of its Commitment later than the Commitment Outside Date, in each case, shall require the consent of such Commitment Party. Notwithstanding the foregoing, any updates to the Schedules performed in accordance with the terms of this Agreement shall not be deemed an amendment or modification of this Agreement. In performing this Agreement, subject to Section 2.6(b), the Private Placement Agent and the Company may rely solely on the most current Schedules.

10.13    Consents to Definitive Documentation. Where this Agreement contemplates that a Definitive Documentation, or any amendment, supplement or modification thereto, be approved, consented to or acceptable to the Commitment Parties or any category or sub-category thereof, or a majority of any of the foregoing, any request for such approval, consent or acceptance shall be sent by the Party requesting such approval, consent or acceptance in writing (which may include e-mail or facsimile); provided that no notice shall be sent to any Commitment Party that has previously notified the Company and counsel to the Ad Hoc Noteholder Group that it does not wish to receive a copy of any such request. Any approval, consent or acceptance shall be deemed to have been given and any Definitive Documentation shall be deemed accepted by those Commitment Parties that fail to respond to such request for approval within five (5) Business Days of such request.

10.14    Governing Law. This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York, without regard to the conflicts of law principles thereof.

10.15    Consent to Jurisdiction. Each of the Parties (a) irrevocably and unconditionally agrees that any actions, suits or proceedings, at Law or equity, arising out of or relating to this Agreement or any agreements or transactions contemplated hereby shall be heard and determined, prior to the commencement of any of the Chapter 11 Cases or the Chapter 15 Case, in any New York state or federal court located in the Borough of Manhattan in the City of New York and, after the commencement of any of the Chapter 11 Cases or the Chapter 15 Case, in the Bankruptcy Court; (b) irrevocably submits to the jurisdiction of such courts in any such action, suit or proceeding; (c) consents that any such action, suit or proceeding may be brought in such courts and waives any objection that such Party may now or hereafter have to the venue or jurisdiction or that such action or proceeding was brought in an inconvenient court; and (d) agrees that service of process in any such action, suit or proceeding may be effected by providing a copy thereof by any of the methods of delivery permitted by Section 10.6 to such Party at its address as provided in Section 10.6; provided that nothing herein shall affect the right to effect service of process in any other manner permitted by Law.

10.16  <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH OF THE PARTIES HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.16</u>.

10.17  <u>Counterparts</u>.  This Agreement may be executed and delivered (including by facsimile or electronic transmission) in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

10.18  <u>Specific Performance</u>.  Each Party acknowledges that, in view of the uniqueness of the securities referenced herein and the transactions contemplated by this Agreement, the other Parties would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that such other Parties shall be entitled to specific performance and injunctive or other equitable relief as the sole and exclusive remedy of any such breach, without the necessity of proving the inadequacy of monetary damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.

*[No further text appears; signature pages follow]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

CGG S.A.

By: _____
Name:
Title:


[EACH GUARANTOR]

By: _____
Name:
Title:

LUCID ISSUER SERVICES LIMITED

By: _____
Name:
Title:

By: _____
Name:
Title:

*[Signature Page to Private Placement Agreement]*

[COMMITMENT PARTY][4]

By: _____

Name:

Title:

Address:

_____

_____

Attn:

_____

Tel:

_____

Fax:

_____

E-mail:

_____

_____

Principal amount of Senior Notes held as of the date hereof (settled amount only), detailed by series of Senior Notes

_____

Principal amount of Senior Notes held as of June 1, 2017 (including open trades not yet settled), detailed by series of Senior Notes

Amount elected pursuant to Euro Option (if any): $ _____(to be converted into euros as indicated in Section 2.11 of this Agreement)

---

[4]    This entire signature page to be redacted when filed.

**Schedule 1**[5]

**BACKSTOP COMMITMENT SCHEDULE**

| Backstop Party | Backstop Percentage |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

---

[5] This entire Schedule 1 to be redacted when filed.

**Schedule 2**[6]

**SUBSCRIPTION COMMITMENT SCHEDULE**

**Additional Commitment Parties:**

| Commitment Party | Private Placement Claim Amount[7] | Subscription Commitment Percentage | Euro Option? [Yes/No and portion of Subscription Commitment (USD) to be represented by euro-denominated notes] |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Backstop Parties:**

| Backstop Party | Private Placement Claim Amount[8] | Subscription Commitment Percentage | Private Placement Percentage | Euro Option? [Yes/No and portion of Subscription Commitment (USD) to be represented by euro-denominated notes] |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

---

[6]    The identity and amount/percentages included in this Schedule 2 to be redacted when filed.

[7]    To be detailed by series of Senior Notes.

[8]    To be detailed by series of Senior Notes.

**Schedule 3**

**Notice Information for Commitment Parties[9]**

---

[9]     Notice information to be redacted when filed.

## Schedule 4

## Commitment Party Representations and Warranties

For each Commitment Party, the term "Private Placement Instruments" as used in this Schedule 4 shall refer to the Private Placement Instruments and be deemed to include the Backstop Fee Instruments whenever the context so requires.

In consideration of being offered Private Placement Instruments in the proposed Private Placement, each Commitment Party hereby acknowledges, undertakes, represents, warrants, confirms and agrees (as the case may be), severally and not jointly, as to itself and not any other Commitment Party, to the Company as follows:

1.  In making any decision to subscribe for or purchase the Private Placement Instruments, we confirm that we have such knowledge and experience in financial, business and international investment matters as is sufficient for us to evaluate the merits and risks of subscribing for or purchasing the Private Placement Instruments. We are experienced in investing in securities of this nature and are aware that we may be required to bear, and are able to bear, the economic risk of, have adequate means of providing for our current and contingent needs, have no need for liquidity and are able to sustain a complete loss in connection with, the Private Placement. We are aware and understand that an investment in the Private Placement Instruments involves a considerable degree of risk and no U.S. federal or state or non-U.S. agency has made any finding or determination as to the fairness for investment or any recommendation or endorsement of any such investment.

2.  We understand that there may be certain consequences under United States and other tax laws resulting from an investment in the Private Placement Instruments and have made such investigation and have consulted our own independent advisors or otherwise have satisfied ourselves concerning, without limitation, the effects of the United States federal, state and local income tax laws and foreign tax laws generally and ERISA, the Investment Company Act and the Securities Act.

3.  We are aware that the Company is an SEC registrant and that its reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) are publicly available at http://www.sec.gov. We have read such information as we have deemed necessary, including the Company's Annual Report on Form 20-F for the year ended December 31, 2016, which the Company filed with the SEC on May 1, 2017. We have: (a) made our own assessment and satisfied ourselves concerning legal, regulatory, tax, business, currency, economic and financial considerations in connection herewith to the extent we deem necessary; (b) had access to review publicly available information concerning the Group that we consider necessary or appropriate and sufficient in making an investment decision; (c) reviewed such information as we believe is necessary or appropriate in connection with our subscription or purchase of the Private Placement Instruments; (d) had the opportunity to ask and have asked any queries regarding (i) the Financial Restructuring and the related Lock-Up Agreement, (ii) the Obligors and their affairs and (iii) the terms of the Private Placement Instruments and have received satisfactory answers from representatives of the Company

thereto; and (e) made our investment decision based solely upon our own judgment, due diligence and analysis of the foregoing materials (and not upon any view expressed or information provided by or on behalf of the Group or any of its Affiliates or any person acting on its behalf). We understand that no offering document or prospectus has been prepared in connection with the offering of the Private Placement Instruments.

4. With respect to any Private Placement Instruments offered to or subscribed for or purchased by us in the United States or for and on behalf of persons in the United States, we understand and agree: (1) that we are a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act ("QIB"); (2) that the Private Placement Instruments are being offered and sold to us in accordance with the exemption from registration under the Securities Act for transactions by an issuer not involving a public offering of securities in the United States and that the Private Placement Instruments and the New Common Stock have not been, and will not be, registered under the Securities Act or with any State (as defined in the Securities Act) or other jurisdiction of the United States; (3) that the Private Placement Instruments and the New Common Stock may not be reoffered, resold, pledged or otherwise transferred by us except (a) outside the United States in an offshore transaction pursuant to Rule 903 or Rule 904 of Regulation S, (b) in the United States to a person whom the seller reasonably believes is a QIB to whom notice is given that the offer, sale or transfer is being made in reliance on Rule 144A, pursuant to Rule 144A under the Securities Act, (c) pursuant to Rule 144 under the Securities Act (if available), (d) to the Company, (e) pursuant to an effective registration statement under the Securities Act, or (f) pursuant to another available exemption, if any, from registration under the Securities Act, in each case in compliance with all applicable laws; (4) that the Private Placement Instruments are "restricted securities" as defined in Rule 144(a)(3) under the Securities Act; (5) to notify any transferee to whom we subsequently reoffer, resell, pledge or otherwise transfer the Private Placement Instruments of the foregoing restrictions on transfer; (6) that, for so long as the Private Placement Instruments or the New Common Stock are "restricted securities" (within the meaning of Rule 144(a)(3) under the Securities Act), we will take commercially reasonable steps to segregate such Private Placement Instruments from any other securities that we hold that are not restricted securities, shall not deposit the New Common Stock in any depositary facility established or maintained by a depositary bank, and will only transfer such Private Placement Instruments in accordance with this paragraph; (7) that if we are acquiring the Private Placement Instruments as a fiduciary or agent for one or more investor accounts, each such account is a QIB, we have sole investment discretion with respect to each such account and we have full power and authority to make the acknowledgements, representations, warranties and agreements herein on behalf of each such account; (8) that we are acquiring such Private Placement Instruments for our own account (or the account of a QIB as to which we have sole investment discretion) for investment purposes and (subject to the disposition of our property being at all times within our control) not with a view to any distribution or resale of the Private Placement Instruments, directly or indirectly, in the United States or otherwise in violation of the United States securities laws; and (9) that no representation has been made as to the availability of the exemption provided by Rule 144 or any other exemption under the Securities Act for the reoffer, resale, pledge or transfer of the Private Placement Instruments. We acknowledge and agree, to the extent the Private Placement

Instruments are delivered in certificated form, such certificate will bear a legend substantially to the effect as set out in this paragraph, unless agreed otherwise with the Company.

5. With respect to any Private Placement Instruments offered to or subscribed for or purchased by us outside the United States, we understand and agree that we are located outside the United States and are participating in the Private Placement from outside the United States and we are neither a U.S. person nor acting for the account or benefit of any U.S. persons.

6. With respect to any Private Placement Instruments offered to or subscribed for or purchased by us in the European Economic Area ("EEA"), we acknowledge that we are persons in member states of the EEA who are "qualified investors" within the meaning of Article 2(1)(e) of the Prospectus Directive (Directive 2003/71/EC, as amended, including by Directive 2010/73/EU, to the extent implemented in the relevant member state of the EEA (the "Prospectus Directive")) and any implementing measure in each relevant member state of the EEA ("Qualified Investors").  In addition, with respect to any Private Placement Instruments offered to or subscribed for or purchased by us in the United Kingdom, we are Qualified Investors who are: (i) investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "FPO"); or (ii) high net worth entities falling within Article 49(2)(a) to (d) of the FPO.

7. We acknowledge that, in accordance with article 211-3 of the AMF General Regulations, the Company has informed them that (a) the Private Placement does not entail the filing by the Company of a prospectus (as this term is referred to, in particular, in Article 1 of EC Regulation N°809/2004 of 29 April 2004) subject to the visa of the AMF; (b) the Commitment Parties that qualify as qualified investors (*investisseurs qualifiés*), or if the Private Placement is only open to a limited circle of investors (*cercle restreint d'investisseurs*), such investors, in accordance with Article L.411-2, II, 2° of the French monetary and financial code, can participate in the Private Placement for their own account only and in the conditions set forth in Articles D. 411-1, D. 411-2, D. 734-1, D. 744-1, D. 754-1 et D. 764-1 of the French monetary and financial code; and (c) the direct or indirect dissemination in the public of the acquired Private Placement Instruments can only be made in the conditions of Articles L. 411-1, L. 411-2, L. 412-1 et L. 621-8 à L. 621-8-3 of the French monetary and financial code.

8. We, and any account for which we are acting, became aware of the Private Placement Instruments, and such were offered to us and each account for which we are acting (if any), solely by means of direct contact between us and the Company, and not by any other means.  We and any fund, entity or account for which we are acting or advising or sub-advising did not become aware of the Private Placement Securities, and such were not offered to us or any account for which we are acting, by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act or through any directed selling efforts within the meaning of Regulation S.

9.  We understand that no action has been or will be taken by the Company or any person acting on behalf of the Company that would, or is intended to, permit a public offer of the Private Placement Instruments in any country or jurisdiction where any such action for that purpose is required.

10. We are not aware of any facts that would cause our subscription or purchase of the Private Placement Instruments to violate applicable laws and regulations in France or the jurisdiction of our residence.

11. We will subscribe for or acquire any Private Placement Instruments subscribed for or purchased by us for our account or for one or more accounts as to each of which we exercise sole investment discretion and we have full power to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

12. We understand that the foregoing representations, warranties, agreements and acknowledgements are intended to ensure compliance with applicable United States and other securities laws and acknowledge that the Company will rely upon the truth and accuracy of the representations, warranties and acknowledgements set forth herein. We will notify the Company promptly and in writing if any of the acknowledgements, representations, warranties and agreements made herein and in connection with acquiring the Private Placement Instruments is no longer accurate.

**Schedule 5**

| Common Stock of the Subsidiary | Jurisdiction of Incorporation | Ownership by the Company | Details |
|---|---|---|---|
| Alitheia Resources Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF)<br>• Stock Pledge, 8 August 2013 (French RCF)<br>• Stock Pledge, 22 December 2015 (TLB) |
| CGG Data Services AG | Switzerland | 100% (indirect) | • Pledge Agreement over Shares, 3 November 2015 (US RCF and French RCF)<br>• Confirmation of Pledge over Shares, 22 December 2015 (TLB)<br>• Confirmation of Pledge over Shares, 4 February 2016 (US RCF and French RCF) |
| CGG Holding I (UK) Limited | UK | 100% (indirect) | • Charge over Shares, 7 January 2016 (US RCF, French RCF and TLB) |
| CGG Holding II (UK) Limited | UK | 100% (indirect) | • Charge over Shares, 7 January 2016 (US RCF, French RCF and TLB) |
| CGG Holding III (UK) Limited | UK | 100% (indirect) | • Charge over 1,346 ordinary shares, 21 September 2016 (French RCF, the US RCF and the TLB) |
| CGG Holding (U.S.) Inc. | USA | 100% (indirect) | • Pledge over 100 shares of common stock, 18 July 2013 (US RCF)<br>• Pledge over 100 shares of common stock, 8 August 2013 (French RCF)<br>• Pledge over 100 shares of common stock, 22 December 2015 (TLB) |
| CGG Land (U.S.) Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF)<br>• Stock Pledge, 8 August 2013 (French RCF)<br>• Stock Pledge, 22 December 2015 (TLB) |
| CGG Marine B.V. | Netherlands | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF)<br>• Share Pledge (759,180 registered ordinary shares), 18 July 2013 (French RCF and US RCF)<br>• Second Ranking Share Pledge (759,180 registered ordinary shares), 22 December 2015 (TLB) |
| CGG Marine (U.S.) Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF)<br>• Stock Pledge, 8 August 2013 (French RCF)<br>• Stock Pledge, 22 December 2015 (TLB) |
| CGG Services (Canada) Inc. | Canada | 100% (indirect) | • Pledge over shares, 21 September 2016 (French RCF, US RCF and TLB) |
| CGG Services (UK) Limited | United Kingdom | 100% (indirect) | • Charge over Shares, 3 November 2015 (US RCF and French RCF)<br>• Second Ranking Charge over Shares, 22 |

| Common Stock of the Subsidiary | Jurisdiction of Incorporation | Ownership by the Company | Details |
|---|---|---|---|
| | | | December 2015 (TLB) |
| | | | • Third Ranking Charge over Shares, 4 February 2016 (US RCF, French RCF and TLB) |
| CGG Services (U.S.) Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF) |
| | | | • Stock Pledge, 8 August 2013 (French RCF) |
| | | | • Stock Pledge, 22 December 2015 (TLB) |
| CGG Services SAS | France | 100% (direct) | • First Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 18 July 2013 (US RCF) |
| | | | • Second Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 8 August 2013 (French RCF) |
| | | | • Third Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 22 December 2015 (TLB) |
| | | | • Fourth Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 4 February 2016 (French RCF and US RCF) |
| | | | • Fifth Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 27 January 2017 (French RCF and US RCF) |
| | | | • Stock Pledge, 18 July 2013 (US RCF) |
| Sercel-GRC Corp. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF) |
| | | | • Stock Pledge, 8 August 2013 (French RCF) |
| | | | • Stock Pledge, 22 December 2015 (TLB) |
| Sercel, Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF) |
| | | | • Stock Pledge, 8 August 2013 (French RCF) |
| | | | • Stock Pledge, 22 December 2015 |
| Sercel Holding SAS | France | 100% (direct) | • First Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 18 July 2013 (US RCF) |
| | | | • Second Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 8 August 2013 (French RCF) |
| | | | • Third Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 22 December 2015 (TLB) |
| | | | • Fourth Ranking Securities Account Pledge (*nantissement de compte de titres financiers*), 4 February 2016 (French RCF and US RCF) |
| | | | • Fifth Ranking Securities Account Pledge |

| Common Stock of the Subsidiary | Jurisdiction of Incorporation | Ownership by the Company | Details |
|---|---|---|---|
| | | | (*nantissement de compte de titres financier*s), 27 January 2017 (French RCF and US RCF) |
| | | | • Stock Pledge, 18 July 2013 (US RCF) |
| Sercel SAS | France | 100% (direct) | • First Ranking Securities Account Pledge (*nantissement de compte de titres financier*s), 3 November 2015 (US RCF and French RCF) |
| | | | • Second Ranking Securities Account Pledge (*nantissement de compte de titres financier*s), 22 December 2015 (TLB) |
| | | | • Third Ranking Securities Account Pledge (*nantissement de compte de titres financier*s), 4 February 2016 (US RCF and French RCF) |
| | | | • Fourth Ranking Securities Account Pledge (*nantissement de compte de titres financier*s), 27 January 2017 (US RCF and French RCF) |
| Viking Maritime Inc. | USA | 100% (indirect) | • Stock Pledge, 18 July 2013 (US RCF) |
| | | | • Stock Pledge, 8 August 2013 (French RCF) |
| | | | • Stock Pledge, 22 December 2015 (TLB) |

**Exhibit A**

**LOCK-UP AGREEMENT**

**Exhibit B**

**ASSUMPTION AND JOINDER AGREEMENT**

THIS ASSUMPTION AND JOINDER AGREEMENT (this "Joinder Agreement") is entered into as of [_____], 2017 by the undersigned ("Joining Commitment Party"). Reference is made to that certain Private Placement Agreement, dated as of [__], 2017 (as amended, modified or supplemented from time to time, the "Agreement"), by and among CGG S.A., a French *société anonyme* (the "Company"), the other Obligors party thereto, and each of the Commitment Parties party thereto from time to time. Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement. A copy of the Agreement is attached hereto as Annex I.

Upon execution and delivery of this Joinder Agreement, the undersigned hereby becomes a Commitment Party under the Agreement and agrees to be bound thereby (including all the terms, conditions and obligations set forth therein).

By executing and delivering this Joinder Agreement, the undersigned represents and warrants, severally and not jointly, to each Obligor as of the date hereof and as of the Closing Date (except for representations and warranties that are made as of a specific date, which are made only as of such date) each of the representations and warranties applicable to Commitment Parties in the Agreement (including Section 4 and Schedule 4 thereto).

The undersigned acknowledges and agrees that once delivered to the Company, it may not revoke, withdraw, amend, change or modify this Joinder Agreement unless the Agreement has been terminated according to its terms.

This Joinder Agreement shall take effect and shall become an integral part of the Agreement immediately upon its execution, and the Joining Commitment Party shall be deemed to be bound by all of the terms, conditions and obligations of the Agreement and entitled to all of the rights under the Agreement as of the date thereof. The Joining Commitment Party shall hereafter be deemed to be a "Commitment Party" and a "Party" for all purposes under the Agreement.

THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Joinder Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

*[Signatures on Following Page]*

IN WITNESS WHEREOF, this Assumption and Joinder Agreement has been duly executed by each of the undersigned as of the date specified below.

Date: [____]

<div style="margin-left:50%">

_____ [10]

Name of Joining Commitment Party

_____

Authorized Signatory

_____

(Type or Print Name and Title of Authorized Signatory)

Address:

_____

_____

Attn:

_____

Tel:

_____

Fax:

_____

E-mail:

_____

_____

Principal amount of Senior Notes held as of the date hereof (settled amount only, detailed by series of Senior Notes)

If committing as an Additional Commitment Party prior to the Placement End Date:

_____

Principal amount of Senior Notes held as of June 1, 2017 (including, if elected, open trades not yet settled and detailed per series of Senior Notes)

Amount elected pursuant to Euro Option (if any): $ _____(to be converted into euros as indicated in Section 2.11 of this Agreement)

</div>

---

[10]     This entire signature page to be redacted if filed.

**Exhibit C**

**TRANSFER NOTICE**

THIS TRANSFER NOTICE (this "<u>Transfer Notice</u>") is provided, as of [_____], 2017, by the undersigned Transferee and Transferor, for the benefit of the parties to that certain Private Placement Agreement, dated as of [__], 2017 (as amended, modified or supplemented from time to time, the "<u>Agreement</u>"), by and among CGG S.A., a French *société anonyme* (the "<u>Company</u>"), the other Obligors party thereto, and each of the Commitment Parties party thereto from time to time.  Each capitalized term used but not defined herein shall have the meaning given to it in the Agreement.

The undersigned Transferee and Transferor hereby represent, warrant, acknowledge and agree, for the benefit of the Parties and the Private Placement Agent, as follows:

(a)        Transferee represents and warrants that, as of the date hereof, Transferee is a Commitment Party or will become a Commitment Party through the execution and delivery of a Joinder Agreement;

(b)        Transferee and Transferor each represent and warrant that, on or prior to the date hereof, Transferor Transferred to Transferee the Commitments described on <u>Annex A</u> hereto;

(c)        Subject to the terms and conditions of the Agreement, as of the date hereof, Transferee agrees to be bound by all of the terms and conditions of the Agreement as a Commitment Party with respect to the Transferred Commitments, including the requirement to subscribe for the Private Placement Instruments in respect of the Transferred Commitments according to the terms and conditions of the Agreement;

(d)        Transferor and Transferee each acknowledge and agree, severally and not jointly, that the terms and conditions of <u>Section 2.7</u> of the Agreement apply to the Transfer, and each represent and warrant to the best of its knowledge that the Transfer complies with the terms and conditions of <u>Section 2.7</u> of the Agreement; and

(e)        Transferor and Transferee acknowledge that the Schedules to the Agreement may be updated to reflect the Transfer of the Transferred Commitment, and agree that the Company and the Private Placement Agent may rely on the representations, warranties, acknowledgements and agreements herein, in connection with implementing the terms of the Agreement.

Each of the undersigned acknowledges and agrees that once delivered to the Company, it may not revoke, withdraw, amend, change or modify this Transfer Notice unless the Agreement has been terminated.

THIS TRANSFER NOTICE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

This Transfer Notice may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

*[Signature on Following Page]*

IN WITNESS WHEREOF, the Parties have caused this Transfer Notice to be duly executed and delivered by their proper and duly authorized officers as of this [___] day of [____].

TRANSFEREE[11]

[NAME]

_____

as a Commitment Party

Name:
Title:


TRANSFEROR

[NAME]

_____

as a Commitment Party

Name:
Title:

---

[11]    This entire signature page to be redacted if filed.

## ANNEX A

### Transferred Commitments

Date of Transfer: _____

Transferor Name:    _____

Is Transferor a Backstop Party?  [Y/N]

Transferee Name:    _____

Is Transferee a Backstop Party? [Y/N]

If Backstop Commitments were Transferred:

Backstop Percentage Transferred:  _____%

If Subscription Commitments were Transferred:

Private Placement Claim Amount Transferred:[12] $ _____ (of which, ___USD to be represented by euros denominated Private Placement Notes[1])

---

[12]    To be detailed per series of Senior Notes

**Schedule 12**
**Cash Collateral Term Sheet**

## CGG Holdings (US) Inc.
## Cash Collateral Term Sheet

*In the event that CGG Holding B.V., CGG Holding (U.S.) Inc. ("**CGG U.S.**") and certain of CGG U.S.'s affiliates and subsidiaries file petitions for relief under chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"), this term sheet describes the proposed terms of consensual use of cash collateral (this "**Cash Collateral Term Sheet**") to, among other uses, fund working capital during the pendency of such chapter 11 cases.*

*This Cash Collateral Term Sheet is not intended to present a comprehensive list of all relevant terms and conditions of the potential use of cash collateral by the Debtors. It shall not constitute an offer to buy, sell, or exchange any of the securities or instruments described herein. It also shall not constitute a solicitation of the same.*

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

| | |
|---|---|
| *Company:* | CGG S.A. and all of its direct and indirect subsidiaries (the "**Company**"). |
| *Debtors:* | CGG U.S., CGG Holding B.V., CGG Marine B.V., CGG Marine Resources Norge AS, Sercel, Inc., Sercel-GRC Corp., Sercel Canada Ltd. ("**Sercel Canada**"), CGG Canada Services Ltd. ("**CGG Canada**"), CGG Services (U.S.) Inc., Viking Maritime Inc., Alitheia Resources Inc., CGG Land (U.S.) Inc., CGG Holding I (UK) Limited, and CGG Holding II (UK) Limited (each, a "**Debtor**"). |
| *Non-Debtors:* | CGG S.A. and all of its direct and indirect subsidiaries other than the Debtors. |
| *Prepetition Secured Parties:* | <u>First Lien Secured Parties</u>:[1]<br><br>Wilmington Trust U.S. ("**Wilmington U.S.**"), as administrative agent under that certain Term Loan Credit Agreement, dated as of November 19, 2015, by and among CGG U.S., as borrower, CGG S.A. ("**CGG**"), as parent guarantor, the Debtors (other than CGG U.S., Sercel Canada and CGG Canada), as guarantors, Wilmington U.S., as administrative agent, Credit Suisse AG ("**Credit Suisse**"), as collateral agent, and the financial institutions from time to time party thereto, as lenders (the "**U.S. TL Lenders**;" such agreement, as amended, modified, or supplemented from time to time, and including all related credit documents, the "**U.S. TL Credit Agreement**;" Wilmington U.S. in such capacity, including any successor administrative agent, the |

---

[1]    To the extent any of the administrative agents of record for the U.S. TL Credit Agreement, the U.S. RCF Agreement, and the French RCF Agreement are replaced, this Cash Collateral Term Sheet will be revised accordingly.

"*U.S. TL Agent*");

Credit Suisse, as administrative agent under that certain Credit Agreement, dated as of July 15, 2013, by and among CGG U.S., as borrower, CGG, as parent guarantor, the Debtors (other than CGG U.S., Sercel Canada and CGG Canada), as guarantors, Credit Suisse as administrative agent and collateral agent, Credit Suisse Securities (U.S.A.) LLC as sole bookrunner and sole lead arranger, and the financial institutions from time to time, as lenders (the "*U.S. RCF Lenders*;" such agreement, as amended, modified, or supplemented from time to time, and including all related credit documents, the "*U.S. RCF Agreement*;" Credit Suisse in such capacity, including any successor administrative agent, the "*U.S. RCF Agent*"); and

Wilmington Trust U.K., ("*Wilmington U.K.*"), as administration agent under that certain Multicurrency Revolving Facility Agreement, dated as of July 31, 2013, by and among CGG, as borrower, the Debtors (other than Sercel Canada and CGG Canada), as guarantors, Wilmington U.K., as administration agent, documentation agent, and coordinator, Barclays Bank PLC, CIC (Groupe Crédit Mutuel - CIC), KBC Bank N.V., and Succursale Francaise, as multiple lead arrangers, and the financial institutions from time to time party thereto, as lenders (the "*French RCF Lenders*;" such agreement, as amended, modified, or supplemented from time to time, and including all related credit documents, the "*French RCF Agreement*;" Wilmington U.K. in such capacity, including any successor administrative agent, the "*French RCF Agent*").

The U.S. TL Agent, the U.S. RCF Agent, and the French RCF Agent are collectively referred to as the "*Prepetition Secured Agents*."

The U.S. TL Credit Agreement, the U.S. RCF Agreement, and the French RCF Agreement are collectively referred to as the "*Prepetition Loan Documents*."

The credit facilities under the U.S. TL Credit Agreement, the U.S. RCF Agreement, and the French RCF Credit Agreement are collectively referred to as the "*Prepetition Secured Facilities*."

The lenders and holders under the Prepetition Secured Facilities and the Prepetition Agents are collectively referred to as the "*Prepetition Secured Creditors*."

*Certain Definitions:*  "*Ad Hoc Secured Lender Committee*" means the ad hoc committee of certain Prepetition Secured Creditors represented by Kirkland & Ellis LLP.

"*Ad Hoc Noteholder Committee*" means the ad hoc committee of

certain holders of the Debtors' senior notes (such senior notes include (i) the 5.875% senior notes due 2020, (ii) 6.5% senior notes due 2021 and (iii) 6.875% senior notes due 2022) represented by Willkie Farr & Gallagher LLP.

"*Cash Collateral*" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code and includes, without limitation, (i) all existing and future cash of each Debtor that is an obligor under the Prepetition Secured Obligations on deposit in accounts controlled by the Prepetition Secured Creditors and (ii) all existing and after-acquired cash proceeds of the Prepetition Collateral (as defined below). For the avoidance of doubt, Cash Collateral shall not include cash proceeds from a permitted DIP financing.

"*Chapter 11 Cases*" means voluntary cases filed by the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (as defined below).

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Business Day*" means any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close.

"*Lock-Up Agreement*" means that certain Lock-Up Agreement, dated as of June [__], 2017 (including the Term Sheet, the Milestones Schedule and all other schedules and exhibits thereto), by and among _____, as may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"*Petition Date*" means the date on which the Chapter 11 Cases are commenced.

"*Prepetition Collateral*" means the collateral granted by the Debtors under the Prepetition Loan Documents and, for the avoidance of doubt, the Cash Collateral."*Prepetition Secured Obligations*" means all obligations of (i) CGG U.S., as borrower, and the Debtors (other than CGG U.S., Sercel Canada and CGG Canada), as guarantors, under the U.S. TL Credit Agreement, (ii) CGG U.S., as borrower, and the Debtors (other than CGG U.S., Sercel Canada and CGG Canada), as guarantors, under the U.S. RCF Agreement, and (iii) the Debtors (other than Sercel Canada and CGG Canada), as guarantors, under the French RCF Agreement.

| | |
|---|---|
| *Entities With Interests in Cash Collateral:* | The Prepetition Secured Creditors have interests in the Cash Collateral. |

The respective interests of the Prepetition Secured Creditors in the Cash Collateral are governed by that certain Intercreditor Agreement dated as of August 8, 2013, by and among the U.S. TL Agent, the U.S. RCF Agent, the French RCF Agent, CGG U.S., CGG, and the subsidiaries and affiliates of CGG U.S. and CGG named therein (the "*Prepetition Intercreditor Agreement*")

*Use of Cash Collateral:*  The Debtors shall be permitted to use all Cash Collateral on both an interim and final basis, as provided in the interim and final orders of the Bankruptcy Court authorizing and permitting such use (the "*Interim Cash Collateral Order*" and "*Final Cash Collateral Order*," respectively, and collectively, the "*Cash Collateral Orders*"), for, among other things: (i) working capital purposes; (ii) other general corporate purposes of the Debtors, including intercompany loans in accordance with the Debtors' cash management and pooling practices (with any approved intercompany loans to non-Debtors being subject to a secured intercompany lending arrangement); and (iii) the satisfaction of the costs and expenses of administering the Chapter 11 Cases, including the Adequate Protection (as defined below) payments; in each case, in accordance with the Budget (as defined below), subject to any Permitted Variance (as defined below); *provided, further*, that the Cash Collateral shall not be used, directly or indirectly, (i) to permit any Debtor or any of their representatives to directly or indirectly challenge or otherwise contest or institute any proceeding to determine (x) the validity, perfection or priority of security interests in favor of any of the Prepetition Secured Creditors, or (y) the enforceability of the obligations of the Debtors under the Prepetition Secured Facilities, (ii) to investigate, commence, prosecute or defend any claim, motion, proceeding or cause of action against any of the Prepetition Secured Agents, each in such capacity, or Prepetition Secured Creditors and each of their respective agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, or (iii) to fund acquisitions, capital expenditures, capital leases, or any other expenditure other than as set forth in the Budget. This provision shall not restrict the use of up to $75,000 by any Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "*Committee*") for legal fees and expenses incurred during a challenge period commencing on the date of the appointment of the Committee and expiring 60 calendar days after the date on which the Bankruptcy Court enters the Final Cash Collateral Order solely for the purpose of investigating the liens of, and claims held by, the Prepetition Secured Creditors solely related to the Prepetition Secured Facilities; *provided, however*, that any such legal fees incurred by the Committee in excess of $75,000 shall be disallowed. The Cash Collateral Orders shall be in a form and substance that is acceptable to the Ad Hoc Secured Lender Committee but shall reflect the terms set forth in this term sheet (and

no terms inconsistent herewith).

*Carve-Out*

Notwithstanding anything herein or in any other order of the Bankruptcy Court to the contrary, all of the rights and claims of the Prepetition Secured Creditors, including, without limitation, the Adequate Protection Liens, the Superpriority Claims and the Adequate Protection Payments, shall be subject and subordinate in all respects to the payment of the Carve-Out. The term "*Carve-Out*" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. §1930(a) plus interest at the statutory rate, (b) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not exceeding $250,000, (c) all allowed unpaid fees and expenses (the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") and the Committee (the "*Committee Professionals*" and, together with the Debtor Professionals, the "*Professional Persons*") at any time before delivery by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice and (d) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $5,000,000 incurred after delivery by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, of the Carve Out Trigger Notice, to the extent allowed by final order (the amounts set forth in this clause (iv) being the "*Post-Carve Out Trigger Notice Cap*"). For purposes of the foregoing, "*Carve Out Trigger Notice*" shall mean a written notice delivered by email (or other electronic means) by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, to counsel to the Debtors, the U.S. Trustee, counsel to the Creditors' Committee and Willkie Farr & Gallagher LLP as counsel to the Ad Hoc Noteholder Committee, which notice may be delivered following the occurrence of an Event of Default or Termination Event, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

*Tracing Cash Collateral*

The Debtors shall segregate Cash Collateral and continuously track the deposit and use of all such Cash Collateral in a manner such that the Bankruptcy Court shall find that such actions satisfy any requirement that the Prepetition Secured Creditors trace the Cash Collateral in accordance with any provisions of the Uniform Commercial Code, the Bankruptcy Code, or other applicable law.

*Debtor Financial Reporting:*

The Debtors shall provide the Prepetition Secured Agents (for distribution to the Prepetition Secured Creditors (other than those who have indicated that they do not wish to receive material non-public

information)) and to the financial advisors and counsel to the Ad Hoc Noteholder Committee with the following:

- On the first Business Day of the week that follows the Petition Date, a 13-week cash flow forecast setting forth the US Debtors', the Non-US Debtors' and the total Debtors' projected cash receipts and operating disbursements in the form previously agreed covering the 13-week period beginning on such Business Day, which shall be in substance reasonably satisfactory to the Prepetition Secured Agents (the "*13-Week Budget*"), and (y) every four weeks thereafter, on the first Business Day of such new four-week period, an updated 13-Week Budget, which updated 13-Week Budget shall be in substance reasonably satisfactory to the Prepetition Secured Agents.

- On the first Business Day of each week, a weekly report (the "*Budget Variance Report*") of the aggregate variance between actual cash receipts and operating disbursements and projected cash receipts and operating disbursements for the then applicable testing period under the financial covenant ending with the week that began two weeks prior to the applicable reporting date.  For the avoidance of doubt, the term "operating disbursements" shall exclude Professional Fees and Adequate Protection Payments (as defined below).

- Calls with management with reasonable frequency (expected to be monthly, but which could be more frequent depending on prevailing facts and circumstances) at times to be mutually agreed.

| | |
|---|---|
| *Company Financial Reporting:* | Commencing in the first full calendar month after the Petition Date, on or before the twenty fifth (25th) day of each calendar month (or, if such day is not a Business Day, the next Business Day thereafter), the Company shall provide the Administrative Agent and the financial advisors and counsel to the Ad Hoc Noteholder Committee with (a) an updated 3-month consolidated EBITDA less CAPEX forecast with respect to the Company, which shall be in the form previously agreed (the "*Three-Month Company Forecast*"), and (b) a reconciliation of actual versus forecasted amounts reflected in the prior Three-Month Company Forecast provided by the Company and (c) a calculation of the Minimum Available Liquidity (as defined below) as of the last Business Day of the immediately preceding month demonstrating compliance with the Liquidity Covenant (as defined below) as of the last Business Day of the immediately preceding month.  Additionally, the Company shall provide as soon as available (and after such is reviewed and approved by its board of directors, in any event), on a quarterly basis, a report of the aggregate variance between actual and projected amounts reflected in the consolidated cash flow forecast |

with respect to the Company, in the form previously agreed.

In addition, on a weekly basis commencing on the first Business Day of the first week after the Petition Date, the Company shall provide the Prepetition Secured Parties and the financial advisors and counsel to the Ad Hoc Noteholder Committee with the Comprehensive View of Cash by Legal Entity[2] report listing the cash balances in each Material Bank Account as of the last Business Day of the week that began two weeks prior to the applicable reporting date. A "***Material Bank Account***" means any bank account maintained by the Company or any of its subsidiaries with a cash balance that is greater than $500,000 at such time.

| | |
|---|---|
| *Termination Events:* | The Debtors' interim and final authority to use Cash Collateral shall terminate (the "***Termination Date***") upon the earliest of the following events (each, a "***Termination Event***") to occur: |

- the Cash Collateral Orders cease to be in full force and effect for any reason, other than as a result of entry of the Final Cash Collateral Order superseding the Interim Cash Collateral Order;

  - February 28, 2018 (or such later date as reflected in the Milestone Schedule as amended (if at all) in accordance with the terms of the Lock-Up Agreement);

- the effective date of a confirmed chapter 11 plan for the Debtors occurs;

- the Bankruptcy Court enters an order dismissing any of the Chapter 11 Cases without the consent of the Ad Hoc Secured Lender Committee, which consent shall not be unreasonably withheld;

- the Bankruptcy Court enters an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, without the consent of the Ad Hoc Secured Lender Committee, which consent shall not be unreasonably withheld;

- the Bankruptcy Court enters an order appointing a chapter 11 trustee or any examiner with expanded powers relating to the operation of the businesses in any of the Chapter 11 Cases;

- the Bankruptcy Court enters a final order (i) reversing, amending, supplementing, vacating, or otherwise modifying the Cash

---

[2] Report as named and provided by Yves Goulard to Zolfo Cooper on June 2, 2017.

Collateral Orders without the consent of the Ad Hoc Secured Lender Committee or (ii) avoiding or requiring repayment of any material portion of the payments made to the Prepetition Secured Creditors pursuant to the terms thereof;

- the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Secured Agents (other than a holder(s) of a security interest ranking senior in priority to the security interests securing the Prepetition Secured Obligations) with respect to any material liens securing the Prepetition Secured Facilities or the collateral, including cash collateral, granted under the Cash Collateral Orders without the written consent of the Ad Hoc Secured Lender Committee, which consent may be withheld in their sole discretion;

- the Debtors shall create, incur or suffer to exist any postpetition liens or security interests other than in the ordinary course of business in accordance with the terms of the Cash Collateral Orders (other than in connection with any junior DIP financing that the Ad Hoc Secured Lender Committee has consented to pursuant to the Lock Up Agreement or, if the Lock Up Agreement is terminated, the Ad Hoc Secured Lender Committee has reasonably consented to);

- the Cash Collateral Orders or any other pleading filed or supported in the Chapter 11 Cases by the Debtors provide for the nonconsensual priming of any prepetition liens;

- the Debtors shall create, incur or suffer to exist any other claim which is *pari passu* with or senior to the adequate protection claims granted to the Prepetition Secured Creditors;

- the Bankruptcy Court enters the Final Cash Collateral Order without providing for any of the specific "waivers" contemplated herein, including, but not limited to waivers with respect to "marshalling," "equities of the case," and "surcharge" under 11 U.S.C. § 506(c); and

- a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing any of the Prepetition Secured Facilities or asserting any other cause of action against and/or with respect to any of the Prepetition Secured Facilities or any of the liens securing the Prepetition Secured Facilities (or if the Debtors support any such motion, pleading, application or

adversary proceeding commenced by any third party).

*Events of Default:*   The occurrence of any of the following events, unless waived in writing by the Prepetition Secured Agents, shall constitute an "***Event of Default***":

- the occurrence of the date that is five (5) Business Days after written notice has been provided by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, that the Debtors have failed to make any Adequate Protection payment required by the Cash Collateral Orders when due and the outstanding payment is not made within such five (5) Business Days;

- the Debtors shall have received written notice from the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, that a Budget Variance Report provided to the Prepetition Secured Agents shows a variance in disbursements that is not a Permitted Variance, unless the Prepetition Secured Agents have waived such noncompliance within five (5) Business Days after written notice of such noncompliance;

- the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, shall have provided the Debtors with written notice that the Debtors have failed to comply with any other material term of the Cash Collateral Orders (including the Liquidity Covenant (as defined below)) and such failure is not remedied by the Debtors or waived by the Prepetition Secured Agents within five (5) Business Days' written notice of such noncompliance by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively;

- the failure within three (3) Business Days' written notice by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, of the Debtors to deliver to the Prepetition Secured Creditors any of the documents or other information required to be delivered pursuant to the Cash Collateral Orders when due or any such documents or other information shall contain a material misrepresentation;

- the Bankruptcy Court shall not have entered the Interim Cash Collateral Order within five (5) days after the Petition Date, which order shall be in a form and substance reasonably acceptable to the Ad Hoc Secured Lender Committee; and

- the Bankruptcy Court shall not have entered the Final Cash Collateral Order within forty (40) days after the Petition Date,

which order shall be in a form and substance reasonably acceptable to the Ad Hoc Secured Lender Committee;

- the Debtors shall have filed a disclosure statement that is inconsistent with the Lock Up Agreement or that is not otherwise reasonably acceptable to the Ad Hoc Secured Lender Committee, unless the chapter 11 plan described therein proposes to pay the Prepetition Secured Obligations in full in cash on the effective date; and

- the Debtors shall have filed a chapter 11 plan that is inconsistent with the Lock Up Agreement or that is not otherwise reasonably acceptable to the Ad Hoc Secured Lender Committee, unless such plan proposes to pay the Prepetition Secured Obligations in full in cash on the effective date.

| | |
|---|---|
| *Remedies Upon Termination Date or Occurrence of Event of Default:* | Upon the Termination Date, following the receipt by the Debtors of written notice of the occurrence of a Termination Event by the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent, respectively, the Prepetition Secured Creditors may, without further order of the Bankruptcy Court, revoke the Prepetition Secured Creditors' consent to the Debtors' use of Cash Collateral under the Cash Collateral Orders. |
| | Upon the occurrence and during the continuance of an Event of Default and following the U.S. TL Agent, the U.S. RCF Agent, or the French RCF Agent's giving of five (5) Business Days' written notice (without duplication of any applicable cure periods expressly set forth above) to the Debtors, their lead restructuring counsel, the United States Trustee, lead counsel to any statutory committees appointed in the Chapter 11 Cases and the financial advisors and counsel to the Ad Hoc Noteholder Committee (the "***Notice Period***"), the Prepetition Secured Creditors may, without further order of the Bankruptcy Court, exercise any and all remedies available under the Prepetition Loan Documents against the Prepetition Collateral. |
| *Adequate Protection:* | In consideration and solely to the extent of any diminution in any value of the interests of the Prepetition Secured Creditors in the Prepetition Collateral resulting from the imposition of the automatic stay or the Debtors' use, sale, or lease of the Prepetition Collateral during the Chapter 11 Cases, the Prepetition Secured Creditors shall receive the following Adequate Protection and acknowledge the sufficiency thereof: |

- (i) valid and perfected senior, first-priority, priming security interests in and liens (including replacement liens) on the Prepetition Collateral and (ii) valid and perfected security interests

in and liens on any of the Debtors' assets that are not Prepetition Collateral (collectively, the "***Adequate Protection Liens***"), including, upon entry of the Final Cash Collateral Order, on proceeds of avoidance actions.  The Adequate Protection Liens shall be subject to the Prepetition Intercreditor Agreement (insofar as the relative rights of the Prepetition Secured Parties is concerned) and shall be subordinate only to unavoidable, valid, and properly perfected liens existing as of the Petition Date or perfected subsequent to the Petition Date pursuant to section 546(b) of the Bankruptcy Code that are senior to the prepetition liens on the Prepetition Collateral.

- allowed superpriority administrative expense claims (the "***Superpriority Claims***") against the Debtors (jointly and severally) pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code.

- payment of all outstanding prepetition and postpetition reasonable and documented fees and expenses (collectively, the "***Professional Fees***") incurred by: (i) Kirkland & Ellis LLP, Kirkland & Ellis International LLP, and De Pardieu Brocas Maffei A.A.R.P.I, as counsel to the Ad Hoc Secured Lender Committee; (ii) Zolfo Cooper LLC, as restructuring advisor to the Ad Hoc Secured Lender Committee; (iii) Rothschild & Co., as investment banker to the Ad Hoc Secured Lender Committee; and (iv) any local counsel retained by the Prepetition Creditors Parties in connection with the Chapter 11 Cases (collectively, the "***Professionals***"), which may be effectuated through application of any retainers.

With respect to postpetition Professional Fees, the Debtors shall pay such Professional Fees within fifteen (15) days after receipt of a reasonably detailed invoice therefor, and such Professional Fees shall not be subject to Bankruptcy Court approval; *provided*, *however*, if the Debtors, the United States Trustee (the "***U.S. Trustee***") or counsel for any official committee of unsecured creditors (the "***Creditors' Committee***") objects to the reasonableness of the Professional Fees and cannot resolve such objection within ten (10) days of receipt of such invoices, the Debtors, the U.S. Trustee or the Creditors' Committee, as the case may be, shall file and serve on such Professionals an objection with the Court (the "***Fee Objection***") limited to the issue of reasonableness of such fees and expenses.

The Debtors shall timely pay the Professionals' invoices after the expiration of the fifteen (15) day period if no Fee Objection is received in such ten (10) day notice period.  If a Fee Objection is timely received, the Debtors shall only be required to pay the

undisputed amount of the invoice and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

- immediate cash payment of all accrued and unpaid interest at the contract rate (calculated by reference to the then applicable 3 month "LIBOR" rate) (including for the avoidance of doubt the utilization fee set forth under clause 12.6 of the French RCF Agreement) and letter of credit fees, as applicable, through the Petition Date owed under the Prepetition Secured Facilities (excluding payment of outstanding default interest, which the Prepetition Secured Creditors reserve the right to accrue, and the Debtors reserve all rights to object to such accrual and payment) ("*Adequate Protection Payments*");

- continued cash payments equal to interest payments (including for the avoidance of doubt the utilization fee set forth under clause 12.6 of the French RCF Agreement) at the contract rate (calculated by reference to the then applicable 3 month "LIBOR" rate) as and when such payments would have come due under the Prepetition Secured Facilities had the Chapter 11 Cases and the safeguard proceedings at the level of CGG S.A. not been commenced; *provided* that the Prepetition Secured Creditors waive the right for the payment of postpetition default interest for the period that the Lock Up Agreement is effective; *provided further* that if the Lock Up Agreement is terminated, the Prepetition Secured Parties reserve their right to payment of postpetition default interest accrued from the Petition Date and the Debtors reserve all rights to object to such accrual and payment);

- the Debtors shall maintain and insure the Prepetition Collateral on commercially reasonable terms and consistent with past practice and as required in the Prepetition Loan Documents; and

- any additional reporting required by the Prepetition Secured Creditors (which reporting shall, upon delivery to any Prepetition Secured Creditor, be delivered simultaneously to the financial advisors and counsel to the Ad Hoc Noteholder Committee).

| | |
|---|---|
| *Access to Records* | In addition to, and without limiting, whatever rights to access the Prepetition Secured Creditors have under their respective Prepetition Secured Loan Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents and employees of the Ad Hoc Secured Lender Committee and the financial advisors and counsel to the Ad Hoc Noteholder Group (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to |

discuss the Debtors' affairs, finances and condition with the Debtors' officers and financial advisors.

*Chapter 11 Pleadings*

To the extent practicable under the circumstances, the Debtors shall provide advance copies and a reasonable opportunity to review and provide comments to all material pleadings planned to be filed by the Debtors in the Chapter 11 Cases with copies simultaneously being provided to the financial advisors and counsel to the Ad Hoc Noteholder Committee.

*Proof of Claim*

The Prepetition Secured Creditors will not be required to file a proof of claim in connection with the Chapter 11 Cases.

*Covenants:*

As additional consideration for the use of Cash Collateral, and as an integral part of the Adequate Protection for the Prepetition Secured Creditors under the Prepetition Secured Facilities, the Debtors shall agree to the following:

(i) A covenant to maintain the Company's total cash and permitted cash equivalents (but excluding (A) any restricted cash or cash equivalents, (B) any cash or cash equivalents pledged as collateral to secure letters of credit, (C) Trapped Cash (to be mutually defined but in any event to exclude cash and cash equivalents in Brazil, China, Egypt, Russia, South Africa, Tunisia and India) in excess of $91 million and (D) the outstanding balance of any drawn amounts under any DIP financing), and adding back the cumulative amount of interest and fees paid in respect of any DIP financing) ("**Minimum Available Liquidity**") above the levels set out below and to be tested on a monthly basis (the "*Liquidity Covenant*"):

| For the period commencing June 14, 2017 and ending on: | Minimum Available Liquidity |
|---|---|
| August 31, 2017 | 170.0 |
| Any month thereafter | 130.0 |

and

(ii) a covenant to comply with the 13-Week Budget described below.

For each 13-Week Budget delivered to the Administrative Agent, (i) during the third and fourth week of such 13-Week Budget, as of the last Business Day of each such week, the cumulative aggregate operating disbursements of the Debtors shall not be greater than an

amount equal to the projected operating disbursements during that period multiplied by the Permitted Disbursements Variance set forth in the Permitted Variance Schedule and (ii) the aggregate cash balance for the total Debtors shall not be less than an amount equal to the projected cash balance during that period multiplied by the Permitted Cash Variance set forth in the Permitted Variance Schedule.   Each of the foregoing variances set forth in this paragraph, individually and collectively, shall be a "*Permitted Variance*".

| PERMITTED VARIANCE SCHEDULE | | |
|---|---|---|
| Budget | Permitted Disbursements Variance | Permitted Cash Variance |
| First Week | No test | 75% |
| Second Week | No test | 75% |
| Third Week | 120% | 75% |
| Fourth Week | 120% | 75% |

In determining whether a breach of the covenant set forth in the column entitled "Permitted Disbursements Variance" in clause (ii) above shall have occurred, $500,000 shall be subtracted from the cumulative aggregate operating disbursements of the Debtors in the relevant test period.

*Stipulations:*    In the Cash Collateral Order the Debtors shall stipulate to the following facts:

- the validity and amount of the Prepetition Secured Obligations;

- that all of the Debtors' cash, wherever located, is Cash Collateral (other than (i) any proceeds of any other permitted DIP financing and (ii) any proceeds (including insurance proceeds) arising from or in respect of the operation, lease and/or disposal of the maritime equipment purchased by CGG Marine BV from SAS Sea Survey IV pursuant to a sale agreement with reservation of title (*Vente avec clause de reserve de propriété*) dated 19 December 2013);

- the validity, priority, unavoidability, and perfection of the liens and security interests securing the Prepetition Secured Obligations;

- that no defenses or causes of action reducing the amount or priority of the Prepetition Secured Obligations exist;

- that the Prepetition Secured Obligations are not subject to

avoidance or any other challenges under applicable law;

- that the U.S. TL Credit Agreement, U.S. RCF Agreement, and French RCF Agreement, as applicable, are valid and enforceable;

- that the Prepetition Secured Obligations constitute allowed claims against the applicable Debtors' estates;

- that the Prepetition Intercreditor Agreement governs the payment priority, rights, remedies, and relative priorities of the liens related to the Prepetition Secured Obligations; and

- other customary stipulations in form and substance reasonably requested by the Ad Hoc Secured Lender Committee.

Moreover, the Debtors undertake to not take any action with the view of (a) challenging or supporting any other party in challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Prepetition Secured Facilities, (b) asserting or supporting any other party in asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims, and (c) asserting or supporting any other party in asserting any cause of action or claim against the Prepetition Secured Creditors.

| | |
|---|---|
| *No Nonconsensual Priming Liens:* | The Cash Collateral Orders and any other pleading filed in the Chapter 11 Cases shall not provide for the nonconsensual priming of any prepetition lien. |
| *Junior DIP Financing:* | The Debtors shall be permitted to incur DIP financing and grant liens on the Debtors' assets and any non-Debtors' assets in connection therewith; provided that (i) none of such liens shall prime any prepetition lien without the consent of the applicable Prepetition Secured Creditors and (ii) such DIP financing is reasonably acceptable to the Ad Hoc Secured Lender Committee. |
| *Releases* | The Debtors shall release, subject to the investigation and challenge period applicable to other parties in interests, all claims against the Prepetition Secured Creditors effective upon entry of the Interim Cash Collateral Order.  Consistent with the prior sentence, the plan shall contain customary releases, exculpations, and injunctions for the benefit of the Prepetition Secured Creditors, which shall each be in a form and substance reasonably acceptable to the Ad Hoc Secured Lender Committee. |
| *Waivers:* | ***No Section 506(c) Claims.***  Subject to entry of the Final Cash Collateral Order, no costs or expenses of administration which have |

been or may be incurred in any of the Debtors' Chapter 11 Cases at
any time shall be charged against any Prepetition Secured Party, any
of the Prepetition Secured Obligations, or the Prepetition Collateral
pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or
otherwise, without the prior written consent of the Ad Hoc Secured
Lender Committee, and no such consent shall be implied from any
other action, inaction, or acquiescence by any of the Ad Hoc Secured
Lender Committee or their respective representatives.

***No Liability to Third Parties.***  In consenting to the Cash Collateral
Orders, or in taking any other action(s) related to the Cash Collateral
Orders, none of the Prepetition Secured Creditors (i) shall have
liability to any third party or be deemed to be in control of the
operation of any of the Debtors or to be acting as a "controlling
person," "responsible person," or "owner or operator" with respect to
the operation or management of any of the Debtors (as such term, or
any similar terms, are used in the Internal Revenue Code, the United
States Comprehensive Environmental Response, Compensation and
Liability Act, as amended, or any other Federal or state statute), or (ii)
shall owe any fiduciary duty to any of the Debtors, their creditors or
estates, or shall constitute or be deemed to constitute a joint venture or
partnership with any of the Debtors.

***No Marshalling or Application of Proceeds.***  Subject to entry of the
Final Cash Collateral Order, the Prepetition Secured Agents shall be
entitled to apply the payments or proceeds of the Prepetition Collateral
in accordance with the provisions of the Prepetition Loan Documents,
including the Prepetition Intercreditor Agreement, and in no event
shall any of the Prepetition Secured Creditors be subject to the
equitable doctrine of "marshaling" or any other similar doctrine with
respect to any of the Prepetition Collateral for the benefit of any non-
Prepetition Secured Creditor.

***Section 552(b).***  Each of the Prepetition Secured Creditors shall be
entitled to all of the rights and benefits of section 552(b) of the
Bankruptcy Code.  Subject to entry of the Final Cash Collateral Order,
the "equities of the case" exception under section 552(b) of the
Bankruptcy Code shall not apply to them with respect to proceeds,
product, offspring, or profits with respect to any of the Prepetition
Collateral.

***Preservation of Rights.***  The Cash Collateral Orders must state that,
notwithstanding any provision therein to the contrary, it is without
prejudice to, and does not constitute a waiver of, expressly or
implicitly, any of the Prepetition Secured Creditors' rights with
respect to any person or entity other than the Debtors or with respect
to any other collateral owned or held by any person or entity other

than the Debtors.

The rights of the Prepetition Secured Creditors are expressly reserved and entry of the Cash Collateral Orders shall be without prejudice to, and will not constitute a waiver, expressly or implicitly, of:

- the Prepetition Secured Creditors' rights under any of the Prepetition Loan Documents;

- the Prepetition Secured Creditors' rights to seek any other or supplemental relief in respect of the Debtors;

- subject to the terms and conditions of the Interim or Final Cash Collateral Order, as applicable, and the Bankruptcy Code, the Prepetition Secured Creditors' rights to seek further or different adequate protection; *provided*, *however*, that the Debtors or any other party in interest may contest any such request (notwithstanding their agreement to otherwise consent to the terms of this Cash Collateral Term Sheet);

- any of the Prepetition Secured Creditors' rights under the Bankruptcy Code or under non-bankruptcy law, including without limitation, to the right to:

  o subject to the terms and conditions of the Interim or Final Cash Collateral Order, as applicable, request modification of the automatic stay of section 362 of the Bankruptcy Code subject to the Debtors' rights to object to such request;

  o request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers, or

  o propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

- any of the Prepetition Secured Creditors' unqualified right to credit bid up to the full amount of the Prepetition Secured Facilities in the sale of any Prepetition Collateral pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code;

- any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Prepetition Secured Creditors to the extent their

exercise is not inconsistent with the Cash Collateral Orders or the Bankruptcy Code.

**SIGNATURE PAGES**

Pursuant to the provisions of Article 1375 of the French Code civil, only one original copy of this Agreement will be executed for each of the following category of executors: (i) the Company (the original copy being held by Linklaters LLP) and (ii) the Calculation Agent (their original copy being held by Linklaters LLP).

**SIGNATURE PAGES**

Pursuant to the provisions of Article 1375 of the French Code civil, only one original copy of this Agreement will be executed for each of the following category of executors: (i) the Company (the original copy being held by Linklaters LLP) and (ii) the Calculation Agent (their original copy being held by Linklaters LLP).

**The Company**

Address:
CGG
Tour Maine Montparnasse
33, avenue du Maine - 75015 Paris

Fax No: + 33 1 64 47 34 29

Attention: Ms. Béatrice Place-Faget

By: Jean-Georges Malcor

**SIGNATURE PAGES**

Pursuant to the provisions of Article 1375 of the French Code civil, only one original copy of this Agreement will be executed for each of the following category of executors: (i) the Company (the original copy being held by Linklaters LLP) and (ii) the Calculation Agent (their original copy being held by Linklaters LLP).

**The Calculation Agent**

By:

Sunjeeve Patel
Managing Director

Yves Theis
Managing Director